**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DOUBLELINE CAPITAL LP; DOUBLELINE INCOME SOLUTIONS FUND; and DOUBLELINE FUNDS TRUST (on behalf of its: 1) DOUBLELINE CORE FIXED INCOME FUND SERIES; 2) DOUBLELINE EMERGING MARKETS FIXED INCOME FUND SERIES; and 3) DOUBLELINE SHILLER ENHANCED CAPE® SERIES),<br><br>                                    Plaintiffs,<br><br>        v.<br><br>ODEBRECHT FINANCE, LTD.; CONSTRUTORA NORBERTO ODEBRECHT, S.A.; and ODEBRECHT, S.A.<br><br>                                    Defendants. | No.<br><br>**COMPLAINT** |

## I.       INTRODUCTION

1.       Defendant Odebrecht, S.A. ("Odebrecht"), through various subsidiaries, including Defendant Construtora Norberto Odebrecht, S.A. ("CNO"), is the largest engineering and construction firm in Latin America, and one of the largest in the world.  Defendant CNO primarily engages in the construction of large-scale infrastructure and other public projects such as highways, railways, power plants, bridges, tunnels and airports.  The vast majority of these projects are awarded to contractors through a public bidding process overseen by public officials.

2.       Defendant CNO needed additional capital to finance its growing business, and decided to sell bonds to investors.  Defendant Odebrecht set up shell-company, Odebrecht Finance, Ltd., to be the "Issuer" of the bonds, which were unconditionally guaranteed by Defendant CNO because Odebrecht Finance lacked any economic substance.

3.      In the Offering Memoranda used to sell these bonds to the public, Defendant CNO reported large revenues and net income, and portrayed itself as being extraordinarily successful in obtaining these types of large public contracts based on its business skills, expertise and efficiencies.

4.      But underlying Odebrecht's façade of success was a dark secret.  Its success in obtaining public contracts was not due to its claimed expertise, but rather to a widespread bribery and kickback scheme whereby Defendants CNO and Odebrecht paid more than $800 million in bribes to various governmental officials that corruptly awarded CNO the lucrative construction contracts in return.

5.      Unaware of this scheme, Plaintiffs bought a substantial amount of these Odebrecht Finance bonds, which traded on the secondary market at prices approximating par value throughout most of the time period, with investors unaware of the true nature of the companies.

6.      But starting on June 19, 2015, Odebrect and CNO's bribery and kickback scheme began to unravel following news reports that Brazilian police had arrested Marcelo Odebrecht (the CEO of Odebrecht) for his role in the bribery scandal.

7.      For the next year and a half, Defendants vehemently denied any wrongdoing, even claiming time and again that the CEO's arrest was illegal.  While Defendants doggedly stuck to their false story, the continuing stream of bad news resulting from governmental investigations began to overtake their denials, sinking the price of these bonds to 30% (or less) of their face value.  During this time, more than 70 other Odebrecht and CNO employees were arrested in these investigations.

8.      By December, 2016, Defendant Odebrecht had retracted its false denials, issued a public apology and plead guilty to criminal charges in federal court in the United States.  As part of its plea agreement, Odebrecht admitted to paying more than $800 million in bribes to obtain its contracts, and agreed to pay a remarkable $2.6 billion criminal penalty.  Now, after what news

reports call "one of the biggest corruption cases in history" has been exposed, Plaintiffs suffered significant losses from their investment in the bonds issued by Odebrecht Finance.

## II.      PARTIES

### A.      Plaintiff

9.      Plaintiff DoubleLine Capital LP ("DoubleLine") is a limited partnership formed under the laws of the state of Delaware.  DoubleLine asserts claims on behalf of its advisory clients.

10.      Plaintiff DoubleLine Income Solutions Fund ("DISF") is a business trust formed under the laws of the Commonwealth of Massachusetts.

11.      Plaintiff DoubleLine Funds Trust ("DFT") is a statutory trust formed under the laws of the state of Delaware.  DFT asserts claims on Behalf Of Its: 1) DoubleLine Core Fixed Income Fund Series; 2) DoubleLine Emerging Markets Fixed Income Fund Series; And 3) DoubleLine Shiller Enhanced Cape® Series).

### B.      The Odebrecht Defendants

12.      Defendant Odebrecht, S.A. ("Odebrecht") is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in the construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States.

13.      Defendant Construtora Norberto Odebrecht, S.A.  ("CNO") is a subsidiary of Odebrecht, S.A., and is the largest construction and engineering business in Latin America and one of the largest in the world.  CNO housed a unit called the Division of Structured Operations, which was created to allow Odebrecht to make and conceal bribes to government officials in Brazil and throughout the world.

14.      Defendant Odebrecht Finance, Ltd. ("Odebrecht Finance") is incorporated under the laws of the Cayman Islands.  Odebrecht Finance is a wholly-owned subsidiary of Defendant

Odebrecht, S.A., and was created for the sole purpose of raising money from investors through the issuance of bonds, the proceeds of which were turned over to Defendant CNO.

### III.   JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1332 1367.

17.     Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

18.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate telephone communications.

19.     Defendants each have sufficient minimum contacts within New York to make the exercise of jurisdiction over them by New York federal courts consistent with traditional notions of fair play and substantial justice.

20.     In addition, Defendants Odebrecht Finance and CNO specifically consented to jurisdiction and venue in this Court for any actions "arising out of or related to" the 7.50% Notes, the 5.25% Notes or the 7.125% Notes (as defined in Section IV(A), *infra*):

> The Issuer and the Guarantor have irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Notes, the Guaranty or the Indenture.  The Issuer and the Guarantor have irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been

brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.[1]

## IV.   BACKGROUND INFORMATION

### A.   The Securities at Issue

21.   During the Relevant Period, Plaintiffs purchased a significant quantity of three bonds issued by Defendant Odebrecht Finance: 1) 7.125% Notes due June 26, 2042 (the "7.125% Notes"); 2) 7.50% Perpetual Notes (the "7.50% Notes"); and 3) 5.250% Notes due June 27, 2029 (the "5.25% Notes").  Each of these notes was unconditionally and irrevocably guaranteed by Defendant CNO.

