UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DOUBLELINE CAPITAL LP, DOUBLELINE      :
INCOME SOLUTIONS FUND, and             :
DOUBLELINE FUNDS TRUST (on behalf of its: :
1) DoubleLine Core fixed Income Fund Series; 2)  :
DoubleLine Emerging Markets Fixed Income Fund  :
Series; and 3) DoubleLine Shiller Enhanced Cape®  :
Series),                               :
                                       :
                            Plaintiffs, :
                                       :
            -against-                  :
                                       :
ODEBRECHT FINANCE, LTD.,               :
CONSTRUTORA NORBERTO ODEBRECHT,        :
S.A., ODEBRECHT ENGENHARIA E           :
CONSTRUÇÃO S.A., and ODEBRECHT, S.A.   :
                                       :
                            Defendants. :
-----------------------------------------------------------------X

1:17-cv-4576-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

**GREGORY H. WOODS**, United States District Judge:

In 2014, Brazil found itself embroiled in what has become a widely publicized scandal.

Brazilian authorities launched an investigation (Operation "Lava Jato" or "Car Wash") into a

sprawling bribery and kickback scheme. Construction and engineering conglomerates were accused

of bribing government officials in order to secure lucrative contracts. Not initially implicated in the

scandal, Defendant Odebrecht, S.A. and several of its subsidiaries later joined the ranks of those

targeted by Brazilian prosecutors and police investigators. Odebrecht's CEO was arrested, indicted,

and sentenced to prison in connection with his participation in the scheme. Odebrecht itself

pleaded guilty to charges brought against it in the Eastern District of New York. Plaintiffs, who

purchased substantial quantities of Notes issued by Defendant Odebrecht Finance, Ltd. and

guaranteed by Defendant Construtora Norberto Odebrecht ("CNO"), saw the value of their

holdings drop precipitously after news of Defendants' participation in the bribery scheme. Plaintiffs

filed suit, asserting claims against Defendants under Section 10(b) and 20(a) of the Exchange Act, as well as various state law claims. Defendants Odebrecht Finance, CNO, and Odebrecht Engenharia E Construção S.A. ("OEC") have moved to dismiss Plaintiffs' claims. Because Plaintiffs adequately plead that CNO's failure to disclose its participation in the bribery scheme rendered its explanation for its success materially misleading, Plaintiffs' Section 10(b) claim with respect to that statement survives. And because Plaintiffs sufficiently plead their intentional fraudulent conveyance claim, that claim also survives dismissal. Defendants' motion is granted with respect to Plaintiffs' remaining claims against the moving Defendants.

## I.      BACKGROUND[1]

### A.  The Parties

Plaintiff DoubleLine Capital LP is a Delaware limited liability company. Second Amended Complaint (ECF No. 41) ("SAC") ¶ 11. It brings claims on behalf of its advisory client. *Id.* Plaintiff DoubleLine Income Solutions Fund is a Massachusetts business trust. *Id.* ¶ 12. Plaintiff DoubleLine Funds Trust is a Delaware statutory trust. *Id.* ¶ 13. It brings claims on behalf of DoubleLine Core Fixed Income Fund Series, DoubleLine Emerging Markets Fixed Income Fund Series, and DoubleLine Shiller Enhanced Cape® Series. *Id.*

Defendant Odebrecht, S.A. ("Odebrecht") is a Brazil-based corporation. *Id.* ¶ 14. Through its subsidiaries, Odebrecht operates in the construction, engineering, infrastructure, chemical, utilities, and real estate businesses. *Id.* ¶ 29. Odebrecht and its subsidiaries conduct business in Brazil and twenty-seven other countries, including the United States. *Id.* Marcelo Odebrecht has

---

[1] Unless otherwise noted, the facts are taken from the second amended complaint and accepted as true for purposes of this motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

served as the company's president and Chief Executive Officer ("CEO") since 2009. *Id.* ¶¶ 30, 43. Hilberto Silva is the head of Odebrecht's Division of Structured Operations. *Id.* ¶ 30.

Defendant Construtora Norberto Odebrecht, S.A. ("CNO") is a subsidiary of Odebrecht. *Id.* ¶ 15. Prior to and during 2009, Marcelo Odebrecht served as CNO's CEO. *Id.* ¶ 43. CNO primarily handles large-scale infrastructure construction projects, including highways, railways, bridges, tunnels, airports, and power plants. *Id.* ¶¶ 1, 15. It is the largest engineering and construction firm in Latin America, and among the largest globally. *Id.* ¶ 31. CNO is Brazil's largest exporter of services and the world's fifteenth largest "international contractor." *Id.* ¶ 32. With its roots in Brazil, CNO has branched out into other countries. *Id.* Its international revenues increased from 30% in 1992 to 54.3% in 2012. *Id.*

Defendant Odebrecht Engenharia e Construção S.A. ("OEC") is also a subsidiary of Odebrecht and the parent company of CNO. *Id.* ¶ 16.

Defendant Odebrecht Finance, Ltd. ("Odebrecht Finance") is a wholly owned subsidiary of Odebrecht and incorporated under the laws of the Cayman Islands. *Id.* ¶ 17. As of March 31, 2012, the corporation had a net capital deficit of $386,659. *Id.* ¶ 34. Odebrecht Finance has no "legitimate assets." *Id.* ¶ 35. Rather, its only listed assets are long-term receivables from Odebrecht and other "Odebrecht-related entities of questionable solvency." *Id.* According to Plaintiffs, Odebrecht and CNO have treated Odebrecht Finance as "their own piggy-bank, sweeping every dime out of the company in exchange for only a small number of utterly worthless 'receivables.'" *Id.* ¶ 36. Plaintiffs allege on information and belief that Odebrecht Finance has been insolvent since its incorporation. *Id.* ¶ 34.

Odebrecht Finance is a shell company and was organized for the "sole purpose" of raising investment funds for CNO through the issuance of bonds. *Id.* ¶¶ 17, 33. From 2010 through 2014, the company issued billions of dollars in notes, all of which were guaranteed by CNO. *Id.* ¶ 37.

Between May 6, 2013 and March 31, 2015, Plaintiffs purchased significant quantities of two bonds issued by Odebrecht Finance: (1) 7.125% Notes due on June 26, 2042 (the "7.125% Notes"), and (2) 7.50% Perpetual Notes (the "7.50% Notes"). *Id.* ¶¶ 24-26. Each of the Notes was "unconditionally and irrevocably guaranteed" by CNO. *Id.* ¶ 24. Odebrecht Finance immediately conveyed all of the proceeds from sales of the notes to CNO and Odebrecht without receiving anything of equivalent value in return. *Id.* ¶ 39. Those proceeds were used for CNO's "general corporate purposes" and as additional equity investments in other Odebrecht subsidiaries. *Id.* ¶ 36.

**B. Defendants' Alleged Bribery and Kickback Scheme**

Between 2001 and 2016, CNO and Odebrecht paid at least $800 million in bribes to government officials in Brazil and at least a dozen other countries. *Id.* ¶ 40. These bribes were paid "in order to influence the award of more than 100 large construction contracts to CNO." *Id.* In furtherance of this scheme, Defendants established the Division of Structured Operations (the "Division") as a "standalone division" of Odebrecht in 2006. *Id.* ¶ 41. The Division had one purpose: to act as a "bribe department," making "illicit payments" to government officials in exchange for public contracts for CNO. *Id.* ¶ 42. From 2006 to 2009, Marcelo Odebrecht approved the Division's payments. *Id.* ¶ 43. After Marcelo became the CEO of Odebrecht in 2009, Hilberto Silva became the head of the Division. *Id.* Silva reported directly to Marcelo, providing Marcelo with periodic updates of the bribes paid by the Division. *Id.*

Of the $788 million that was paid by the Division in bribes from 2001 through 2016, $349 million was paid to Brazilian officials and political parties. *Id.* ¶¶ 49-50. The Division paid, for example, $20 million to Guido Mantega, Brazil's former Finance Minister, and other officials to secure a $184 million transportation project for CNO. *Id.* ¶ 51. The Division also paid $9.7 million to Paulo Roberto Costa, a Brazilian legislator, in exchange for a $142 million public construction contract for CNO. *Id.* ¶ 52. In all, Defendants received over $1.9 billion in benefits from the

contracts secured by the bribes to Brazilian officials. *Id.* ¶ 50. The Division also paid approximately $439 million to officials and political parties outside of Brazil. *Id.* ¶ 53. Defendants obtained contracts valued in excess of $1.4 billion as a result. *Id.* Overall, Defendants benefited in excess of $3.3 billion from contracts secured by bribes between 2001 and 2016. *Id.* ¶ 49.

The money used to make the bribes was obtained through various "off the books" means, including: (1) collection of standing overhead charges from clients; (2) attributing overcharges and fees to service providers and subcontractors as legitimate without including them in project budgets; (3) undeclared retainers and success fees for the purchase of company assets; and (4) self-insurance and self-guarantee transactions. *Id.* ¶ 46. After the funds were generated, they were not recorded. *Id.* Rather, the funds were sent by the Division to a series of offshore entities that were not identified as related entities in CNO or Odebrecht's financial statements. *Id.*

The Division laundered the bribe payments through a network of banks located in countries with "strict bank-secrecy laws." *Id.* ¶ 48. The Division also funneled the money through various "dummy corporations" that transacted with "friendly" banks. *Id.* ¶ 54. By 2010, one of the banks used by the Division located in Antigua collapsed. *Id.* ¶ 55. Division executives Fernando Migliaccio and Luiz Eduardo Soares then purchased the majority interest in another Antigua bank, and that bank began to charge Odebrecht a 2% "commission" to launder the bribe payments. *Id.* ¶¶ 43, 55.

The Division did not record the bribe payments in CNO and Odebrecht's accounting records. *Id.* ¶ 44. Rather, the Division used two "shadow" systems to track the payments. *Id.* The "MyWebDay" system was used to generate payment requests, process payments, and create spreadsheets documenting the payments. *Id.* The "Drousys" system was used by Division employees to communicate with each other and "other co-conspirators" using secure email and instant messaging. *Id.* Both of these systems were accessible only by Division members. *Id.*

Neither CNO nor Odebrecht reported the bribe payments in their reported financial results, and the payments were also concealed from external auditors.  *Id.* ¶ 45.

In 2014, Brazilian law enforcement began investigating bribes accepted by executives of a state-owned oil company, Petrobras, in an operation coined Lavo Jato, or "Operation Car Wash." *Id.* ¶¶ 6, 56, 81.  Initially, Odebrecht and CNO were not targets of that investigation.  *Id.* ¶ 56.  After the investigation began, Defendants concealed and destroyed evidence of their own bribe payments. *Id.* ¶ 57.  In addition, Odebrecht bribed Antiguan Prime Minister Gaston Browne so that he would prevent Brazilian authorities from obtaining subpoenaed documents from Antigua banks through which the Division had laundered bribe money.  *Id.* ¶ 60.

By the time of Operation Car Wash, the Division ran a "substantial portion" of the bribery scheme in the United States.  *Id.* ¶ 58.  In light of the investigation, Marcelo Odebrecht told Silva to flee Brazil and to continue the Division's work outside of the grip of Brazilian authorities.  *Id.* Specifically, Marcelo told Silva, "I think you all should go abroad to work because here, when you use the phone you will be scared, when you use the computer you will be afraid.  You will be afraid your offices will be bugged . . . [a]nd you will fall asleep wondering whether the next day the police will come for you."  *Id.* (alterations in original).  Silva stayed in Brazil, but Migliaccio and Soares moved to Miami and "got cover jobs" working in Odebrecht's office there.  *Id.*  By 2015, due to Silva's medical issues, Migliaccio and Soares were operating the Division.  *Id.* ¶ 59.  Migliaccio and Soares conducted some business for the Division in the Dominican Republic, but a majority of the bribe-related work was conducted from Florida.  *Id.*

According to the second amended complaint, it was not until June 19, 2015, when Marcelo Odebrecht was arrested, that Odebrecht and CNO were implicated in the scandal.  *Id.* ¶ 82.  Silva, Migliaccio, and Soares were also arrested by Brazilian law enforcement.  *Id.* ¶ 63.  They, along with Marcelo, all agreed to cooperate with prosecutors in exchange for leniency.  *Id.*

## C. CNO's GAAP Violations

Plaintiffs allege that many of Defendants' public statements were rendered false or misleading as a result of the undisclosed bribery scheme. Among those statements are CNO's quarterly and annual financial statements. According to Plaintiffs, those statements were false and misleading because they did not comply with Brazilian generally accepted accounting principles ("GAAP"). *Id.* ¶ 65. Specifically, Plaintiffs allege four ways in which CNO's financial statements violated Brazilian GAAP.

First, Plaintiffs allege that the 2009 through 2015 financial statements failed to provide for "the clearly foreseeable and estimable financial obligations arising from [CNO's] ongoing illegal bribery scheme." *Id.* ¶ 68. According to Plaintiffs, the illicit bribery scheme carried with it "a knowable and estimable range of possible civil, criminal and financial penalties and consequences." *Id.* ¶ 70. Paragraph 37 of the *Conceptual Structure for the Preparation and Presentation of the Financial Statements* promulgated by the Brazilian Accounting Standards Committee (Comitê de Pronunciamentos Contábeis or "CPC") recognizes that certain liabilities may only be measured "using a high degree of estimation." *Id.* ¶ 69. A "provision" must be identified as a charge against income under the Brazilian *Technical Pronouncement CPC 25 Provisions, Contingent Liabilities and Assets* when "(1) it is probable that a present obligation for a past event or conduct exists; (2) which will more likely than not require a future disbursement to settle the obligation; and (3) a reasonable estimate of the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes." *Id.*[2] Because the potential financial consequences of the bribery scheme were estimable, Plaintiffs allege that CNO's failure to accrue a provision for those estimated consequences and to simultaneously charge the estimate against income violated CPC 25. *Id.* ¶ 70.

---

[2] CPC 25 correlates to International Accounting Standard ("IAS") 37. *See* Comitê de Pronunciamentos Contábeis ("CPC"), *Pronunciamento Técnico CPC 25, Provisões, Passivos Contingentes e Ativos Contingentes* [*Technical Pronouncement CPC 25*] at 1.

Second, and related to the first, Plaintiffs allege that CNO failed to disclose the illegal bribery scheme and its "clearly foreseeable and estimable expected financial costs" in the notes to the company's publicly filed financial statements. *Id.* ¶ 71. Brazilian GAAP, and CPC 25 in particular, requires a separate disclosure in the financial statement notes that includes a "(1) brief description of the nature of the provision or contingent liability, including an expected timeline during which disbursement will be made to settle the obligation; and (2) an indication of any uncertainties related to the value or amount of settlement of the liability, including the main assumptions adopted related to future events." *Id.* ¶ 72. This disclosure in the notes is required even if a company does not accrue a provision because there is no present obligation or it is impossible to create a sufficiently reliable estimate of the cost of such a liability. *Id.* ¶ 73. Because CNO failed to disclose any information related to the bribery scheme, Plaintiffs allege that CNO has separately violated this provision of CPC 25.

Third, Plaintiffs allege that CNO's financial statements violated Brazilian GAAP because they failed to disclose the revenues from foreign and domestic contracts that the company obtained as a result of the bribes that it paid separately from CNO's other contract revenue. *Id.* ¶ 74. CPC 00 (*Conceptual Structure for the Preparation and Presentation of the Financial Statements*) explains that common practice is to separately disclose different types of revenue "to assist investors in assessing the ability of a business to generate cash in the future and distinguish revenues that arise in the normal course of the entity's business from revenues stemming from contingent activities that may not be repeated on a regular basis." *Id.* ¶ 75. Plaintiffs allege that investors and others would not "necessarily" have expected contract revenue obtained by fraud to be a reliable indicator of future revenue. *Id.* ¶ 76.

Finally, Plaintiffs allege that CNO's financial statements were prepared in violation of Brazilian GAAP because they failed to disclose the monies that were paid in bribes. *Id.* ¶ 77. CPC 00 (Basic Conceptual Pronouncement) and CPC 17 (Construction Contracts) require that the books

and financial records of a company reflect the "assets and expenses directly associated with generating particular contract revenue." *Id.* Those assets and expenses must also be reflected in a company's income statement in the same period as the revenue. *Id.* By concealing the costs of the CNO contracts (the bribes), Plaintiffs allege, CNO failed to comply with GAAP. *Id.* Plaintiffs further allege that CNO was required to disclose the bribe funds in the notes to its financial statements, yet failed to do so. *Id.* ¶ 78.

### D.  Other False and Misleading Statements

Plaintiffs also allege that Defendants misrepresented CNO's financial status from March 23, 2011 through May 6, 2016 (the "Relevant Period"). *Id.* ¶ 83. The allegedly false and misleading statements were contained in offering memoranda, public statements including press releases, and statements made directly to Plaintiffs. *Id.*

### 1.  Offering Memoranda

Odebrecht Finance initially sold its Notes in private offerings pursuant to various offering memoranda. *Id.* ¶ 84. Those offering memoranda disclosed CNO's financial condition, including that a majority of the company's revenues were from large-scale engineering and construction projects completed for governmental and quasi-governmental entities. *Id.* According to the second amended complaint, Odebrecht Finance was responsible for all of the statements in the offering memoranda as the issuer of the Notes. *Id.* ¶¶ 100, 113, 129. Plaintiffs allege that various statements in the offering memoranda were false or misleading, as follows.

### a.  7.50% Notes Offering Memorandum

The offering memorandum issued on November 15, 2011 in connection with the Odebrecht Finance 7.50% Notes ("7.50% Notes OM") included the following financial information for CNO: CNO's unaudited financial statements for the six-month periods ended June 30, 2010 and June 30, 2011; CNO's audited financial statements for the years ended December 31, 2009 and December 31,

2010; and CNO's audited financial statements for the years ended December 31, 2009 and December 31, 2008. *Id.* ¶¶ 85-86. According to the second amended complaint, those financial results were false and misleading because they violated Brazilian GAAP, as discussed earlier in Section I.C. *Id.* ¶ 86. The 7.50% Notes OM falsely stated that the reported financial information was prepared "in accordance with Brazilian GAAP." *Id.* ¶ 87.

Plaintiffs further allege that the 7.50% Notes OM was materially false and misleading because it failed to disclose that the reported financial results were "unsustainable" and the product of a "massive and illegal bribery scheme." *Id.* ¶ 86.

According to the second amended complaint, the 7.50% Notes OM contained additional false and misleading statements. The OM's disclosure of CNO's "competitive strengths" is alleged to have been false and misleading because the financial figures were overstated, as described earlier, and the disclosure concealed the existence and scope of the bribery scheme and the attendant risks. *Id.* ¶ 89. That disclosure read as follows:

> **Our Competitive Strengths**
>
> We believe that our main competitive strengths include the following:
>
> *Leadership Position*
>
> We are Latin America's largest engineering and construction company as measured by our gross revenues in 2009, according to ENR. Our geographic diversification, extensive operations and leading market share in Brazil enable us to capitalize on additional business opportunities as they arise.
>
> \*   \*   \*
>
> *Financial Strength*
>
> We believe that our financial performance has been consistent, enabling us to rely primarily on our cash flow from operations to grow our business. Our EBITDA margins (which we define as EBITDA as a percentage of our net service revenues) for the six-month period ended June 30, 2010, 2009, 2008, and 2007 were 10.8%, 9.7%, 14.0%,

and 10.3%, respectively. Our cash and cash equivalents and financial investments totaled R $2,513.9 million (U.S. $1,395.4 million) and R $3,135.0 million (U.S. $1,740.2 million) as of June 30, 2010 and as of December 31, 2009, respectively. We are focused on maintaining the relatively strong financial position and liquidity we have as compared to many of our competitors.

*Id.* ¶ 88.

The 7.50% Notes OM also allegedly made false and misleading statements about CNO's "diversification." *Id.* ¶ 90. Those statements read:

### Diversification

We have expanded our business internationally in order to broaden our client base and diversify the risks inherent in an excessive reliance on the Brazilian market, as well as to increase the share of our revenues denominated in dollars and other currencies. As of June 30, 2010, we had 157 ongoing projects: Brazil (70); Angola (33); Venezuela (12); Peru (10); Panama (8); the Dominican Republic (5); the United States (5); Portugal (3); Argentina (3); Libya (2); Mozambique (2); Colombia (2); and other (2).

The percentage of our gross service revenues derived from international projects increased from approximately 30% in 1992 to 57.9% in the six-month period ended June 30, 2010. We believe our diversification provides us with revenue growth opportunities, while reducing our exposure to one single market and related risks including political risks.

### Strong and Diversified Backlog

We define backlog to include payments under contracts that we have signed for a particular project and for which an identified source of funding exists, but have not been recognized as revenue by us. As of June 30, 2010, (1) our backlog represented U.S. $21,519.6 million, or more than two years of future services based on our performance of 2009 and (2) we expect to complete approximately 20% of our total backlog by the end of 2010.

Our backlog includes a diversified portfolio of engineering and construction projects in various infrastructure sectors and different types of construction undertakings in numerous countries.

*Id.* The 7.50% Notes OM also described CNO's prior success in securing international contracts:

> During the last five years, we have successfully secured important international projects not only in Brazil, but also in Argentina, Angola, Colombia, the Dominican Republic, Libya, Mozambique, Panama, Peru, the United States, Portugal, Venezuela, and certain countries in the Middle East. New projects awarded during the six-month period ended June 30, 2010, had a total contract amount of U.S. $2,853.8 million (plus acquisitions on existing contracts of U.S. $3,276.8 million), of which U.S. $4,633.3 million is for projects located in Brazil and U.S. $1,497.3 million is for projects located outside Brazil.

*Id.* ¶ 95. Plaintiffs allege that these statements were false and misleading because they failed to disclose the fact that the contracts had been secured by bribes. *Id.* ¶¶ 91, 96. The statements also aided in concealing the existence and scope of the bribery scheme and the attendant risks. *Id.* ¶¶ 91, 96.

