UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DOUBLELINE CAPITAL LP, DOUBLELINE     :
INCOME SOLUTIONS FUND, and            :
DOUBLELINE FUNDS TRUST (on behalf of its:  :
1) DoubleLine Core fixed Income Fund Series; 2)  :
DoubleLine Emerging Markets Fixed Income Fund  :
Series; and 3) DoubleLine Shiller Enhanced Cape®  :
Series),                              :
                                      :
                          Plaintiffs, :
                                      :
          -against-                   :
                                      :
CONSTRUTORA NORBERTO ODEBRECHT,       :
S.A., ODEBRECHT ENGENHARIA E          :
CONSTRUÇÃO S.A., and ODEBRECHT, S.A.  :
                                      :
                          Defendants. :
-------------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  9/23/2019 |

1:17-cv-4576-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

　　　After Defendants Construtora Norberto Odebrecht ("CNO"), Odebrecht Engenharia e

Construção S.A. ("OEC"), and Odebrecht, S.A. ("OSA") joined the ranks of the many other

Brazilian construction and engineering conglomerates accused of bribing government officials to

secure lucrative contracts, Plaintiffs, substantial purchasers of Notes issued by Odebrecht Finance

Ltd. ("Odebrecht Finance") and guaranteed by CNO and OEC, saw the value of their holdings drop

precipitously.  Plaintiffs sued, asserting claims under Section 10(b) and 20(a) of the Exchange Act, as

well as various state law claims.  This Court dismissed many of Plaintiffs' claims on Defendants'

motion, and permitted Plaintiffs an opportunity to replead those dismissed without prejudice.

Because Plaintiffs remedied most of the failures of their second amended complaint—including

adequately pleading the concealment of CNO's involvement in the bribery scheme and the

materialization of that risk when auditors refused to certify CNO's financial reports—many of its

claims survive Defendants' motion to dismiss.

I.      BACKGROUND

The Court assumes familiarity with the facts and procedural posture of this case as broadly outlined in *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393 (S.D.N.Y. 2018) (the "August 2018 Opinion"). There, the Court partially granted and partially denied Defendants' motion to dismiss, granting Plaintiffs permission to replead all claims denied without prejudice. Plaintiffs then filed a third amended complaint ("TAC"), alleging new claims and supplementing the record accordingly. Dkt. No. 61. Defendants, however, again moved to dismiss. Defs.' Mem. in Supp. Mot. to Dismiss, Dkt. No. 77 ("MTD").

Many of the facts asserted in the third amended complaint are substantially identical to those asserted in the prior version of the complaint. In response to the Court's August 2018 Opinion, Plaintiffs have bolstered a number of allegations. The principal categories of those expanded allegations are described below. Some of the new facts alleged in the third amended complaint indicate that CNO violated Brazilian generally accepted accounting principles ("GAAP"). Others support claims that statements in the Notes issued by Odebrecht Finance were false. Still more advance Plaintiffs' claims for compensation for CNO's alleged federal and state law violations from both OEC—under New York's successor liability law—and OSA—as a control person and a co-conspirator. The Court addresses each in turn.

A.  **CNO's GAAP Violations**

Plaintiffs allege that many of Defendants' public statements were false or misleading as a result of their undisclosed participation in the massive bribery scheme that entangled many Brazilian corporations and politicians. Among those statements are CNO's quarterly and annual financial statements. In the offering memoranda for the 7.50%, 7.125%, 4.375%, and 5.250% Notes, CNO asserted that it had prepared its financial statements in accordance with Brazilian GAAP. TAC ¶¶ 122-124, 141-43, 158-160, 179-181. According to Plaintiffs, the controlling GAAP regulations

are those issued by the Brazilian Accounting Pronouncements Committee (*Comitê de Pronunciamentos Contábeis*), which promulgates accounting standards using the prefix "CPC," and the International Financial Reporting Standards ("IFRS"), which promulgates the International Accounting Standards ("IAS").  TAC ¶¶ 93 n.12, 95.  According to Plaintiffs, CNO's statements were false and misleading because they did not, in fact, comply with Brazilian GAAP requirements in three ways.  TAC ¶ 95.

First, Plaintiffs allege that the 2009 through 2015 financial statements failed to disclose the bribery scheme and any expected financial costs of the bribery scheme as contingent liabilities.  The provisions of Brazilian GAAP that address the reporting and disclosure of contingent liabilities are CPC 25—or the substantially similar IAS 37.  TAC ¶ 97.  According to IAS 37, contingent liabilities are possible obligations whose existence will be confirmed by uncertain future events that are not wholly within the control of the entity.  TAC ¶ 98.  Those standards, Plaintiff alleges, demand that a contingent liability "more likely than not" to result in a loss—namely, slightly more than fifty percent likely—be footnoted.  TAC ¶ 99.

The bribery and kickback scheme presented substantial risk to CNO.  If exposed, Plaintiffs claim, the company faced many foreseeable consequences, including downgrades by ratings agencies, deteriorating liquidity, regulatory investigations and actions leading to massive fines or penalties, criminal prosecution, and increased auditor scrutiny precluding CNO from timely filing required financial statements. Any of those events would result in losses.  TAC ¶ 100.

The volume of bribes increased by an order of magnitude between 2006 and 2014.  TAC ¶ 101.  In 2006, OSA created a Division of Structured Operations to manage the bribery scheme.  TAC ¶¶ 63-64.  As early as 2009, the head of that division warned OSA's Chief Executive Officer, Marcelo Odebrecht, that the escalating level of bribes constituted "financial suicide" and posed extreme risk to the company.  TAC ¶ 102.  By 2014, Marcelo Odebrecht had instructed the Division of Structured Operations to flee Brazil to evade Brazilian investigators, and Defendant OSA was

assisting Division members in acquiring visas and paid their relocation expenses.  TAC ¶¶ 84-85.

Plaintiff alleges that these facts demonstrate that the potential legal troubles and financial loss was

certainly more likely than not, and should have been disclosed in CNO's financial statement

footnotes.  TAC ¶ 103.

Second, Plaintiffs assert that CNO violated CPC 00 when it failed to separately disclose the

amount of revenue it obtained through its use of bribes.  TAC ¶ 105.  CPC 00 (*Conceptual Structure for

the Preparation and Presentation of the Financial Statements*) explains that the common practice is to

separately disclose different types of revenue "to assist investors in assessing the ability of a business

to generate cash in the future and distinguish revenues that arise in the normal course of the entity's

business from revenues stemming from contingent activities that may not be repeated on a regular

basis."  TAC ¶ 106.  Plaintiffs allege that investors and others would not necessarily have expected

contract revenue obtained by fraud to be a reliable indicator of future revenue.  TAC ¶ 109.

Third, CNO's failure to report bribes as costs to obtain its reported revenue, according to

Plaintiffs, violated IAS 11.  TAC ¶¶ 110-17.  Specifically, Plaintiffs argue that CNO should have

reported the bribes used to secure a specific contract as "contracting costs" incurred the year that

the bribe was paid.  TAC ¶¶ 111-13.  The third amended complaint highlights several of those bribes

Plaintiffs paid out to officials in the hope of receiving awards for various contracting projects,

including $23 million paid to a director at Petrobras in 2010 to obtain the construction contract for

Brazil's Abreu e Lima Refinery.  TAC ¶ 75.

### B.  Offering Memoranda Statements

In addition to those already alleged in their second amended complaint and previously

identified in the August 2018 Opinion, Plaintiffs assert several more statements that CNO made in

the Odebrecht Finance Notes' offering memoranda about the company that were false and

misleading.  These statements span everything from a discussion of CNO's financial strength, to its dexterity in avoiding political risk, and its compliance with local regulations.

Plaintiffs argue that the offering memoranda made false and misleading statements when discussing CNO's success in navigating political risk without mentioning that its principal strategy was bribing officials to the tune of more than $3.3 billion.  *See* TAC ¶¶ 132, 151 168, 189. Ultimately, these statements in the offering memoranda concealed the existence of the bribery scheme and its attendant risks.  The applicable language follows:

### Managing Political Risk

We have operated for more than two decades in many countries that have significant levels of political risk.  We are currently active in numerous countries, including Angola, Argentina, Brazil, Colombia, the Dominican Republic, Libya, Mozambique, Panama, Peru, Portugal, the United States and Venezuela.  We attribute our success in certain countries with significant levels of political risk to the following competitive strengths:

* * *

We attempt to mitigate political risk through our experience and knowledge of the markets in which we are active and by entering into joint ventures with local companies and using local subcontractors, suppliers and labor.  By establishing these partnerships with local entities, we also seek to integrate our operations into the communities in which we operate.