### B.   Background Regarding Odebrecht Finance

22.   Odebrecht Finance was merely a shell company with no separate economic substance, and was created for the sole purpose of selling bonds and turning over the proceeds to CNO.  In recognition of this fact, CNO was the guarantor of the bonds issued by Odebrecht Finance, and the offering memoranda used to sell these bonds to investors relied primarily upon Defendant CNO's financial results.  Odebrecht Finance issued more than $9 billion in bonds from 2010 through 2014, each of which was guaranteed by Defendant CNO.

### C.   Background Regarding Defendant CNO

23.   Defendant CNO is the largest engineering and construction company in Latin America, and one of the largest such companies in the world.  Defendant CNO primarily engages in the construction of large-scale infrastructure and other projects, including the construction of highways, railways, power plants, bridges, tunnels, subways, buildings, port facilities, dams, manufacturing and processing plants, as well as mining and industrial facilities.

---

[1] *Offering Memorandum*, Odebrecht Finance, Ltd. 7.50% Perpetual Notes (Nov. 15, 2011), p. 94; *Offering Memorandum*, Odebrecht Finance, Ltd. 7.125% Notes due June 26, 2042 (July 4, 2012), p. 84; *Offering Memorandum*, Odebrecht Finance, Ltd. 5.25% Notes due June 27, 2029 (July 4, 2012), p. 89.

**D.     Defendant CNO's Financial Results Were Based Upon an Undisclosed Kickback and Bribery Scheme**

24.     Unbeknown to Plaintiffs, between 2001 and 2016, Defendants paid almost $800 million in bribes to government officials in Brazil and at least 12 other countries in order to influence the award of more than 100 large construction contracts to Defendant CNO.

**1.     CNO's Division of Structured Operations**

25.     To further its kickback and bribery scheme, in approximately 2006, Defendants established a standalone division within CNO called the Division of Structured Operations, which was created to allow CNO and Odebrecht to make unrecorded payments, many of which were used to bribe government officials in Brazil and in other countries.

26.     As Defendants would later concede in a plea agreement with U.S. authorities, the Division of Structured Operations effectively functioned as a "bribe department" for Defendants CNO and Odebrecht.

27.     The Division of Structured Operations managed and distributed funds that Odebrecht never recorded on its balance sheet.  These unrecorded funds were generated by Odebrecht through a variety of methods, including: i) standing overhead charges collected from clients; ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; iii) undeclared retainers and success fees for the purchase of company assets; and iv) self-insurance and self-guarantee transactions.

28.     Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included in either CNO or Odebrecht's financial statements as related entities.

29.     Defendants used these offshore entities to further the bribery scheme and to conceal and disguise improper payments made to, or for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates in various countries.

2.    **Bribery of Brazilian Officials**

30.    From 2003 through 2016, Defendants paid $349 million in bribes to various Brazilian officials and political parties in order to secure lucrative public construction contracts. In return, Defendants obtained financial benefits exceeding $1.9 billion from the illicitly obtained construction contracts.

3.    **Bribery of Foreign Officials and Political Parties in Other Countries**

31.    Between approximately 2001 and 2016, Defendants paid illicit bribes of about $439 million to foreign officials and political parties in various countries outside of Brazil, including Angola, Argentina, Colombia, Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela in order to secure an improper advantage to obtain and retain public construction projects in those countries. Defendants benefitted by more than $1.4 billion from these contracts.

4.    **The Odebrecht Defendants' Obstruction of Justice to Hide Their Misconduct**

32.    In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lavo Jato, or "Operation Carwash." This investigation did not originally focus on Odebrecht or CNO. Thereafter, investigations were launched in the United States and Switzerland.

33.    After Defendants became aware of these investigations, they sought to keep Defendants out of the crosshairs of the investigations by concealing or destroying evidence of their criminal activities by, *inter alia*, i) Odebrecht's CEO directing employees to delete records that might reveal illegal activities; ii) seeking to bribe foreign officials to prevent their compliance with requests for information from these investigators; and iii) destroying the ability to access an email platform containing evidence of Defendants' misconduct. These tactics were successful for a time, preventing any trouble for Odebrecht until the arrest of its CEO on June 19, 2015.

34.     With Plaintiffs and other investors unaware of this undisclosed bribery and kickback scheme, Defendants misrepresented CNO's financial results and future prospects from at least November 11, 2011, through May 6, 2016 (the "Relevant Period") in order to sell billions of dollars of bonds to Plaintiffs and other investors.

## V.      FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS

35.     The Odebrecht Finance bonds were initially sold in private offerings pursuant to various offering memoranda.  These memoranda contained CNO's financial results, including reported net income in the many hundreds of millions or billions of dollars per year.  These memoranda also disclosed that the majority of CNO's revenues came from engineering and construction of large infrastructure projects for governmental or quasi-governmental entities, portraying CNO as being successful because it had sufficient expertise to generate its reported revenues and net income by winning large public contracts through competitive bidding processes.

### A.      The 7.50% Notes Offering Memorandum

36.     Defendants sold the 7.50% Perpetual Notes pursuant to an Offering Memorandum dated Nov. 11, 2011 (the "7.50% Notes OM").

37.     The 7.50% Notes OM contained certain of CNO's financial results, including: i) the company's unaudited financial statements for the six month periods ended June 30, 2010, and June 30, 2011; ii) the company's audited financial statements for the years ended December 31, 2009, and 2010; and iii) the company's audited financial statements for the years ended December 31, 2009, and 2008.