Plaintiffs additionally allege that the 7.50% Notes OM's statement that CNO's "bid success rate for Venezuelan operations is high and reflects our selectivity in bidding for new work in Venezuela" was false and misleading in that it attributed CNO's success in Venezuela to the company's "selectivity" rather than the $98 million in illegal bribes paid to Venezuelan officials between 2006 and 2015. *Id.* ¶ 93-94. The OM also explained that CNO had "a large and diversified backlog in Venezuela, which currently ranks the country, together with Angola, as our two most important foreign markets in terms of future revenues." *Id.* ¶ 93. The statement regarding Angola's ranking is alleged to have been false and misleading because it failed to disclose that CNO's success in that country was due to more than $50 million in bribe payments to Angola officials between 2006 and 2013. *Id.* ¶ 94.

Other allegedly false and misleading statements in the 7.50% Notes OM portrayed CNO's successes as the result of CNO's "experience," "reputation," "technological capabilities," or other "legitimate" factors. *Id.* ¶ 98. Specifically, the OM stated:

We are the largest engineering and construction company in Latin America as measured by 2009 revenues. Most of our ongoing construction projects were awarded through a competitive bidding process. While price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships.

\* \* \*

. . . we believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

\* \* \*

We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons. First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer most cost-effective alternatives to proposed plans of governmental authorities in invitations for bids. Second, our decentralized management approach has generally allowed us to efficiently manage our projects. Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

*Id.* ¶ 97.

In addition to the false and misleading statements regarding CNO's financials, Plaintiffs allege that the 7.50% Notes OM contained false and misleading statements regarding Odebrecht Finance's condition. *Id.* ¶ 100. Odebrecht Finance disclosed in its financial statements that it was insolvent and "entirely dependent" on OEC, CNO, and Odebrecht for funding. *Id.* However, Odebrecht Finance neglected to disclose that the prospect that it would repay the Notes was "materially diminished" because the other Defendants on which Odebrecht Finance was dependent were subject to "serious undisclosed risks" as a result of the bribery scheme. *Id.*

Plaintiffs relied on these statements in purchasing the 7.50% Notes. *Id.* ¶ 99.

### b. 7.125% Notes Offering Memorandum

The 7.125% Notes were sold pursuant to an offering memorandum issued on July 4, 2012 (the "7.125% Notes OM"). *Id.* ¶ 101. That offering memorandum contained CNO's audited financial statements for the years ending December 31, 2010 and 2011, and its unaudited financial statements for the first quarter of 2012. *Id.* ¶ 102. Plaintiffs allege that the 7.125% Notes OM contained many of the same false and misleading statements found in the 7.50% Notes OM. The 7.125% Notes OM's reported net income and revenues for CNO for 2011 and the first quarter of 2012 were false and misleading because, like the 7.50% Notes OM, they violated Brazilian GAAP, as discussed in Section I.C. *Id.* Plaintiffs also allege that, like the 7.50% Notes OM, the 7.125% Notes OM failed to disclose that CNO's financial results "were unsustainable" and the product of the bribery scheme. *Id.* The 7.125% Notes OM was also false and misleading because it stated that the financial figures were prepared "in accordance with Brazilian GAAP," when, in fact, the figures were prepared in violation of those principles. *Id.* ¶ 103.

The 7.125% Notes OM, like the 7.50% Notes OM, made various allegedly false and misleading disclosures regarding CNO's "competitive strengths," its successes in obtaining international contracts, and the reasons for the company's success. *Id.* ¶¶ 104-05, 107-12. The 7.125% Notes OM stated:

> ### Leadership Position
>
> We are Latin America's largest engineering and construction company as measured by our gross revenues in 2010, according to ENR. Our geographic diversification, extensive operations and leading market share in Brazil enable us to capitalize on additional business opportunities as they arise.
>
>    \*   \*   \*

## Financial Strength

We believe that our financial performance has been consistent, enabling us to rely primarily on our cash flow from operations to invest in our business. Our EBITDA margins (which we define as EBITDA as a percentage of our net service revenues) for the three-month periods ended March 31, 2012 and 2011 were 10.2% and 9.9%, respectively, and for the years ended December 31, 2011 and 2010 were 10.7% and 11.1%, respectively. The sum of our cash and cash equivalents and financial investments totaled R $5,006.0 million (U.S. $2,747.4 million) at March 31, 2012, compared to R $6,831.1 million (U.S. $3,749.0 million) and R $4,717.1 million (U.S. $2,588.8 million) at December 31, 2011 and 2010, respectively. We are focused on maintaining a relatively strong financial position and liquidity we have as compared to many of our competitors.

## Diversification

We have expanded our business internationally in order to broaden our client base and diversify the risks inherent to a strong exposure to the Brazilian market, as well as to increase the share of our revenues denominated in dollars and other currencies. At March 31, 2012, we had 185 ongoing projects: Brazil (80); Angola (33); Venezuela (18); Peru (9); the Dominican Republic (10); Panama (7); Argentina (6); the United States (7); Portugal (1); Mozambique (4); Colombia (2); Mexico (2); Ecuador (2) and other (4).

The percentage of our gross service revenues derived from international projects has increased from approximately 30.0% in 1992 to 54.5% in the three-month period ended March 31, 2012. We believe our diversification provides us with revenue growth opportunities, while reducing our exposure to one single market and related risks, including political risks.

## Strong and Diversified Backlog

We define backlog to include payments under contracts that we have signed for a particular project and for which an identified source of funding exists, but have not been recognized as revenue by us. At March 31, 2012, our backlog represented U.S. $33.7 billion, or more than two and a half years of future services based on our performance of 2011. We expect to complete approximately 20% to 25% of our total backlog by the end of 2012.

Our backlog includes a diversified portfolio of engineering and construction projects in various infrastructure sectors and different types of construction undertakings in numerous countries.

*Id.* ¶ 104. These statements were allegedly false because they overstated the financial figures and failed to disclose the bribery scheme. *Id.* ¶ 105.

With respect to CNO's success in contracting, the 7.125% Notes OM stated:

> Our bid success rate for Venezuelan operations is high and reflects our selectivity in bidding for new work in Venezuela. We have a large and diversified backlog in Venezuela, which currently ranks the country, together with Angola, as our two most important foreign markets in terms of future revenues.

*Id.* ¶ 107. As with the 7.50% Notes OM, this representation was allegedly false and misleading because it attributed CNO's successful bidding to the company's "selectivity" rather than the bribery scheme. *Id.* ¶ 108. The statement also omitted the bribes paid to Angolan officials. *Id.*

Additionally, the 7.125% Notes OM described CNO's other international success:

> During the last five years, we have successfully secured important projects not only in Brazil, but also in Argentina, Angola, Colombia, the Dominican Republic, Mozambique, Panama, Peru, the United States, Portugal, Venezuela, and certain countries in the Middle East. New projects awarded during the three-month period ended March 31, 2012 had a total contract amount of U.S. $2,024.8 million, of which U.S. $212.1 million is for projects located in Brazil and U.S. $1,812.7 million is for projects located outside Brazil. These new projects include: (1) Cibao Sur, Dominican Republic (U.S. $298.8 million); (2) the Ecovias Santiago road, Dominican Republic (U.S. $295.6 million); (3) Gas Anaco, Venezuela (U.S. $316.6 million); (4) the São Paulo Metro Line V, Brazil (U.S. $212.1 million); and (5) the Morar Feliz Project, Brazil (U.S. [$]45.3 million).

*Id.* ¶ 109. Plaintiffs allege that this statement was false and misleading because it overstated the financial information (due to violations of Brazilian GAAP) and failed to disclose that the contracts described were secured only because of the bribery scheme. *Id.* ¶ 110. As with the 7.50% Notes OM, the 7.125% Notes OM also misleadingly attributed CNO's successful bidding to the company's "experience," "reputation," "technological capabilities," and other "legitimate" factors rather than to the bribery scheme. *Id.* ¶ 112. In that respect, the OM stated:

We are the largest engineering and construction company in Latin America as measured by 2010 revenues. Most of our ongoing construction projects were awarded through a competitive bidding process. While price generally is the most important factor that determines whether we are awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships.

*   *   *

. . . we believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

*   *   *

We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons: First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids. Second, our decentralized management approach has generally allowed us to effectively manage our projects. Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

*Id.* ¶ 111.

Plaintiffs additionally allege that Odebrecht Finance's own financial statements in the

7.125% Notes OM were false and misleading. *Id.* ¶ 114. The OM explained:

The issuer's ability to make payments on the notes depends on its receipt of payments from us.

The issuer's principal business activity is to act as a financing vehicle for Odebrecht's activities and operations. The issuer has no substantial assets, and accordingly, holders of the notes must rely on our cash flow from operations to pay amounts due in connection with the notes. The ability of the issuer to make payments of principal, interest and any other amounts due on the notes is contingent on its receipt from us of amounts sufficient to make these payments, and, in turn, on our ability

> to make these payments. In the event that we are unable to make such
> payments for any reason, the issuer will not have sufficient resources
> to satisfy its obligations under the indenture governing the notes.

*Id.* ¶ 33 & n.3. The OM also stated: "To fund its activities, the Company relies on the operational

structure of ODB and its operations depend on the remittance of funds from ODB and from other

related parties of the Odebrecht Organization." *Id.* ¶ 34 & n.4. These disclosures omitted the

diminished likelihood of Odebrecht Finance's repayment of the Notes due to Odebrecht Finance's

total dependence on OEC, CNO, and Odebrecht, which faced "serious undisclosed risks" because

of the bribery scheme. *Id.* ¶ 114.

Plaintiffs relied on all of these statements in purchasing the 7.125% Notes. *Id.* ¶ 113.

### c. 4.375% Notes Offering Memorandum

In addition to the 7.50% and 7.125% Notes, Defendants sold 4.375% Notes due on April

25, 2025 pursuant to an offering memorandum dated June 3, 2013 (the "4.375% Notes OM"). *Id.* ¶

115. Plaintiffs did not purchase those notes. *Id.* Nonetheless, Plaintiffs allege that the false

statements and omissions in the 4.375% Notes OM affected the market price of the notes that

Plaintiffs did purchase. *Id.*

As with the other offering memoranda, the 4.375% Notes OM contained CNO's financial

information, including audited financial statements for years ended December 31, 2011 and

December 31, 2012. *Id.* ¶ 116. Plaintiffs allege that those financial results were "overstated"

because they violated Brazilian GAAP, as discussed earlier in Section I.C. *Id.* ¶¶ 116, 119. Plaintiffs

also allege that the 4.375% Notes OM, like the 7.50% and 7.125% Notes OMs, omitted the fact that

the financial results were "unsustainable" in light of the bribery scheme and falsely stated that

CNO's financial statements were prepared "in accordance with Brazilian GAAP." *Id.* ¶¶ 116-17.

The 4.375% Notes OM contained disclosures regarding CNO's "competitive strengths," its

diversification and backlog, and its successful bidding that were nearly identical to the disclosures

made in the 7.50% and 7.125% Notes OMs. *See id.* ¶¶ 118-19, 121-23, 125. Plaintiffs allege that those disclosures were false and misleading because they overstated CNO's financial results, failed to disclose that the contracts were secured with bribes, and falsely attributed the company's successes to various legitimate factors rather than the illegal scheme. *Id.* ¶¶ 119, 122, 124, 126-28. Plaintiffs also allege that the 4.375% Notes OM contained false statements related to Odebrecht Finance's financial results because the OM failed to disclose the "materially diminished" possibility that the entity would repay the notes due to its reliance on OEC, CNO, and Odebrecht, which were subject to the risks inherent in the bribery scheme. *Id.* ¶ 129.

### d. 5.250% Notes Offering Memorandum

Defendants also sold Odebrecht Finance 5.250% Notes pursuant to a July 15, 2014 offering memorandum (the "5.250% Notes OM"). *Id.* ¶ 130.[3] That OM contained CNO's financial statements for the three-month period ended March 31, 2014 and for the year ended December 31, 2013. *Id.* ¶ 131. These financial results are alleged to have been false and misleading because they were prepared in violation of Brazilian GAAP, as described in Section I.C. *Id.* Like the other OMs, the 5.250% Notes OM was also materially misleading because it failed to disclose the unsustainability of the financial results and falsely stated that the financial statements were prepared "in accordance with Brazilian GAAP." *Id.* ¶¶ 131-32. The 5.250% Notes OM additionally contained statements regarding CNO's "competitive strengths," its diversification and backlog, and its successful bidding that were nearly identical to the disclosures made in the other offering memoranda. *See id.* ¶¶ 133, 136, 138. Those statements were false and misleading, Plaintiffs allege, because they overstated CNO's financial information, failed to disclose the bribery scheme, and falsely attributed CNO's success to legitimate factors and not to the true underlying cause—the

---

[3] Plaintiffs do not allege that they purchased the 5.250% Notes. Nor do they provide any explanation for the relevance of those notes or the 5.250% Notes OM to Plaintiffs' claims.

bribery scheme. *Id.* ¶¶ 134, 137, 139. The 5.250% Notes OM also contained the same misleading statements in Odebrecht Finance's financial disclosures as the other offering memoranda: the OM failed to disclose the "materially diminished" possibility of repayment of the notes that was the result of Odebrecht Finance's complete dependence on OEC, CNO, and Odebrecht and, in turn, those entities' risks associated with the bribery scheme. *Id.* ¶ 140.

### 2. Statements Made in Conference Calls and Meetings

Plaintiffs allege that various false and misleading statements were made in quarterly and annual financial reports and press releases. *Id.* ¶ 141. Plaintiffs "received, reviewed and relied upon" those financial reports. *Id.* The reports were also often discussed during conference calls hosted by CNO, many of which were attended by Plaintiffs. *Id.*

On March 23, 2011, Odebrecht and CNO held a conference call to discuss the Odebrecht Finance Notes. *Id.* ¶ 142. Odebrecht's Chief Financial Officer ("CFO") at the time, Luciano Nitrini Guidolin, and CNO's CFO Jayme Fonseca participated in the call, as did Plaintiffs. *Id.* During the call, potential tender offers and consent fees for covenant changes for investors were discussed. *Id.* The next day, on March 24, 2011, Plaintiffs' representatives met with CNO employees at DoubleLine headquarters in Los Angeles, California. *Id.* ¶ 143. They discussed CNO's operating results and business prospects. *Id.* Plaintiffs allege that the "disclosures" that the CNO representatives made during that meeting were false and misleading because they failed to disclose information regarding the bribery scheme. *Id.*

The following year, on January 11, 2012, Plaintiffs' representatives met with CNO representatives in Cancun, Mexico at a conference hosted by Santander. *Id.* ¶ 144. CNO again discussed its financial results and business prospects, including the funding of "sister subsidiaries." *Id.* Again, the CNO representatives omitted information regarding the bribery scheme. *Id.*

20

Three years later, on March 24, 2015, Plaintiffs attended a J.P. Morgan securities conference in Miami. *Id.* ¶ 175. CNO gave a presentation at that conference regarding its business and operations. *Id.* In its presentation, CNO made no mention of the fact that its business model was based on the illegal bribery scheme. *Id.*

### 3. CNO's Financial Statements

Plaintiffs allege that CNO's reported financial statements for the year ended December 31, 2011, its *Earnings Release December 2012*, its first and third quarter 2013 financial statements, its *Earnings Release – September 2013* containing the third quarter 2013 financial information, annual financial statements for the year ended December 31, 2013, and its first, second, and third quarter 2014 financial statements all violated Brazilian GAAP as described in Section I.C. *Id.* ¶¶ 145, 148, 151, 155, 158-59, 163, 166, 170. Each of those financial statements is also alleged to have omitted any disclosure that the reported financial results were "unsustainable" and only the product of the bribery scheme. *Id.* ¶¶ 145, 148, 151, 155, 158-59, 163, 166, 170.

Those financial statements are also alleged to have misleadingly explained CNO's credit ratings. The notes to CNO's December 31, 2011 annual financial statements stated:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

*Id.* ¶¶ 146, 156, 164, 171. The notes to CNO's Earnings Release December 2012 reported the following:

> On May 23, 2012, Standard & Poor's raised CNO's Global and National ratings to investment grade, at BBB- and brAAA respectively. With this upgrade, CNO achieve [sic] the triple-investment grade, across the three main rating agencies.

*Id.* ¶ 149. The notes to CNO's first quarter 2013 financial statements described the company's credit ratings as follows:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.
>
> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale.
>
> In October 2010, the rating agency Fitch Ratings assigned a BBB- investment grade rating on the global scale and AA+ on the Brazilian national scale.
>
> In June 2011, the rating agency Standard & Poor's assigned a BB+ rating on the global scale and br AA+ on the national scale.

*Id.* ¶ 152.  The notes to CNO's third quarter 2013 financial statements similarly stated:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.
>
> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and an Aa1.br rating on the Brazilian national scale.  In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and a br AAA rating on the national scale.  In September 2013, the rating agency Fitch Ratings upgraded the Company's rating to BBB on the global scale and AAA on the Brazilian national scale.

*Id.* ¶ 156.  The notes to CNO's annual financial statements for the year ended December 31, 2013, as well as a contemporaneously disseminated presentation entitled *Earnings Release – December 2013*, described the company's credit ratings in nearly identical language.  *Id.* ¶¶ 160, 162.

CNO's financial statements for 2014 contained similar disclosures.  The notes to the financial statements contained in CNO's first quarter 2014 Earnings Release explained:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale. In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and br AAA on the national scale. In September 2013, the rating agency Fitch Ratings assigned a BBB investment grade rating on the global scale and AAA on the Brazilian national scale. In May 2014, the rating agency Standard & Poor's upgraded Company's Credit Risk from BBB- to BBB on the global scale, maintaining the br AAA on the national scale.

*Id.* ¶ 163-64. The notes to CNO's second quarter 2014 financial statements, as well as a contemporaneously disseminated report entitled *Earnings Release – 2nd Quarter 2014*, contained a nearly identical disclosure. *Id.* ¶¶ 166-67, 169. And the notes to CNO's third quarter 2014 financial statements, dated November 13, 2014, reported the following:

The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale.

In October 2010, the rating agency Fitch Ratings upgraded the Company's ratings to BBB- investment grade on the global scale and to AA+ on the Brazilian national scale. In September 2013, the rating agency upgraded the Company's rating to BBB on the global scale and AAA on the Brazilian national scale.

In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and br AAA on the national scale. In May 2014, the rating agency Standard & Poor's upgraded the Company's rating to BBB investment grade on the global scale and assigning a stable outlook.

*Id.* ¶¶ 170-71.

Plaintiffs allege that all of these statements regarding CNO's credit ratings were false and misleading because they failed to disclose that the credit ratings were achieved "only by concealing" the bribery scheme. *Id.* ¶¶ 147, 150, 153, 157, 161, 163, 165, 168, 169, 172. Had the bribery scheme

been disclosed, the second amended complaint predicts, CNO would not have obtained its favorable credit ratings. *Id.* In fact, CNO's credit ratings "would have been downgraded significantly." *Id.*

Following the dissemination of the third quarter 2014 financial statements, CNO hosted a conference call with investors and analysts to discuss the first quarter results. *Id.* ¶ 173. In connection with that call, CNO released its *Earnings Release 3rd Quarter 2014*, which was referenced during the call and which contained the same financial information and credit rating disclosures as the 2013 annual financial statements. *Id.* Plaintiffs allege that the Earnings Release was false and misleading for the same reasons as the third quarter financial statements. *Id.* The Earnings Release also falsely stated that the "Petrobras investigation has not impacted CNO, despite of [*sic*] the negative watch given by Fitch to all heavy construction companies." *Id.* However, the second amended complaint alleges, to the contrary, that Odebrecht and CNO "were embroiled" in that investigation and "were certain to be charged criminally or civilly by Brazilian and a host of other governments." *Id.* ¶ 174.

### 4. Odebrecht's 2014 Annual Report

Plaintiffs allege that Odebrecht's annual report for 2014 contained various false and misleading statements. First, Plaintiffs allege that the report failed to disclose the bribery scheme and instead falsely described Odebrecht as "being built on a foundation of public service" when it stated:

> For 70 years, the ethos of service has been the decisive hallmark that sets the Odebrecht Group apart. It is impossible to translate that ethos into words, but it can be easily identified in the conduct of people who are always willing to perceive, understand, and meet the needs of others, whether they are a client, a co-worker or anyone linked to their work or personal lives.
>
> Identifying and bringing in people endowed with that constant and steadfast desire to serve others has been Odebrecht's main drive for

seven decades. Thanks to them, things became simple, and everything else ensures naturally: the client's satisfaction, support for national development, the generation of social wealth, and the Group's survival, growth, and perpetuity.

Odebrecht's history is the story of people with the ethos of service. People who apply it on a daily basis, no matter what. It is in their blood, so for them, any time is a good time for serving others. For them, service is an ongoing commitment.

*Id.* ¶ 176.

Second, Plaintiffs allege that the annual report's statements regarding Odebrecht's Code of Conduct were false and misleading. *Id.* ¶ 180. The annual report stated:

**Code of Conduct**

The Odebrecht Group's Code of Conduct contains concepts and guidelines in addition to TEO that reflect developments in global legislation. Therefore, it is a Group policy that must be adhered to in a disciplined manner by all Odebrecht Members. It particularly guides their external relations, as well as applying to the entire value chain in all of the Businesses, geographic regions and societies in which we are present.

*Id.* ¶ 177. Section 5 of the Code of Conduct referenced in the annual report provides:

All Team Members of the Organization are prohibited from:

- financing, funding or in any way sponsoring the practice of illegal acts;
- using any person as an intermediary to disguise or hide his or her identity and real interest in order to practice illegal acts;
- offering, promising, granting, authorizing, accepting or receiving, either directly or indirectly, any type of benefit, payment, gift or form of entertainment that:
  - conflicts with the Organization's Policies or guidelines; or
  - may be interpreted as conferring some type of inappropriate advantage, tip, bribe or payment in violation of any law, including inappropriate and/or illegal payments to any individual, whether associated with a public, private or non-profit entity; or
  - violates any law or regulation to which an Organization Company is subject.

*Id.* ¶ 178. The Code of Conduct specifically prohibits bribery by providing that "[i]t is prohibited to offer gifts or benefits, including trips, to public officials or private individuals or their family members with the intention of improperly influencing or rewarding a decision." *Id.* ¶ 179. The annual report's statement regarding the Odebrecht Code of Conduct is alleged to have been false and misleading when made because Odebrecht and its senior executives, including Marcelo Odebrecht, were "well aware" of the bribery scheme. *Id.* ¶ 180.