We generally seek to establish long-term operations in countries in which we are active and seek appropriate project opportunities that meet our rigorous risk management criteria.  Our long presence in countries such as Peru (34 years), Angola (29 years), and Venezuela (19 years), including during periods of social unrest or war, and our involvement in high visibility projects that are important to a country's economy and development, have earned us goodwill with the governments of these countries.  Accordingly, while other construction companies generally avoid operating in certain of the countries in which we are active, our management believes that our extensive experience in these countries, our diversification and our extensive contract risk assessment and risk sharing with other project participants allow us to effectively manage the political risks presented by construction projects in these countries.

TAC ¶ 167 (omissions in original); *see also* TAC ¶¶ 131, 150, 188.

Plaintiffs also assert that the statements about CNO's adherence to local regulations were false and misleading.  All of the offering memoranda (except those for the 5.250% Notes)

incorporated the statements excerpted below, which, according to Plaintiffs, omit the material fact that CNO's bribes violated local regulations.  *See* TAC ¶¶ 134, 153, 170.

> *Regulatory*
>
> The construction sector in Brazil is not regulated by a particular federal or state agency.  We must register each contract on which we commence work with the applicable Regional Council of Engineering and Architecture (Conselho Regional de Engenharia e Arquitetura). In addition, we are required to obtain all necessary licenses (excluding environmental licenses, which are generally obtained by the project owner) related to each project that we perform in Brazil as a condition of pre-qualification.  In relation to work performed outside Brazil, we are obliged to comply with all applicable regulations imposed on the local and state level and to obtain all necessary permits

TAC ¶¶ 133, 152, 169.

Finally, the third amended complaint reiterated the claim that CNO's offering memoranda made false and misleading disclosures about the reason for the company's financial strength and liquidity.  TAC ¶¶ 126, 145, 162, 183; *see* August 2018 Op. at 412, 414.

> *Financial Strength*
>
> We believe that our financial performance has been consistent, enabling us to rely primarily on our cash flow from operations to invest in our business.  Our EBITDA margins (which we define as EBITDA as a percentage of our net service revenues) for the three-month periods ended March 31, 2012 and 2011 were 10.2% and 9.9%, respectively, and for the years ended December 31, 2011 and 2010 were 10.7% and 11.1%, respectively.  The sum of our cash and cash equivalents and financial investments totaled R $5,006.0 million (U.S. $2,747.4 million) at March 31, 2012, compared to R $6,831.1 million (U.S. $3,749.0 million) and R $4,717.1 million (U.S. $2,588.8 million) at December 31, 2011 and 2010, respectively. We are focused on maintaining a relatively strong financial position and liquidity we have as compared to many of our competitors.

TAC ¶¶ 144; *see also* TAC ¶¶ 125, 161, 182.

**C. Materially False and Misleading Statements About CNO's Credit Ratings**

In CNO's 2012 Earnings Release, the company disclosed the investment grade credit ratings that each of the three major rating agencies had awarded CNO.

> On May 23, 2012, Standard & Poor's raised CNO's Global and National ratings to investment grade, at BBB- and brAAA respectively.  With this upgrade, CNO achieve the triple-investment grade, across the three main rating agencies.

TAC ¶ 195.  Because the release failed to disclose that these ratings were achieved only by concealing the bribery and kickback scheme from the rating agencies, Plaintiffs allege, the statements touting CNO's consecutive upgrades were false and misleading.  TAC ¶ 196.

The notes to CNO's first quarter 2013 financial statements similarly described CNO's success in achieving strong credit ratings.

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale.

> In October 2010, the rating agency Fitch Ratings assigned a BBB- investment grade rating on the global scale and AA+ on the Brazilian national scale.

> In June 2011, the rating agency Standard & Poor's assigned a BB+ rating on the global scale and br AA+ on the national scale.

TAC ¶ 198.  And in CNO's third and fourth quarters, the financial statements portrayed an even rosier picture of CNO's successful credit ratings history.

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and an Aa1.br rating on the Brazilian national scale.  In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and a br AAA rating on the national scale.  In September 2013, the rating agency Fitch Ratings upgraded the Company's rating to BBB on the global scale and AAA on the Brazilian national scale.

TAC ¶¶ 202, 206.  CNO continued discussing its credit ratings in similar language in all its 2014 earnings releases.  TAC ¶¶ 210, 213, 217.  These pronouncements were false and misleading, according to Plaintiffs, because they obscured the fact that those ratings were achievable only because credit rating agencies were unaware of Defendants' involvement in the bribery scheme. TAC ¶¶ 203, 207.

**D. OSA's Materially False and Misleading Statements**

Plaintiff alleges that OSA falsely characterized its company as one based on a foundation of public service, and committed to following a strict code of conduct that effectively prohibited engaging in bribery.  In its 2014 Annual Report, Odebrecht asserted:

> For 70 years, the ethos of service has been the decisive hallmark that sets the Odebrecht Group apart.  It is impossible to translate that ethos into words, but it can be easily identified in the conduct of people who are always willing to perceive, understand, and meet the needs of others, whether they are a client, a co-worker or anyone linked to their work or personal lives.
>
> Identifying and bringing in people endowed with that constant and steadfast desire to serve others has been Odebrecht's main drive for seven decades.  Thanks to them, things became simple, and everything else ensures naturally: the client's satisfaction, support for national development, the generation of social wealth, and the Group's survival, growth, and perpetuity.
>
> Odebrecht's history is the story of people with the ethos of service.  People who apply it on a daily basis, no matter what.  It is in their blood, so for them, any time is a good time for serving others.  For them, service is an ongoing commitment.
>
> * * *
>
> *Code of Conduct*
>
> The Odebrecht Group's Code of Conduct contains concepts and guidelines in addition to TEO that reflect developments in global legislation.  Therefore, it is a Group policy that must be adhered to in a disciplined manner by all Odebrecht Members.  It particularly guides their external relations, as well as applying to the entire value chain in all of the Businesses, geographic regions and societies in which we are present.

TAC ¶¶ 219-20.  Additionally, Plaintiffs note that Odebrecht's code of conduct, featured on its website, specifically prohibited employees from bribing public officials.  *See* TAC ¶¶ 221-222.  These statements were materially false and misleading, according to Plaintiffs, because OSA and its senior management were all aware of the company's involvement in the bribery scheme.  TAC ¶ 223.

Plaintiffs also take issue with OSA's statements about its dedication to reliable and transparent accounting processes and the requirement that OSA members respect the rule of law, citing to the following provisions in the company's code of conduct on its website:

*Accounting Records*

The reliability and transparency of the accounting practiced by the Companies at the Organization are considered crucial.

Commonly accepted legislation, standards and accounting principles should be rigorously observed in order to guarantee consistent records and reports that will permit the disclosure and evaluation of the Company's operations and results.

* * *

*Respect for Laws*

In their business actions, the Organization's Team Members should respect and obey the laws and regulations of each country or region in which they operate.

TAC ¶¶ 224, 226.  The Plaintiffs assert that these statements are materially false and misleading because OSA had established a shadow accounting system designed to hide the bribes from CNO's financial records, and team members clearly were not obeying the law when bribing officials for favorable contracts.  TAC ¶¶ 224-27.

## II.   LEGAL STANDARD

For a complaint to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it "must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  Courts follow a "two-pronged approach" in determining plausibility.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (brackets and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)

(quoting *Iqbal*, 556 U.S. at 679).  This analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

In the securities context, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI,* 493 F.3d at 99.  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  *Id.*  Furthermore, under the PSLRA, securities fraud plaintiffs alleging an untrue statement of material fact or an omission of a material fact necessary to make statements not misleading must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).  A plaintiff must therefore "do more than say that the statements . . . were false and misleading; [she] must demonstrate with specificity why and how that is so." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004).