38.     These reported financial results were materially false and misleading and overstated due to the bribery and kickback scheme alleged herein, including the material understatement of expenses, overstatement of the value of CNO's assets, book value, shareholders' equity and income.

39.    The 7.50% Notes OM further disclosed that the majority of CNO's revenues came from engineering and construction of large infrastructure projects for governmental or quasi-governmental entities.

> We are the largest engineering and construction company in Latin America as measured by 2010 revenues.  Most of our ongoing construction projects were awarded through a competitive bidding process. While price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships.
>
> *    *    *
>
> .    .    . **we believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities**.
>
> *    *    *
>
> **We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons**.  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to efficiently manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.  [Emphasis added.]

40.    This disclosure was materially false and misleading because it portrayed CNO's success in obtaining public works contracts as resulting from its "experience," "reputation," "technological capabilities" or other legitimate business reasons.  But, in reality, CNO obtained these public contracts only by virtue of a widespread bribery and kickback scheme.

41.     The 7.50% Notes OM disclosed that the "main competitive strengths" of Defendant CNO included its: i) leadership position; ii) financial strength; iii) diversification; iv) backlog; and v) management team.[2]

42.     This disclosure was materially false and misleading when made because it attempted to portray CNO's success in winning public contracts to legitimate business factors. Instead, CNO obtained these contracts only through employment of its bribery and kickback scheme alleged herein.

**B.      The 7.125% Notes Offering Memorandum**

43.     On July 4, 2012, Defendants issued an offering memorandum (the "7.125% Notes OM") in connection with the sale of 7.125% Notes due 2042 issued by Odebrecht Finance, Ltd.[3] From that time through 2016, Plaintiffs purchased a significant amount of these bonds based upon numerous false and misleading statements and misrepresentations disclosed by the July 4, 2012 PPM.

44.     For example, the 7.125% Notes OM disclosed CNO's financial results, including reported net income in the many hundreds of millions or billions of dollars per year.

45.     The 7.125% Notes OM further disclosed that the majority of CNO's revenues came from engineering and construction of large infrastructure projects for governmental or quasi-governmental entities.  The 7.125% Notes OM attributed CNO's reported financial success to its expertise and ability to win large public contracts through competitive bidding processes:

> We are the largest engineering and construction company in Latin America as measured by 2010 revenues.  Most of our ongoing construction projects were awarded through a competitive bidding process.  While price generally is the most important factor that determines whether we are awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance,

---

[2] 7.50% Note OM at 2-3.

[3] *Offering Memorandum*, Odebrecht Finance, Ltd. 7.125% Notes due 2042 (July 4, 2012).

as well as reputation, experience, access to funding sources and client relationships.

\* \* \*

.   .   . we believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

\* \* \*

We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons:  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to effectively manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.[4]

46.     This disclosure was materially false and misleading because it portrayed CNO's success in obtaining public works contracts as resulting from its "experience," "reputation," "technological capabilities" or other legitimate business reasons.  But, in reality, CNO obtained these public contracts only by virtue of a widespread bribery and kickback scheme.

47.     On January 21, 2015, Moody's issued a press release reiterating its Baa3 rating for bonds issued by Odebrecht Finance (including the 7.125% Notes and the 7.50% Notes), but changing its outlook to negative.  Moody's cited CNO's exposure to countries with high political risk, as well as the deteriorating industry fundamentals for engineering and construction companies following the Lava Jato investigation, but noted that "CNO had no executives indicted for corruption."

_____

[4] 7.125% OM at 59-60.

## VI.   DEFENDANTS' SCHEME BEGINS TO UNRAVEL

48.     Prior to June 19, 2015, Odebrecht Finance bonds were issued either at, or very close to, par value.  The bonds continued to trade at price close to par, and sometimes in excess of par while investors were unaware of the massive undisclosed bribery and kickback fraud that was responsible for CNO's reported financial success.

49.     Defendants had successfully concealed their illicit schemes from investors until June 19, 2015.  However, the fraud began to unravel on that day, when Brazilian police arrested Marcelo Odebrecht (the CEO of Odebrecht) for his role in the bribery scandal, as reported by the NEW YORK TIMES:

> Brazilian police on Friday arrested one of the country's richest men, Marcelo Odebrecht, the fallout broadens in an investigation into corruption at the state-run oil giant Petrobras.
>
> The investigation, which is looking into whether subcontractors may have colluded with top Petrobras  executives to overbill the company and pay bribes, has touched the highest levels of government and business.
>
> In the latest development, Mr. Odebrecht, the billionaire chief executive of the Odebrecht conglomerate, was arrested with three other senior company executives and the chief executive of Andrade Gutierrez, another major construction conglomerate.  The federal prosecutor accused the executives of knowing that their companies paid bribes to politicians that added up to 710 million reais ($230 million).
>
> "'We have material proof that they knew about the practice of overbilling contracts with Petrobras and they participated directly in the division of contracts within the cartel,'" a police investigator, Igor Romário de Paula, said in a news conference Friday.[5]

50.     On June 20, 2015, Moody's reacted to this shocking development by placing the ratings of the Odebrecht Finance Notes (including the 7.125% Notes and the 7.50% Notes) under review for downgrade based on Moody's perception of increased risk due to Marcelo Odebrecht's arrest.

---

[5] Dan Horch, *Brazilian Tycoon Is Arrested in Petrobras Scandal*, NEW YORK TIMES (June 20, 2015), p. B2.