Plaintiffs also allege that, despite the annual report's statement that all Odebrecht employees are required to adhere to the Code of Conduct, Odebrecht and its senior management were not only aware that the Division was operating a "shadow accounting system" to conceal the illegal bribes, but Odebrecht's CEO, Marcelo, established the scheme and oversaw the Division. *Id.* ¶ 182. This directly violated another provision of the company's Code of Conduct regarding accounting records. *Id.* That provision states:

> The reliability and transparency of the accounting practiced by the Companies at the Organization are considered crucial.
>
> Commonly accepted legislation, standards and accounting principles should be rigorously observed in order to guarantee consistent records and reports that will permit the disclosure and evaluation of the Company's operations and results.

*Id.* ¶ 181.

Section 11 of the Code of Conduct further provides, "In their business actions, the Organization's Team Members should respect and obey the laws and regulations of each country or region in which they operate." *Id.* ¶ 183. Odebrecht and its senior management's participation in the bribery scheme violated Section 11 because the scheme was unlawful in all of the countries in which Odebrecht and CNO operated. *Id.* ¶ 184.

Finally, Plaintiffs allege that the 2014 annual report's summary of Odebrecht and CNO's financial results was false and misleading. *Id.* ¶ 185. CNO's reported gross revenue exceeded $14

billion and its reported EBITDA was $1.35 billion.  *Id.*  Those numbers were false and misleading because they (1) failed to recognize the hundreds of millions of dollars paid in bribes as expenses required to secure the contracts that generated the reported revenues, in violation of GAAP; (2) included the illegally obtained revenues in violation of GAAP; and (3) failed to disclose the unsustainability of the reported results or that the results were the product of the illegal bribery scheme.  *Id.*

### E.  The Bribery Scheme is First Revealed

On June 19, 2015, Brazilian police arrested Marcelo Odebrecht.  *Id.* ¶ 187.  Reuters reported the arrest in an article that same day entitled "Odebrecht Bonds Spiral South on Executive Arrest." *Id.*  That article explained:

> Multi-point price drops in bonds issued by Odebrecht dominated LatAm credit markets' attention on Friday following news that the Brazilian construction firm's CEO had been arrested.
>
> The move marked the first time an Odebrecht executive had been detained by the police in connection with the kick-back scandal embroiling state-owned oil company Petrobras and linked the firm close to the so-called "Car Wash" scandal.
>
> The company's bonds were marked down about 10 points immediately following the news, but have since come off their lows to trade some four points weaker on the day, traders said.

*Id.*  The market price of the Odebrecht Finance Notes fell dramatically that day as a result of the disclosure.  *Id.* ¶ 189.  The value of the 7.125% Notes fell from a close of $86.25 on June 18, 2015 to $80.50 at close on the day of Marcelo's arrest—a 6.7% loss.  *Id.*  The value of the 7.50% Notes likewise fell, from a close of $87.47 on the previous day to $78.75—a 10.0% loss.  *Id.* ¶ 189 n.38.

The day after Marcelo's arrest, the New York Times reported:

> Brazilian police on Friday arrested one of the country's richest men, Marcelo Odebrecht, the fallout broadens in an investigation into corruption at the state-run oil giant Petrobras.

The investigation, which is looking into whether subcontractors may have colluded with top Petrobras executives to overbill the company and pay bribes, has touched the highest levels of government and business.

In the latest development, Mr. Odebrecht, the billionaire chief executive of the Odebrecht conglomerate, was arrested with three other senior company executives and the chief executive of Andrade Gutierrez, another major construction conglomerate. The federal prosecutor accused the executives of knowing that their companies paid bribes to politicians that added up to 710 million reais ($230 million).

"We have material proof that they knew about the practice of overbilling contracts with Petrobras and they participated directly in the division of contracts with the cartel," a police investigator, Igor Romário de Paula, said in a news conference Friday.

*Id.* ¶ 188.

Two days later, on June 22, 2015, Odebrecht issued a press release to "express its indignation" at Marcelo's arrest, which it claimed was "illegal." *Id.* ¶ 190. The press release stated:

The Odebrecht Group, for respecting for its Clients, Partners, Investors, Financial Institutions, Suppliers, Users of its Services, Friends and Team Members, hereby expresses its indignation at the arrest of five of its executives and the search and seizure warrants served last Friday (June 19) at some of our subsidiaries as part of the 14th stage of Operation Lava Jato ("Car Wash"; a Brazilian corruption scandal involving alleged payoffs and the state-owned oil giant Petrobras).

The court order approving the arrest of our executives and the search and seizure warrants demonstrates that, since the beginning of Lava Jato over a year ago, the Federal Police have not presented, as alleged in the court order, any new evidence that justifies the forceful measures taken, which were completely unnecessary and for that very reason, illegal.

*Id.* The press release further explained:

[T]he Odebrecht Group never hindered the investigations in any way. To the contrary, its executives have always made themselves available to authorities to provide any clarifications. In fact, four of the five arrested executives had traveled to the headquarters of the Federal Police in Brasília and provided testimony in the course of the Lava Jato

> investigations conducted by the Superior Court of Justice and the Federal Supreme Court. They have also furnished all requested documents and formally offered to testify before the Federal Court in the State of Paraná—testimony that they were never invited to provide, but which certainly would have clarified all of the points raised.

*Id.* ¶ 192.

According to the second amended complaint, the press release statements were false and misleading. Contrary to the press release's suggestion, Defendants were well aware of Marcelo Odebrecht's role in the bribery scheme and that his arrest was in fact justified. *Id.* ¶ 191. Further, the press release's statement that Odebrecht "never hindered the investigations in any way" was also false; Odebrecht had "done everything that it could to impede the investigations." *Id.* ¶ 193. For example, Marcelo Odebrecht had directed employees to delete records that could reveal illegal activities. *Id.* Odebrecht had also paid an Antigua government official's representative millions of dollars to prevent incriminating documents from being turned over to international authorities. *Id.* Odebrecht had also intentionally destroyed encryption keys that were needed to access evidence stored on a "secret email system." *Id.*

The press release was effective: the market price of the Odebrecht Finance Notes rose "significantly." *Id.* ¶ 194. The value of the 7.125% Notes increased from $79.77 on June 22, 2015 to $80.97 the following day and to $81.85 on June 24, 2015—a two-day gain of 2.6%. *Id.* Similarly, the 7.50% Notes increased in value from $80.50 on June 22, 2015 to $82.50 on June 23, 2015 and $83.67 on June 24, 2015—a two-day gain of 3.9%. *Id.* ¶ 194 n.39.

Odebrecht had not entirely escaped hot waters, however. On June 24, 2015, after the market had closed, Reuters reported the following:

> Brazilian police said on Wednesday they intercepted a note from the jailed chief executive of Odebrecht SA to his lawyers asking to "destroy email," after he became the highest-profile executive arrested in Brazil's largest ever corruption investigation.

The handwritten note, reproduced by Federal Police and posted in court documents online, says "destroy email drilling rigs."

Marcelo Odebrecht, head of Brazil's largest engineering and construction conglomerate, was arrested Friday in a sweeping investigation into a kickback scheme at the state-run oil company Petrobras.

*Id.* ¶ 195. That same day, Odebrecht attempted to preempt the drop in bond prices that would likely result from the email disclosure by issuing another press release. *Id.* ¶ 196. According to that press release,

there is nothing in Marcelo Odebrecht's note to suggest that any illegality has been committed. Besides being uncharacteristic of the executive, it would make no sense to suggest "destroying" (not the contents, as intended, but literally, as interpreted the police authority) emails that were seized during the operation conducted in November 2014, which were widely investigated and made public. Destroying something that is already in the custody of the PF and Judge Sergio Moro makes no sense. In other words, the term "destroy" must have a different meaning.

Finally, Odebrecht regrets that an attempt was made to create a procedural issue regarding an expression that was clearly taken out of context. Through a petition and personal contact, the company's lawyers have attempted to show the police that it makes no sense to raise suspicions about the subject, but unfortunately they have opted to publicize it and lend a whiff of scandal to a note that merely contains a client's instructions to his lawyers—thereby violating the [confidential] relationship that the law guarantees to all Brazilian citizens.

*Id.* (alteration in original). Odebrecht issued a second press release on June 24, 2015. *Id.* ¶ 197. That release, entitled "Note of Clarification," stated:

Odebrecht would like to clarify that there are false rumors circulating that its executives have threatened authorities and public officials, as well as the future of the Brazilian Republic, in response to the investigations of Operation Lava Jato ["Car Wash"; a Brazilian corruption scandal involving payoffs and the state-owned oil giant Petrobras].

It is untrue, for example, that the CEO of Odebrecht SA, Marcelo Odebrecht, linked the future "of the Republic" to the arrest warrant issued against him, a warrant this [sic] manifestly illegal.

Similarly, it is also a complete fiction that the Chairman of the Board of Directors of Odebrecht SA, Emílio Odebrecht, warned that more cells would be required to hold politicians whom he would denounce in Brazil and abroad.

The Odebrecht Group and its executives have never hindered the ongoing investigations in any way and have always been available to the authorities to provide information. Odebrecht remains at the authorities' disposal to help ensure that these matters are cleared up quickly, convinced that the truth will come out and that justice will prevail.

*Id.* (alteration in original). Both of the June 24, 2015 press releases contained false and misleading statements. *Id.* ¶ 198. The first press release was false and misleading because Marcelo Odebrecht did in fact direct employees of Odebrecht and CNO to destroy documents that were evidence of Defendants' criminal activities. *Id.* The second press release was false because it falsely claimed that Marcelo Odebrecht was arrested illegally and that Odebrecht had not attempted to impede the investigation into its conduct. *Id.* ¶ 197. As a result of the disclosure that Marcelo Odebrecht ordered the destruction of incriminating evidence, the price of the 7.125% Notes and the 7.50% Notes suffered a three-day loss of 7.1% and 5.9%, respectively. *Id.* ¶ 199 & n.41. Plaintiffs allege that the losses would have been more extensive had Odebrecht not issued the misleading press releases. *Id.* ¶ 199.

### F. Additional Details of Defendants' Unlawful Conduct Are Disclosed

On July 21, 2015, the Dow Jones Newswire reported that Brazilian police had found notes in Marcelo Odebrecht's phone that tied Odebrecht and CNO to bribes paid to Brazilian officials. *Id.* ¶ 200. The report was released after the market closed. *Id.* The following day, the 7.125% Notes declined in price from $75.38 to $74.00. *Id.* The 7.50% Notes declined in price from $81.50 to $80.25. *Id.* ¶ 200 n.43.

On July 22, 2015, also after the close of the market, the Wall Street Journal reported that Swiss prosecutors had initiated an investigation into Odebrecht and CNO. *Id.* ¶ 201. The article also reported that Odebrecht and CNO had paid bribes to Brazilian and Petrobras officials. *Id.* The following day, the price of the 7.125% Notes dropped from $74.00 to $71.00, and the price of the 7.50% Notes dropped from $80.25 to $75.75. *Id.* ¶ 201 & n.45.

On July 24, 2015, news sources reported that Brazilian prosecutors were prepared to file formal charges against Marcelo Odebrecht in connection with the bribery scheme. *Id.* ¶ 202. After the market closed that day, it was reported that charges had been filed against Marcelo. *Id.* The 7.125% Notes declined further in price, from $71.00 to $67.00. *Id.* The 7.50% Notes also declined in price, from $75.75 to $72.25. *Id.* ¶ 202 n.48.

The following month, on August 20, 2015, The Economist issued an article that resulted in a further decline in the value of the Odebrecht Finance Notes. *Id.* ¶ 203. That article read:

> Last year McKinsey, an American consulting firm, published a highly flattering interview with Emílio Odebrecht, the chairman, which was headed: "Principles and values have helped this Brazilian family-owned conglomerate thrive."
>
> Odebrecht's boosters will surely be regretting their words of praise, especially the bit about principles and values, now that the firm has become caught up in a huge bribery scandal that is engulfing Brazil. On August 16th mass street protests were held, for the third time this year, in which 800,000 people railed against corruption and called for the removal of President Dilma Rousseff. Prosecutors allege that, in return for padded contracts with Petrobras, a state-controlled oil giant, a "gang" of Brazil's biggest builders funneled cash to politicians from Ms Rousseff's Workers' Party and its coalition allies.
>
> The scheme has cost Petrobras 6 billion reais ($1.7 billion), its auditors reckon. But it is Brazilian builders that have taken the most direct hit. Two large ones have already filed for bankruptcy; and a handful of construction bosses are in custody awaiting trial, including Emílio Odebrecht's son Marcelo, their firm's chief executive . . . . The younger Mr Odebrecht has been charged with corruption and money-laundering.

> The knocks have kept coming. Last month the authorities opened an unrelated investigation into whether Luiz Inácio Lula da Silva, Ms Rousseff's predecessor, had lobbied illegally to help Odebrecht win juicy foreign contracts since leaving office in 2010. On August 14th the police raided Odebrecht's offices in an investigation into alleged corruption over the contract to build the Arena Pernambuco, one of the stadiums in which Brazil staged the 2014 football World Cup. In all these cases Mr Odebrecht, his company and the politicians involved all protest their innocence.

*Id.* (omission in original). Following the release of this article, the price of the 7.125% Notes dropped from $64.50 on August 20, 2015 to $62.00 the following day and $60.75 on August 24, 2015.[4] *Id.* Similarly, the 7.50% Notes declined in price from $69.00 on August 20, 2015 to $67.25 on August 21, 2015. *Id.* ¶ 203 n.49. The price remained $67.25 on August 24, 2015. *Id.*

On December 10 and 11, 2015, Odebrecht issued a press release announcing that Marcelo Odebrecht had resigned from his position as the company's CEO. *Id.* ¶ 204. The press release falsely reported, however, that Marcelo was innocent of the criminal charges against him. *Id.* The press release explained:

> After 6 months in detention and given the developments in his court case, Marcelo Odebrecht yesterday decided to formally resign from his post as President and CEO of Odebrecht S.A., as well as the chairmanship of Braskem, Odebrecht Oil & Gas, Odebrecht Real Estate Developments and Odebrecht Environmental.
>
> The Board of Odebrecht S.A. has officialized the appointment of Newton de Souza, who will continue as President and CEO of Odebrecht S.A. and Chairman of the abovementioned companies.
>
> Odebrecht believes that Marcelo's unjust and unnecessary preventive detention will be revoked, which will enable him to devote himself to his family and concentrate on his defense. Odebrecht has full confidence that at the end of the current legal proceedings, Marcelo Odebrecht's innocence will be officially recognized.

---

[4] The second amended complaint states the date as August 24, 2017. Second Am. Compl. (ECF No. 41) ("SAC") ¶ 203. From the context, however, it is apparent that Plaintiffs intended the date to read as August 24, 2015.

*Id.* Plaintiffs allege that this press release was false and misleading because Odebrecht knew that Marcelo was not innocent of the charges and that his arrest was "neither unjust nor unnecessary." *Id.* ¶ 205. Following the disclosure of Marcelo's resignation, the price of the 7.125% Notes dropped from $53.00 on December 10, 2015 to $51.75 on December 14, 2015. *Id.* ¶ 206. The price of the 7.50% Notes dropped from $57.00 to $55.75. *Id.* ¶ 206 n.51. Plaintiffs allege that the decline would have been significantly greater in the absence of Odebrecht's false and misleading press release. *Id.* ¶ 206.

On February 23, 2016, news sources began reporting that Odebrecht's bribery scheme may not have been limited to Brazil. *Id.* ¶ 207. On that date, Reuters reported that Brazilian law enforcement was investigating possible bribes that were paid to the president of Peru by Odebrecht and CNO. *Id.* Also that day, the Buenos Aires Herald reported allegations by the Brazilian investigators that Odebrecht had paid bribes to Argentina's Secretary of Transportation Ricardo Jaime in order to secure his aid in obtaining public works contracts in that country. *Id.* ¶ 208. Following this news, the price of the 7.125% Notes declined from $49.24 to $43.00, and the price of the 7.50% Notes declined from $48.75 to $44.50. *Id.* ¶ 210 & n.54.

On March 8, 2016, the Wall Street Journal reported that Marcelo Odebrecht was sentenced to nineteen years of prison time for his role in the bribery scheme. *Id.* ¶ 211. Two weeks later, on March 22, 2016, various news outlets reported that the Brazilian police were targeting Odebrecht in their corruption investigation. *Id.* ¶ 212. News sources also reported that day that several Odebrecht executives and other employees had been arrested for their participation in the bribery scheme. *Id.* News outlets further reported a deal that was struck between Odebrecht and the Brazilian prosecutors whereby Odebrecht agreed to cooperate with and assist the prosecutors in their investigations. *Id.* The next day, the Wall Street Journal reported that "[j]ailed billionaire construction mogul Marcelo Odebrecht is ready to turn state's evidence in a massive Brazilian

corruption probe that threatens to upend the government of President Dilma Rousseff and land her predecessor Luis Inácio Lula da Silva in jail." *Id.* ¶ 213. These disclosures marked a "stark contrast" to Odebrecht and CNO's previous false statements that the companies were not involved in the bribery scandal. *Id.* ¶ 214. As a result, the price of the 7.125% Notes declined significantly further, from $49.25 on March 21, 2016 to $44.00 on March 22, 2016. *Id.* The 7.50% Notes also suffered, dropping in price from $51.00 on March 21, 2016 to $44.50 on March 23, 2016. *Id.* ¶ 214 n.57.

On May 2, 2016, Standard & Poor's issued a press release over the Dow Jones Newswire after the market closed indicating that the rating agency had downgraded the ratings of the Odebrecht Finance Notes, including the 7.125% Notes and the 7.50% Notes, from "B+" to "BB-." *Id.* ¶¶ 215-16. The press release also reported that Standard & Poor's had placed the Odebrecht Finance Notes, including the 7.125% Notes and the 7.50% Notes, on negative Creditwatch. *Id.* The agency explained that it was the ongoing corruption investigation that led to the downgrade. *Id.* ¶ 215.

The next day, Fitch Ratings similarly issued a press release announcing that it too had downgraded the bonds issued by Odebrecht Finance, from "BB" to "B+/RR4." *Id.* ¶ 216. That press release explained the downgrade and the reasons for the downgrade as follows:

> Fitch has downgraded to "B+/RR4" from "BB" the approximately USD3.1 billion issuances of Odebrecht Finance Ltd. (OFL), which OEC unconditionally and irrevocably guarantees. The "B+/RR4" rating of OFL's unsecured public debt reflects average recovery prospects in the event of a default, ranging between 31% - 50%.
>
>     \*   \*   \*
>
> **KEY RATING DRIVERS**
>
> The downgrade reflects the increased risks and uncertainties associated with the non-publication of OEC's 2015 financial statements at the end of April 2016. OEC's independent auditor requested additional information on the latest phases of the Lava-Jato (Car-Wash)

investigation and further checks have delayed the publication of the company's financial statements.

The rating action also reflects the prolonged uncertainty of any potential impact on OEC's credit profile stemming from the investigations on the corruption scandal. This has led to low visibility on the company's short- and medium-term future operating performance and liquidity. Fitch believes these risks are not commensurate with the "BB" rating category.

The Negative Watch reflects OEC's challenges to mitigate vulnerabilities due to the publishing delay of its 2015 financial statements, with potential debt payment acceleration of USD2.7 billion. Investors of five out of the eight OFL bonds could declare an event of default (EoD) if the bonds reach a low threshold of 25% of the outstanding bond. This would trigger a 60-day cure period for OEC to publish the accounts. Otherwise, bondholders could notify the company of another EoD.

On a preliminary basis, OEC released to the market total debt of BRL3.6 billion and cash of BRL2.5 billion at the end of 2015. Fitch estimates that bondholders could request the anticipated payment of approximately 80% of this debt.

*Id.*

The same day that Fitch announced its downgrade of the Odebrecht Finance Notes, Moody's did the same. *Id.* ¶ 217. Moody's press release announced that it had downgraded the notes, including the 7.125% Notes and the 7.50% Notes, from "Ba2" to "B2." *Id.* The reasons for the downgrade were explained as follows:

The downgrade to B2 was prompted by increased credit risk and rising financial constraints for OEC as a result of the evolving corruption investigations in the country, with potential monetary fines and other business sanction affecting the company's liquidity and operating sustainability. The company's ratings also reflect the business challenges related to the ongoing investigations, which create management distractions that may hinder efforts to improve operations and corporate governance amid the already challenging industry fundamentals.

The rating remains on review reflecting continued concern about potential liquidity pressures that could arise as a consequence of not providing timely financial statements. The company's debt agreements

include covenants for the provision of audited financial statements. As such, extended delays in providing audited financial statements carries the risk that creditors may take actions that could eventually lead to payment acceleration.

\*   \*   \*

Additional rating actions will consider any further developments in the ongoing corruption investigation and the passage of time without clear progress towards normal production of financial statements. Failure to make sure progress over the next couple of months may lead to further downgrade.

OEC's ratings could be downgraded if Moody's perceives a higher risk arising from the developments of those investigations, such as lower liquidity to meet its debt service requirements or a backlog deterioration that would prospectively result in a higher leverage and weaker business profile.

*Id.*

The ratings downgrades by these credit rating agencies were a primary factor in yet another drop in the market price of the Odebrecht Finance Notes. *Id.* ¶ 218. The 7.125% Notes declined from $33.50 on May 2, 2016 to $31.00 on May 3, 2016 and to $28.00 on May 4, 2016. *Id.* The 7.50% Notes dropped in price from $39.10 on May 2, 2016 to $33.00 on May 3, 2016 and $31.00 on May 4, 2016. *Id.* ¶ 218 n.59. Another factor identified as a contributing cause to the significant decline was CNO's failure to file its 2015 financial statements by the deadline. *Id.* ¶ 220. On May 3, 2016, two Reuters articles reported that CNO had missed the filing deadline because of concerns about the bribery investigations. *Id.*

Following the credit rating downgrades, on May 6, 2016, the Brazilian Federal Public Prosecutors Office formally indicted Marcelo Odebrecht. *Id.* ¶ 221. The Esmerk Brazil News reported the indictment:

Brazil's Federal Public Prosecutors Office (MPF) has indicted Marcelo Odebrecht, Leo Pinheiro (OAS) and Ricardo Pessoa (UTC) for alleged corruption practices. The indictment is part of the Lava Jato corruption investigation, which involves Petrobras. Together with the

> businessmen, MPF has also indicted other people, such as former senator Gim Argello. According to MPF, they are accused of being involved in the payment of money laundering, active and passive corruption, among other crimes. MPF has also requested the seizure of BRL 7.50mn (EUR 1.88mn USD 2.14mn) and EUR 200,000, in addition to the payment of BRL 70mn in fines. The investigation has also found evidence of the involvement of Toyo Setal.