## III.   DISCUSSION

### A. Federal Securities Fraud Claims

Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act. The Securities and Exchange Commission ("SEC") rule implementing that section makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *see also* 15 U.S.C. § 78j(b).  To succeed on a Section 10(b) claim, a plaintiff must therefore show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152 (2d Cir. 2013) (citing *Dura Pharm. v. Broudo,* 544 U.S. 336, 341-42, (2005)).  Defendants challenge both the materiality of many of the statements identified by Plaintiffs and assert that Plaintiffs have not adequately pleaded loss causation.

Section 20(a) of the Securities Exchange Act  provides that " [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.  "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010).  "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

### 1.   CNO's Actionable Statements & Omissions

Where a company does not have an obligation to speak but chooses to do so anyway, it

assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312,

331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010)

(explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary

or required, the representation must be complete and accurate" (quotation omitted)).   Ultimately,

companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by

controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).

Courts employ this principle to triangulate when disclosure is required.   For example, where

a corporation's illegal conduct and misleading statements are connected "beyond the simple fact that

a criminal conviction would have an adverse impact upon the corporation's operations in general or

the bottom line," the corporation may be compelled to disclosed uncharged wrongdoing if its

statements otherwise are or will become materially misleading.   *Menaldi v. Och-Ziff Capital Mgmt. Grp.*

*LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016), *reconsideration denied*, 2016 WL 2642223 (S.D.N.Y.

May 6, 2016) (quotation omitted).   This includes situations "when a corporation puts the reasons for

its success at issue, but fails to disclose that a material source of its success is the use of improper or

illegal business practices." *Id.* (quotation omitted).   On the other hand, the disclosure of a

company's violations of its internal code of conduct is generally not required unless its absence

renders any particular statement false or misleading.   *See In re Pfizer Inc. S'holder Derivative Litig.*, 722 F.

Supp. 2d 453, 463-65 (S.D.N.Y. 2010).   Key here is the presence of a prior statement that otherwise

is or will become materially misleading—without one, a corporation need not affirmatively disclose

"uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,

752 F.3d 173, 184 (2d Cir. 2014) (quotation omitted).

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citation and internal quotation marks omitted). In other words, for a misstatement to be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38 (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); accord *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). A complaint "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (omission in original) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). This is because the determination of whether a false or misleading statement or omission is material requires courts to "engage in a fact-specific inquiry" that "depends on all relevant circumstances" and because "materiality is a mixed question of law and fact." *Id.* (citations omitted); see also *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

Plaintiffs allege that numerous statements in CNO's offering memoranda were materially false or made misleading because of their omission of information regarding the ongoing bribery scheme. Defendants challenge three groups of those allegations, namely that: (a) financial statements violated Brazilian GAAP; (b) statements in the offering memoranda misrepresented CNO's financial success, management of political risk, and compliance with local regulations; and (c)

misleading statements about CNO's credit ratings required disclosure of the bribery scheme. The Court addresses each in turn.

### a.   GAAP Violations

SEC regulations dictate that where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading.  17 C.F.R. § 210.4–01(a)(1); *see also Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016).[1]  CNO's offering memoranda for the 7.125% and 7.50% Notes stated that its financial statements were prepared "in accordance with accounting practices adopted in Brazil, or Brazilian GAAP."  TAC ¶ 94.  These statements, Plaintiffs allege, are false and misleading because CNO's financial statements violated Brazilian GAAP in three ways: first, CNO violated CPC 25 by failing to disclose the bribery scheme and any expected financial costs of the bribery scheme as contingent liabilities in the notes to its financial statements; second, CNO violated CPC 00 when it failed to separately disclose the amount of revenue it obtained through use of bribes; and third, CNO violated CPC 00 and CPC 17 when it failed to report the bribes as costs to obtain the reported revenues.

**Contingent liabilities under CPC 25**:  Plaintiffs assert that the TAC identified actionable omissions in CNO's financial reports.  Specifically, Plaintiffs claim that Defendant CNO's financial statements breached Brazilian GAAP standards by failing to disclose the nature and range of contingent losses attributable to the bribery scheme.  TAC ¶¶ 97-104.  According to Plaintiffs, CPC 25 and IAS 37 requires the accrual of expenses related to a contingent liability if the loss is "probable" and can be reasonably estimated.  TAC ¶ 98.  If the contingency is simply "more likely

---

[1] "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Indiana Pub Ret. Sys.*, 818 F.3d at 93 (internal quotation marks and citations omitted).  Because Defendants have challenged only materiality of the statements identified by Plaintiffs and assert that Plaintiffs have not adequately pleaded loss causation, the Court need not address any issues involving scienter.

than not" (slightly more than 50%, according to Plaintiffs) to result in a loss, the contingency must be disclosed in a footnote.  TAC ¶¶ 98, 103.

The August 2018 Opinion dismissed these allegations for failing to plead facts sufficient to demonstrate that a such a loss was more than a remote possibility during the periods reported in the November 2011 and July 2012 offering memoranda.  The TAC remedies this deficiency.  It pleads that the amount of money paid in bribes increased sharply in the four years leading up to 2009, and remained high for the following five years.  In 2006, CNO paid out $60 million in bribes.  In 2007, they paid $80 million.  In 2008, $120 million.  By 2009, CNO paid $260 million in bribes.  From 2010 through 2014, it paid $420 million, $520 million, $730 million, $730 million, and $450 million respectively.  Such a "dramatically escalating scheme," Plaintiffs allege, could not indefinitely "evade the notice of regulators" and was "'more likely than not' to be exposed."  TAC ¶ 102.  Even OSA's head of Structured Operations seemed aware of the risk, warning Marcelo Odebrecht that by 2009 the bribes were "financial suicide" and posed extreme risk to the company.  TAC ¶ 102.  By 2014, CEO Odebrecht was even asking members of the Structured Operations team to flee Brazil to avoid investigation.  TAC ¶¶ 84, 102.

Relying on this Court's prior opinion, Defendants contend that Plaintiffs' complaint still fails to proffer facts supporting the contention that an increasing amount of money paid out in bribes make it any more likely that discovery of the bribery scheme was more than remote.  MTD at 13.  Further, Defendants challenge the head of Structured Operations' reported warnings to Marcelo Odebrecht as articulating generic worries "presumably shared by most undiscovered criminals" rather than concrete facts demonstrating any likelihood of detection.  *Id.* at 13.  Defendants also stress that Marcelo Odebrecht's warning to Structured Operation employees to flee the country is not a fact suggesting that Brazilian authorities were investigating the Odebrecht entities.  *Id.*

Defendants overstate Plaintiffs' burden here.  Plaintiffs did not need to plead that the investigation was likely to have revealed the scheme between 2009 and March 2012.  Rather, Plaintiffs needed to allege facts sufficient to show that although the company believed exposure "more likely than not," CNO still failed to disclose the liability per GAAP.  Given these newly alleged facts, Plaintiffs adequately demonstrate that company officials thought the possibility of detection was more than remote by 2009, triggering their obligation to footnote the liability in any of the covered reporting periods.

**Failing to identify illegally obtained contract revenue**:  Plaintiffs assert that CNO violated CPC 00 and Brazilian GAAP in its financial reports by failing to distinguish revenues generated in the normal course of the company's business from those derived from contingent activities that may not be recurring.[2]  TAC ¶¶ 105-09.  In its prior opinion, this Court found that Plaintiffs failed to identify which, if any, revenue derived from unlawfully obtained contracts should have been reported separately on CNO's financial disclosures.  August 2018 Op. 446-47.  In the TAC, Plaintiffs clarified that CNO obtained all of the Petrobras contracts through bribery, and listed CNO's yearly revenue from those contracts between 2009 and 2013.  TAC ¶ 107.[3]

Defendants argue that Plaintiffs fail to particularly allege when the revenue should have been recognized or disclosed, and therefore which financial statements violate GAAP.  This is incorrect—

---

[2] The Court notes that Plaintiffs' description of CPC 00 suggests that distinguishing between normal revenue streams and revenue derived from contingent activities is a "common practice"—permissive, not mandatory. TAC ¶ 106.  Because Defendants did not challenge Plaintiffs' characterization of CPC 00, the Court assumes, without deciding, that violating CPC 00 constitutes a violation of Brazilian GAAP.