51.     Seeking to "spin" this bad news, on June 22, 2015, Odebrecht issued a press release to "express its indignation" at the arrest of Marcelo Odebrecht and its other executives, claiming that his arrest was "illegal":

> The Odebrecht Group, for respecting for its Clients, Partners, Investors, Financial Institutions, Suppliers, Users of its Services, Friends and Team Members, hereby expresses its indignation at the arrest of five of its executives and the search and seizure warrants served last Friday (June 19) at some of our subsidiaries as part of the 14th stage of Operation Lava Jato ("Car Wash"; a Brazilian corruption scandal involving alleged payoffs and the state-owned oil giant Petrobras).
>
> The court order approving the arrest of our executives and the search and seizure warrants demonstrates that, since the beginning of Lava Jato over a year ago, the Federal Police have not presented, as alleged in the court order, any new evidence that justifies the forceful measures taken, which were completely unnecessary and for that very reason, illegal.

52.     This press release was materially false and misleading because, as Odebrecht was well aware, Marcelo Odebrecht was a central player in the bribery and kickback scheme, and his arrest was entirely justified under the circumstances.

53.     Odebrecht's June 22, 2015 press release continued by claiming that it had "never hindered the investigations in any way":

> In addition, the Odebrecht Group **never hindered the investigations in any way**. To the contrary, its executives have always made themselves available to authorities to provide any clarifications. In fact, four of the five arrested executives had traveled to the headquarters of the Federal Police in Brasília and provided testimony in the course of the Lava Jato investigations conducted by the Superior Court of Justice and the Federal Supreme Court. They have also furnished all requested documents and formally offered to testify before the Federal Court in the State of Paraná – testimony that they were never invited to provide, but which certainly would have clarified all of the points raised.

This disclosure was materially false and misleading when made because Odebrecht had, in fact, done everything that it could to impede the investigations, including: 1) its CEO Marcelo Odebrecht directing employees to delete records that might reveal illegal activities; 2) making multi-million dollar payments to a governmental official in Antigua in order to prevent

documents that would prove Odebrecht's guilt from being provided to international authorities; and 3) intentionally destroying encryption keys necessary to access evidence stored in an email system.

54.     On June 24, 2015, Odebrecht issued another press release to once again "express its indignation," this time falsely claiming that Marcelo Odebrecht did not direct employees to delete records that might reveal Odebrecht's illegal activities:

> Therefore there is nothing in Marcelo Odebrecht's note to suggest that any illegality has been committed.  Besides being uncharacteristic of the executive, it would make no sense to suggest "destroying" (not the contents, as intended, but literally, as interpreted the police authority) emails that were seized during the operation conducted in November 2014, which were widely investigated and made public.  Destroying something that is already in the custody of the PF and Judge Sergio Moro makes no sense.  In other words, the term "destroy" must have a different meaning.

> Finally, Odebrecht regrets that an attempt was made to create a procedural issue regarding an expression that was clearly taken out of context.  Through a petition and personal contact, the company's lawyers have attempted to show the police that it makes no sense to raise suspicions about the subject, but unfortunately they have opted to publicize it and lend a whiff of scandal to a note that merely contains a client's instructions to his lawyers – thereby violating the [confidential] relationship that the law guarantees to all Brazilian citizens.

55.     Defendant Odebrecht issued a second press release on June 24, 2015, this one, entitled "Note of Clarification," falsely maintained that Marcelo Odebrecht's arrest was "manifestly illegal" and again falsely maintained that Odebrecht had not attempted to impede the ongoing investigations against it:

> Odebrecht would like to clarify that there are false rumors circulating that its executives have threatened authorities and public officials, as well as the future of the Brazilian Republic, in response to the investigations of Operation Lava Jato ["Car Wash"; a Brazilian corruption scandal involving payoffs and the state-owned oil giant Petrobras].

> It is untrue, for example, that the CEO of Odebrecht SA, Marcelo Odebrecht, linked the future "of the Republic" to the arrest warrant issued against him, a warrant this manifestly illegal.

Similarly, it is also a complete fiction that the Chairman of the Board of Directors of Odebrecht SA, Emílio Odebrecht, warned that more cells would be required to hold politicians whom he would denounce in Brazil and abroad.

The Odebrecht Group and its executives have never hindered the ongoing investigations in any way and have always been available to the authorities to provide information.  Odebrecht remains at the authorities' disposal to help ensure that these matters are cleared up quickly, convinced that the truth will come out and that justice will prevail.

56.     Both of the June 24, 2015 press releases were materially false and misleading.  As Defendant Odebrecht would later admit in its Plea Agreement with the U.S. Department of Justice, Marcelo Odebrecht did, in fact, direct Odebrecht employees to delete business records that were evidence of Odebrecht's criminal activities.

57.     On June 30, 2015, Fitch issued a press release announcing that it had downgraded all bonds issued by Odebrecht Finance from "BBB" to "BBB-" based on its concerns regarding Marcelo Odebrecht's incarceration and the potential for reputational damage to Odebrecht and CNO from the Lava-Jato investigation.

58.     On July 24, 2015, Odebrecht issued a press release once again claiming that Marcelo Odebrecht's jailing was unjustified and illegal:

Odebrecht considers that the charges filed today by the Federal Prosecution Office (MPF) of the state of Paraná mark the starting point of the work of the defense.  Now the legal counsel can discover the allegations made against the executives under investigation and analyze the set of documents presented by the prosecution, which will finally enable the due exercise of the right to defense.

However, the allegations made this afternoon by the MPF in such a way as to scandalously capture the media spotlight do not justify, under any circumstances, the continuation of the arbitrary and illegal detention of the chief executive officer of the Odebrecht Group, Marcelo Odebrecht, and of four former executives.  Much less does it justify the surprising declaration of a new preventive detention, revoking the previous one, in a clear move to annul the effects of the petition for habeas corpus filed at the Superior Court of Justice (STJ).