*Id.* This led to a further decrease in the market value of the Odebrecht Finance Notes. *Id.* ¶ 222.

The 7.50% Notes dropped from $29.75 on May 6, 2016 to $28.50 on May 9, 2016. *Id.*

On June 13, 2016, Fitch Ratings announced a further downgrade of the ratings of the Odebrecht Finance Notes:

> Fitch has downgraded to "B-/RR4" from "B+/RR4" approximately USD 3.1 billion issuances of Odebrecht Finance Ltd. (OFL), which OEC unconditionally and irrevocably guarantees. The "B-/RR4" rating of OFL's unsecured public debt reflects average recovery prospects in the event of a default, ranging between 31% - 50%.

> \*   \*   \*

> The downgrade reflects the difficulty OEC continues to face monetizing receivables with banks and multi-lateral agencies, which has diminished its cash position relative to historical levels. OEC's cash position stood at BRL 6 billion (USD 1.9 billion) as of March 31, 2016, which is a sharp decline from USD 4.4 billion at the end of 2014. In order to protect its liquidity, OEC has reduced activities on projects that are facing any type of issues.

> The Negative Watch incorporates the challenges imposed by the rapid cash burn during the first quarter of 2016. The depletion of cash also makes the company very vulnerable to fines from Brazilian authorities and/or countries abroad.

*Id.* ¶ 224.

## G. Defendants Admit Their Role in the Bribery Scheme

Odebrecht issued a press release on December 1, 2016 entitled "Odebrecht Apologizes for its Mistakes." *Id.* ¶ 225. In that press release, the company admitted its criminal actions:

> Odebrecht acknowledges its participation in illicit actions in its business activities.

> It does not matter that we gave in to external pressure. Nor is it relevant that there are behaviors that the private and public sectors must resist and correct in their relationships. What matters is that we acknowledge our involvement. We were complicit and did not fight these practices, as we should have. This was a grave error. We violated our own principles and transgressed against the values of honesty and ethics.
>
> We will not let this happen again.
>
> Odebrecht apologizes, particularly for its failure not to have acted sooner. Odebrecht's ability to manage and execute that is recognized by our clients, the competency and commitment of our professionals, and the quality of our products and services should have been the basis for avoiding these mistakes.
>
> Odebrecht has learned from these mistakes and is evolving. We are committed, with great conviction, to reform.

*Id.*

On December 21, 2016, Odebrecht entered into a plea agreement with the United States Attorney for the Eastern District of New York. *Id.* ¶ 226. Pursuant to that plea agreement, the company pleaded guilty to violating the anti-bribery provisions of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-3. *Id.* Odebrecht also agreed to pay a penalty of $2.6 billion and agreed to have its operations monitored by an independent compliance monitor. *Id.*

The plea agreement contained a lengthy twenty-three-page statement of facts regarding the bribery scheme. *Id.* ¶ 227. By entering into the plea agreement, Odebrecht "agree[d] and stipulate[d]" that the facts outlined in the statement of facts were "true and accurate" and that it would not challenge the facts set forth in the plea agreement. *Id.* ¶¶ 227-28. The statement of facts included details of $349 million that were paid to Brazilian officials and politicians as bribes for awards of public construction contracts to CNO and other Odebrecht subsidiaries. *Id.* ¶ 229. Defendants admitted that they obtained over $1.9 billion in contracts as a result of the bribes. *Id.* Specifically, Defendants paid more than $20 million to Brazilian officials, including a "high-level

elected official" identified as "Brazilian Official 4," in exchange for the officials' aid in ensuring that Defendants continued working on a large public transportation project in the country. *Id.* ¶ 230. Defendants' profit from that project was approximately $184 million. *Id.* Also, between 2011 and 2014, Defendants paid $9.7 million in bribes to a "high-level official within the legislative branch of government in Brazil" for that official's help in ensuring the continuation of a Rio de Janeiro construction project. *Id.* ¶ 231. Defendants' profits from that project were about $142 million. *Id.*

The statement of facts in the plea agreement also contained detailed information regarding bribes paid to officials in countries other than Brazil:

> **Angola**. Between 2006 and 2013, Defendants paid more than $50 million in bribes to government officials in Angola in order to secure public works contracts. Defendants realized benefits of approximately $261.7 million as the result of these bribes;
>
> **Argentina**. Between 2007 and 2014, Defendants paid more than $35 million in bribes (directly and indirectly) from Defendant CNO's Division of Structured Operations to government officials in Argentina related to at least three public infrastructure projects for which Defendants were awarded the contracts, resulting in approximately $278 million in benefits to Defendants;
>
> **Colombia**. Between 2009 and 2014, Defendants (through Defendant CNO's Division of Structured Operations) paid more than $11 million in bribes to government officials that illicitly caused Defendants to be awarded public construction contracts generating more than $50 million in revenues to Defendants;
>
> **Dominican Republic**. Between 2001 and 2014, Defendants paid more than $92 million in bribes to government officials and intermediaries working on their behalf to secure public construction contracts in the Dominican Republic, thereby obtaining illicit benefit of more than $163 million;
>
> **Ecuador**. Between 2007 and 2016, Defendants paid more than $33.5 million in bribes to government officials in Ecuador, realizing benefits of more than $116 million in exchange;
>
> **Guatemala**. Between 2013 and 2015, Defendants paid approximately $18 million in bribes to government officials in Guatemala, including an $11.5 million payment to a governmental official representing a

percentage of the value of a governmental construction contract the official steered to Defendants in exchange for the bribe;

**Mexico**. Between 2010 and 2014, Defendants paid corrupt Mexican government officials approximately $18 million in bribes in order to secure public works contracts, including a $6 million bribe to an official of Pemex, Mexico's stateowned petroleum company, in exchange for the official's assistance in winning a contract. Defendants received benefits of more than $39 million from these bribes;

**Mozambique**. Between 2011 and 2014, Odebrecht paid approximately $900,000 in bribes to government officials in Mozambique;

**Panama**. Between 2010 and 2014, Defendants paid more than $59 million in bribes to Panamanian governmental officials, obtaining contracts worth more than $175 million resulting from these bribes;

**Peru**. Between 2005 and 2014, Defendants paid approximately $29 million in bribes to government officials in Peru, receiving benefits of more than $143 million in return; and

**Venezuela**. Between 2005 and 2016, Defendants paid approximately $98 million in bribes to Venezuelan officials in order to obtain and retain public works contracts.

*Id.* ¶ 232 (citations omitted).

The statement of facts also included various details regarding Defendants' attempts to conceal or destroy evidence of their criminal activities. *Id.* ¶ 233. Among those facts was that Marcelo Odebrecht instructed Odebrecht and CNO employees to delete records that could expose unlawful activities. *Id.*[5] The statement of facts further identified an executive of the Division ("Odebrecht Employee 4") who, in 2015, agreed to pay an Antigua government official $4 million to refrain from providing international investigators with banking documents that contained evidence of the bribery scheme. *Id.* ¶ 234. An individual identified as Odebrecht Employee 3 thereafter made

---

[5] Plaintiffs allege on information and belief that it was Marcelo Odebrecht who, according to the plea agreement, directed the destruction of the records. SAC ¶ 233 n.66. Plaintiffs explain that the statement of facts in the plea agreement does not identify that person by name, but instead identifies the person as "Odebrecht Employee 1." *Id.* Based on the description of Odebrecht Employee 1 and Plaintiffs' counsel's investigation, Plaintiffs believe that Marcelo Odebrecht is the only person that fits the description. *Id.*

three of the agreed-upon payments of one million Euros.  *Id.*  The statement of facts further explained that, in January 2016, Defendants intentionally destroyed physical encryption keys that were required to access the My WebDay system, which held evidence of the bribery scheme.  *Id.* ¶ 235.  In the plea agreement, Odebrecht admitted that it was "responsible for the acts of its officers, directors, employees, and agents."  *Id.* ¶ 227.

## H. Allegations of Loss Causation

Plaintiffs allege loss causation by pleading the materialization of the risks inherent in the concealed bribery scheme and by pleading corrective disclosures.  *Id.* ¶¶ 243, 244.

### 1. Risk Materialization

Plaintiffs allege that Defendants' misstatements and omissions caused the price of the Odebrecht Finance Notes to be "artificially inflated" at the time that Plaintiffs purchased those notes.  *Id.* ¶ 238.  Had investors been aware of the bribery scheme, the Notes would have traded at "dramatically lower prices."  *Id.*  Specifically, Plaintiffs allege that the Odebrecht Finance Notes' values were artificially inflated as a result of the undisclosed bribery scheme, CNO's false financial statements, and Odebrecht Finance's false financial statements.  *Id.* ¶ 240.  These misstatements concealed the risks related to the exposure of the bribery scheme and to CNO and Odebrecht's "preparation and dissemination of false financial statements."  *Id.* ¶ 241.  According to Plaintiffs, it was foreseeable that the undisclosed bribery scheme would lead to the following:  ratings agency downgrades, deteriorating liquidity, regulatory investigations, criminal prosecutions of Defendants and their employees, civil regulatory actions carrying substantial fines or penalties, and Defendants' inability to timely file financial statements.  *Id.* ¶ 242.  Plaintiffs allege that the value of their investment in the Odebrecht Finance Notes was adversely affected when these concealed risks materialized.  *Id.* ¶ 243.

### 2. Corrective Disclosures

As an alternative to risk materialization, Plaintiffs allege loss causation through the various corrective disclosures that exposed the truth of Defendants' bribery scheme. *Id.* ¶ 244. Plaintiffs allege that the series of partial disclosures caused Plaintiffs to suffer "significant losses" as the price of the Odebrecht Finance Notes plummeted with each disclosure. *Id.* Those disclosures are: (1) disclosures regarding the arrest of Marcelo Odebrecht for his role in the bribery scheme, *id.* ¶¶ 187-94; (2) the disclosure regarding the evidence seized from Marcelo Odebrecht's phone, *id.* ¶ 200; (3) the disclosure of the Swiss investigation into Odebrecht and CNO, *id.* ¶ 201; (4) the disclosure that formal charges had been filed against Marcelo Odebrecht, *id.* ¶ 202; (5) the August 20, 2015 Economist article, *id.* ¶ 202; (6) the December 10, 2015 disclosure that Marcelo Odebrecht had resigned as Odebrecht's CEO, *id.* ¶¶ 155-56; (7) the February 23, 2016 disclosures regarding the international nature of Defendants' bribery scheme, *id.* ¶ 207; (8) the March 22 and 23, 2016 disclosures, *id.* ¶¶ 212-14; (9) the May 2 and 3, 2016 announcements by the three credit rating agencies of their downgrade of the Odebrecht Finance Notes, *id.* ¶¶ 215-18; and (10) the May 6, 2016 disclosure of Marcelo Odebrecht's formal indictment, *id.* ¶¶ 221-24.

Plaintiffs allege that the decline in prices of the Odebrecht Finance Notes that followed each of these partial disclosures are "directly attributable" to the disclosures, as well as to the materialization of the concealed risks. *Id.* ¶ 245. Had Plaintiffs been aware of the undisclosed information or "the truth behind [Defendants'] material misstatements," they would not have purchased the Odebrecht Finance Notes at the prices at which they did. *Id.* According to the second amended complaint, "the timing and magnitude of the price declines in the Odebrecht Finance Notes negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct." *Id.* ¶ 247.

### I.  Reliance Allegations

In purchasing the Odebrecht Finance Notes, Plaintiffs relied on Defendants' false statements, including those made directly to Plaintiffs during the March 23, 2011 conference call, the March 24, 2011 meeting at Plaintiffs' headquarters, and the January 11, 2012 Santander conference, as well as those made in earnings releases and telephone conferences that discussed those releases. *Id.* ¶ 248.

Plaintiffs also allege that the fraud-on-the-market presumption of reliance applies.  *Id.* ¶ 249. Alternatively, Plaintiffs allege that, because Defendants violated a duty to disclose material information, the presumption of reliance established in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), applies.  *Id.* ¶ 250.

### J.  Safe Harbor

Finally, Plaintiffs allege that the safe harbor for forward-looking financial statements does not apply to any of the allegedly false and misleading statements pleaded.  *Id.* ¶ 251.

### H. Procedural History

Plaintiffs initiated this action on June 16, 2017.  ECF No. 1.  On September 1, 2017, Plaintiffs amended their complaint.  ECF No. 26.  Defendants CNO and Odebrecht Finance moved to dismiss the amended complaint on October 31, 2017.  ECF No. 37.  In response to that motion, Plaintiffs filed a second amended complaint on November 21, 2017.  ECF No. 41.  On January 12, 2018, Defendants Odebrecht Finance, CNO, and OEC moved to dismiss the second amended complaint.  ECF No. 49.  Plaintiffs opposed that motion on March 5, 2018, and Defendants filed a reply on March 26, 2018.  ECF Nos. 52, 55.  Odebrecht, S.A. has not appeared in this action.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint

must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (brackets and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted), including documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## III. DISCUSSION

### A. Federal Securities Fraud Claims

Plaintiffs bring claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as claims for control person liability against Odebrecht and OEC.

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Promulgated under authority granted to the SEC

by Section 10, Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (per curiam) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). A corporation does not have a duty to disclose information simply because it is material. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Similarly, a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct. *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). However, "[d]isclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing

duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). A duty to disclose may also arise "expressly pursuant to an independent statute or regulation—i.e., an affirmative legal disclosure obligation." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

### 1. Statute of Limitations

Defendants move to dismiss Plaintiffs' federal claims on several grounds, with a threshold argument that the claims are time-barred.

The statute of limitations is an affirmative defense as to which Defendants carry the burden of showing that Plaintiffs failed to plead timely claims. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("The lapse of a limitations period is an affirmative defense that a defendant must plead and prove."). Dismissal of a complaint based on an affirmative defense at the pleading stage is warranted only if "it is clear from the face of the complaint, and matters of which the court

may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Id.* (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)); *accord Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).

Claims sounding in fraud that are brought under the Securities Exchange Act "must be filed within the earlier of five years from the alleged violation or two years 'after discovery of the facts constituting the violation.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) (quoting 28 U.S.C. § 1658(b)); *see Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010) (holding that a private securities fraud claim is timely if the complaint is filed "no more than two years after the plaintiffs 'discovered the facts constituting the violation.'" (brackets omitted) (citing 28 U.S.C. § 1658(b)(1))).

"'[W]hen the circumstances would suggest . . . the probability that' a violation of the securities laws has occurred—a situation sometimes called 'storm warnings'—[courts] deem the plaintiff on inquiry notice and assume that a reasonable person in his or her shoes would conduct further investigation into the potential violation." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holdings Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (alterations in original) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005)). A "storm warning" triggering inquiry notice "need not detail every aspect of the alleged" securities law violation. *Staehr*, 547 F.3d at 427. Rather, it only triggers the duty to investigate if it "relates directly to the misrepresentations and omissions the [p]laintiffs . . . allege in their action against the defendants." *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (citing *Morin v. Trupin*, 809 F. Supp. 1081, 1097 (S.D.N.Y. 1993)).

Under prior law, such inquiry notice would trigger the running of the statute of limitations. *See Staehr*, 547 F.3d at 426. The Supreme Court held in *Merck*, however, that the statute of limitations period does not begin to run until the plaintiff actually learns of the violation or "a

reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (quoting *Merck*, 559 U.S. at 653). The point at which inquiry notice is triggered is still relevant. *See Merck*, 559 U.S. at 653 ("In determining the time at which 'discovery' of [the facts constituting the violation] occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating."). Nonetheless, the clock does not start to tick on the statute of limitations until "such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac*, 637 F.3d at 174. A plaintiff is deemed to have discovered the facts constituting the violation only after "a reasonably diligent plaintiff would have sufficient information . . . to adequately plead [its claim] in a complaint." *Schwab*, 883 F.3d at 94 (alterations in original) (quoting *City of Pontiac*, 637 F.3d at 175).

Plaintiffs initiated this action on June 16, 2017. The "violation" that Defendants allegedly committed was their failure to disclose the bribery scheme. Therefore, for Plaintiffs' federal securities fraud claims to be timely, Plaintiffs must not have discovered the facts of Defendants' knowing participation in that scheme earlier than June 16, 2015.

Defendants argue that Plaintiffs were aware of the bribery scheme as early as late 2014. In support, Defendants cite to various news articles and a transcript of deposition testimony given by individuals in a criminal case in Brazil. *See* Defs.' Mem. in Support of Motion to Dismiss (ECF No. 51) ("Defs.' Mem.") at 12-14; Declaration of Michael B. Carlinsky (ECF No. 50) ("Carlinsky Decl."), Exs. D-I. For purposes of evaluating Defendants' timeliness argument, the Court may, and does, take judicial notice of the *fact* of these news reports and testimony, "without regard to the truth of their contents." *Staehr*, 547 F.3d at 425; *see id.* at 427 ("It is unremarkable that courts consider the

extent of media coverage in deciding when inquiry notice for securities fraud claims was triggered.");

*see also Global Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court

may take judicial notice of a document filed in another court not for the truth of the matters

asserted in the other litigation but rather to establish the fact of such litigation and related filings."

(citation omitted)); *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003)

(taking judicial notice of *National Underwriter* article in evaluating whether plaintiffs had inquiry

notice).

The articles pointed to by Defendants provide some information regarding the bribery

scheme, but that information is insufficient to have permitted Plaintiffs to plead their claims with

the particularity demanded of Rule 9(b). For example, an October 20, 2014 article published by

Bloomberg explained that Odebrecht S.A. was "among the companies winning the[ ] inflated

Petrobras contracts." Carlinsky Decl., Ex. D at 7 (Bloomberg News Enterprise, *Brazil Fixated as

"Human Bomb" Revelations Rock Elections*, Oct. 20, 2014). However, the article provides no details

regarding Odebrecht's involvement in the bribery scheme. In fact, the article goes on to explain that

Odebrecht denied its involvement and maintained that the company had in fact "complied with

bidding rules in all the Petrobras contracts it has won over the decades." *Id.* Defendants also point

to a November 14, 2014 article published by Reuters that reported a raid by Brazilian police of

Odebrecht and another firm in which police seized "*potentially* incriminating documents" and

arrested eighteen people. Carlinsky Decl., Ex. E at 1 (Reuters, *Petrobras ex-director arrested, shares sink

amid graft scandal*, Nov. 14, 2014) (emphasis added). Yet the incriminating nature of the documents

was not confirmed, and a reasonable investor provided with this tidbit of information would not be

able to plead a Section 10(b) claim with particularity.

Other news articles that Defendants cite to include a December 29, 2014 Reuters article

indicating that Odebrecht was among the list of companies "*implicated* in a police investigation into

the alleged kickback scheme" and that Petrobras had blocked payments to the company; a February 4, 2015 article published by a Canadian source, The Globe and Mail, reporting that "Brazilian police are *investigating* a fraud estimated to be worth billions of dollars, in which senior managers at companies such as Odebrecht allegedly paid off Petrobras directors in order to obtain contracts with the company"; a February 20, 2015 online Wall Street Journal article reporting that Odebrecht was among "companies that prosecutors *allege* took part in the corruption, but weren't among those prosecutors [were] seeking repayment from"; a March 11, 2015 Reuters article explaining that Brazil's comptroller general had "*opened a case* against 10 additional firms that may be involved in a massive corruption scheme at state-run oil firm Petroleo Brasileiro SA" and that the "case runs against . . . Odebrecht"; and an April 22, 2015 Reuters article reporting the conviction of Paulo Roberto Costa, a former Petrobras director. Carlinsky Decl., Exs. H, J-M (emphasis added).

These articles may have been sufficient to trigger inquiry notice, but they do not provide the who, what, where, when, and how that securities fraud plaintiffs must plead.[6] The articles show that Odebrecht was being investigated for potential fraud but do not provide details regarding the specific bribes that were paid, the date on which they were paid, or the identities of the officers or directors of the Defendant companies that were responsible for those payments or who knew of those payments. *See Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 488 (S.D.N.Y. 2012) ("[D]escriptions . . . of government and private investigations are insufficient, alone, to permit a claim to be brought on any individual certificate.").

---

[6] Defendants cite to *Fogel v. Wal-Mart de México SAB de CV*, No. 13-cv-2282 (KPF), 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017) in support of their argument that the articles they cite "allowed Plaintiffs to discover the alleged violation." Defs.' Memorandum of Law in Support of Motion to Dismiss (ECF No. 51) ("Defs.' Mem.") at 12. *Fogel* is distinguishable. In *Fogel*, the New York Times had published an article that exposed the bribery scheme at issue. 2017 WL 751155, at *3. That article provided much greater detail of the scheme than the articles pointed to by Defendants here. In fact, the *Fogel* plaintiff was able to plead her claims by reproducing many of the facts reported in the New York Times article. *Id.* Here, on the other hand, the articles relied on by Defendants provide only selected, unlinked nuggets of information, but not a detailed account of Defendants' participation in the bribery scheme.

Furthermore, the February 20, 2015 and March 11, 2015 articles explain that Odebrecht denied the allegations of wrongdoing. *See* Carlinsky Decl., Exs. K. at 1, M at 2. These express denials of the reported allegations could have allayed a reasonable investor's concerns. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580 (LGS), 2018 WL 2382600, at *5 (S.D.N.Y. May 24, 2018) (declining to dismiss complaint on statute of limitations ground when the defendants "countered" statements in "many news reports of delays and accounting irregularities" with explicit denials of any wrongdoing); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) ("[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements."); *Siebert v. Nives*, 871 F. Supp. 110, 115 (D. Conn. 1994) (finding that disclosure of FDIC investigation did not trigger inquiry notice where company simultaneously announced that it had revised its policies to meet investigators' concerns); *cf. Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 352-53 (S.D.N.Y. Feb. 20, 2014) (finding "reassurances" by defendants did not delay the running of the statute of limitations when those reassurances "expressed optimism" but "did not suggest that nationalization was no longer a material risk" and "concerned future investment plans and thus had no bearing on whether the Registration Statement omitted material information").