[3] Defendants seem to read the third amended complaint—particularly the list of bribes in Paragraph 75—as Plaintiffs "not plead[ing] that every single Petrobras contract was obtained illicitly."  MTD at 15-16.  The Court does not agree with this interpretation.  Plaintiffs clearly allege that all of CNO's Petrobras contracts were obtained illegally. *See* TAC ¶ 107.  To the extent that Defendants' interpretation is premised on reading Paragraph 75 as comprising all the illicitly obtained contracts, the Court notes that the list in Paragraph 75 is preceded by a statement that it "*include[s]*" the following projects, not that the list represents all bribes made. TAC ¶ 75 (emphasis added).  Further, adding the dollar amounts spent on bribes as listed in Paragraph 75 yields only about a third of the alleged total of $3.3 billion.

in the chart underneath Paragraph 107 in the third amended complaint, Plaintiffs clearly indicate the five years in which the contract yielded revenue that ought to have been separately reported in CNO's financial disclosures.  This is more than adequate to meet their pleading burden.

**Failing to properly report bribes as contract expenses**:  Paragraph 21 of IAS 11 requires the recognition of costs incurred in securing a contract if those costs can be separately identified and measured reliably, and if it is probable that the contract will be obtained.  Previously, the Court found this GAAP violation to have been insufficiently pleaded because Plaintiffs provided only an aggregate amount of bribe payments made between 2001 and 2016.  August 2018 Op. at 447.  In contrast, the third amended complaint identifies at least one $23 million payment in 2010 that CNO made in 2010 to a specific individual to secure a construction contract for Brazil's Abreu e Lima Refinery.  *See* TAC ¶ 75.

Defendants argue that a separate provision of IAS 11 governs these types of costs, and that CNO need not have reported them at all because they are not properly cognizable as a contracting expense.  To the extent that Defendants' concerns raise questions answerable only with the help of expert testimony about Brazilian accounting procedures, they are more appropriately reserved for summary judgment.  As it stands, Plaintiffs have met their burden under Rule 9(b) to particularly allege a violation.

### b.  Financial Success and Regulatory Compliance

Among other things, Plaintiffs allege that CNO misrepresented its financial success and prospects by failing to disclose the bribery scheme.  TAC ¶ 120.

**Financial strength**:  In the Notes' offering memoranda under a section labelled "Financial Strength," CNO alleged that its "EBITDA margins (which we define as EBITDA as a percentage of our net service revenues) for the six-month period ended June 30, 2010, 2009, 2008, and 2007 were 10.8%, 9.7%, 14.0%, and 10.3%, respectively.  Our cash and cash equivalents and financial

investments totaled R $2,513.9 million (U.S. $1,395.4 million) and R $3,135.0 million (U.S. $1,740.2 million) as of June 30, 2010 and as of December 31, 2009, respectively." TAC ¶ 125; *see also* August 2018 Op. at 412; TAC ¶¶ 144, 161, 182. The success of this argument rises and falls along with Plaintiffs' allegations that CNO violated Brazilian GAAP: If CNO violated GAAP in failing to account for the cost of the bribery scheme, it may have similarly misreported its earnings, and, therefore, its earnings before interest, taxes, depreciation, and amortization, or "EBITDA."

Defendants repeat their contentions that because Plaintiffs failed to sufficiently plead that CNO violated GAAP, the offering memoranda's explanations for CNO's financial strength could not be material misstatements. This Court has concluded otherwise, and therefore also finds that Plaintiffs successfully pleaded that CNO made material misstatements in the "Financial Strength" section of the offering memoranda.

**Political risk**: Plaintiffs allege that the offering memoranda's descriptions of how CNO manages "political risk" are material misstatements because it obscures the fact that CNO's primary tool in managing political risk was spending more than $3.3 billion in illicit bribes and kickbacks. *See, e.g.*, TAC ¶ 132. Defendants assert that Plaintiffs have failed to clarify the meaning of "political risk," and therefore fail to plead with particularity that the statement is false. MTD at 19. Further, Defendants argue that because CNO's foreign operations pre-date the alleged bribery, Plaintiffs have failed to plead that bribery was used to manage political risk at all.

This argument is not well taken. Admittedly, political risk is a broad concept, but it is not as amorphous as Defendants make it out to be. The offering memoranda sufficiently contextualize the meaning of political risk by describing CNO's work in countries such as Peru, Angola, and Venezuela persisting despite periods of "social unrest or war." *See, e.g.*, TAC ¶ 131; *see also* Pls' Opp'n, Dkt. No. 79 ("Opp.") at 5-6, 21. CNO claimed that its success in managing political risk stemmed from project diversification, extensive risk assessment and sharing, joint ventures with

local companies, and integration with the communities in which CNO operated.  TAC ¶ 131.  But, as Plaintiffs allege, another critical facet of this success was the billions of dollars of bribes paid to government officials in these countries.  TAC ¶ 62; *see also In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (statements suggesting that defendant had particular ability to obtain FDA approval could have been misleading as defendant's success in getting approvals was due to bribery of FDA employees).  Regardless, the dispute over whether a reasonable investor would have understood "political risk" to mean falling out of favor with the political authority *du jour* presents a factual dispute, not a legal one.  Determining whether a reasonable investor, in the exercise of due care, would have received a false impression from a statement requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts."  *TSC Indus.*, 426 U.S. at 450.  This decision is therefore generally a question of fact for the jury.  *See SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 863 (2d cir. 1968) (remanding for the district court as factfinder to apply "the standard of whether the reasonable investor, in the exercise of due care, would have been misled by [the press release].").

**Compliance with local regulations**:  The Notes' offering memoranda also informed investors regarding the scope of CNO's regulatory obligations.  Plaintiffs characterize those statements as material misstatements because they falsely portray CNO as complying with local laws.  The memoranda describe CNO as "required to obtain all necessary licenses" and as "obliged to comply with all applicable regulations imposed on the local and state level."  TAC ¶¶ 133-134, 152-53, 169-70.  These statements say nothing about CNO's actual compliance with those regulations.  Further, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'  This is particularly true where, as here, the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  *City of Pontiac*, 752

F.3d at 183.  CNO's statements fall even further outside the circle of actionable statements than aspirational puffery; they reflect the company's obligations, not its intentions or practice.

**Other claims:**  Plaintiffs alleged that many other statements in Defendants' offering memoranda were false and misleading.  Those include statements about CNO's backlog of contracts, TAC ¶¶ 127, 146, 163, 184, 194, and that CNO has historically obtained important international projects, TAC ¶ 137, 173.  Plaintiffs also alleged that some of OSA's statements were also false or misleading, including OSA's reported adherence to the company's internal code of conduct, TAC ¶¶ 219-29, and comments OSA made about Marcelo Odebrecht's role in the bribery scheme, TAC ¶¶ 234-48.  In their motion to dismiss, Defendants have argued that these statements are all inactionable.  Plaintiffs did not oppose any of the arguments and have therefore abandoned their Section 10(b) claims in connection with those misstatements.  *See* August 2018 Op. at 449 (citing cases).

### c.   Credit Ratings

Although this Court previously dismissed the Plaintiffs' allegations that CNO's statements regarding its prior credit ratings were materially false or misleading, *see* August 2018 Op. at 448, Plaintiffs contend that CNO's disclosure of those ratings are half-truths because CNO never admitted that the ratings would not have been as high absent the illicit bribery scheme, *see* Opp. at 22.  Again, this Court disagrees.

Multitudes of case law in this district foreclose any argument that accurate statements about past performance could be actionable under the securities laws.  *See, e.g., In re EDAP TMS S.A. Sec. Litig.*, No. 14-cv-6069 (LGS), 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (finding statements inactionable when they only "comment[ed] on the evolving status of the Company's PMA application"); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("[I]t is undisputed that accurate statements of historical fact . . . are nonactionable."