59.     On July 28, 2015, Defendant CNO issued a press release admitting that its offices and the home of one of its executives had been searched by authorities, but falsely claiming that it "has never taken part in offering or paying kickbacks for contracts with any public or private client":

> Construtora Norberto Odebrecht clarifies that it was the target of a search and seizure procedure at its head offices in Rio de Janeiro this morning (Tuesday, July 28, 2015) and at the home of one of its executives, which was conducted coercively, in order to make a deposition at the Federal Police offices in Rio de Janeiro.
>
> All of our executives and the company have always been available to the authorities to provide clarification and present documents within the domain of Operation Lava Jato ["Car Wash"] investigations, with the measures adopted on this date being unjustifiable.
>
> CNO reaffirms that it has never taken part in offering or paying kickbacks for contracts with any public or private client, which obviously includes Eletronuclear.  Therefore, it does not acknowledge the allegations made by a whistle blower as true, which were made in order to obtain his freedom, on account of a pre-trial detention, and does not have any commitment to the truth.

60.     This statement was materially false and misleading when made because CNO systematically engaged in bribery and kickbacks, as it would later be forced to admit in its Plea Agreement with the U.S. Government.

61.     On September 8, 2015, Moody's issued a press release disclosing that it had concluded its review and decided not to downgrade its "Baa3" rating of Odebrecht Finance Notes (including the 7.125% Notes and the 7.50% Notes).

62.     On October 30, 2015, Defendant Odebrecht issued a press release maintaining that it was "absolutely clear" that Marcelo Odebrecht was not implicated in any misconduct and that his imprisonment was "absolutely illegal":

> Marcelo Odebrecht testified today to provide clarifications to the judge regarding accusations against him made by the Federal Prosecutor's Office of Paraná (MPF-PR).
>
> In a written statement to the judge, Marcelo vehemently refuted the allegations made by the prosecution.  After all the evidence and

testimony were collected, it was absolutely clear that Marcelo had no involvement whatsoever in the facts stated by the prosecution.

When asked by the Federal Prosecutor's Office and the judge in charge of the case, none of the "informants" and witnesses brought by the prosecution reported any participation by Marcelo in the alleged irregularities.

Furthermore, Marcelo regretted the absolutely illegal imprisonment he has been subjected to for more than 130 days. There are no subsisting grounds for this extreme measure restricting his freedom.

In fact, all the allegations that served as grounds for Marcelo's arrest have already been disproved:

- An alleged deposit in Barusco's account, denied by the task force itself;

- An email between the company's executives, which was fully clarified in Pedro Barusco's testimony to the same judge yesterday;

- And the notes made by Marcelo for himself, which do not constitute a crime but are merely absolutely personal observations on matters that Marcelo learned about through the media.

As such, we are confident of not only his acquittal in this criminal proceeding but also the repeal of his detention through the writ of habeas corpus, which is awaiting the decision of the Superior Court of Justice.

63.     This statement was materially false and misleading when made because CNO systematically engaged in bribery and kickbacks, as it would later be forced to admit in its Plea Agreement with the U.S. Government.

64.     On November 13, 2015, Defendant Odebrecht issued a press release consisting of a notice that it had published in various newspapers that day.  This notice again stridently maintained Defendants' innocence:

**Odebrecht Notice**

Odebrecht voices its indignation with the undue exposure of its team members and those that maintain relations with the company due to the many leaks of documents, personal data and confidential

information extracted from the investigation involving some of its executives or former executives.

During the course of this investigation, many of these incomplete documents, data and information, often lacking context, have been released to the media in a distorted and mystifying manner, confusing the public opinion, generating erroneous conclusions and raising unfounded suspicions of facts and people that have no relation to Operation Car Wash.

Recent news on donations by Construtora Norberto Odebrecht to Fundação iFHC is a clear example of this regrettable and abusive practice that has become a routine part of this investigation, despite formal complaints to competent authorities in an effort to stem their occurrence.

Reports from the investigation that were presented with the pretext of revealing suspicious acts are nothing more than bank extracts of donations by the Odebrecht group company to the Foundation in question in the form of institutional support.

The fact that Construtora Norberto Odebrecht provided support to Fundação iFHC, as well as other institutions in Brazil and overseas, is no secret, and is in fact a part of the institutional policy of the Odebrecht Group. Both Construtora Norberto Odebrecht and the entities it supports always confirm these relations as a legitimate and common practice among dozens of other companies.

Odebrecht deplores the illegitimate exposure to which it continues to be exposed and the inconveniences caused to people affected by these clearly illegal leaks, which have no other objective than to expose the Odebrecht group and its team members to public shaming, fostering an unfavorable public opinion of the group, its executives and former executives currently under criminal investigation within Operation Car Wash.

Odebrecht hopes that level heads prevail in leading the investigation and the respect of the rights and guarantees of all citizens, including those under investigation, is unconditional.

**ODEBRECHT S.A.**

65.     On December 10, 2015, Odebrecht issued a press release entitled "Marcelo Odebrecht formally resigns from Odebrecht S.A." This press release announced that Marcelo Odebrecht had formally resigned from his post as CEO of the Company, but continued to falsely maintain his innocence:

After 6 months in detention and given the developments in his court case, Marcelo Odebrecht yesterday decided to formally resign from his post as President and CEO of Odebrecht S.A., as well as the chairmanship of Braskem, Odebrecht Oil & Gas, Odebrecht Real Estate Developments and Odebrecht Environmental.

The Board of Odebrecht S.A. has officialized the appointment of Newton de Souza, who will continue as President and CEO of Odebrecht S.A. and Chairman of the abovementioned companies.

Odebrecht believes that Marcelo's unjust and unnecessary preventive detention will be revoked, which will enable him to devote himself to his family and concentrate on his defense. Odebrecht has full confidence that at the end of the current legal proceedings, Marcelo Odebrecht's innocence will be officially recognized.