Defendants also rely on statements made in various court filings in other cases. For example, Defendants point to allegations in a December 8, 2014 complaint filed against Petrobras in the Southern District of New York in the case of *Kathman v. Petrobras*, No. 14-cv-09662 (JRS). Carlinsky Decl., Ex. F. That complaint alleged that Petrobras executives accepted bribes from contractors, including Odebrecht. *Id.* ¶ 8. It also alleged that "Petrobras' senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies such as Odebrecht S.A. . . . ." *Id.* ¶ 3. The complaint alleged that "Odebrecht's offices were subsequently searched, and documents were seized that concerned Odebrecht grossly

overbilling Petrobras in an $835 million contract." *Id.* ¶ 8. A second complaint relied upon by Defendants is a consolidated amended complaint filed in the same case on March 31, 2015. Carlinsky Decl., Ex. G. That amended complaint alleged that Odebrecht was "part of the cartel" that rigged the Petrobras bribery scheme. *Id.* ¶ 76.

The filing of a complaint containing allegations of the underlying fraud may start the clock on the two-year statute of limitations. *See Eton Park Fund, L.P. v. Am. Realty Capital Props., Inc.*, No. 16-cv-9393 (AKH), 2017 WL 4898226, at *4 (S.D.N.Y. Aug. 14, 2017) (concluding that plaintiffs' Exchange Act claims accrued upon the filing of a complaint for defamation in a New York State court that alleged that defendant "had acted with scienter by intentionally making errors in its 2013 financial disclosures"); *see also Hopkinson v. Estate of Siegal*, No. 10-cv-1743 (LBS), 2011 WL 2935876, at *2 (S.D.N.Y. July 12, 2011) (explaining, on reconsideration of the dismissal of a complaint as time-barred, that complaint filed in another action "was sufficient to put [p]laintiff on notice of the fraud"). Here, the allegations in the other complaints likely pointed reasonably diligent investors to the *probability* that Odebrecht had defrauded its investors. *See Staehr*, 547 F.3d at 411 ("When there is no actual knowledge, but 'the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." (quoting *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir. 1993))). However, that is no longer sufficient to trigger the statute of limitations, *see Merck*, 559 U.S. at 653, and, absent more detailed allegations of the bribery scheme, these complaints cannot have provided Plaintiffs with notice of the securities-law violation.[7]

---

[7] Defendants cite to *Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*, 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012). In that case, the court found that a reasonably diligent investor would have discovered the securities-law violation based on allegations asserted in three other lawsuits. *Id.* at 365-366. The complaints in those lawsuits contained detailed allegations of the fraud, describing "how state attorneys general were investigating Countrywide's loan origination practices" and citing to a complaint filed by the U.S. Securities Exchange Commission ("SEC") alleging that Countrywide "was aware of its underwriting deficiencies." *Id.* at 366. The court also noted that these lawsuits "were reasonably accessible to an ordinary

In addition to the complaints against Petrobras, Defendants argue that Plaintiffs should have discovered the violation from a transcript of the October 22, 2014 deposition testimony of Paulo Roberto Costa, former Petrobras executive, and Alberto Yusseff, a black market money launderer. Carlinsky Decl., Ex. I. That transcript was filed on the public docket of *Kathman v. Petrobras*, No. 14-cv-09662 (JRS), on April 17, 2015. Carlinsky Decl. ¶ 10. The testimony provides greater details regarding the bribery scheme, including that high-ranking executives of Odebrecht were aware of the bribes being paid. *See* Carlinsky Decl., Ex. I at 5, 8, 31. Plaintiffs argue that it is entirely unclear from the record currently before the Court that a reasonable investor in Plaintiffs' position would have uncovered that transcript prior to June 16, 2015. The Court agrees. The transcript is one of fifteen exhibits to a declaration. *See* No. 14-cv-09662 (JRS), ECF No. 155. Assuming that the news reports placed Plaintiffs on inquiry notice prior to the filing of the deposition testimony, there are no facts presented to the Court to support a finding as a matter of law that a reasonably diligent investor, conducting a reasonably diligent investigation, would have discovered the declaration and the attached transcript prior to June 16, 2015—a mere two months after the transcript was filed. *Cf. Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 279 (3d Cir. 2013) (concluding, based on detailed facts presented to the court, that it would have taken a reasonable institutional investor in RMBS using a "proprietary process" that involved analyzing "court filings" two months to uncover loan-quality misrepresentations in offering documents).

Finally, Defendants contend that the drops in the market value of the Odebrecht Finance Notes following the above disclosures "warned" Plaintiffs about Defendants' misconduct. Defs.'

---

investor because [the defendant] described them in various disclosures." *Id.* Several news articles had also reported on the lawsuits and related litigation. *Id.* That is not the case here. There is no evidence, or even an allegation, indicating that the case against Petrobras was either the subject of immediate widespread media coverage or, if the subject of media coverage, that its connection with Odebrecht was reported. Moreover, the claims raised in *Pa. Public Sch.* were brought under Section 11 of the Securities Act, which does not require a plaintiff to plead scienter, reliance, or loss causation. *Id.* at 365. Therefore, the facts that the plaintiff in that case had to discover to plead its claim were more limited than those that Plaintiffs must plead here.

Mem. at 13.  While a "sharp decline" in the value of securities over a short period of time may be a factor giving rise to inquiry notice, *Newman*, 335 F.3d at 195, Defendants cite to no authority holding that such a decline is also enough under *Merck* to inform a reasonably diligent investor of a securities-law violation.

In sum, none of the public reports of the ongoing investigation into Odebrecht shows, as a matter of law, that a reasonably diligent investor in Plaintiffs' position would have discovered Defendants' participation in the bribery scheme prior to June 16, 2015.  Accordingly, the Court declines to dismiss Plaintiffs' Exchange Act claims as time-barred.

### 2.  Actionable Statements and Omissions

Substantively, Defendants attack Plaintiffs' allegations on the basis that they do not plead actionable misstatements or omissions.  "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citation and internal quotation marks omitted).  Therefore, for a misstatement to be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *accord ECA, Local 134 IBEW Joint Pension Tr. of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  A complaint "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  This is because the determination of whether a false or misleading statement or omission is material requires courts to "engage in a fact-specific inquiry" that "depends on all relevant circumstances"

and because "materiality is a mixed question of law and fact." *Id.* (citations omitted); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

### a. Defendants' Duty to Disclose the Bribery Scheme

Plaintiffs allege that the various misstatements they identify were false and misleading because of Defendants' failure to disclose its participation in the bribery scheme. Accordingly, the threshold question to be answered is whether Defendants had a duty to disclose the bribery scheme.

"[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). "Such a duty may arise when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Id.* (citation and internal quotation marks omitted) (alteration in original). Therefore, where a company does not have an obligation to speak, but chooses to speak on a topic, it assumed "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (citation omitted)). Thus, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market." *Matrixx*, 563 U.S. at 45. Indeed, in the absence of an express prior disclosure, a corporation has no affirmative duty to disclose "uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Nor must a

corporation disclose illegal internal policies, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 377 (S.D.N.Y. 2009), or violations of the corporation's internal codes of conduct and legal policies, *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 463-65 (S.D.N.Y. 2010).

However, a duty to disclose uncharged criminal conduct may arise when failure to disclose such conduct would make other statements materially misleading. *In re VEON Ltd. Sec. Litig.*, No. 15-cv-8672 (ALC), 2017 WL 4162342, at *5 (S.D.N.Y. Sept. 19, 2017); *see In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016)).

In order for a prior statement to give rise to a duty to disclose uncharged wrongdoing, "there must be a connection between the illegal conduct and the [prior] misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." *Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (citation omitted). As the court in *Menaldi* explained:

> District courts have identified such a connection in three circumstances. First a duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices. Second, a duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring. Third, a duty to disclose can arise when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.

*Id.* (internal citations omitted). In light of this connection requirement, the Court cannot simply conclude in general terms that Defendants had a duty to disclose their participation in the bribery

scheme.  Rather, the Court must evaluate any such duty in connection with the particular statements

that Plaintiffs allege were rendered false and misleading by the omission.

### b.  CNO's Financial Statements

Plaintiffs allege various statements in CNO's financial statements that were made false and

misleading by the undisclosed scheme.  Those statements can be categorized as:  (1) explanations of

CNO's success; (2) statements made in violation of Brazilian GAAP; (3) statements regarding

CNO's backlog, diversification, and its international contracts; and (4) other statements.

### i.  Explanations of CNO's Success

Plaintiffs contend that a duty to disclose the bribery scheme arose because CNO put the

source of its success in issue in its financial statements.  "[A] company's misleading statements about

the sources of its revenue do not make the company's statements of the revenue figures misleading;

rather, liability is limited to the misleading statements themselves."  *VEON*, 2017 WL 4162342, at

*6 (quoting *Marsh & Mclennan*, 501 F. Supp. 2d at 470); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp.

2d 346, 356 (S.D.N.Y. 2008) ("*Accurate* statements of past earnings figures are not themselves

actionable under Section 10(b)."); *accord City of Brockton Ret. Sys. v. Avon Products, Inc.*, No. 11-cv-4665

(PGG), 2014 WL 4832321, at *17 (S.D.N.Y. Sept. 28, 2014).  Therefore, accurately reported income

that is obtained from an unlawful source may not be actionable only on the grounds that the

unlawful source is not disclosed.  On the other hand, statements that put the source of the revenue

at issue may be actionable if they fail to disclose the impropriety of the source.  *See Virtus Inv.

Partners*, 195 F. Supp. 3d at 537 (finding omission of misleading performance history of funds was

actionable when a public statement suggested that investors' decisions to purchase shares of the

funds was driven by portfolio managers' investment performance); *In re Van der Moolen Holding N.V.

Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding requisite connection between the

statements and undisclosed improper activity when company discussed sources of its revenue while omitting that the "true source" of that revenue was illegal trading).[8]

Plaintiffs argue that statements attributing CNO's successful bidding to its engineering capabilities and experience, its decentralized management approach, its superior access to financing, and, with respect to Venezuela, its "selectivity in bidding for new work" were misleading because they suggested that CNO's successes were the result of legitimate factors. Pls.' Opp. at 14; *see, e.g.*, SAC ¶¶ 93, 97, 107, 111, 121, 125, 136, 138. Defendants, on the other hand, contend that these statements amount to nothing more than puffery.

Notwithstanding the ordinarily fact-intensive nature of the materiality inquiry, courts have recognized that certain kinds of statements are inactionable as a matter of law because they are "too general to cause a reasonable investor to rely upon them." *City of Pontiac*, 752 F.3d at 183 (citation omitted). The archetypes of such inactionable "puffery" are "general statements about reputation, integrity, and compliance with ethical norms," particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *Id.* In addition, "[s]tatements of general corporate optimism . . . do not give rise to securities violations" unless "they are worded

---

[8] There appears to be some debate among district courts in this Circuit as to the extent to which *Van der Moolen*'s holding applies. Some courts have read its holding—that a company that places its success in issue is obligated to disclose information regarding the source of its success—to suggest that accurately reported financial figures may be actionable misstatements if some of the revenue derived from illegal activity. *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). This Court, however, agrees with those courts that have read *Van der Moolen* more narrowly. *See In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) (rejecting an expansive reading of Van der Moolen and instead finding that "a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves"); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (finding "convincing" the rejection of an expansive reading of *Van der Moolen* and stating that "[a]ccurate statements of past earnings figures are not themselves actionable under Section 10(b)"). A more expansive reading of *Van der Moolen*'s holding could easily lead to Section 10(b) claims based on information too tenuously related to the alleged misstatement itself. As *Marsh & Mclennan* recognized, "a single misstatement regarding a company's revenues could conceivably create liability for the company's revenue disclosures throughout the [Relevant] Period." 501 F. Supp. 2d at 470.

as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *IBEW Local 58*, 783 F.3d at 392 (citations omitted).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Novak*, 216 F.3d at 315 (finding general statements that inventory was "in good shape" and "under control" actionable where defendants knew contrary was true); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless . . . ."). It is possible, therefore, that while challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to "rely on them as reflective of the true state of affairs at the [c]ompany." *Petrobras*, 116 F. Supp. 3d at 381.

The statements regarding CNO's competitive strengths are framed in CNO's financial disclosures as the company's opinion: "*We believe* that we are able to make competitive bids in Brazil and internationally for three principal reasons." SAC ¶¶ 97, 111, 125, 138 (emphasis added). Opinions are actionable "if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). Opinions are also actionable when, "though sincerely held and otherwise true as a matter of fact, . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* (citing *Omnicare*, 135 S. Ct. at 1332). With respect to this second basis, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). This inquiry is to be conducted narrowly, however, and "a statement of opinion 'is not necessarily misleading when an issuer knows,

but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). Rather, the statement must be analyzed in the context in which it is made to determine if there exists an "omission of material facts that cannot be squared with . . . a fair reading" of the statement. *Omnicare*, 135 S. Ct. at 1330.

Plaintiffs sufficiently allege that the opinion that CNO believed its competitive advantage to be the three legitimate reasons listed was materially misleading. A review of the context of that statement is particularly illuminating. In the paragraphs immediately leading up to that statement, CNO explains the competitive bidding process. Carlinsky Decl., Ex. A at 59 ("7.125% Notes OM"), Ex. B ("7.50% Notes OM") at 65. CNO then states that it faces competition from international construction companies in Brazil "as a result of liberalization of Brazilian government rules that had previously limited foreign competitors." 7.125% Notes OM at 59; 7.50% Notes OM at 65. The offering memoranda explain that international firms at the time were "seeking to increase their presence in the Brazilian construction industry," but that CNO believed that "domestic players" maintained certain advantages. 7.125% Notes OM at 59-60; 7.50% Notes OM at 65. Internationally, CNO stated, the company competed with "some of the largest contractors in the world." 7.125% Notes OM at 60; 7.50% Notes OM at 65. This context would suggest to an ordinary investor that CNO faced increasingly stiff competition, both domestically and internationally. Any advantages that CNO had over its competitors would likely have been relevant to a potential investor's decision to purchase Notes guaranteed by CNO. Therefore, Plaintiffs allege that CNO sufficiently placed in issue the reasons for its success amidst such competition.

While CNO's ability to secure projects that it bid on may very well have been due to its engineering capabilities and experience, decentralized management approach, and access to Brazilian governmental funding, an ordinary investor would be misled by the company's failure to disclose that an additional reason for its success was its illegal bribery scheme. *See VEON*, 2017 WL

4162342, at *6 (finding defendant's failure to disclose bribes actionable when the company disclosed only the legitimate reasons for its success); *City of Brockton*, 2014 WL 4832321, at *17 ("[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." (internal quotation marks and citation omitted)); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. at 675, 677-78 (denying motion to dismiss where "defendants' public disseminations touting [their] competitive advantage in obtaining speedy FDA approvals and . . . earnings performance were false and misleading because defendants failed to disclose . . . that such advantage was obtained through an illegal scheme of bribes rather than through defendants' expertise and business acumen").

CNO's statement that its "bid success rate for Venezuelan operations is high and reflects our selectivity in bidding for new work in Venezuela" is likewise actionable. True, the omission of the bribery scheme's contribution to the bidding success does not render this statement false. The statement does not attribute the success in Venezuela *only* to the company's selective bidding. Thus, in addition to the bribes, CNO's selectivity could have also contributed to successes in that country. Nonetheless, CNO's omission of the bribes underlying the bidding process "was a class half-truth." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 760 (S.D.N.Y. 2017); *see Virtus Inv. Partners*, 195 F. Supp. 3d at 537 ("Such a statement is a half-truth sufficient to state a claim.").

### ii. Statements Violating GAAP

"Financial statements . . . which are not prepared in accordance with GAAP are presumptively . . . misleading or inaccurate." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (omissions in original) (internal brackets omitted) (quoting 17 C.F.R. § 210.4-01(a)(1)), *cert. granted sub nom. Leidos, Inc. v. Indiana Pub. Ret. Sys.*, 137 S. Ct. 1395 (2017), and *cert. dismissed sub nom.*

*Leidos, Inc. v. Indiana Pub. Ret. Sys.*, No. 16-581, 2018 WL 3026583 (U.S. June 18, 2018). Nonetheless, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Id.* (quoting *Novak*, 216 F.3d at 309). "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (quoting *Novak*, 216 F.3d at 309).

Plaintiffs allege that CNO's representation that its financial disclosures were prepared in accordance with Brazilian GAAP was false and misleading. This, Plaintiffs allege, is because CNO's financial statements violated Brazilian GAAP in four ways: (1) CNO failed to accrue a provision for the financial obligations arising from the bribery scheme, in violation of CPC 25; (2) CNO failed to disclose the bribery scheme and any expected financial costs of the bribery scheme in the notes to its financial statements, in violation of CPC 25; (3) CNO failed to separately disclose the amount of revenue it obtained through use of bribes, in violation of CPC-00; and (4) CNO failed to report the bribes as costs to obtain the reported revenues, in violation of CPC 00 and 17. *See* SAC ¶¶ 68-79.

With respect to the first alleged violation, CPC 25 requires that a "provision" be recognized in financial statements as a charge against income when (1) it is probable that a present obligation for a past event exists; (2) which will more likely than not require a future disbursement to settle the obligation; and (3) a reliable estimate of the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes. SAC ¶ 69; Comitê de Pronunciamentos Contábeis ("CPC"), *Pronunciamento Técnico CPC 25, Provisões, Passivos Contingentes e Ativos Contingentes* [*Technical Pronouncement CPC 25*], ¶ 14. The CPC explains that in most cases it will be clear when a past event gives rise to a present obligation. *Technical Pronouncement CPC 25* ¶ 16. CPC 25 anticipates that it will be unclear that a past event gives rise to a present obligation only in rare cases, such as those involving matters to be determined by judicial proceedings. *Id.* In those rare cases, CPC 25 explains that it is presumed that a past event gave rise to a present obligation if,

considering all of the available evidence, it is more probable than not that an obligation exists as of the balance sheet date. *Id.* ¶ 15.

The offering memoranda at issue here were issued on November 15, 2011 and July 4, 2012. The 7.125% Notes OM reports CNO's financial figures for the years ended December 31, 2009, 2010, and 2011, and for the three-month periods ended March 31, 2011 and March 31, 2012. *See* Carlinsky Decl., Ex. A at 12-13. The 7.50% Notes OM reports CNO's financial figures for the years ended December 31, 2008, 2009, and 2010, and for the six-month periods ended June 30, 2010 and June 30, 2011. *See* Carlinsky Decl., Ex. B at 12-14. Plaintiffs' allegations do not even suggest that, by the end of any of the covered reporting periods, any evidence existed, much less was available to or known by any of Defendants, that it was probable that CNO faced any obligation for the bribery scheme—much less an obligation that would have triggered the duty to report a provision for the covered periods. Rather, Plaintiffs allege that Operation Car Wash did not begin until 2014 and that CNO was not even implicated in the scheme until the arrest of Marcelo Odebrecht in June 2015. SAC ¶¶ 56, 82. Plaintiffs, therefore, fail to allege that CNO's financial statements contained in the offering memoranda violated CPC 25 by omitting a provision. *See Marsh & Mclennan*, 501 F. Supp. 2d at 471 (finding allegations insufficient when they failed to plead that defendant was "likely to be subjected to litigation—during the Class Period for the misconduct alleged in the Complaint"); *cf. Indiana Pub. Ret. Sys.*, 818 F.3d at 93-94 (finding that plaintiffs sufficiently alleged a violation of Financial Accounting Standard ("FAS") No. 5, which required disclosure of a loss contingency when a loss was a "reasonable possibility"—a standard applicable when there has been a "manifestation by a potential claimant of an awareness of a possible claim or assessment"—because plaintiffs alleged that New York City had a "manifest awareness of a possible material claim against [the defendant]").

With respect to the second alleged GAAP violation, CPC 25 requires certain disclosures for each "provision." *Technical Pronouncement CPC 25* ¶¶ 84-85. Those disclosures are only required,

however, when a provision is reported. Nonetheless, CPC 25 also requires certain disclosures for contingent liabilities other than provisions. *See id.* ¶ 86. A contingent liability is defined as a possible obligation that results from past events and the existence of which will be confirmed only upon the occurrence, or nonoccurrence, of one or more uncertain future events not wholly within the control of the company. *Id.* ¶ 10. While a company is not required to recognize a contingent liability, *id.* ¶ 27, it is required to make disclosures regarding that liability unless the possibility of an outflow of economic resources is remote, *id.* ¶ 86. Those disclosures include an estimate of the financial effect of the liability, an indication of the uncertainties relating to the amount or timing of any outflow, and the possibility of any reimbursement. *Id.* ¶ 86. Here, Plaintiffs allege that CNO violated the disclosure requirements of CPC 25 because CNO disclosed no information regarding the corruption scheme or the likely legal and financial impact of the scheme. SAC ¶ 73. What Plaintiffs do not plead, however, are facts showing that CNO had any reason to believe that losses related to the bribery scheme were more than a remote possibility at the time the company filed its financial statements. Therefore, Plaintiffs fail to sufficiently allege that CNO's public statements violated CPC 25. *See Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 290-91 (S.D.N.Y. 2013) (dismissing claim based on failure to disclose contingent liability under IAS 37—the international accounting standard on which CPC 25 is based—and noting that "[a]t most, the disclosure obligation would arise when an investigation into the conduct began, and the language of IAS 37 suggests that even an investigation does not trigger the duty to disclose where the possibility of liability remains 'remote'"), *vacated in part on other grounds sub nom. Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*, 258 F. Supp. 3d 1037, 1043-44 (N.D. Cal. 2017) (citing to Gusinsky and finding that complaint failed to plead that possibility of potential penalties was more than remote).

Turning to the third GAAP violation, Plaintiffs fail to allege with particularity that Defendants violated CPC 00, which explains that it is "common practice" to disclose different types of revenue separately in order to assist investors in distinguishing revenues that are generated in the normal course of the company's business from those derived from contingent activities that may not be recurring. SAC ¶ 75. Plaintiffs allege that under CPC 00, CNO should have disclosed separately the revenue derived from unlawfully obtained contracts and that derived from lawfully obtained contracts. *See id.* ¶¶ 74-75. However, as discussed below, Plaintiffs fail to identify which, if any, revenue derived from unlawfully obtained contracts during the periods for which CNO's financial figures were disclosed.