(quotation omitted)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 594 (S.D.N.Y. 2007) ("[M]any of the statements merely cite historical facts . . . and as such are not actionable under the securities laws."). Even though CNO may have known that it could not support these artificially inflated credit ratings indefinitely, the "[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997). The credit ratings reported by Defendants were factually accurate. Thus, Plaintiffs have not sufficiently pleaded that CNO's statements about its prior credit ratings were false or misleading.

* * *

Because Plaintiffs adequately plead that CNO's financial statements violated Brazilian GAAP and included materially false and misleading statements about CNO's financial strengths and ability to manage political risk, those claims survive. Defendants did not challenge Plaintiffs' allegations that CNO made false and misleading statements about the reason for CNO's success in Venezuela, TAC ¶¶ 135, 154, 171, 190, competitiveness in Brazil, TAC ¶¶ 129, 148, 165, 186, and disclosures in the 4.375% Notes about CNO's overall main competitive strengths, TAC ¶ 177, thus those claims also survive dismissal. Defendants' motion is granted with respect to Plaintiffs' remaining claims.

## 2.  Loss Causation

A plaintiff's burden to plead loss causation is "not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015); *see also In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, at *11 (S.D.N.Y. Sept. 19, 2017). To plead loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). She may do so either by alleging (a) "the existence of cause-in-fact on the ground that the

market reacted negatively to a corrective disclosure of the fraud;" or (b) that "'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010) (quoting *ATSI*, 493 F.3d at 107).

To plead loss causation by materialization of risk, a plaintiff must plead facts to show that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 513 (quoting *ATSI*, 493 F.3d at 107).  Under this theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *Id.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)).  This zone of risk is determined by the purposes of the securities laws—namely, "to make sure that buyers of securities get what they think they are getting." *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).  Plaintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of, only "that plaintiffs would have been spared all or an ascertainable portion of the that loss absent the fraud." *Lentell*, 396 F.3d at 175.

Pleading a materialization of the risk requires identifying a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007) (risk of impending bankruptcy was not concealed by audit opinion); *Lentell,* 396 F.3d at 177 (risk of stock volatility was not concealed by "buy" and "accumulate" recommendations); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197-98 (2d Cir. 2003) (risk of defendants' "dumping" their own shares of company stock was concealed by failure to reveal previous "pump and dump" schemes by the defendants); *Suez Equity Investors*, 250 F.3d at 970-98 (risk of liquidity crisis was concealed by edited background report omitting important negative events in executive's financial and business

history); *see also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 264 (S.D.N.Y. 2015) (discussing a case where plaintiffs' pleading of ratings downgrades and unexpected asset sales adequately alleged the materialization of the company's concealed liquidity risk).  In their third amended complaint, Plaintiffs did exactly that.

One of the risks CNO shouldered when preparing materially false or misleading financial statements was the possibility that auditors would refuse to certify its financial statements and delay the release of its financial reporting.  Opp. at 7.  This heightened scrutiny, Plaintiffs contend, was a foreseeable consequence of falsifying financial information, and the risk materialized when accountants refused to certify the statements, resulting in the anticipated delay of the company's reporting.  The unexpected delay caused holders of the company's debt to "panic" and sell, prompted rating agencies to downgrade the Odebrecht Finance bonds.  TAC ¶ 263.

Plaintiffs also allege that CNO issued financial statements that did not accurately describe the company's operating margins, costs, likelihood of future success in winning construction contracts, and—most importantly—exposure to government investigation, thereby obscuring the fact that CNO was a volatile, devaluation-prone investment.  The risk that materialized—namely, CNO's devaluation—came about when credit rating agencies lowered the rating of the company, finding that CNO's credit profile would be affected by corruption investigations.  TAC ¶¶ 260-61. Again, the market reacted immediately to these revelations.  TAC ¶ 262.

Relying on the Court's earlier analysis, Defendants argue that Plaintiffs' third amended complaint fail to satisfy loss causation in the same way that the second amended complaint failed: namely, none of Plaintiffs' identified disclosures "provide[d] the market with new information."  MTD at 9-10, Pls' Mem. Reply, Dkt No. 80 ("Reply") at 1-2; *see also* August 2018 Op. 456-58.  True, the August 2018 Opinion found that only two June 2015 articles about OSA sufficiently provided the market with new information to satisfy loss causation.  August 2018 Op. at 458-59.  But in its

prior opinion, the Court had dismissed all of Plaintiffs' Section 10(b) and Rule 10b-5 claims against CNO—except those based on CNO's opinion statements regarding the reasons for its success—by the time it began its loss causation analysis.  Now that Plaintiffs have properly pleaded other Section 10(b) and Rule 10b-5 claims, such as those involving CNO's GAAP violations and falsified financial statements, the Court can evaluate whether any of *those* misstatements were the reason that Plaintiffs' bet on Odebrecht Finance's Notes turned out to be a losing one.

Put plainly, although Defendants argue that the 2015 reporting broke open the story of OSA's involvement in the bribery and kickback scheme, leaving nothing new for the market to learn about CNO's misstatements and omissions, it is CNO's concealment of the scheme and false financial reporting—*not the company's involvement in the scheme itself*—that resulted in a risk materializing in 2016.  Pleading a materialization of the risk requires identifying a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss.  As discussed above, Plaintiffs here have done just that.

Defendants also seize on a footnote in the Court's August 2018 Opinion, and now argue that neither of the two June 2015 articles mention CNO by name, and therefore could not constitute corrective disclosures with respect to CNO.  Reply at 4-5.  The articles' failure to specifically identify CNO is irrelevant.  The June 20, 2015 New York Times piece, for example, revealed that Brazilian police had proof that senior Odebrecht executives "knew about the practice of overbilling contracts with Petrobras" and "participated directly in the division of the contracts within the cartel."  August 2018 Op. at 457-459; Decl. of Michael Carlinsky Supp. Defs' Mot. to Dismiss, Dkt. No. 76, Ex. D at 1.  CNO was the subgroup of Odebrecht executing those Petrobras contracts.  *See, e.g.*, TAC ¶ 107 (describing revenue CNO received from its Petrobras contracts).  Thus, this article sufficiently reveals the falsity of CNO's statements that its successful bidding within Brazil was the result of

legitimate factors.  And market-watchers certainly knew that any discussion of OSA's involvement in the "Car Wash" scandal implicated its wholly-owned subsidiaries as well.

* * *

In sum, Plaintiffs adequately plead loss causation for their remaining Section 10(b) and Rule 10b-5 claims against CNO, and those claims all survive Defendants' motion to dismiss.

### 3.   OEC's Successor Liability

Generally, under New York common law,[4] a business entity's acquisition of assets from another,[5] as alleged by Plaintiffs here, *see* TAC ¶¶ 38-41, "results in no successor liability, with four exceptions:  (1) the successor corporation expressly or impliedly assumed the liabilities of its predecessor; (2) there was a consolidation or de facto merger of the two business entities; (3) the successor is a 'mere continuation' of the predecessor; or (4) the transaction is entered into fraudulently to escape such obligations."  *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07-cv-489, 2007 WL 3253592, at *2 (S.D.N.Y. Nov. 2, 2007).  "[P]leadings of successor liability are subject to the lenient pleading requirements of Rule 8(a), not the more rigorous standards of Rule 9(b)."  *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 376 (S.D.N.Y. 1997).

The hallmarks of a *de facto* merger include:  "(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) a continuity of management, personnel, physical location, assets, and general business operation."  *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 46 (2d Cir. 2003) (quoting *Fitzgerald v. Fahnestock & Co.*, 730 N.Y.S.2d 70, 71 (1st Dep't 2001).  Legal dissolution is not

---

[4] The offering memoranda provided that the indenture, notes and the guaranty would be governed by the laws of the State of New York.  Declaration of Michael B. Carlinsky, Ex. F at 24.  The parties do not dispute the applicability of New York law here.

[5] In the TAC, Plaintiff describes what it later calls the "de facto merger" as a corporate restructuring.  *See* TAC ¶ 38-41.

necessary as long as the acquired corporation is "shorn of its assets and has become, in essence, a shell." *Fitzgerald*, 730 N.Y.S.2d at 72.