66.     On May 3, 2016, Fitch issued a press release over the BUSINESS WIRE announcing that it had downgraded all bonds issued by Odebrecht Finance from "BB" to "B+/RR4":

Fitch has downgraded to 'B+/RR4' from 'BB' the approximately USD3.1 billion issuances of Odebrecht Finance Ltd.  Click for Enhanced Coverage Linking Searches(OFL), which OEC unconditionally and irrevocably guarantees.  The 'B+/RR4' rating of OFL's unsecured public debt reflects average recovery prospects in the event of a default, ranging between 31% - 50%.

*   *   *

**KEY RATING DRIVERS**

The downgrade reflects the increased risks and uncertainties associated with the non-publication of OEC's 2015 financial statements at the end of April 2016. OEC's independent auditor requested additional information on the latest phases of the Lava-Jato (Car-Wash) investigation and further checks have delayed the publication of the company's financial statements.

The rating action also reflects the prolonged uncertainty of any potential impact on OEC's credit profile stemming from the investigations on the corruption scandal.  This has led to low visibility on the company's short- and medium-term future operating performance and liquidity.  Fitch believes these risks are not commensurate with the 'BB' rating category.

The May 3, 2016 Fitch press release also specifically identified the 7.125% Notes and the 7.50% Notes as among those that had been downgraded from "BB" to "B+/RR4," and noted that both notes were also placed on Rating Watch Negative.

67.     Also on May 3, 2016, Moody's issued a press release announcing that it had downgraded the Odebrecht Finance notes from "Ba2" to "B2."  This press release specifically identified the 7.125% Notes and the 7.50% Notes as among those that had been downgraded, and explained that the continuing corruption probe was the driving force behind the downgrade:

> RATINGS RATIONALE
>
> The downgrade to B2 was prompted by increased credit risk and rising financial constraints for OEC as a result of the evolving corruption investigations in the country, with potential monetary fines and other business sanction affecting the company's liquidity and operating sustainability.

68.     On May 5, 2016, S&P lowered its credit rating for Odebrecht Finance (and related company Odebrecht Engenharia e Construcao S.A.) from "BB" to "BB+."  S&P cited the ongoing corruption investigations as the reason for this downgrade.

69.     On May 6, 2016, the Relevant Period ends when the Brazilian Federal Public Prosecutors Office formally indicted Marcelo Odebrecht for his role in the bribery and kickback scheme, as reported by ESMERK BRAZIL NEWS:

> Brazil's Federal Public Prosecutors Office (MPF) has indicted Marcelo Odebrecht, Leo Pinheiro (OAS) and Ricardo Pessoa (UTC) for alleged corruption practices.  The indictment is part of the Lava Jato corruption investigation, which involves Petrobras. Together with the businessmen, MPF has also indicted other people, such as former senator Gim Argello.  According to MPF, they are accused of being involved in the payment of money laundering, active and passive corruption, among other crimes. MPF has also requested the seizure of BRL 7.50mn (EUR 1.88mn USD 2.14mn) and EUR 200,000, in addition to the payment of BRL 70mn in fines.  The investigation has also found evidence of the involvement of Toyo Setal.

70.     With all of the bad news regarding Defendants' previously undisclosed misconduct now out in the open, the value of Plaintiffs' Odebrecht Finance Notes were

substantially lower than the prices paid by Plaintiffs during the Relevant Period, resulting in

substantial losses to Plaintiffs.

### VII.   DISCLOSURES FOLLOWING THE RELEVANT PERIOD CONFIRM DEFENDANTS' FRAUDULENT SCHEME

71.     On December 1, 2016, Odebrecht issued a press release entitled "Odebrecht

Apologizes for its Mistakes," admitting its misconduct:

> Odebrecht acknowledges its participation in illicit actions in its business activities.
>
> It does not matter that we gave in to external pressure.  Nor is it relevant that there are behaviors that the private and public sectors must resist and correct in their relationships.  What matters is that we acknowledge our involvement.  We were complicit and did not fight these practices, as we should have.  This was a grave error. We violated our own principles and transgressed against the values of honesty and ethics.
>
> We will not let this happen again.
>
> Odebrecht apologizes, particularly for its failure not to have acted sooner.  Odebrecht's ability to manage and execute that is recognized by our clients, the competency and commitment of our professionals, and the quality of our products and services should have been the basis for avoiding these mistakes.
>
> Odebrecht has learned from these mistakes and is evolving.  We are committed, with great conviction, to reform.

72.     On December 21, 2016, Defendant Odebrecht entered into a plea agreement (the

"Plea Agreement") with the United States Attorney for the Eastern District of New York.

Pursuant to the Plea Agreement, Odebrecht: a) pleaded guilty to violating the anti-bribery

provisions of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3); b) agreed to an

independent compliance monitor to oversee its operations; and c) agreed to pay a massive

criminal penalty of $2.6 billion.[6]

---

[6] Plea Agreement (Dkt. # 10), *United States v. Odebrecht, S.A.*, Cr. No. 16-643 (RJD) (E.D.N.Y.), filed December 21, 2016, ¶ 28 (pp. 22-23).

73.     The Plea Agreement also included a 23-page "Statement of Facts," outlining the

scope and nature of Defendants' bribery and kickback scheme.  Defendant Odebrecht stipulated

and agreed that the entire Statement of Facts is true and accurate:

> The following Statement of Facts is incorporated by reference as
> part of the Plea Agreement (the "Agreement") between the United
> States Department of Justice, Criminal Division, Fraud Section
> (the "Fraud Section"), the United States Attorney's Office for the
> Eastern District of New York (the "EDNY") and the defendant
> Odebrecht S.A.   **Odebrecht S.A. hereby agrees and stipulates
> that the following information is true and accurate**.  Odebrecht
> S.A. admits, accepts, and acknowledges that it is responsible for
> the acts of its officers, directors, employees, and agents as set forth
> below.[7]  [Emphasis added.]