The fourth alleged GAAP violation is insufficiently pleaded for the same reason as the third. Plaintiffs allege that CNO violated CPCs 00 and 17, "which require that assets and expenses directly associated with generating particular contract revenue must be reflected in the books and records of the entity and must be simultaneously recognized in the income statement in the same period as the revenue." *Id.* ¶ 77. According to the second amended complaint, CNO violated CPCs 00 and 17 by failing to report the bribe payments as expenses associated with the contracts that CNO secured. Plaintiffs allege that between 2001 and 2016, CNO, through the Division, paid over $788 million in illicit bribes to secure contracts. *Id.* ¶ 49. Specifically, between 2010 and 2014, the Division paid more than $20 million to Guido Mantega, the former Finance Minister of Brazil, as well as other public officials in exchange for assistance in securing a $184 million contract. *Id.* ¶ 51. Between 2011 and 2014, the Division paid $9.7 million to Paulo Roberto Costa, a Brazilian legislator, for aid in securing a $142 million contract. *Id.* ¶ 52. The second amended complaint also lists various bribes paid to officials in countries other than Brazil. *Id.* ¶ 232. All of the bribe payment allegations, however, do not provide specific dates on which the bribes were paid or on which their corresponding contracts were granted to CNO or Odebrecht. Plaintiffs merely provide date ranges,

which involve several years, and the total sums paid in each country. As explained above, the offering memoranda contain CNO's financial results for 2009 through the first quarter of 2012. Therefore, any bribe payments that resulted in contract revenue obtained before or after those periods—or otherwise not reported during the relevant periods—could not have been considered costs to be reported against the revenues listed in the offering memoranda. Because the second amended complaint does not identify which illegally obtained contract revenues were reported in those financial statements and the corresponding bribe payments that should have been reported as expenses, the second amended complaint fails to plead with particularity CNO's violation of CPCs 00 and 17.[9] And to the extent that Plaintiffs allege that CNO violated CPCs 00 and 17 because it also failed to report the income generated "off the books" to pay the bribes, Plaintiffs do not allege that CNO itself—as opposed to another Odebrecht-related entity—generated that income.

### iii. Statements Regarding CNO's Backlog, Diversification, and International Contracts

Defendants move to dismiss Plaintiff's claims based on CNO's statements regarding its backlog, diversification, and international contracts, arguing that these statements reflect historical facts which Plaintiffs have not alleged to be untrue. Defs.' Mem. at 15, 17. The Court agrees.

"The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)); *see Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate

---

[9] In opposition to Defendants' motion, Plaintiffs argue that CNO's violation of CPC 00 resulted in an overstatement of CNO's reported net income. Pls.' Opp. at 15. The Court is not convinced that this allegation is logical in light of Plaintiffs' other alleged facts. The second amended complaint alleges that the money that was used to pay the near $800 million in bribes was generated by "off the books" operations and was never recorded. SAC ¶ 46. Taking these allegations as true, as the Court must for purposes of this motion, the bribes were not paid out of reported revenues from the secured contracts, or out of any other revenue source that CNO reported in its financial disclosures. Accordingly, the fact that the bribes were not listed as costs in the public disclosures does not, by itself, render the reported net income false.

statements about past performance are self evidently not actionable under the securities laws." (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004))); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("[A]ccurate statements of historical fact . . . are non-actionable." (citation omitted)); *In re EDAP TMS S.A. Sec. Litig.*, No. 14-cv-6069 (LGS), 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (finding statements inactionable when they only "comment[ed] on the evolving status of the Company's PMA application"); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 594 (S.D.N.Y. 2007) ("[M]any of the statements merely cite historical facts . . . and as such are not actionable under the securities laws.").

Plaintiffs counter Defendants' argument by pointing to allegations in the second amended complaint that plead that the historical facts were, in fact, false. Those allegations plead that the financial figures were false because they were overstated "as described in Section IV(F)." SAC ¶¶ 89, 105, 110, 119.[10] Section IV(F) of the second amended complaint contains Plaintiffs' allegations regarding the Brazilian GAAP provisions that they allege were violated by CNO's financial statements. *See id.* ¶¶ 65-79. However, as the Court has explained, Plaintiffs insufficiently plead any GAAP violation. Moreover, Section IV(F) alleges that GAAP violations led to overstatements of CNO's net income, *see id.* ¶ 77-79; Section IV(F) does not allege that GAAP violations led to an overstatement of other figures, such as the total number of ongoing projects, *id.* ¶¶ 90, 104, 118; gross service revenues derived from international contracts, *id.* ¶¶ 90, 104, 118; total contract amount of previously secured contracts, *id.* ¶ 109; or total value of the company's backlog, *id.* ¶¶ 90, 104, 118.

---

[10] Plaintiffs' allegations in paragraphs 124 and 134 similarly assert that the financial figures contained in the 4.375% Notes OM and the 5.250% Notes OM were false and misleading because they were overstated. *See* SAC ¶¶ 123-24, 133-34. However, Plaintiffs acknowledge that they did not purchase any 4.375% Notes and provide no explanation for their allegations regarding the 5.250% Notes. *See id.* ¶¶ 115, 130.

Additionally, Plaintiffs allege that the reported facts were false because they failed to disclose that the CNO contracts were secured with illicit bribes. *Id.* ¶¶ 89, 105, 110, 119. Plaintiffs stop short, however, of explaining in what way this omission rendered these statements false. None of the statements purport to explain the manner in which the various contracts were secured by CNO. Even if the statements had put in issue the source of the contracts, any connection between the source of the contracts and the historical data reported in connection with those contracts would be too tenuous to be actionable under the federal securities laws. *See, e.g., Marsh & Mclennan*, 501 F. Supp. 2d at 470 ("[A] company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves."); *VEON*, 2017 WL 4162342, at *6 (following *Marsh & Mclennan*); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (noting the "debate" among district courts in this Circuit "as to whether statements that put the sources of stated revenue at issue without revealing their actual improper source can render the reports of revenue themselves actionably misleading" and finding the "rejection of this possibility convincing" (citing *Marsh & Mclennan*, 501 F. Supp. 2d at 470-71)); *see also supra*, n.8.

Beyond these arguments, Plaintiffs fail to allege how the reported past EBITDA, total assets, numbers of ongoing projects, values of prior projects, and the company's backlog were false or misleading. Accordingly, Plaintiffs fail to allege sufficient facts to plead that these statements of historical fact were false, and the statements are inactionable.

### iv. Other Statements

Defendants argue that Plaintiffs' allegations that CNO's statements were false and misleading because the company failed to disclose that its financial results were "unsustainable," *see* SAC ¶ 86, fail to state a Section 10(b) claim. Defs.' Mem. at 16-17. Plaintiffs do not oppose this argument and have, therefore, abandoned their Section 10(b) claim in connection with this

misstatement. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. R and C Transit, Inc.*, No. 16-cv-2481 (ADS) (ARL), 2018 WL 794572, at *4 (E.D.N.Y. Feb. 7, 2018) (concluding that plaintiff had abandoned claims not addressed in its opposition to a motion to dismiss); *Robinson v. Fischer*, No. 09-cv-8882 (LAK) (AJP), 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim." (citation omitted)); *Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08-cv-8786 (RMB) (THK), 2009 WL 856682 at *9 (S.D.N.Y. Mar. 30, 2009) (dismissing plaintiff's constructive discharge claim because plaintiff abandoned it by failing to address it in her opposition motion to defendant's motion to dismiss all claims); *Martinez v. Sanders*, No. 02-cv-5624 (RCC), 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) ("Because Plaintiff did not address Defendant's motion to dismiss with regard to these claims, they are deemed abandoned."); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) (holding that plaintiff's failure to provide any argument opposing defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment of the issue").

Even if Plaintiffs had not abandoned this claim, Plaintiffs' theory that CNO breached a duty to disclose that its revenues were "unsustainable" does not pass muster. Plaintiffs fail to allege any duty to disclose, nor is the Court aware of one. *See, e.g., Marsh & Mclennan*, 501 F. Supp. 2d at 469 ("Simply alleging the nondisclosure of material information . . . is insufficient to state an actionable misrepresentation absent a duty to disclose."); *see also In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no statements regarding AXIS's accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'"); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586 (E.D. Va. 2006) ("The general allegation that the reporting of revenues

[pursuant to contingent commission agreements] implicitly represented that such results would continue is insufficient . . . . [P]laintiff fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued."); *Citigroup*, 330 F. Supp. 2d at 378 (finding that plaintiff failed to state a Section 10(b) claim when it alleged that defendant "breached a duty to disclose that its revenues were 'unsustainable'" because plaintiff pointed to "no projections or future predictions in the challenged disclosure documents").  Absent such a duty, the omission of the unsustainability of CNO's financial results is inactionable.

Plaintiffs allege that other statements made by CNO in its financial disclosures were false and misleading.  For example, Plaintiffs allege that the statement in CNO's third quarter 2014 earnings release that the "Petrobras investigation has not impacted CNO," SAC ¶¶ 173-74, was false.  Defendants do not move in their opening brief to dismiss any claims based on this statement. Defendants only address this statement in a footnote in their reply.  *See* Defs.' Reply (ECF No. 55) at 16 n.26.  Therefore, Defendants have waived the argument raised in their reply.  *See In re Grand Jury Subpoenas Returnable Dec. 16, 2015*, 871 F.3d 141, 147 (2d Cir. 2017) ("We ordinarily will not consider issues raised for the first time in a reply brief." (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009))); *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 625 n.1 (2d Cir. 2007) ("Although EDP did belatedly contend in its reply brief that the district court erred in its finding on these elements, its failure to press those arguments in its opening brief waives them." (citing *Dixon v. Miller*, 293 F.3d 74, 80 (2d Cir. 2002); *Nat'l Labor Relations Bd. v. Star Color Plate Serv.*, 843 F.2d 1507, 1510 n.3 (2d Cir. 1988))).

Because Defendants have not effectively moved to dismiss Plaintiffs' claim that the statement regarding the investigation's impact on CNO was false and misleading, that claim will survive dismissal at this stage.  Nonetheless, the Court observes that Plaintiffs' allegations in this respect are internally inconsistent.  Plaintiffs allege that the reported statement was false because

"despite their statements to the contrary, Defendants Odebrecht and CNO were embroiled in the Petrobras investigation, and were certain to be charged criminally or civilly by Brazilian and a host of other governments." SAC ¶ 174. Plaintiffs provide no further facts to support this conclusory allegation. At the same time, Plaintiffs allege that "the first indication that CNO and Odebrecht were involved in this scandal was the June 19, 2015 arrest of Odebrecht's Chief Executive Officer, Marcelo Odebrecht." SAC ¶ 82. It is unclear from these allegations what Plaintiffs mean when they assert that CNO was "certain to be charged criminally or civilly," yet also allege that the company was first implicated in the scandal in mid-2015. Given the competing allegations of the complaint, Plaintiffs insufficiently allege that the statement that CNO had not been impacted by the Petrobras investigation was false when it was made. *See Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (noting that "wholly conclusory and inconsistent allegations" do not suffice to state a claim).

The final category of statements in CNO's financial disclosures that Plaintiffs allege to be false and misleading are those contained in the company's 2012 to 2014 financial statements regarding its credit ratings. *See* SAC ¶¶ 149-50, 152-53, 156-57, 160-61, 164-65, 167-68, 171-72. Those statements also appear to be nothing more than inactionable historical facts. However, Defendants do not move to dismiss Plaintiffs' claims predicated on these statements. Accordingly, the Court declines to hold these statements inactionable at this time.

### v. Odebrecht Finance's Liability for CNO's Financial Statements

Defendants move to dismiss any direct claims against Odebrecht Finance premised on CNO's financial statements, arguing that Odebrecht Finance is not the "maker" of those statements because Odebrecht Finance did not exercise ultimate authority over the offering memoranda. Defs.' Mem. at 19-20.

In *Janus*, the Supreme Court held that, in order to be liable for a violation of Rule 10b-5, a defendant must have "made" the allegedly material misstatements. *Janus Capital Grp., Inc. v. First*

*Derivative Traders*, 564 U.S. 135, 141 (2011).  The Court explained that "make" means "to state," not "to create."  *Id.* at 142, 144-45.  The Court then set out the following rule for determining whether a defendant is the "maker of a statement":  "For Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 142; *see also id.* at 144 ("Without [ultimate] authority, it is not necessary or inevitable that any falsehood will be contained in the statement").  Significantly, the Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.  This rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142-43.

Plaintiffs allege that Odebrecht Finance is liable for CNO's false and misleading statements "as the issuer of the Notes."  SAC ¶ 100.  A review of the offering memoranda, however, suggests otherwise.  Each of the 7.125% Notes OM and the 7.50% Notes OM explains that "[t]his offering memorandum has been prepared *by us* . . . ."  Carlinsky Decl., Ex. A at ii, Ex. B at ii.  The memoranda define "us" and "we" as CNO only.  *Id.*  The offering memoranda then warrant:

> *We*, having made all reasonable inquiries, confirm that the information contained in this offering memorandum with regard to us is true and accurate in all material respects, that the opinion and intentions expressed in this offering memorandum are honestly held, and that there are no other facts the omission of which would make this offering memorandum as a whole or any of such information or the expression of any such opinions or intentions misleading in any material respect.  *We* accept responsibility accordingly.

*Id.* (emphasis added). This express attribution of CNO's financial statements contained in the offering memoranda to CNO, and only to CNO, strongly suggests that Odebrecht Finance was not the maker of those statements. *See id.*; *cf. In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-md-2017 (LAK), 2013 WL 5730020, at *2 (S.D.N.Y. Oct. 22, 2013) (finding that, "[a]lthough defendants did not sign the offering memorandum," defendants were the makers of the statements contained therein when the defendants were the CEO and CFO of the company's whose financial statements were reported and the statements "were explicitly attributed to [the company] in the offering memorandum").

The Court recognizes that at least one other court in this district has determined that "explicit attribution is not absolutely dispositive." *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 473 (S.D.N.Y. 2015). According to that court, the proper inquiry is whether a plaintiff sufficiently pleads that a particular defendant "made it necessary or inevitable that any falsehood would be contained in the statement." *Id.* (quoting *In re Lehman Bros.*, 2013 WL 5730020, at *2) (internal quotation marks and brackets omitted). As this line of reasoning suggests, where a third party is alleged to have exercised substantial control over the reporting company itself, the allegedly false and misleading statements "may be imputed" to the third party for purposes of the federal securities laws. *Id.* at 473-74.

Applying that reasoning here, as Plaintiffs do, *see* Pls.' Opp. at 23 & n.45, there is not even a suggestion in Plaintiffs' allegations that Odebrecht Finance "made it necessary or inevitable" that CNO's false and misleading disclosures would be contained within the offering memoranda. Rather, as the documents themselves show, CNO prepared the offering memoranda; CNO attested to the accuracy of its disclosures contained in the offering memoranda; and CNO accepted responsibility for the accuracy of its statements. There is no indication that Odebrecht Finance either ratified CNO's financial disclosures or had any role in the preparation of the offering

memoranda. Nor do Plaintiffs allege that the ultimate responsibility for filing the offering memoranda lay with Odebrecht Finance. *See Janus*, 564 U.S. at 146-47 (noting, in finding that Janus Investment Fund was the maker of the statements at issue, that Janus Investment Fund was the entity that bore the obligation of filing prospectuses). In light of *Janus*'s clear rejection of an argument similar to the one advanced by Plaintiffs here, *see* 564 U.S. at 146-48, the Court cannot conclude that on these allegations, Odebrecht Finance was a maker of CNO's financial statements contained in the offering memoranda.

Plaintiffs' alternative argument, based on the laws of the Luxembourg Stock Exchange, is equally unavailing. Plaintiffs point out in a footnote in their opposition that the Luxembourg Stock Exchange, on which the Odebrecht Finance Notes trade, requires the filing of a prospectus as a condition of listing securities. Pls.' Opp. at 22 n.43. Under Article 9 of the Luxembourg Stock Exchange's Law of 10 July 2005, the "[r]esponsibility for the information given in a prospectus attaches to the issuer, the offeror, the person asking for the admission to trading on a regulated market or the guarantor, as the case may be." *Id.*; *see* Declaration of Michael B. Carlinsky in Further Supp. of Mot. to Dismiss (ECF No. 56) ("Second Carlinsky Decl."), Ex. U. The 7.125% Notes OM is available on the Luxembourg Stock Exchange's website as the prospectus for the 7.125% Notes. *See* Pls.' Opp. at 22 n.43; Luxembourg Stock Exchange, *OdebrechtFin 7,125% 26/06/2042*, https://www.bourse.lu/security/USG6710EAL41/189574 (last visited July 31, 2018). Because the offering memorandum is the prospectus that was required to be filed in connection with listing the Notes, Plaintiffs allege that Odebrecht Finance is the maker of the statements contained in the offering memorandum.

What Plaintiffs omit from their discussion of this topic, however, is the complete provision of the Law of 10 July 2005. Section 1 of Article 9 reads as follows:

> Responsibility for the information given in a prospectus attaches to the issuer, the offeror, the person asking for the admission to trading on a regulated market *or the guarantor, as the case may be.* The persons responsible shall be clearly identified in the prospectus by their names and functions or, in the case of legal persons, their names and registered offices, *as well as the declarations by them that, to the best of their knowledge, the information contained in the prospectus is in accordance with the facts and that the prospectus makes no omission likely to affect its import.*

Second Carlinsky Decl., Ex. U at 15 (emphasis added). The first line, which Plaintiffs reference, provides a disjunctive list of the persons responsible for the information in a prospectus; it does not make responsible all of the persons listed, but only assigns responsibility to the person listing the securities, "as the case may be." The second sentence sheds additional light on who that person may be; it requires the responsible person to warrant that the information contained in the prospectus is accurate. The offering memoranda at issue here state that CNO "ha[s] applied to list the notes on the Official List of the Luxembourg Stock Exchange" and that CNO "will furnish to the Luxembourg Stock Exchange all such information required in connection with the listing of the notes." Carlinsky Decl., Ex. A at iv, Ex. B at iv. These statements strongly suggest that it was CNO, as the guarantor of the Notes, that undertook the filing of the prospectuses in connection with the Notes' listing. Further, as the Court has explained, it is CNO, not Odebrecht Finance, that has made the warrants required by Article 9, section 1. On these facts, it appears that CNO is the entity responsible for the information contained in the prospectus, and not Odebrecht Finance.

Plaintiffs point to no additional authority that supports the proposition that an issuer of securities, as a matter of law, is always the maker of any statement contained in a prospectus or offering memorandum that is issued in connection with those securities. In the absence of such authority, and for the reasons stated above, the Court concludes that Plaintiffs have failed to plead Odebrecht Finance's ultimate authority over CNO's financial disclosures reported in the offering

memoranda. Because Odebrecht Finance is not alleged to be a "maker" of those statements, it cannot be held liable under Section 10(b) or Rule 10b-5.

### c. CNO's Other Misstatements

Defendants argue that CNO's misstatements made during conference calls and meetings are also inactionable. Defs.' Mem. at 19; *see* SAC ¶¶ 142-44, 174. Plaintiffs' allegations with respect to those statements are sparse: they do not identify the statements that were made. The allegations regarding the March 23, 2011 conference call, for example, merely explain that the call was held on that date "regarding various issues related to the Odebrecht Finance Notes, including issues related to potential tender offers and consent fees for covenant changes for investors." SAC ¶ 142. The second amended complaint says nothing about what particular statements were made during that call or why they were false or misleading. Similarly, the allegation regarding the March 24, 2011 meeting states that CNO employees met with Plaintiffs' representatives on that date "to discuss CNO's operating results and business prospects." *Id.* ¶ 143. According to Plaintiffs, CNO's "disclosures" were false and misleading, *id.*, but Plaintiffs fail to identify what those disclosures were or even the specific reporting period for which CNO's "operating results" were discussed. Continuing in similar fashion, Plaintiffs next allege the falsity of CNO's "disclosures" made during a January 11, 2012 conference call in which CNO "discussed its operating results and future business prospects, including the funding of 'sister subsidiaries.'" *Id.* ¶ 144. Once again, Plaintiffs fail to allege the specific disclosures that were false. And finally, Plaintiffs allege that CNO's "disclosures" made during a March 24, 2015 conference in Miami were false, yet fail to plead the particular disclosures. *Id.* ¶ 175. These allegations are insufficient to state a Section 10(b) or Rule 10b-5 claim. *See ATSI Commc'ns*, 493 F.3d at 99 (noting that, to satisfy Rule 9(b)'s requirement, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent").

### d. Odebrecht Finance's Financial Statements

Defendants also move to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims against Odebrecht Finance that are predicated on Odebrecht Finance's financial statements contained in the offering memoranda. Plaintiffs allege that Odebrecht Finance's financial disclosures were false and misleading because "they failed and omitted to disclose that the possibility of Odebrecht Finance repaying the Notes had been materially diminished because the parties upon which Odebrecht Finance was completely dependent were engaged in the Bribery and Kickback Scheme, which subjected them to serious undisclosed risks and made the possibility of repayment significantly less than disclosed." SAC ¶¶ 100, 114. Plaintiffs point to no duty requiring Odebrecht Finance to disclose the bribery scheme—of which, as discussed below, Plaintiffs fail to allege that Odebrecht Finance had knowledge. And Plaintiffs point to no particular statement made by Odebrecht Finance that was rendered false and misleading by this omission, such as any disclosure by Odebrecht Finance regarding its ability to repay the Notes. *Id.* ¶ 2. This is insufficient to state a claim under Section 10(b) or Rule 10b-5. *See ATSI Commc'ns*, 493 F.3d at 99.

### e. Odebrecht's Disclosures Following Marcelo Odebrecht's Arrest

Defendants argue that various allegedly false and misleading statements that were made by Odebrecht in press releases and other public statements are also inactionable. Defs.' Mem. at 24 n.23. The Court agrees. Those statements, among other things, declared unlawful the arrest of Marcelo Odebrecht and touted Marcelo's innocence. *See* SAC ¶¶ 190, 192, 196, 197, 204. They were each issued after Marcelo Odebrecht's June 2015 arrest. Plaintiffs' last purchase of the Odebrecht Finance Notes, however, took place on March 31, 2015, months prior to Marcelo's arrest. *See id.* ¶¶ 25-26. Therefore, any misstatements by Defendants that were made after March 31, 2015 are not actionable. *See Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 n.2 (2d Cir. 2011) ("Typically, a 'holder' of securities lacks standing to prosecute a claim under the federal

securities laws."); *Adato v. Kagan*, 599 F.2d 1111, 1120 (2d Cir. 1979) (noting that "buyers" and "sellers" are "the class of persons which the securities laws were designed to protect").