The *de facto* merger and mere continuity exceptions work to "avoid the patent injustice which might befall a party simply because a merger has been called something else." *Cargo Partner*, 352 F.3d 41, 46-47 (2d Cir. 2003) (quotation omitted). Thus, New York law requires courts to apply these tests "in a flexible manner . . . disregard[ing] mere questions of form," *Tap Holdings, LLC v. Orix Fin. Corp.*, 970 N.Y.S.2d 178, 184 (1st Dep't 2013) (quotation omitted), recognizing "the realities of the transaction that took place," *Miller v. Forge Mench P'ship Ltd.*, No. 00-cv-4314 (MBM), 2005 WL 267551, at *8 (S.D.N.Y. Feb. 2, 2005). *See also In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-mc-2543 (JMF), 2018 WL 1989572, at *2 (S.D.N.Y. Apr. 25, 2018). Numerous cases support the notion that not all four elements are necessary for a court to find a *de facto* merger. *See Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 350 (S.D.N.Y. 2019). Instead, the heart of a merger is continuity of ownership. *Cargo Partner*, 352 F.3d at 47.

OEC was founded in January 2014. TAC ¶ 38. In March 2015, it became "the direct controller" of CNO. TAC ¶¶ 17, 39. According to Plaintiffs, CNO became "an empty shell" after this corporate reorganization. TAC ¶ 40. It no longer reports quarterly or annual earnings; it relinquished its contracts to OEC, and OEC became the guarantor of all previously-issued Odebrecht Finance Notes that CNO used to guarantee. TAC ¶ 44. Further, Plaintiffs allege that at least five of OEC's senior officers in 2015 had been officers at CNO, and that a sixth had been a CNO director. TAC ¶ 47. OEC took over CNO's physical location and address, projects, assets and liabilities, and identity as a corporation founded in 1944 that expanded in the 1970s taking on projects such as the Rio de Janeiro international airport and State University. TAC ¶¶ 48-49, 51-53. Thus, Plaintiffs contend, OEC is subject to CNO's liabilities under either New York's *de facto* merger or mere continuation exception.

Defendants challenge these allegations, claiming that Plaintiffs' complaint fails because it did not allege facts supporting that CNO sold or transferred any assets to OEC.  MTD at 22.  Much of Defendants' argument hinges on the Plaintiffs' characterization of CNO as a "mere shell" rather than alleging that CNO was legally dissolved.  MTD at 22-24.  In support of its contentions, Defendants ask the Court to review a report by Moody's that it argues Plaintiffs incorporated into the third amended complaint.  MTD at 22-23.  The rest of Defendants' argument concerns Plaintiffs' pleading only that OEC began guaranteeing CNO's Notes, not that CNO stopped guaranteeing the Notes.  This, according to Defendants, demonstrates that Plaintiffs did not adequately plead that OEC assumed CNO's liabilities.

Defendants' argument does not move the needle in the context of this motion to dismiss. The Moody's report does not necessarily contradict the complaint; it simply quotes Odebrecht press releases that, according to a generous reading of Plaintiffs' complaint, proved inaccurate when CNO stopped reporting any earnings.  Without that paragraph of the complaint, Plaintiff already noted that CNO was longer functioning as a full-fledged corporation, replaced, instead, by OEC.  TAC ¶ 43-44.  For example, Plaintiff pleaded that OEC now holds CNO's construction contracts, noting that OEC's financial statements describe CNO's projects as its own, and that even third parties considered OEC to be CNO's new identity.  TAC ¶¶ 51-52.  CNO, Plaintiffs allege, has not reported quarterly or annual earnings since 2015.  TAC ¶ 44.  Instead, OEC operates out of CNO's old address, with much of the same officers, and has coopted much of CNO's corporate history. TAC ¶¶ 47-50.  Even if both CNO and OEC are guaranteeing the operative Notes, these allegations satisfy Federal Rule of Civil Procedure 8(a)(2)'s liberal pleading requirement.  *See Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 535 (W.D.N.Y. 2001) (finding *de facto* merger when there was "a continuity of assets, physical location, and general business operations, as well as an assumption of certain liabilities necessary for the uninterrupted continuation of the business"); *see also NYKCool*

*A.B. v. Pac. Int'l Servs., Inc.*, No. 12 CIV. 5754 LAK AJP, 2013 WL 1274561, at *14–15 (S.D.N.Y. Mar. 29, 2013), *aff'd sub nom. NYKCool A.B. v. Ecuadorian Line, Inc.*, 562 F. App'x 45 (2d Cir. 2014) (citing cases where the standard is satisfied because plaintiff provided evidence of continuity of business and management from the same location with the same employees selling the same products).

Finally, Defendants attack Plaintiffs' pleading on the grounds that the third amended complaint sometimes uses the present tense to describe CNO, and other times employs the past tense. Reply at 13. Drawing all reasonable inferences in Plaintiffs' favor, as we must, this inartful drafting does not create the internal inconsistencies necessary to defeat the third amended complaint's claims.

### 4. OSA's Materially False and Misleading Statements

#### a. Jurisdiction Over OSA

Defendants move to dismiss all claims against OSA for lack of personal jurisdiction. On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (Sotomayor, J.) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citation omitted)). But at the pleading stage—before the parties have engaged in discovery practice— a plaintiff need only make a *prima facie* showing that jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015).

If the court considers only pleadings and affidavits, a plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84-85 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).

In determining whether it may exercise personal jurisdiction over a defendant, the Court engages in a two-step inquiry. First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013) (citation omitted). A federal court applies the forum state's personal jurisdiction rules unless a federal statute "specifically provide[s] for national service of process." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). Second, the Court must determine whether the exercise of personal jurisdiction over the defendant would comport with due process under the Constitution. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).[6]

The statutory analysis in cases brought under the Exchange Act is relatively straightforward: Section 27 of the Exchange Act, 15 U.S.C. § 78aa "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028,

---

[6] The defendant must also have been properly served. *Licci*, 673 F.3d at 59. Defendants noted in their motion that Plaintiffs failed to properly serve OSA, but Plaintiffs have since remedied that problem. *See* Opp. at 28.

1033 (2d Cir. 1990). Thus, the sole question here is whether due process permits the exercise of jurisdiction over OSA.[7]

Due process requires that if a defendant is "not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The analysis proceeds in two parts: the "minimum contacts" analysis and the "reasonableness" inquiry. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

To establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, a plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quotation omitted). Although foreseeability is a component of the minimum contacts analysis, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). "Because the Exchange Act authorizes worldwide service of process, the relevant contacts for purposes of the 'minimum contacts' analysis are those with the United States as a whole." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017). "The second part of the jurisdictional analysis asks 'whether the assertion of

---

[7] Ordinarily, a plaintiff must plead personal jurisdiction with respect to each claim asserted. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). But the doctrine of pendent personal jurisdiction provides that "where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available." *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (internal quotation marks and citation omitted). Because the Court finds that Plaintiffs' sufficiently allege a *prima facie* showing of personal jurisdiction with respect to the federal claims here, Plaintiffs need not establish jurisdiction for their state law claims stemming from the sale of the same Odebrecht Finance bonds.

personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert*, 305 F.3d at 129 (quotation omitted). If the defendant's contacts with the forum do rise to that level of "minimum contacts," a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Plaintiffs reference various OSA activities in support of their assertion that OSA's contacts with the United States justify jurisdiction. The third amended complaint tells a story of OSA representatives travelling on road shows in the United States to sell Notes whose offering memoranda various incorporated false or misleading statements and specifically participating in actions directed to deceive United States shareholders. At least one of those road shows took place in 2013 in Miami. TAC ¶ 92. To enforce SEC regulations, courts have exercised jurisdiction where "an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders" *See SEC v. Straub*, 921 F. Supp. 2d at 244, 256-57 (S.D.N.Y. 2013) (quotation omitted). Here, OSA even deployed an Investor Relations executive to Miami full-time to respond to investor inquiries in an effort to better sell those Notes. *See* TAC ¶ 92. Defendants' challenges as to the particularity of these allegations—namely, that Plaintiff failed to state who went to what conference and when—do not change the analysis. Plaintiffs need only make a *prima facie* showing of jurisdiction. They did. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.").

Once a plaintiff has demonstrated the requisite minimum contacts between the defendant and the forum state, a court must evaluate "(1) the burden that the exercise of jurisdiction will

impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113-14 (1987)). "This prong of the inquiry rarely defeats jurisdiction where a defendant has sufficient forum contacts, and is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process." *Banco Bradesco*, 277 F. Supp. 3d at 645 (quotation omitted).