74.     Defendant Odebrecht further agreed that it would not challenge any portion of the

Statement of Facts in any public statement, including this or any other court proceedings:

> **The Defendant expressly agrees that it shall not**, through present
> or future attorneys, officers, directors, employees, agents or any
> other person authorized to speak for the Defendant to **make any
> public statement**, **in litigation or otherwise**, contradicting the
> acceptance of responsibility by the Defendant set forth above, or
> the facts described in the Information and the Statement of Facts.
>
>                   *   *   *
>
> The Defendant shall be permitted to raise defenses and to assert
> affirmative claims in other proceedings relating to the matters set
> forth in the Information and the Statement of Facts **provided that
> such defenses and claims do not contradict, in whole or in part,
> a statement contained in the Information or the Statement of
> Facts**. [Emphasis added.]

75.     The Statement of Facts provided significant detailed information regarding $349

million in bribes to various Brazilian officials and political parties in order to secure lucrative

public construction contracts.  In return, Defendants obtained financial benefits exceeding $1.9

billion from the illicitly obtained construction contracts.  SOF ¶ 32.[8]

---

[7] *See* Statement of Facts, included as Attachment B to the Plea Agreement, p. B-1.

[8] All references to "SOF __" are to the Statement of Facts.

76.    For example, Defendants (through CNO's Division of Structured Operations) made payments totaling more than $20 million to several Brazilian officials, including a high-level elected official in Brazil ("Brazilian Official 4") in exchange for their assistance in ensuring Defendants' continued work on a large public transportation project in Brazil.  Defendants profited approximately $184 million from this project.  SOF ¶ 41.

77.    Similarly, between 2011 and 2014, Defendants (through CNO's Division of Structured Operations) paid bribes of approximately $9.7 million to a "high-level official within the legislative branch of government in Brazil" in exchange for that official's assistance in securing the continuation of a construction project in Rio de Janeiro, from which Defendants profited by approximately $142 million.  SOF ¶ 42.

78.    The Statement of Facts also set forth, in great detail, hundreds of millions of dollars of bribes paid to officials of the following countries:

- **Angola**.  Between 2006 and 2013, Defendants paid more than $50 million in bribes to government officials in Angola in order to secure public works contracts.  Defendants realized benefits of approximately $261.7 million as the result of these bribes (SOF ¶¶ 47-48);

- **Argentina**.  Between 2007 and 2014, Defendants paid more than $35 million in bribes (directly and indirectly) from Defendant CNO's Division of Structured Operations to government officials in Argentina related to at least three public infrastructure projects for which Defendants were awarded the contracts, resulting in approximately $278 million in benefits to Defendants (SOF ¶¶ 49-51);

- **Colombia**.  Between 2009 and 2014, Defendants (through Defendant CNO's Division of Structured Operations) paid more than $11 million in bribes to government officials that illicitly caused Defendants to be awarded public construction contracts generating more than $50 million in revenues to Defendants (SOF ¶¶ 52-53);

- **The Dominican Republic**.  Between 2001 and 2014, Defendants paid more than $92 million in bribes to government officials and intermediaries working on their behalf to secure public construction contracts in the Dominican Republic, thereby obtaining illicit benefit of more than $163 million (SOF ¶¶ 53-54);

- **Ecuador**.  Between 2007 and 2016, Defendants paid more than $33.5 million in bribes to government officials in Ecuador, realizing benefits of more than $116 million in exchange (SOF ¶ 55);

- **Guatemala**.  Between 2013 and 2015, Defendants paid approximately $18 million in bribes to government officials in Guatemala, including a $11.5 million payment to a governmental official representing a percentage of the value of a governmental construction contract the official steered to Defendants in exchange for the bribe (SOF ¶¶ 57-58);

- **Mexico**.  Between 2010 and 2014, Defendants paid corrupt Mexican government officials approximately $18 million in bribes in order to secure public works contracts, including a $6 million bribe to an official of Pemex, Mexico's state-owned petroleum company, in exchange for the official's assistance in winning a contract.  Defendants received benefits of more than $39 million from these bribes (SOF ¶¶ 59-60);

- **Mozambique**.  Between 2011 and 2014, Odebrecht paid approximately $900,000 in bribes to government officials in Mozambique (SOF ¶¶ 61-62);

- **Panama**.  Between 2010 and 2014, Defendants paid more than $59 million in bribes to Panamanian governmental officials, obtaining contracts worth more than $175 million resulting from these bribes (SOF ¶¶ 63-64);

- **Peru**.  Between 2005 and 2014, Defendants paid approximately $29 million in bribes to government officials in Peru, receiving benefits of more than $143 million in return (SOF ¶¶ 65-67); and

- **Venezuela**.  Between 2005 and 2016, Defendants paid approximately $98 million in bribes to Venezuelan officials in order to obtain and retain public works contracts (SOF ¶¶ 68-70).

79.     The Statement of Facts also described the lengths that Defendants went to in order to try and hide their misconduct.  For example, after Defendants became aware of investigations of them being performed by Brazil, the United States and Switzerland, they sought to conceal or destroy evidence of their criminal activities.

80.     For example, Marcelo Odebrecht, the CEO of Defendant Odebrecht, directed Odebrecht employees to delete records that might reveal illegal activities.  SOF ¶ 71.