### f.  Statements by OEC

Defendants argue that Plaintiffs fail to allege any misstatements by OEC.  Plaintiffs do not address this argument in their opposition and have effectively abandoned their Section 10(b) claim against OEC.  *See supra*, Section III.A.2.b.iv.

### g.  Odebrecht's 2014 Annual Report

Plaintiffs allege that Odebrecht's 2014 Annual Report contained various false and misleading statements in relation to the company's code of conduct and that the reported gross revenue and EBITDA figures were false and misleading.  SAC ¶¶ 176-85.  Defendants have not argued that the Annual Report's statements are not actionable, and Odebrecht has not appeared to defend the claims lodged against it.  The Court therefore declines to address the merits of Plaintiffs' claims against this Defendant.

*    *    *

In sum, for purposes of this motion, the only statements and omissions that Plaintiffs sufficiently plead as the basis for their Section 10(b) and Rule 10b-5 claims, or that Defendants fail to argue are inactionable, are:  (1) CNO's statements contained in the offering memoranda regarding the reasons for its success and CNO's failure to disclose the bribery scheme in connection with those statements; (2) CNO's statements contained in its 2012 through 2014 financial statements regarding the company's credit ratings; and (3) the statement made in CNO's third quarter 2014 earnings release that the Petrobras investigation had not impacted CNO.  Because these are the only actionable statements, the Court continues to address the parties' remaining Section 10(b) arguments with respect to those statements only.

### 3. Scienter

Defendants do not challenge Plaintiffs' allegations of scienter with respect to Odebrecht and CNO. They assert, however, that Plaintiffs have failed to plead Odebrecht Finance or OEC's scienter. The Court need not address these arguments, however, as it has already concluded that Plaintiffs have abandoned their claim of direct liability against OEC and have not sufficiently pleaded that Odebrecht Finance made any false or misleading statements.

### 4. Loss Causation

Defendants move to dismiss Plaintiffs' Section 10(b) claims for failure to adequately plead loss causation. "It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Lentell*, 396 F.3d at 172 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)); *accord Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir. 1992). To plead transaction causation, a plaintiff must plead simply that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Defendants do not dispute that Plaintiffs have pleaded transaction causation. Plaintiffs allege that the prices of the Notes were artificially inflated as a result of Defendants' failure to disclose their participation in the bribery scheme, SAC ¶ 238, and that they would not have purchased the Notes at such prices had they known of the scheme, *id.* ¶ 245. This is sufficient to plead transaction causation. *See Lentell*, 396 F.3d at 174 (finding that an allegation that misstatements "induced a 'purchase-time value disparity' between the price paid for a security and its 'true investment quality'" is "nothing more than a paraphrased allegation of transaction causation").

"Loss causation" in the context of a private securities fraud action refers to a "causal connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)); *see Vivendi*, 838 F.3d at 260 ("Loss causation 'is

the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" (quoting *Lentell*, 396 F.3d at 172))). A plaintiff is required to plead "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 544 U.S. at 347; *accord Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (burden of pleading loss causation is "not a heavy one" and complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations" (quoting *Dura Pharms.*, 544 U.S. at 347)).

"To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Barclays*, 750 F.3d at 232 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). That is, plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. A plaintiff may plead loss causation "*either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Barclays*, 750 F.3d at 232 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).

To plead loss causation by materialization of risk, a plaintiff must plead facts to show that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 513 (quoting *ATSI*, 493 F.3d at 107). Under this theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *Id.* (quoting *Lentell*, 396 F.3d at 173). "The zone of risk is determined by the purposes of the securities laws, *i.e.*, 'to make sure that buyers of securities get what they think they are getting." *Id.* (quoting *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).

"In order to plead corrective disclosures, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected . . . and that the market reacted negatively to the corrective disclosure." *Barclays*, 750 F.3d at 233 (citing *Lentell*, 396 F.3d at 175 (internal citation omitted)). That is, when a complaint alleges that misstatements and omissions were exposed by a corrective disclosure, "a plaintiff must point to a statement that, because it corrected a prior falsehood, precipitated a change in the security's price causing his loss." *In re China Organic Sec. Litig.*, No. 11-cv-8623 (JMF), 2013 WL 5434637, at *7 (S.D.N.Y. Sept. 30, 2013); *see also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in the stock price." *Barclays*, 750 F.3d at 233. Rather, if the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether "the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197.

Here, Plaintiffs plead loss causation by both risk materialization and corrective disclosures. Under either theory, Plaintiffs must show that the disclosure of information "concealed . . . from the market . . . negatively affected the value of the security." *Lentell*, 396 F.3d at 173.

Plaintiffs points to various news articles that were published after Marcelo Odebrecht's arrest in June 2015 as "corrective disclosures." The first of these is an article published by Reuters on the date of Marcelo's arrest. SAC ¶ 187. That article reported that "[m]ulti-point price drops in bonds issued by Odebrecht dominated LatAm credit markets' attention on Friday following news that the Brazilian construction firm's CEO had been arrested." *Id.* The article continued, "The move marked the first time an Odebrecht executive had been detained by the police in connection with the kick-back scandal embroiling state-owned oil company Petrobras and linked the firm closer to the so-called 'Car Wash' scandal." *Id.* Plaintiffs also rely on an article published by the New York

Times the following day.  *Id.* ¶ 188.  That article reported that the Brazilian prosecutor had accused

Marcelo Odebrecht, and other senior Odebrecht executives who had been arrested, "of knowing

that their companies paid bribes to politicians that added up to 710 million reais ($230 million)."  *Id.*

The article quoted Igor Romário de Paula, a police investigator, as stating during a news conference

the day before, "We have material proof that they knew about the practice of overbilling contracts

with Petrobras and they participated directly in the division of contracts within the cartel."  *Id.*

Defendants argue that news of Marcelo Odebrecht's arrest did not reveal anything new to

the market because Odebrecht had been implicated in the bribery scheme as early as 2014.  Defs.'

Mem. at 23.  For support, Defendants cite to the various news articles, lawsuits, and deposition

testimony on which they rely in support of their argument that Plaintiffs' claims are time-barred.  *See*

*supra*, Section III.A.1.  Those documents, however, are extrinsic to the complaint.  Plaintiffs do not

cite to them in their pleading, and it is far from apparent that Plaintiffs relied on those documents in

drafting the second amended complaint.  Therefore, the Court will not consider that extrinsic

evidence.  *See Goel*, 820 F.3d at 560 (concluding that the "appropriate occasion to consider"

extraneous materials was "on summary judgment, not a motion to dismiss"); *Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (noting that a court may only consider material

extrinsic to the complaint in evaluating a motion to dismiss when the extrinsic material is "either in

[the] plaintiff['s] possession" or is material "of which [the] plaintiff[ ] had knowledge and relied on in

bringing suit" (citation omitted)); *Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 134-35 (S.D.N.Y.

1998) (declining to consider evidence provided by defendants to refute complaint's allegations when

that evidence was "not within the four corners of the Complaint").

Examining only Plaintiffs' allegations, the second amended complaint alleges that neither

Odebrecht nor CNO was implicated in the Petrobras investigation until Marcelo's arrest.  SAC ¶ 82.

Therefore, drawing all inferences in Plaintiffs' favor, Marcelo Odebrecht's arrest and the reports that

prosecutors had proof of Odebrecht senior executives' knowledge of the company's bribe payments are sufficiently alleged to have been the first revelations to the market of Odebrecht's participation in the bribery scheme.[11]

Defendants' other argument—that the news reports of Marcelo's arrest did not reveal the falsity of CNO's representations regarding its competitive strengths—also fails. CNO's statements, according to the second amended complaint, concealed the fact that CNO had successfully secured large contracts as the result of bribes that it had paid, both to Brazilian officials and to international officials. The June 20, 2015 New York Times article revealed that Brazilian police had proof that senior Odebrecht executives participated directly in the division of the overbilled Petrobras contracts. This is sufficient to allege that the falsity of CNO's statement—that its successful bidding within Brazil was the result of legitimate factors—was revealed to the market when this article was published.

Plaintiffs' allegations are also sufficient to plead that the news of Marcelo Odebrecht's arrest and of the Brazilian police's proof of Odebrecht's involvement in the Petrobras scandal resulted in a decline of the market value of the Notes. Plaintiffs allege that the Odebrecht Finance Notes were issued at, or very close to, par value and continued to trade at par value until mid-June 2015—the time of Marcelo's arrest. SAC ¶ 186. As Reuters reported, immediately following the arrest, Odebrecht's bonds dropped 10 points. *Id.* ¶ 187. Between June 19 and June 20, 2015, Plaintiffs allege that the value of the Notes similarly dropped 6.7% (the 7.125% Notes) and 10.0% (the 7.50% Notes). *Id.* ¶ 189 & n.38. From these allegations, it can reasonably be inferred that the revelation of Odebrecht's involvement in the bribery scheme led to the losses. This is sufficient at this stage to

---

[11] The Court observes that the news reports refer generally to "Odebrecht" and do not refer specifically to CNO. Defendants, however, do not argue that the failure of the news reports to either make the distinction between the entities or to provide information specific to CNO renders them insufficient disclosures for purposes of loss causation.

plead that the disclosure of CNO's misleading statement about the reasons for its success in Brazil caused Plaintiffs' losses. *See In re Braskem*, 246 F. Supp. 3d at 766 (concluding that allegations that "the disclosure of th[e] scheme caused Braskem's shares to drop more than 20% on the day . . . when the scheme was revealed" sufficiently pleaded loss causation).

Plaintiffs allege that several subsequent news reports further disclosed additional details of Defendants' involvement in the Brazilian bribery scheme, leading to even greater declines in the value of the Notes. *See, e.g.*, SAC ¶¶ 195, 200-03, 211-13. The additional details offered in each of those news articles, however, did not reveal the falsity of any of the actionable misstatements. The misleading nature of CNO's statement that its successful bidding on Brazilian projects had already been revealed by the news reports immediately following Marcelo Odebrecht's arrest. The June 24, 2015 article reporting Marcelo's note to his lawyers to destroy emails merely confirmed what the New York Times's earlier article had reported: that there was proof of Odebrecht's involvement in the scandal. The July 2015 reports likewise confirmed what had already been disclosed. The Down Jones report of notes found on Marcelo's phone again confirmed the existence of incriminating evidence; the Wall Street Journal's report of the Swiss investigation into bribes paid by Odebrecht and CNO to Brazilian and Petrobras officials offered no new material information to the market; and the reports that Brazilian prosecutors were ready to press formal charges against Marcelo confirmed that authorities could link him to the scandal. Similarly, the August 20, 2015 Economist article did nothing more than to summarize already public information. Nor did Odebrecht's press release announcing the resignation of Marcelo transmit any new information that proved the falsity of any of the alleged misstatements; his resignation by itself says nothing regarding CNO's success, its prior credit ratings, its selectivity in bidding in Venezuela, or about the impact of the Petrobras

investigation on CNO in the last quarter of 2014.[12]

The initial reports of Marcelo's arrest and the existence of proof tying Odebrecht officials to the Petrobras scheme let the cat out of the bag. Subsequent reports merely confirmed what the market already knew. Therefore, these later reports were not corrective disclosures. *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("[I]n order to qualify as a 'corrective disclosure' for loss causation purposes, an alleged disclosure must 'reveal the falsity of an alleged misstatement.'" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008))); *see also Omnicom Grp.*, 597 F.3d at 512 ("[N]egative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").[13]

Turning to the disclosure of the misleading nature of CNO's statement that its bidding success in Venezuela was due to its selectivity, Plaintiffs fail to allege any resulting losses. All of the previously discussed partial disclosures revealed details about the bribery scheme, but they were limited to bribes paid to Brazilian officials. Plaintiffs allege that it was not until early 2016 that the international scope of CNO's bribery scheme was revealed. However, the news reports at that time discussed only bribes paid to officials in Peru and Argentina. *See* SAC ¶¶ 207-08. It was not until Odebrecht entered into the plea agreement, which was publicly filed on December 21, 2016, that the bribes paid to Venezuelan officials came to light. *See* SAC ¶¶ 226, 232. Yet Plaintiffs allege nothing regarding any further decline in the value of the Notes after that date, or any other losses that they

---

[12] Likewise, news of Marcelo Odebrecht's prison sentence and Defendants' cooperation with authorities did not offer any new information to show the falsity of any of the actionable misstatements.

[13] Plaintiff also allege that various press releases issued by Odebrecht successfully prevented more substantial losses than those incurred. *See* SAC ¶¶ 190, 192, 194, 196, 197, 199, 204, 206. Those disclosures cannot support a theory of loss causation because they are alleged to have actually *stopped* additional losses, and not to have *caused* any Plaintiff a loss.

purportedly suffered as a result of this corrective disclosure. In the absence of allegations of loss in connection with this statement, Plaintiffs' Section 10(b) claims predicated on this statement fail. *See Lentell*, 396 F.3d at 173.

With respect to CNO's other statements—regarding its prior credit ratings and the fact that the Petrobras investigation had not impacted CNO in the third quarter of 2014—Plaintiffs fail to allege loss causation. None of the partial corrective disclosures identified by Plaintiffs revealed the falsity of either of these statements. CNO's prior credit ratings themselves were not shown to have been false when reported. And the fact that CNO was publicly implicated in the scandal in 2015 does not render false its prior statement—that it was not impacted by the scandal the year before. In fact, Plaintiffs allege that the Notes continued to trade at par value during the third quarter of 2014, when that statement was made. *See* SAC ¶¶ 173, 186. Without any allegation of the disclosure of the falsity of these statements, Plaintiffs cannot logically plead that their losses are the result of these misstatements. *See Vivendi*, 838 F.3d at 261.

Defendants additionally argue that Plaintiffs can attribute only a "fraction" of the alleged decline in market value of the Odebrecht Finance Notes to Defendants because the second amended complaint reflects declines in the Notes' value during periods unaccounted for by Plaintiffs. Defs.' Mem. at 31. To survive dismissal at the pleading stage, however, Plaintiffs are not required to "allege that their entire loss was caused by the misstatements and omissions complained of," just that Defendants' misstatements or omissions "concealed the circumstances that bear upon the loss suffered such that [P]laintiffs would have been spared all or an ascertainable portion of the loss absent the fraud." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011); *see also Barclays*, 750 F.3d at 233 ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in the stock price."). The Court is satisfied that Plaintiffs have alleged that at least an ascertainable portion of their losses was the

result of the public disclosure of CNO's fraud.[14]

*    *    *

In sum, Plaintiffs adequately plead their Section 10(b) and Rule 10b-5 claims against CNO to the extent those claims are predicated on CNO's misstatement regarding the legitimate reasons for its success. Plaintiffs' other Section 10(b) and Rule 10b-5 claims against CNO, Odebrecht Finance, and OEC are dismissed.

### 5. Section 20(a) Claims

Defendants move to dismiss Plaintiffs' Section 20(a) claim against OEC. *See* Defs.' Mem. at 32-33. To reiterate the standard applicable to Plaintiffs' Section 20(a) claim, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Barclays*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt.*, 603 F.3d at 160.

Plaintiffs emphasize that the determination of whether a defendant is a "controlling person" is "a fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015) (citation and alteration omitted). Nonetheless, "it is not sufficient for [a plaintiff] to allege that [a defendant] has control person *status*; instead, [the plaintiff] must assert that [the defendant] exercised *actual* control over the matters at

---

[14] Plaintiffs allege that, in addition to purchasing the Notes, they also sold some of their Note holdings. See SAC ¶¶ 25-26. Those sales are not further discussed in the second amended complaint, nor are they addressed in the parties' briefing in connection with this motion. All of those sales were made between April 2, 2014 and October 10, 2014. *Id.* That is, those securities were sold prior to the public disclosure of Defendants' participation in the fraud, and prior to the alleged steep decline in the value of the Notes. Therefore, the securities that were sold cannot form the basis of Plaintiffs' Section 10(b) claim. *See VEON*, 2017 WL 4162342, at *12 ("[A]ny individual who both purchased and sold his or her shares prior to [the date of disclosure of the fraud] cannot demonstrate loss causation.").

issue." *In re Smith Barney*, 884 F. Supp. 2d at 166; *see also In re Global Crossing, Ltd. Sec. Litig.*, No. 02-cv-910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (Lynch, J.) ("To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." (citation omitted)).

Plaintiffs argue that they sufficiently allege that OEC exercised control over CNO. According to the second amended complaint, OEC "is currently the parent company of CNO." SAC ¶ 16. OEC's status as a corporate parent, however, says nothing regarding the control that OEC actually exerts over CNO's operations and, in particular, its preparation of its financial disclosures. *See Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Internat'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (explaining that "a parent corporation and its subsidiary are regarded as legally distinct entities"). Plaintiffs also allege that "OEC acted as a controlling person of CNO, and had the power and authority to cause CNO to engage in the wrongful conduct complained of herein." *Id.* ¶ 260. This is nothing more than a conclusory allegation of control and is insufficient to state a Section 20(a) claim against OEC. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (finding insufficient as a matter of law the allegation that defendants were controlling shareholders); *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-3288 (DLC), 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (holding that allegations that holding company defendants were the parents of entities against which a Section 11 claim was pleaded failed to "provide[ ] fair notice of the ground on which the assertion of control rests"). Plaintiffs' Section 20(a) claim against OEC is dismissed.

### B. State Law Claims

Plaintiffs assert various state law claims against Defendants, which include claims for negligent misrepresentation, common law fraud, conspiracy, and violations of sections 273, 276, and 276-a of the New York Debtor and Creditor Law. SAC ¶¶ 263-92. Plaintiffs also assert that the

corporate veil should be pierced, and Odebrecht should be held liable for any misconduct by Odebrecht Finance. *Id.* ¶¶ 293-94. Defendants move to dismiss these claims.

### 1. Negligent Misrepresentations and Fraud

Defendants move to dismiss Plaintiffs negligent misrepresentation and fraud claims on the ground that Plaintiffs have insufficiently pleaded reliance. Defendants do not move to dismiss these claims on the basis of inactionable misstatements or omissions. For that reason, and in light of this Circuit's practice of granting a plaintiff leave to replead claims dismissed at the pleading stage, the Court addresses all of Plaintiffs' reliance allegations to ensure a more efficient disposition of Plaintiffs' claims as the litigation moves forward.

"To plead a common law fraud claim under New York law, a 'plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations.'" *SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC*, 829 F.3d 173, 177 (2d Cir. 2016) (quoting *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1044 (2015)), *cert. denied*, 137 S. Ct. 2326 (2017). Negligent misrepresentation claims also require a pleading of reliance on the alleged misstatements. *See Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012).

"In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital*, 343 F.3d at 195. A plaintiff must also allege that such reliance was to its detriment, *i.e.*, "that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Meyercord v. Curry*, 832 N.Y.S.2d 29, 30 (1st Dep't 2007) (citation omitted). "Although reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss in certain circumstances." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y.

2007).

Additionally, "misstatements are actionable only if . . . plaintiffs' reliance upon the information [is] foreseeable." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Heard v. City of New York*, 603 N.Y.S.2d 414, 418 (1998)). "There must be knowledge or its equivalent on the defendant's part that the information is desired for a serious purpose, that the plaintiff intends to rely and act upon it, and that if the information is false or erroneous, he will suffer injury." *Id.* (internal quotation marks and citation omitted). Such "issues of proximate cause are often fact-laden, requiring a fully developed factual record, and not a bare-bones motion to dismiss." *Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, No. 10-cv-232, 2010 WL 4449366, at *4 (S.D.N.Y. Oct. 13, 2010) (internal quotation marks and citation omitted).[15]

Plaintiffs argue that they sufficiently plead their reliance on the alleged misstatements. The second amended complaint alleges that "[o]n direct reliance of the false and misleading statements identified above, *and/or* in reliance on the integrity of the market price of such securities, *and/or* without knowledge of the material omissions identified herein," Plaintiffs purchased material amounts of the 7.125% Notes and the 7.50% Notes. SAC ¶¶ 25-26 (emphasis added). Plaintiffs also allege that "[i]n making their purchases of the Odebrecht Finance 7.50% Notes, Plaintiffs specifically relied upon the above-identified statements (in addition to the other false and misleading statements identified below), without the knowledge that such statements were materially false and misleading, in making their decisions to purchase the Odebrecht Finance 7.50% Notes." *Id.* ¶ 99. This allegation is repeated in connection with the 7.125% Notes. *Id.* ¶ 113. In addition, Plaintiffs

---

[15] Plaintiffs assert that the fraud-on-the-market presumption applies. Pls.' Opposition (ECF No. 52) ("Pls.' Opp.") at 20-21. That presumption, crafted by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and applicable to Section 10(b) claims, "is to be found nowhere in . . . the common law of fraud or deception." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 483 (2013) (Scalia, J., dissenting). Plaintiffs seem to recognize this, explaining how the presumption arises "in Section 10(b) claims." Pls.' Opp. at 21.

allege that they "received, reviewed and relied upon each of the financial reports and Earnings releases identified below." *Id.* ¶ 141. The reports "identified below" include CNO's 2011 end-of-year financial statements, *id.* ¶¶ 145-47, CNO's 2012 earnings release, *id.* ¶¶ 148-50, CNO's first, third, and fourth quarter 2013 and end-of-year 2013 financial statements, *id.* ¶¶ 151-62, CNO's first, second, and third quarter 2014 financial statements, *id.* ¶¶ 163-74, and Odebrecht's 2014 annual report, *id.* ¶¶ 176-85. Finally, Plaintiffs allege that they "directly relied upon *many* of the false statements identified above in deciding to purchase the Odebrecht Finance Notes, including the 7.125% Notes, the 7.50% Notes, and *various* other statements made directly to Plaintiffs, and statements made in *various* earnings releases or telephonic conferences related to earnings releases." *Id.* ¶ 248 (emphasis added) (citations omitted).