Defendants make no argument that the Court's jurisdiction over them would be unreasonable. Nevertheless, the Court has evaluated the three applicable factors[8] underlying the reasonableness inquiry and does not find that any of them caution against its exercise of jurisdiction here. First, the only potential burden this Court can imagine that the litigation may impose is the inconvenience of litigating in a foreign forum. Because Defendants have said nothing about this potential inconvenience, the Court cannot conclude that this is the "rare case[]" in which inconvenience is "so substantial as to achieve constitutional magnitude." *Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (emphasis in original); *Burger King*, 471 U.S. at 484. With respect to the second factor, because this is a case brought under U.S. federal law, the judicial system has a strong interest in resolving it here. *See Straub*, 921 F. Supp. 2d at 259. Additionally, Plaintiffs' interest in obtaining a convenient and efficient resolution of this dispute is self-evidently robust.

This Court therefore finds that it can exercise specific jurisdiction over OSA.

---

[8] The Court does not understand the fourth and fifth factors of the reasonableness inquiry to be relevant to this case.

### b. OSA's Misstatements

Most of Plaintiffs' federal claims against OSA, however, fail on the merits.  First, in their motion to dismiss, Defendants objected that OSA's statements are all inactionable.  Plaintiffs did not oppose any of Defendants' arguments and have therefore abandoned those claims.  Even if Plaintiffs had not abandoned the claims, statements "too general to cause a reasonable investor to rely upon them" are inactionable as a matter of law.  *City of Pontiac*, 752 F.3d at 183.  The quintessential examples of such inactionable puffery are "general statements about reputation, integrity, and compliance with ethical norms," particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  *Id.*  To be sure, in some cases, corporate statements regarding compliance policies have been held actionable.  *See In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015); *Novak*, 216 F.3d at 315 (finding general statements that inventory was "in good shape" and "under control" actionable where defendants knew contrary was true); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless . . . .").  But the statements at issue in these cases went beyond aspirational or general puffery, so as, for example, to falsely represent a record of past or present compliance with such policies.  Context is key.

OSA's statements that the company is grounded in a seventy-year ethos of service is textbook puffery.  And the context of these statements here change nothing.  Plaintiffs do not allege, for example, that OSA revised its code of conduct to prohibit bribery in reaction or response to market concerns that the company may have bribed politicians or been otherwise implicated in the "Car Wash" scandal.  OSA just made general and generic statements that are not the kind of guarantees actionable under the securities laws.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731,

756 (S.D.N.Y. 2017) (finding inactionable similar allegations of misstatements in another company's code of ethics and anti-bribery prohibitions).

Finally, Plaintiffs' claim that OSA's Head of Investor Relations materially mislead investors when, responding to Plaintiffs' questions about the search warrants police had served on CNO, she informed Plaintiffs that the "'main accusation is that Odebrecht is part of a cartel' and that Defendants believed that this accusation is 'weak.'" TAC ¶ 229.  Defendants argue that Plaintiffs failed to plead facts supporting Defendants' awareness of the true subject of the police warrants. Again, Plaintiff did not oppose Defendants' position and have therefore abandoned its claim in connection with that misstatements.

### c.  Control Person Liability

Plaintiffs also assert that OSA is liable under Section 20(a) for CNO's misstatements.  To prevail under Section 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108).  As to the second element, control over a primary violator, "a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (quoting *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  The third element, culpable participation, requires that plaintiff show "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) (quotation omitted).  Some cases have described this third requirement— "a regular fixture of the Second Circuit's jurisprudence" but not identified in Section 20(a)'s statutory language—as a description of the "degree of control" necessary to "render a person liable"

under Section 20(a).  *See SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017).  This can result in collapsing the distinction between the second and third prongs—as Defendants do here[9]—but these elements require distinct analytical attention.

Courts within the Second Circuit broadly construe the control person provisions "as they 'were meant to expand the scope of liability under the securities laws.'" *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (quoting *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001)).  "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."  *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006); *see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) ("[A]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.").  The heightened pleading standards of the PSLRA, however, apply with respect to the third-prong of a Section 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant.  *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (surveying district courts' interpretation of "culpable participation" and concluding that the Second Circuit requires Section 20(a) plaintiffs to plead "facts indicating that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct" (quoting *Burstyn*, 2002 WL 31191741, at *8)); *see also In re ForceField Energy Inc. Sec. Litig.*, No. 15-cv-3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (further surveying cases and finding that "most judges in th[is] District [have] found that a plaintiff must plead culpable participation with scienter").

---

[9] Defendants' citation to *Arkansas Teacher Retirement System v. Bankrate, Inc.*, clearly demonstrates their conflation of these two elements.  18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014).  In *Arkansas Teacher*, the plaintiffs alleged that the Apex defendants controlled more than half of Bankrate's stock and filled four of the seven seats on Bankrate's board.  *Id.*  The Court determined that the plaintiffs satisfied the "control" prong—but not the "culpable participation" one because they alleged "no particularized facts suggesting that the Apax entities had control over the alleged misrepresentations at issue in this case" and therefore could not have been culpable participants in the defendants' fraud.  *Id.*

Because the Court has found that most of CNO's underlying primary violations of Section 10(b) and Rule 10b-5 survive Defendants' motion to dismiss, Plaintiffs sufficiently meet the first prong of the control person test. *See In re: EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 214 (S.D.N.Y. 2016) (finding that shareholders had made out the "control" prong against a defendant because he was the sole shareholder of voting stock in the company). Plaintiffs' complaint describes OSA as directly owning 100% of CNO's voting shares, and cites to CNO's disclosures in the Odebrecht Finance offering memoranda where the company stated that "[a]ll of our total voting capital is owned by Odebrecht which, in turn, is ultimately controlled by the Odebrecht family . . . . Accordingly, the Odebrecht family has the ability to . . . exercise overall control of our management." TAC ¶¶ 31-33.[10]

Defendants challenge Plaintiffs' characterization of OSA as a "culpable participant," given that OSA did not make the alleged misstatements. MTD at 33-35. Viewing the allegations of the third amended complaint in the light most favorable to Plaintiffs suggests that this third prong, too, has been adequately pleaded. According to the third amended complaint, OSA's Division of Structured Operations was established as the Odebrecht entities' "bribe department," managing the illicit payments to government officials, and concealing them from the reported financial reports of both CNO and OSA. TAC ¶ 63-69. The Division ensured that CNO's reported financials did not reveal the massive illicit payments that OSA was making to politicians by entering all bribery transactions into a "shadow" accounting database rather than CNO or OSA's regular accounting

---

[10] Defendants' citation to *Friedman v. JP Morgan Chase & Co.*, is unpersuasive. No. 15-CV-5899 (JGK), 2016 WL 2903273, at *10-12 (S.D.N.Y. May 18, 2016), *aff'd sub nom. Friedman v. JPMorgan Chase & Co.*, 689 F. App'x 39 (2d Cir. 2017). Plaintiffs in *Friedman* were seeking to find JP Morgan liable under Section 20(a) in the Madoff securities fraud. Although JP Morgan had an ongoing banking relationship with Madoff and had some general "influence" as a result, the bank was merely an investor that "provided commercial lending services" and had no power to direct management and policies or exercise control in any way. *Id.* at *11. To determine whether JP Morgan had the requisite power to control, the Court interrogated JP Morgan's relationship with the Madoff fund at issue. Here though, OSA controls all CNO's voting shares and, Plaintiffs allege, exercise "overall control" of CNO management.

system.  This ensured that CNO's financial statements reflecting strong EBIDTA were materially

false or misleading.  The head of Structured Operations reported to Marcelo Odebrecht, OSA's

CEO, and provided periodic updates of the Division's work.  TAC ¶ 66.  Marcelo Odebrecht was

also the CEO directing OSA's road shows and sale of the Odebrecht Finance Notes that

incorporated CNO's false and misleading statements into its offering memoranda.  TAC ¶ 92.

Plaintiffs have sufficiently pleaded that OSA had both the ability to affect CNO's financial

reports and that it took the opportunity to do so.  *Cf Arkansas Teacher Ret. Sys.*, 18 F. Supp. 3d at 486

(internal quotation marks omitted) (finding no control person liability where complaint "alleged no

particularized facts suggesting that the [defendant] had control over the alleged misrepresentations at

issue").  Marcelo Odebrecht was involved in both the concealment of the funds from CNO's

reporting, and spreading the misstatements in the Odebrecht Finance Notes.  Accordingly, Plaintiffs'

federal claims against OSA survive Defendants' motion to dismiss.

## B.  State Securities Fraud Claims

### 1.  Negligent Misrepresentation and Fraud

To successfully state a claim for fraud under New York law, a plaintiff must allege "a

material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable

reliance by the plaintiff and damages."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553,

559 (2009).  Because reasonable reliance is a highly fact-specific inquiry, it is "often not decided at

the motion to dismiss phase of a litigation."  *Karsch v. Blink Health Ltd.*, 291 F. Supp. 3d 503, 507

(S.D.N.Y. 2018).

Having dealt with the question of falsity above, all that remains is to interrogate the

sufficiency of Plaintiffs' pleading of reliance.  In the August 2018 Opinion, this Court dismissed

Plaintiffs' state-law fraud and negligent misrepresentation causes of action for failing to plead

reliance with particularity.  *See* August 2018 Op. 461-64.  The third amended complaint has remedied

those deficiencies by describing the specific information about CNO's profit margins and financial

rations that Plaintiffs relied on in purchasing their securities.  TAC ¶¶ 294-96.  Plaintiffs describe

each report that they read and reviewed before making each purchase of the Notes.  TAC ¶¶ 273-98.

Accordingly, the Complaint identifies "specific transactions" and specific reports and statements on

which they allegedly relied in entering into those transactions.  *Fir Tree Capital Opportunity Master*

*Fund, L.P. v. Am. Realty Capital Props., Inc.*, No. 1-cv-4975, 2017 WL 10808809, at *5 (S.D.N.Y. Dec.

14, 2017) ("[P]laintiffs have specifically pled actual reliance . . . and identified specific purchases and

statements upon which they relied.");  *accord Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge*

*& Iron Co. N.V.*, No. 18-cv-9927 (LGS), 2019 WL 3996519, at *4 (S.D.N.Y. Aug. 23, 2019).

    This case is unlike *International Fund Management S.A. v. Citigroup Inc.*, where Plaintiffs stated

only that "in connection with their purchases of Securities after February 23, 2007, Plaintiffs and/or

their investment managers read and relied upon Citi's 2006 Form 10–K, including the false financial

statements and other statements alleged herein to be false or misleading."  822 F. Supp. 2d 368, 386

(S.D.N.Y. 2011).  The Court there found that statement too broad because it alleged "reliance on

entire 10–Ks for indefinite periods of time" and failed to provide supporting "factual matter

indicating how plaintiffs relied on the alleged misrepresentations."  *Id.*  Here, the complaint makes

separate factual allegations supporting Plaintiffs' reliance by describing the exact information

Plaintiffs collected in internal reports, and specifies the documents relied upon in each purchase of

Odebrecht Finance Notes.

    Thus, Plaintiffs' negligent misrepresentation and fraud claims survive Defendants' motion to

dismiss.

### 2.  Conspiracy

    Defendants also move to dismiss Plaintiffs' conspiracy claim.  Once again, because the

parties' briefing assumes that California's substantive law governs the conspiracy claim at issue,

"such implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quotations omitted).   To state a conspiracy claim under California law, a plaintiff must allege "(1) formation and operation of the conspiracy and (2) damages resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105 (2014), *as modified on denial of reh'g* (Feb. 27, 2014) (citation omitted).

Because Plaintiffs have adequately alleged an underlying tort of fraud, the only question for this Court is whether they adequately allege that CNO's misrepresentations were made pursuant to an agreement between OSA and CNO.   "It is well settled that bare allegations and rank conjecture do not suffice for civil conspiracy." *AREI II Cases*, 216 Cal. App. 4th 1004, 1022 (2013) (quotation omitted).   "It is not enough that the conspirators knew of an intended wrongful act, they must agree—expressly or tacitly—to achieve it." *Id.* (quotation omitted).

Plaintiffs' allegations fall short.   They plead no facts that Defendants entered into a conspiracy to defraud investors, merely providing conclusory statements that Defendants did so.   *See* TAC ¶¶ 328-29.   That is insufficient.   *See Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1173 (2016) (finding that appellants failed to allege that the respondents conspired to commit fraud when they allege that respondents "agreed to deceive appellants into participating in the loan modification processes" but noted that respondents provided "no factual allegations about the nature of that agreement" (quotations omitted)).   Plaintiffs' conspiracy claim therefore cannot survive Defendants' motion to dismiss.

### 3.   New York Debtor and Creditor Law

The August 2018 Opinion permitted Plaintiffs to proceed with the claim under New York Debtor and Creditor Laws Sections 276 and 276-a.   Because that opinion dismissed all claims against

Odebrecht Finance, Ltd., and Plaintiffs have not repleaded any of those claims, Defendants now move to dismiss Plaintiffs' fraudulent conveyance claims for lack of standing.

New York's Debtor and Creditor Law provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. Section 276-a provides for attorneys' fees in a fraudulent conveyance action. To bring a cause of action for fraudulent conveyance, the plaintiff must be a creditor of the transferor of the alleged fraudulent conveyance. See N.Y. Debt. & Cred. Law §§ 270-81. A creditor is defined as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* § 270. "Under New York's broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor, and that relationship arises the moment the cause of action accrues." *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006).

In the third amended complaint, Plaintiffs stated that "[a]s a result of the Odebrecht Finance Conveyances, there are insufficient assets, if any, remaining in Odebrecht Finance's possession to satisfy any Judgment that Plaintiff may obtain against Odebrecht Finance." TAC ¶ 337. Since Odebrecht Financial is no longer a party to this case, Defendants take this to mean that Plaintiffs have alleged no injury.

The Court agrees, particularly because of the atypical posture of this claim. In the paradigmatic fraudulent conveyance case, a debtor corporation denudes a company of assets by giving them away to preferred insiders or creditors, frustrating the demands of other creditors lawfully entitled to them. Here, this Court has already decided that Plaintiff cannot maintain an action against Odebrecht Finance. Thus, Plaintiffs have no claims against the alleged debtor corporation, and have alleged that any conveyance caused an injured them by precluding Plaintiffs

from recovering damages from Odebrecht Finance.  And even if this Court found that all Odebrecht Finance's transfers were fraudulent, Plaintiff has requested no relief that this Court can provide.

Plaintiffs' Section 276 and 276(a) claims under New York's Debtor and Creditor Law are therefore dismissed for lack of standing.

## IV.   CONCLUSION

For the reasons articulated above, Defendants's motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiffs state claims under Section 10(b) and Rule 10b-5 against CNO based on CNO's GAAP violations; opinion statements regarding its financial strengths, ability to manage political risk, and reason for CNO's success in Venezuela and competitiveness in Brazil; and disclosures in the 4.375% Notes about CNO's overall main competitive strengths.  Plaintiffs also state Section 10(b) and Rule 10b-5 claims again OEC under successor liability to the extent that Plaintiffs stated those claims against CNO.

Plaintiffs state a Section 20(a) claim against OSA.

Plaintiffs' other Section 10(b) and Rule 10b-5 claims against CNO, OEC, and OSA are dismissed without prejudice.

Plaintiffs state a claim for fraud against CNO and OEC.

Plaintiffs state a claim for negligent misrepresentation claim against CNO, OEC, and OSA.

Plaintiffs' conspiracy claim against CNO, OEC, and OSA is dismissed without prejudice.

Plaintiffs' Debtor and Creditor Law § 276 claim against CNO, OEC, and OSA is dismissed without prejudice.

Plaintiffs are granted leave to replead those claims that have been dismissed without prejudice no later than thirty (30) days following the date of this order. See *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that leave to amend is "liberally granted").

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 75.

SO ORDERED.

Dated:  September 22, 2019
New York, New York

_____
GREGORY N. WOODS
United States District Judge