81.     Likewise, in 2015, Odebrecht Employee 4 (who was an executive of the Division of Structured Operations within Defendant CNO), attended a meeting in Miami, Florida with a governmental official from Antigua and an intermediary.  In order to conceal Defendants' corrupt activities, Odebrecht Employee 4 agreed to pay the governmental official a bribe of $4 million to refrain from providing various banking documents to international investigators that

would have contained evidence of the bribery and kickback scheme. Thereafter, Odebrecht Employee 3, also an employee of the Division of Structured Operations, actually made three payments of one million Euros to secure this corrupt deal. SOF ¶ 72.

82. Further, in January 2016, after Lavo Jato and the investigations by the United States and Swiss authorities were well known to Defendants, employees and/or agents of Defendants intentionally destroyed physical encryption keys that were needed to access the My WebDay system, which contained evidence relating to the bribery and kickback scheme. SOF ¶ 73.

## VIII.   LOSS CAUSATION

83. As detailed herein, defendants engaged in a scheme to deceive Plaintiffs and the market and a course of conduct that artificially inflated the price of the Odebrecht Finance Notes and operated as a fraud or deceit on Plaintiffs by failing to disclose and misrepresenting the adverse facts detailed herein.

84. As defendants' prior misrepresentations and fraudulent conduct were disclosed, and when the materialization of the risks that had been concealed by defendants occurred and became apparent to the market, the prices of the Odebrecht Finance Notes declined significantly as the prior artificial inflation came out of the Odebrecht Finance Notes' prices.

85. As a result of its purchases of the Odebrecht Finance Notes, Plaintiffs suffered economic loss (*i.e.,* damages), under the federal securities laws, California statutory law and the common law of negligent misrepresentations.

86. Defendants false and misleading statements and omission had the intended effect and caused the Odebrecht Finance Notes to trade at artificially inflated prices during the Relevant Period, during which Plaintiffs purchased such notes.

87. As the truth about the Defendants was revealed, the prices of the Odebrecht Finance Notes fell significantly, removing the inflation from the prices, causing real economic loss to Plaintiffs.

88.     As alleged above, the declines in the prices of the Odebrecht Finance Notes after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to Plaintiffs and other investors.  The timing and magnitude of the price declines in the Odebrecht Finance Notes negates any inference that the loss suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.     NO SAFE HARBOR

89.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  None of the specific statements pleaded herein were identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false.

## COUNT I

## FOR VIOLATION OF § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
### (Against All Defendants)

90.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

91.     During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Plaintiffs during the Relevant Period.

93.    Plaintiffs acquired bonds issued by Odebrecht Finance without knowledge that the Defendants had misstated or omitted material facts.  In acquiring bonds issued by Odebrecht Finance, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by the Defendants.

94.    Plaintiffs would not have purchased bonds issued by Odebrecht Finance at the prices they paid, or at all, if Plaintiffs had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

95.    As a direct and proximate result of the Defendants' wrongful conduct as alleged herein, Plaintiffs suffered damages in connection with its purchases of bonds issued by Odebrecht Finance.

**COUNT II**

**FOR VIOLATION OF § 20(A) OF THE EXCHANGE ACT**
**(Against Odebrecht, S.A.)**

96.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against Defendant Odebrecht, S.A.

97.    Defendant Odebrecht, S.A. acted as a controlling person of Defendants Odebrecht Finance, Ltd. and Construtora Norberto Odebrecht, S.A., and had the power and authority to cause Defendants Odebrecht Finance, Ltd. and Construtora Norberto Odebrecht, S.A. to engage in the wrongful conduct complained of herein.

98.     Defendant Odebrecht, S.A. culpably participated in the misconduct alleged herein.

99.     By reason of such conduct, Defendant Odebrecht, S.A. is liable pursuant to § 20(a) of the Exchange Act.

### COUNT III

### NEGLIGENT MISREPRESENTATIONS
#### (Against All Defendants)

100.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

101.    Defendants made material false statements, including, without limitation, those representations and omissions in the private placement memoranda related to the offerings of the bonds sold by Odebrecht Finance, as well as press releases, financial statements, and other disclosures made by Defendants, as alleged herein.

102.    These representations were false in that, among other reasons, Defendant CNO's financial statements were misleading, and due to other misrepresentations in connection with the kickback scheme as alleged herein.

103.    Defendants lacked reasonable grounds for believing these statements were true.

104.    Defendants made these untrue statements of material fact in order to induce plaintiffs' reliance on the statement.

105.    Plaintiffs justifiably relied on Defendants' misrepresentations.

106.    Plaintiffs suffered damages resulting from their reliance on Defendants' false statements and misrepresentations.

### COUNT IV

### FRAUD
#### (Against All Defendants)

107.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

108.     Defendants made the misrepresentations alleged herein, including omitting to provide information necessary to make their disclosures regarding CNO's financial results and business prospects not misleading.

109.     Defendants made these misrepresentations with the knowledge of the falsity of such statements.

110.     Defendants made these false statements with the intent to defraud.

111.     Plaintiffs justifiably relied on Defendants' misrepresentations.

112.     Plaintiffs suffered damages resulting from their reliance on Defendants' false statements and misrepresentations.

**COUNT V**

**CONSPIRACY**
**(Against All Defendants)**

113.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is alleged against all Defendants.

114.     By virtue of the conduct alleged herein, Defendants formed and operated a conspiracy and committed wrongful act or acts done pursuant to this conspiracy, which caused damage to Plaintiffs.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Rescission or a rescissory measure of damages;

C.     For punitive damages appropriate to punish or set an example of defendants;

D.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: June 16, 2017                                  **HAGENS BERMAN SOBOL SHAPIRO LLP**

By:   /s/ Jason A. Zweig
     Jason A. Zweig
555 Fifth Avenue
Suite 1700
New York, NY 10017
Telephone:  (212) 752-5455
Facsimile:  (212) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
Karl P. Barth
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

*Counsel for Plaintiffs*