Defendants argue that these allegations are nothing more than conclusory, and the Court agrees. Plaintiffs purchased the 7.125% Notes in thirty-four transactions over the course of nearly two years, between May 6, 2013 and March 31, 2015. *See id.* ¶ 25. Similarly, Plaintiffs purchased the 7.50% Notes in a series of twenty-eight transactions over the course of eighteen months, between August 22, 2013 and March 31, 2015. *See id.* ¶ 26. Given the dates of these transactions, it would have been impossible for Plaintiffs to rely on *all* of the alleged misstatements in deciding to purchase each of the securities. For example, Plaintiffs' purchases in May 2013 predate the statements in CNO's fourth quarter 2013 financial statements, CNO's annual 2013 financial statements, and CNO's 2014 quarterly financial statements. Plaintiffs apparently recognize this by alleging only that they relied on "many" and "various" of the misstatements. *Id.* ¶ 248. With the same token, Plaintiffs also acknowledge that they relied on either the misstatements or the integrity of the market prices of the Notes. *Id.* ¶¶ 25-26. Moreover, Plaintiffs do not allege that they read or reviewed either of the offering memoranda or that they read or reviewed CNO's financial figures in its 2009 and 2010 financial statements—documents which contain several of the alleged misstatements. And

because Plaintiffs' allegations are not specific, they also plead reliance on the alleged misstatements contained in the 4.375% Notes OM and the 5.250% Notes OM. Plaintiffs concede, however, that they did not purchase any of the 4.375% Notes, and their claims rest only on the 7.125% and 7.50% Notes. Therefore, it is entirely unclear how Plaintiffs relied on the representations in the other offering memoranda in their purchases of the Notes at issue here.

These allegations fail to provide Defendants with notice of which misstatements were relied upon by Plaintiffs in their decision to purchase the Notes. Under either Rule 8 or Rule 9(b), such conclusory allegations do not suffice to plead reliance.[16] *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011) (finding allegation that "in connection with their purchases of Securities after February 23, 2007, Plaintiffs and/or their investment managers read and relied upon Citi's 2006 Form 10-K, including the false financial statements and other statements alleged herein to be false or misleading" did not meet the *Iqbal/Twombly* pleading standard); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 309-10 (S.D.N.Y. 2014) (finding allegations that plaintiff, in reliance on alleged misrepresentations in Bear Stearns' 10-K, purchased securities during a "year-long period from March 2007 through March 2008" inadequate to state a claim under Rule 9(b)'s standard when complaint did not "link" the review of any particular statements with particular purchases); *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d

---

[16] The Second Circuit has not yet determined whether Rule 9(b)'s heightened pleading requirement applies to allegations of reliance in connection with a common law fraud claim. *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC*, 829 F.3d 173, 177 n.4 (2d Cir. 2016) ("Because the complaint fails to meet the *Twombly* pleading standard, we do not consider whether the stricter pleading requirements of Federal Rule of Civil Procedure 9(b) apply to the reliance element of [the plaintiff's] common law fraud claims."). District courts in this Circuit have concluded that Rule 9(b) applies to a common law fraud claim brought under New York law. *See, e.g., Batson v. Rim San Antonio Acquisition, LCC*, No. 15-cv-7576 (ALC), 2016 WL 6901312, at *3 (S.D.N.Y. Nov. 22, 2016) ("Where, as here, a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act and the common law, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."); *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig*, 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014) ("To plead common law fraud, a plaintiff must allege with particularity that it actually relied upon the supposed misstatements."), *aff'd*, 829 F.3d 173 (2d Cir. 2016); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 287-91 (S.D.N.Y. 1998) (applying Rule 9(b) to plaintiff's common law fraud claim and dismissing claim in part due to plaintiff's failure to sufficiently plead reliance).

Cir. 2007) (explaining that a complaint must provide sufficient factual allegations "to give the defendant fair notice of what the claim is and the grounds upon which it rests" (citing *Twombly*, 550 U.S. at 555)).

## 2. Conspiracy Claim

Defendants also move to dismiss Plaintiff's conspiracy claim. Defendants note that Plaintiffs have asserted that California law governs this claim. *See* Defs.' Mem. at 39 n.43; ECF No. 32 at 2. Both parties cite to California law in briefing their arguments. *See* Defs.' Mem. at 39-40; Pls.' Opp. at 39 n.91. Where, as here, "the parties' briefs assume that [a certain state's] substantive law governs the issues . . . such implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases). Accordingly, the Court will evaluate the sufficiency of Plaintiffs' conspiracy claim under California law.

To state a conspiracy claim under California law, a plaintiff must allege "(1) formation and operation of the conspiracy and (2) damages resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1136 (2014), *as modified on denial of reh'g* (Feb. 27, 2014) (citation omitted).

Defendants argue that Plaintiffs have failed to plead an actionable tort. The Court has dismissed Plaintiffs' fraud and negligent misrepresentation claims, therefore Defendants are correct that no underlying tort has been sufficiently pleaded. *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 844 (2d Cir. 1998) (explaining that no cause of action for conspiracy to violate Section 10(b) and Rule 10b-5 exists as a result of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). In the absence of an underlying "wrongful act," the conspiracy claim fails.

### 3. Claims Under New York Debtor and Creditor Law

Finally, Defendants move to dismiss Plaintiff's fraudulent conveyance claims brought under sections 273, 276, and 276-a of New York's Debtor and Creditor Law ("DCL"). These sections define different types of conveyances that become recoverable by a creditor because of the conveyance's fraudulent nature. Plaintiffs allege that Odebrecht Finance transferred the proceeds of the Note sales to CNO and Odebrecht immediately after those sales were completed. SAC ¶ 39. The proceeds were used to finance CNO's "general corporate purposes" and as additional equity investments in other Odebrecht subsidiaries. *Id.* ¶ 36. Odebrecht Finance is alleged to have been insolvent since incorporation, and at least since March 31, 2012. *Id.* ¶ 34. Accordingly, Plaintiffs bring a claim for constructive fraudulent transfer under section 273 of the DCL and argue that Odebrecht Finance, an insolvent entity, conveyed the proceeds of the Note sales to CNO and Odebrecht without fair consideration. *Id.* ¶¶ 278-81.

Plaintiffs also bring a claim for an actual fraudulent transfer under DCL § 276. *Id.* ¶¶ 282-89. Plaintiffs allege that the conveyances of the Note proceeds were made with "actual intent to hinder, delay, or defraud either present or future creditors, including the Plaintiffs." *Id.* ¶ 284. Because the conveyances left Odebrecht Finance without the means to satisfy any judgment against it, Plaintiffs allege that Odebrecht and CNO are liable to Plaintiffs for damages. *Id.* ¶ 289.

Finally, Plaintiffs seek recovery of their reasonable attorneys' fees and costs incurred in prosecuting their fraudulent conveyance claims under DCL § 276-a. *Id.* ¶ 292.

Plaintiffs bring these claims against Odebrecht, CNO, and OEC. At the outset, the fraudulent conveyance claims against OEC are dismissed as Plaintiffs have failed to allege OEC's participation in the conveyances or any benefit that OEC received from the conveyances of the Note proceeds. *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993) (explaining that a creditor's remedy for money damages under the DCL exists as against "parties

who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance").

### a. Section 273 Claim

To bring a cause of action for fraudulent conveyance, "the plaintiff must be a creditor of the transferor of the alleged fraudulent conveyance." *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) (citing N.Y. Debt. & Cred. Law §§ 270-81); *see also In re Refco, Inc. Sec. Litig.*, No. 07-MDL-1902 (GEL), 2009 WL 7242548, at *9 (S.D.N.Y. Nov. 13, 2009) (noting that "a legitimate creditor is required to established standing" under the New York Debtor and Creditor Law), *report and recommendation adopted*, No. 07-MDL-1902 (JSR), 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010). Defendants concede that Plaintiffs were creditors of Odebrecht Finance at the time the 5.250% Notes proceeds were conveyed, but dispute their status as creditors at the time of the conveyance of the proceeds from the other Notes. *See* Reply at 20.

The DCL defines "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. Law § 270. DCL § 275 explains that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." *Id.* § 275; *In re Michel*, 572 B.R. 463, 473 (E.D.N.Y. 2017). However, New York courts have held that only section 276 is applicable to future creditors, and not section 273. *See, e.g., Matter of Shelly v. Doe*, 671 N.Y.S.2d 803 (3d Dep't 1998) (concluding that a person is a "creditor" for purposes of section 273 when that person's cause of action against the transferor arises prior to the conveyance); *Bd. of Managers of Chocolate Factory Condo. ex rel. Chocolate Factory Condo. v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157, 2014 WL 1910237, at *16 (Sup. Ct. 2014) (explaining that, to bring a claim under section 273, "a plaintiff must demonstrate that it was a 'creditor' at the time of the

conveyance" (citation omitted)); *see also In re Manshul Const. Corp.*, No. 96-B-44079 (JHG), 2000 WL 1228866, at *44 n.8 (S.D.N.Y. Aug. 30, 2000) (finding that a bankruptcy trustee lacked standing to bring claims on behalf of creditors under DCL § 273 "because DCL § 273 refers only to 'creditors' rather than to both creditors and future creditors").

Based on Plaintiffs' own allegations, the proceeds of the Note sales were "immediately" transferred to Odebrecht and CNO. SAC ¶ 39. The 7.125% Notes were delivered to investors on June 26, 2012. Carlinsky Decl., Ex. A at 1. The 7.50% Notes were delivered on November 9, 2011. Carlinsky Decl., Ex. B at 1. And the 4.375% Notes were delivered on April 25, 2013. Second Carlinsky Decl., Ex. V. Accepting Plaintiffs' allegation as true (that the Note proceeds were surrendered by Odebrecht Finance "immediately" after the sales), the proceeds from these Notes were delivered to Odebrecht and CNO prior to Plaintiffs' first purchase of the Notes—on May 6, 2013. SAC ¶ 25. Plaintiffs' claims against Odebrecht and CNO did not accrue until Plaintiffs' purchase of the Notes; Plaintiffs could not have had any relevant claim at the time of the conveyance of those Note proceeds. Therefore, Plaintiffs' constructive fraudulent conveyance claim can proceed only in connection with the transfer of the proceeds from the sale of the 5.250% Notes, which notes were delivered to investors on June 27, 2014. *Cf. MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, No. 91-cv-3451 (SWK), 1994 WL 560978, at *8-9 (S.D.N.Y. Oct. 12, 1994) (finding that plaintiffs were creditors when they purchased notes more than one year prior to relevant conveyance and held them at the time of the conveyance).

Section 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273. "Fair consideration" is deemed to have been given "for property, or obligation" in two circumstances:

      a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

      b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

*Id.* § 272. "Because intent to defraud is not an element of constructive fraudulent conveyances, such claims, as opposed to claims of actual fraud, are not subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b)." *Waite v. Schoenbach*, No. 10-cv-3439 (RMB), 2010 WL 4456955, at *6 (S.D.N.Y. Oct. 29, 2010) (quoting *Smith v. Pali Capital, Inc.*, No. 06-cv-3362, 2006 WL 3240578, at *4 (S.D.N.Y. Nov. 7, 2006)).

    Plaintiffs allege that Odebrecht Finance "conveyed all or virtually all of the proceeds from the sale of Notes to Defendants CNO and Odebrecht" and, in return, "received nothing of reasonably equivalent value from either Defendant." SAC ¶ 39. Plaintiffs also allege that Odebrecht Finance, though it has "no legitimate assets," received "utterly worthless 'receivables'" from Odebrecht entities in exchange for the conveyances to CNO and Odebrecht. *Id.* ¶¶ 35-36. These conclusory allegations do not suffice to state a constructive fraudulent conveyance claim. *See Waite*, 2010 WL 4456955, at *7 ("Plaintiff's allegations that the 'transfers were made without fair consideration' and 'rendered Defendants insolvent' are conclusory allegations that are insufficient to withstand a motion to dismiss."); *In re Vivaro Corp.*, 524 B.R. 536, 556 (S.D.N.Y. 2015) (finding allegations that certain entities did not "receive[ ] reasonably equivalent value or fair consideration in exchange" for the conveyances to be conclusory). Therefore, Plaintiffs' DCL § 273 claim is dismissed.

    **b. Section 276 Claim**

    Section 276 of the DCL—actual fraudulent transfers—provides that "[e]very conveyance

made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. Thus, unlike a claim under DCL § 273, an intentional fraudulent conveyance under DCL § 276 "is fraudulent as to both present and future creditors." *Id.*; *In re Rosenfield's Will*, 213 N.Y.S.2d 1009, 1015 (Surr. Ct. 1961), *aff'd*, 236 N.Y.S.2d 941 (2d Dep't 1962). Therefore, Plaintiffs may properly bring a claim under section 276 in connection with all of the alleged conveyances.

Also unlike under section 273, a transferor need not receive fair consideration for a conveyance to be fraudulent under section 276. *See MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)). Instead, a plaintiff must allege an "intent to defraud on the part of the transferor." *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). "[T]he relevant intent may be inferred from the facts and circumstances surrounding the transfer." *SEC v. Smith*, 646 F. App'x 42, 45 (2d Cir. 2016) (summary order) (quoting *In re Cassandra Grp.*, 312 B.R. 491, 497 (Bankr. S.D.N.Y. 2004)). These "badges of fraud" are facts and circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp*, 403 F.3d at 56 (quoting *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244 (1st Dep't 1999)). Such "badges" include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Ford Motor Credit Co. LLC v. Orton-Bruce*, No. 14-cv-5382 (KMK), 2017 WL 1093906, at *9 (S.D.N.Y. Mar. 22, 2017) (citation omitted); *see also In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). Other

badges may include whether it was a "secret and hasty transfer not in the usual course of business," the degree of "the transferor's knowledge of the creditor's claim and the transferor's inability to pay it," and "the use of dummies or fictitious parties" in the transfer. *MFS/Sun Life Tr.*, 910 F. Supp. at 935. "Depending on the context, badges of fraud will vary in significance." *Id.* The presence of one badge "is merely circumstantial evidence and does not constitute proof of actual intent." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (S.D.N.Y. 2005) (citing 4 L. King, Collier on Bankruptcy § 548.04[2] (15th ed. 1983)). "[T]he presence of multiple indicia will increase the strength of the inference." *MFS/Sun Life Tr.*, 910 F. Supp. at 935.

"[A] creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." *Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003); *see also Stochastic Decisions*, 995 F.2d at 1172 ("The New York Court of Appeals has made it clear that the pertinent provisions of the New York Debtor and Creditor Law provide a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance.").

Here, Defendants argue that Plaintiffs are estopped from bringing an intentional fraudulent conveyance claim because they were aware of Odebrecht Finance's status as a "shell company" at the time they purchased the Notes and the offering memoranda expressly explained how the Note proceeds would be used. "A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) (quoting *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994)). "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *Id.* (quoting 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* § 87). Ratification requires both "knowledge of a defect in the act to be confirmed" and "the right to reject

or ratify it." *In re Estate of Edgar Wolf Levy*, 893 N.Y.S.2d 142, 144 (2d Dep't 2010) (citing *Matter of Ryan*, 291 N.Y. 376, 417 (1943)); *see also LNC Invs., Inv. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 464 n.6 (2d Cir. 1999) (noting in dicta that it would be "relevant to potential affirmative defenses," including ratification, whether "the Bondholders had the legal ability to direct the trustees to act"). Thus, creditors have been found to be estopped from bringing fraudulent conveyance claims when they actually participated in structuring the fraudulent transaction. *See, e.g., In re Refco*, 2009 WL 7242548, at *11 ("Refco's intimate involvement in the transaction for assertedly worthless shares is more than enough to disqualify Refco as a legitimate creditor.").

Ratification is an affirmative defense to a fraudulent conveyance claim and, as such, must be proven by a defendant. *See In re Lyondell Chem. Co.*, 503 B.R. 348, 384 (Bankr. S.D.N.Y. 2014), *as corrected* (Jan. 16, 2014), *abrogated on other grounds, In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016).

Here, Defendants argue that Plaintiffs knew, or had access to information regarding, the manner in which Odebrecht Finance would use the Note proceeds. Specifically, Defendants point to language in the 7.125% Notes OM that explains:

> Odebrecht Finance intends to use a portion of the net proceeds of this offering to redeem, repay or repurchase all of its 2017 notes, of which U.S. $112.8 million was outstanding as of March 31, 2012. We [CNO] intend to use a portion of the net proceeds of this offering for general corporate purposes and Odebrecht intends to use the remaining portion of the net proceeds of this offering for additional equity investments in OPI and OE.

Carlinsky Decl., Ex. A at 24. The 7.50% Notes OM contains similar language. *See* Carlinsky Decl., Ex. B at 25. These statements would have informed a reasonable investor that the proceeds of the Note sales were to be conveyed to Odebrecht and CNO, and not retained as assets by Odebrecht Finance. The 5.250% Notes OM, on the other hand, tells a different story. That offering memorandum explains:

> Odebrecht Finance intends to use the net proceeds of this offering to purchase certain amounts of the 2020 notes, 2022 notes, 2023 notes and/or 2025 notes tendered to it in connection with the anticipated tender offer.

Carlinsky Decl., Ex. C at 24. Therefore, it is not clear from the second amended complaint and Defendants' public filings that Plaintiffs knew, or should have known, that the proceeds from the 5.250% Notes would be transferred in their entirety to CNO and Odebrecht.

More importantly, Defendants point to no allegation in the complaint to show that Plaintiffs, though having knowledge of some of the conveyances, ratified the conveyances. Defendants highlight that most of the conveyances took place before Plaintiffs purchased their Notes. And Plaintiffs are not otherwise alleged to have participated in any of the conveyances. Ratification requires "knowingly giving sanction or affirmance to an act." *Adelphia Recovery Tr.*, 634 F.3d at 691. Therefore, to successfully assert this defense at this stage, Defendants must point to some allegation in the second amended complaint that shows Plaintiffs' "intent to ratify" the conveyances. *Id.* at 694. Defendants point to no such allegation. Nor is it plain from the face of the second amended complaint that Plaintiffs, as secondhand purchasers of the Notes, had the "legal ability" to direct Odebrecht Finance, or any transferee, to act. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-4394 (AJN) (BCM), 2016 WL 4613390, at *16 (S.D.N.Y. Aug. 31, 2016) (rejecting ratification argument when plaintiff "did not have the 'legal ability' to direct [the defendant] to act, nor any other 'right to reject or ratify' its conduct"). Rather, Plaintiffs asserted their objection to the conveyances by timely bringing this lawsuit. *See id.* (concluding that plaintiff "objected within a reasonable time by bringing suit within the applicable statute of limitations" (internal quotation marks and citation omitted)); *CMMF, LLC v. J.P. Morgan Inv. Mgmt., Inc.*, 992 N.Y.S.2d 158, 2013 WL 8480424, at *28 (Sup. Ct. 2013) (finding no ratification when plaintiff "objected within a reasonable time . . . by bringing this suit.").

Absent plain evidence of ratification, the Court will not dismiss the intentional fraudulent conveyance claim on this ground. *See McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." (citation omitted)); *see also In re Tronox Inc.*, 503 B.R. 239, 276 (S.D.N.Y. 2013) (rejecting argument that bondholders ratified conveyances when they "did not structure the allegedly fraudulent transaction; they simply bought into it based on the information available to them"); *id.* ("If the decision to become a creditor of an entity constitutes a ratification sufficient to bar that creditor from filing a fraudulent conveyance complaint . . . few such actions could be brought, even though it is well accepted that they may have claims under the fraudulent conveyance laws.").

Having found that, for purposes of this motion, Plaintiffs are not estopped from bringing their section 276 claim, the Court must now determine whether sufficient badges of fraud are pleaded to raise an inference of an intent to deceive creditors. Plaintiffs assert in their opposition that they have pleaded the following badges: (1) a close relationship between the parties given their corporate structure, (2) a "secret and hasty transfer not in the usual course of business," (3) inadequacy of consideration, (4) Odebrecht Finance's knowledge of its inability to pay without assistance from the other corporate entities, and (5) the use of dummies, given that Odebrecht Finance was only a "shell company." Pls.' Opp. at 38-39. Plaintiffs' allegations in this regards are sufficient at this stage to withstand dismissal. Odebrecht Finance is alleged to have been created as nothing more than a shell company; CNO prepared the offering memoranda pursuant to which Odebrecht Finance's Notes were sold and assumed responsibility for listing the Notes; Odebrecht Finance was knowingly entirely dependent on Odebrecht and CNO for funding and was insolvent during the Relevant Period; and the conveyance of the proceeds from the 5.250% Notes was not publicly disclosed in the associated offering memorandum. While Plaintiffs have not sufficiently

pleaded the inadequacy of consideration, not all of the badges must be alleged. *See MFS/Sun Life Tr.*, 910 F. Supp. at 935. The Court is satisfied at this stage that Plaintiffs have pleaded an inference of intent to defraud creditors.

### c. Section 276-a Claim

Lastly, DCL § 276-a provides that a creditor may recover its reasonable attorneys' fees "[i]n an action or special proceeding brought by a creditor . . . to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent . . . to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor . . . shall recover judgment." N.Y. Debt. & Cred. Law § 276-a. Because the Court has not dismissed Plaintiffs' section 276 claim in its entirety, Plaintiffs' claim for attorneys' fees also survives.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part:

Plaintiffs state a claim under Section 10(b) and Rule 10b-5 against CNO based on CNO's opinion statements regarding the reasons for its success.

Plaintiffs' other Section 10(b) and Rule 10b-5 claims against CNO, OEC, and Odebrecht Finance are dismissed without prejudice.

Plaintiffs' Section 20(a) claim against OEC is dismissed without prejudice.

Plaintiffs' fraud claim against CNO, OEC, and Odebrecht Finance is dismissed without prejudice.

Plaintiffs' negligent misrepresentation claim against CNO, OEC, and Odebrecht Finance is dismissed without prejudice.

Plaintiffs' conspiracy claim against CNO, OEC, and Odebrecht Finance is dismissed without

prejudice.

Plaintiffs' DCL § 273 claim against OEC and CNO is dismissed without prejudice.

Plaintiffs' DCL § 276 claim against OEC is dismissed without prejudice.

Plaintiffs state a claim under DCL § 276 against CNO.

Plaintiffs are granted leave to replead those claims that have been dismissed without prejudice no later than thirty (30) days following the date of this order. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that leave to amend is "liberally granted").

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 49.

SO ORDERED.

Dated: August 8, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge