UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

DOUBLELINE CAPITAL LP, DOUBLELINE
INCOME SOLUTIONS FUND, AND
DOUBLELINE FUNDS TRUST (ON BEHALF OF
ITS: 1) DOUBLELINE CORE FIXED INCOME
FUND SERIES; 2) DOUBLELINE EMERGING
MARKETS FIXED INCOME FUND SERIES; AND
3) DOUBLELINE SHILLER ENHANCED CAPE®
SERIES),

                    Plaintiffs,

           -against-

CONSTRUTORA NORBERTO ODEBRECHT, S.A.,
ODEBRECHT ENGENHARIA E CONSTRUÇÃO
S.A. AND ODEBRECHT S.A.,

                    Defendants.

1:17-cv-4576-GHW

---

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ................................................................................. iii

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY .................................. 2

I.    The *Lava Jato* Bribery Scheme and Odebrecht's Acceptance of
      Responsibility ..................................................................................... 2

II.   The Defendants' Entry Into the Leniency Agreement and Its
      Limitations on the Access to the Systems ............................................ 3

III.  Odebrecht's Additional Agreements With Foreign Prosecutors ............... 5

IV.   Decisions of Brazilian Courts in Respect of the Systems ........................ 6

      A.    The Brazilian Supreme Federal Court Decision ............................ 6

      B.    The Curitiba Court's Decisions ..................................................... 6

V.    Plaintiffs' Service of the RFPs and Defendants' Efforts to Resolve
      Perceived Factual Disputes .................................................................. 7

ARGUMENT ........................................................................................... 9

I.    Disclosure of the Systems Would Violate Applicable Foreign Law,
      Brazilian Judicial Decisions and Cooperation Agreements, including
      the Leniency Agreement ...................................................................... 9

      A.    The Leniency Agreement Prohibits Production of the Systems
            to Plaintiffs ................................................................................ 10

      B.    Brazilian Judicial Decisions Further Reinforce the Prohibition
            on Production ............................................................................. 11

            1.    Decisions of the Curitiba Court Regarding the
                  Leniency Agreement ........................................................... 11

            2.    The Brazilian Federal Supreme Court's Decision
                  Independently Prohibits Disclosure ..................................... 12

      C.    Additional Agreements with Foreign Prosecutors Prohibit
            Disclosure ................................................................................... 12

II.   The Comity Factors Weigh Heavily in Favor of Granting the Motion ....... 13

A. *First and Fourth Factors*:  Defendants' Admissions and Existing Document Productions Render the Systems of Marginal Additional Value to Plaintiffs and Provide an Alternative Means of Establishing the Facts Sought from the Systems ................................................................................................ 14

B. *Second Factor*:  Plaintiffs' Requests Are Overbroad ..................................... 17

C. *Third Factor*:  The Systems Originate Outside the United States ................................................................................................ 18

D. *Fifth Factor*:  Compelling Production of the Systems in Violation of Applicable Foreign Law Would Violate Important Brazilian Interests ........................................................................................ 19

E. *Sixth Factor*: Compelling Defendants to Violate Applicable Foreign Law Would Give Rise to Potential Civil and Criminal Liability .......................................................................................................... 22

F. *Seventh Factor*:  Defendants' Good Faith Is Not in Dispute .......................... 24

CONCLUSION ............................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Cases**

*Abdell v. City of New York*,
 2006 WL 2664313 (S.D.N.Y. Sept. 14, 2006)......................................................................21

*Catalano v. BMW of N. Am., LLC*,
 2016 WL 3406125 (S.D.N.Y. June 16, 2016) ....................................................................18

*CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*,
 2013 WL 2661037 (S.D.N.Y. June 12, 2013) ............................................................<u>passim</u>

*Cuomo v. Clearing House Ass'n LLC*,
 557 U.S. 519 (2009) ............................................................................................................17

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
 2019 WL 1988525 (S.D.N.Y. May 6, 2019) ................................................................18, 24

*In re Rubber Chemicals Antitrust Litig.*,
 486 F. Supp. 2d 1078 (N.D. Cal. 2007)...............................................................14, 17, 20-21

*Ings v. Ferguson*,
 282 F.2d 149 (2d Cir. 1960) ...............................................................................................13

*Leibovitch v. Islamic Republic of Iran*,
 188 F.Supp.3d 734 (N.D. Ill. 2016) ....................................................................................21

*Linde v. Arab Bank, PLC*,
 262 F.R.D. 136 (E.D.N.Y. 2009) ...................................................................................18, 24

*Linde v. Arab Bank, PLC*,
 706 F.3d 92 (2d Cir. 2013) .............................................................................................13, 19

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
 116 F.R.D. 517 (S.D.N.Y. 1987) .......................................................................14, 17, 20-21

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
 365 F. Supp. 3d 916 (N.D. Ill. 2019)..................................................................................16

*Nat'l Broad. Co. v. U.S. Dep't of Justice*,
 735 F.2d 51 (2d Cir. 1984) ..................................................................................................21

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*,
   2005 WL 3046284 (S.D.N.Y. 2005) *aff'd* 476 F.3d 140 (2d Cir. 2007).................................21

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) ...................................................................................... 14, 16

*S.E.C. v. Stanford Int'l. Bank, Ltd.*,
   776 F. Supp. 2d 323 (2011) ........................................................................................... 21, 24

*Sec. and Exch. Comm'n v. Downe*,
   1993 WL 22126 (S.D.N.Y. Jan. 26, 1993) ..........................................................................21

*Societe Internationale Pour Participations Industrielles Et Commerciales, S. A.*
   *v. Rogers*,
   357 U.S. 197 (1958) ...............................................................................................................23

*Société Nationale Industielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*,
   482 U.S. 522 (1987) ...........................................................................................................9, 13

*Strauss v. Credit Lyonnais, S.A.*,
   242 F.R.D. 199 (E.D.N.Y. 2007) ..........................................................................................14

*Strauss v. Credit Lyonnais, S.A.*,
   249 F.R.D. 429 (E.D.N.Y. 2007) ..........................................................................................22

*Tiffany (NJ) LLC v. Qi Andrew*,
   276 F.R.D. 143 (S.D.N.Y. 2011) ......................................................................................21-22

*U.S. v. Odebrecht S.A.*,
   No. 16-cr-00643 (E.D.N.Y. Dec. 21, 2016) ....................................................................2, 15

*Vaigasi v. Solow Mgmt. Corp.*,
   2016 WL 616386 (S.D.N.Y. Feb. 16, 2016)...................................................................17-18

**Rules**

Fed. R. Evid. 44.1 ......................................................................................................................10

Defendants Construtora Norberto Odebrecht, S.A., Odebrecht Engenharia E Construção S.A. and Odebrecht S.A. - Em Recuperação Judicial ("Odebrecht") (collectively, and together with Odebrecht, the "Defendants"), submit this memorandum of law in support of their motion for a protective order (the "Motion") in respect of certain of the requests for production (the "RFPs") propounded by plaintiffs in this action (collectively, the "Plaintiffs" and, together with the Defendants, the "Parties"), dated November 29, 2019, which seek production of documents or data from Drousys or MyWebDay (as defined below).[1]

### PRELIMINARY STATEMENT[2]

Consistently and from the inception of discovery, Defendants have been clear that they cannot produce documents or data from two file systems, Drousys and MyWebDay, because doing so would violate applicable foreign law, including Defendants' ongoing obligations to multiple foreign prosecutors and decisions of Brazilian courts. Plaintiffs have sought to recast Defendants' assertion of this clear legal bar as some form of gamesmanship intended to deprive them of facts necessary to prosecute their claims. Not so. Indeed, well before this case was filed, Defendants accepted responsibility for the actions of their former employees and the illegal payments they orchestrated and, in doing so, made significant admissions regarding the bribery scheme at the heart of this case. Each of these admissions, although binding in their own right, has been reconfirmed in Defendants' answer to Plaintiffs' complaint. And, Defendants have repeatedly expressed their willingness to stipulate to or agree they would not put at issue facts

---

[1] Contemporaneously with the Motion, Defendants have filed (i) the Declaration of Thomas S. Kessler in support of the Motion (the "Kessler Decl."), (ii) the Sealed Declaration of Thomas S. Kessler in support of the Motion (the "Sealed Kessler Decl."), (iii) the Legal Opinion of Barros Pimentel (the "BP Op."), (iv) the Legal Opinion of Professor Marta Saad (the "Saad Op."); (v) the Opinion of Emiliano Javier Donoso Vinueza (the "Vinueza Op."); (vi) the Declaration of Robert Valdez (the "Valdez Decl."); (vii) and the Declaration of Paula Duarte Rocha (the "Rocha Decl."). Unless indicated otherwise, references to numbered exhibits contained herein refer to exhibits to the Kessler Decl., and references to lettered exhibits refer to exhibits to the Sealed Kessler Decl.
[2] Capitalized terms used in the Preliminary Statement have the meaning ascribed to them herein.

that would eliminate perceived open factual questions.  Plaintiffs have not, because they cannot, identify any material facts in dispute that could justify compelling the violation of applicable foreign law and Defendants' obligations to foreign governments (and Plaintiffs' strategic refusal to accept alternative forms of evidence cannot manufacture such a dispute).

In stark contrast to Plaintiffs' threadbare interests, the interests of the Brazilian government in enforcing their strict protocol for access to the Systems is manifest.  Forcing Defendants to violate applicable foreign law and their agreements with prosecutors would damage the integrity of ongoing investigations around the world, something courts have repeatedly refused to do when faced with a request to enforce discovery requests in civil litigation.  The Brazilian prosecutors themselves have submitted a certification expressly in response to Plaintiffs' requests, affirming their position that the Systems cannot be accessed by civil litigants under the Leniency Agreement they signed with Defendants.  And, as evidenced by the opinions submitted herewith, violation of the Leniency Agreement and the applicable foreign law that prohibits production of the Systems could well result in the imposition of severe penalties against Defendants in multiple jurisdictions.

Given these circumstances, Defendants should not be forced to violate the laws of multiple countries and their obligations to foreign prosecutors, and the Motion should be granted.

## BACKGROUND AND PROCEDURAL HISTORY

### I.     The *Lava Jato* Bribery Scheme and Odebrecht's Acceptance of Responsibility

There is no dispute among the Parties that until 2016, certain former Odebrecht executives participated in an illegal bribery scheme that principally involved the payment of bribes by Odebrecht to certain private and governmental entities and individuals in connection with the awarding and performance of construction projects.  *See* Ex. 1, Attachment B, ECF No. 10, Plea Agreement, (the "Plea Agreement") *U.S. v. Odebrecht S.A.*, No. 16-cr-00643 (E.D.N.Y.

Dec. 21, 2016) (the "Statement of Facts" or "SOF").  By December 2016, Odebrecht had

formalized its cooperation with prosecutors in the United States, Brazil and several other

jurisdictions and, as part of that cooperation, agreed to plead guilty to crimes in the United States

and to pay more than $2.6 billion in fines to various governments.  In connection with its

ongoing cooperation in the United States and abroad, Odebrecht has made expansive admissions,

many of which were reconfirmed in Defendants' answer to the operative complaint in this action

(ECF No. 106, the "Answer").  These binding admissions include that:

- From 2001-2016, Odebrecht paid more than $788 million in bribes to
  government officials, companies and executives, SOF ¶ 20; Answer ¶ 62;

- The payments were made in respect of more than 100 projects in twelve
  countries, including Angola, Argentina, Brazil, Colombia, Dominican
  Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and
  Venezuela, SOF ¶ 20; Answer ¶¶ 76, 155, 253, 269–70;

- The bribery scheme involved the creation and funding of "an elaborate,
  secret financial structure," SOF ¶ 21; Answer ¶ 64;

- Odebrecht never recorded the distribution of bribes on its balance sheet,
  nor disclosed the existence of the bribery scheme in its financial
  statements, SOF ¶ 23; Answer ¶¶ 68, 93, 110.

Moreover, as part of its plea agreement, Odebrecht agreed that it would not dispute the accuracy

of any of the factual admissions it made in the SOF.  *See* Plea Agreement ¶ 15.  That

commitment was reaffirmed in the Answer.  *See* Answer at 1 n.2.

## II.     **The Defendants' Entry Into the Leniency Agreement and Its Limitations on the Access to the Systems**

As explained above, the Defendants have been actively cooperating with

government regulators, including the *Ministério Público Federal do Brasil* (Brazil's Federal

Prosecutor's Office, the "MPF").  In connection with that cooperation, on December 1, 2016,

Odebrecht and the MPF entered into a *Termo de Acordo de Leniência* (the "Leniency

Agreement").  As part of the Leniency Agreement, Odebrecht made a series of detailed factual

admissions, detailed in a series of appendices, agreed to provide relevant documents and other materials to the MPF and, more generally, to cooperate with the MPF in its ongoing investigations regarding the Bribery Scheme. *See generally* Ex. 1. The failure to adhere to the terms of the Leniency Agreement could lead to its termination, which in turn could result in the imposition of severe fines, the dramatic acceleration of fines already imposed, the prohibition of bidding for government projects and even potential prosecution. *See* Saad Op. ¶ 50; BP Op. ¶ 42. Because the Leniency Agreement provides for payment of the fines over a period of years and allows the Defendants to participate in critically important public bidding, immediate termination of the Leniency Agreement could also lead to the liquidation of the Defendants.

Among the materials delivered to the MPF, Odebrecht turned over the entirety of the Systems and relinquished its ownership rights to them. *See* Ex. I., Cl. 1; Saad Op. ¶ 10. Access to the Systems is strictly controlled by the Leniency Agreement. BP Op. ¶ 11. For example, the Leniency Agreement provides that ████████████████████ ███████████████████████████████████████████████ ██████████████████████ In fact, even the MPF may:

███████████████████████████████████ ███████████████████████████████████ In 2019, ███████████████████████ █████████████████████████████ ███████████████████████

---

### III.     Odebrecht's Additional Agreements With Foreign Prosecutors

As part of the global cooperation the Leniency Agreement was intended to foster, Defendants have entered into multiple agreements with foreign prosecutors that govern their cooperation with ongoing investigations, each of which prohibit disclosure of the Systems.

For example, Defendant CNO S.A. entered into a cooperation agreement (the "Ecuadorian Cooperation Agreement") with the *Fiscalía General del Estado* (the General Prosecutor of Ecuador or the "FGE").  Vinueza Op. ¶¶ 4-6.  In connection with the Ecuadorian Cooperation Agreement, the FGE was granted access to the Systems.  *Id.*  Under Ecuadorian law, all documents provided to the FGE pursuant to the Ecuadorian Cooperation Agreement are strictly confidential and cannot be disclosed to any third parties.

CNO S.A. also has executed a cooperation agreement (the "Peruvian Cooperation Agreement") with the *Ministério Público del Perú* (the Public Prosecution Office of Peru or the "MPP").  Ex. 2 at 2.  According to the MPP, which issued a letter after being apprised of Plaintiffs' requests, documents submitted in connection with the Peruvian Cooperation Agreement are confidential under Peruvian law and must remain confidential in order to safeguard ongoing investigations.  *Id.*

Odebrecht also entered into a leniency agreement (the "Dominican Leniency Agreement") with the *Procuradoría General de la República* (the "PGR") in the Dominican Republic.  Valdez Decl. ¶ 3.  Under Dominican Republic law and the Dominican Leniency Agreement, all evidence that Odebrecht provided to the PGR must remain strictly confidential and may not be disclosed to third parties.  Valdez Decl. ¶¶ 6-8, 10-11.[4]

---

[4] Defendants have entered into similar agreements with multiple other foreign governmental authorities, including Mozambique.  *See* Rocha Decl. ¶¶ 4-5.

**IV.**   **Decisions of Brazilian Courts in Respect of the Systems**

    **A.**   **The Brazilian Supreme Federal Court Decision**

        On May 30, 2017, the Brazilian Federal Supreme Court issued an order (the "<u>FSC</u> <u>Order</u>") approving a request to maintain under seal the testimony and corroborating evidence provided in furtherance of the cooperation agreements executed by seventy-seven "members and former members of the Odebrecht Group" as part of the ongoing investigations into the *Lava Jato* bribery scheme.  Ex. 3 at 2.  This corroborating evidence largely came from the Systems and other Odebrecht files.  *See* Saad Op. ¶ 32.  In arriving at its decision, the court recognized "the clear public interest in the investigation of illegal conduct to the maximum extent possible."  Ex. 3 at 4.  The court imposed the "exceptionality of the restriction" in an order to guarantee a favorable environment for negotiations with foreign regulators.  *Id.*  The FSC Order therefore prohibits Defendants from reproducing the Systems to Plaintiffs.

    **B.**   **The Curitiba Court's Decisions**



## V.   Plaintiffs' Service of the RFPs and Defendants' Efforts to Resolve Perceived Factual Disputes

In their initial RFPs, Plaintiffs sought, among their broad requests (1) "[a]ll

DOCUMENTS stored on the [Systems] CONCERNING any payments made to political parties,

foreign officials, or corporate executives (or their representatives or agents)."  ECF No. 114, Ex.

A at 18–19.  Defendants objected to each of Plaintiffs' RFPs, and to RFPs 5 and 6 specifically:

to the extent it calls for the production of documents subject to confidentiality
restrictions or other limitation on their dissemination, including, without limitation,

those imposed by applicable leniency or similar agreements with governmental authorities, and/or other applicable law.   In particular, production of such documents in contravention of agreements, orders and/or applicable law would subject Defendants to sanctions and penalties and violate principles of comity.

*Id*. at 5.  Defendants have steadfastly preserved this objection.

During the meet and confer process, Defendants repeatedly raised their numerous binding admissions in an effort to understand what, if any, further factual development would be necessary for Plaintiffs to prosecute their case.  *See, e.g.*, ECF No. 110 at 4.  Plaintiffs made generalized statements about the basic elements of a securities fraud claim, but raised only one instance where they believed a material factual question existed, namely whether the "real" amount of bribes paid by Odebrecht was more than $788 million, as Plaintiffs' allege had been suggested by a criminal defendant during his testimony in a Brazilian proceeding.  *Id*.  In response, Defendants offered to stipulate that (i) Plaintiffs would not be required to establish that the total amount of bribe payments made during the relevant period was more than $788 million in order to satisfy any element of any claim in their complaint, and (ii) Defendants would not raise any claim or defense in this action (or otherwise assert that any element of any claim asserted in Plaintiff's complaint was not met), on the basis of the total amount of bribe payments during the relevant period was anything less than $3.3 billion.  *See id*.  Plaintiffs' only response has been that such a proposal is "contrary to Plaintiffs' interests."  ECF No. 111 at 3.

On October 13, 2020, in response to a request from Plaintiffs, the Court held a discovery conference at which it determined that full briefing was warranted in order to more fully evaluate Defendants' position regarding their inability to produce the Systems without violating Brazilian law.  As demonstrated herein, Defendants' objection to the production of the Systems is well founded, and the Court should issue a protective order to confirm that

Defendants will not be required to violate Brazilian law, and imperil their cooperation with the MPF and other foreign authorities, in order to satisfy Plaintiffs' requests for production.

## ARGUMENT

It is well established that "American courts should[] take care to demonstrate due respect for any special problem confronted by [a] foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Société Nationale Industielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987). Accordingly, courts carefully consider whether a foreign litigant should be forced to comply with a discovery request where doing so would run afoul of applicable foreign law. *Id.*

There can be no dispute that compelled production of the Systems would violate applicable foreign law, including Odebrecht's obligations under multiple agreements with foreign prosecutors, as well as decisions of Brazilian courts. The consequences for such violations would be severe and could include termination of those agreements, the assertion of civil liability and/or the imposition or acceleration of crippling fines that could force Defendants into liquidation. Plaintiffs have failed to demonstrate why, in light of the substantial admissions already made by Defendants, the Court should sweep aside applicable foreign law and ignore the harm that doing so would create. Accordingly, the Motion should be granted.

## I. Disclosure of the Systems Would Violate Applicable Foreign Law, Brazilian Judicial Decisions and Cooperation Agreements, including the Leniency Agreement

"[T]he threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law." *Societe Nationale Industrielle Aérospatiale*, 482 U.S. at 555.[6] Here, Defendants are faced with precisely such a conflict: Applicable foreign law

---

[6] It is well established that, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a part or admissible under the Federal Rules of Evidence. The

prohibits the production of the Systems to Plaintiffs.  This prohibition flows from the Leniency Agreement reached between Odebrecht and the MPF, as well as multiple decisions from Brazilian courts and cooperation agreements with foreign prosecutors.

**A.      The Leniency Agreement Prohibits Production of the Systems to Plaintiffs**

As set forth above, on December 1, 2016, Odebrecht and the MPF executed the Leniency Agreement, principally to document the terms on which Odebrecht would assist the MPF with its ongoing *Lava Jato* investigations.  *See* Saad Op. ¶¶ 14-17; BP Op. ¶ 10; Ex. 1. Because the MPF recognized the extraordinarily sensitive nature of the Systems, and because investigations were still ongoing, the Leniency Agreement established strict confidentiality requirements with respect to the Systems.  ███████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

The limited right of access provided for in the Leniency Agreement has been sparingly used to date.  ████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

---

court's determination must be treated as a ruling on a question of law."  Fed. R. Evid. 44.1; *see also CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, 2013 WL 2661037, at *5 (S.D.N.Y. June 12, 2013).



It is true that, with the MPF's permission, Odebrecht has retained a copy of the Systems for the limited purposes of (1) fulfilling its obligation to aid the MPF in its ongoing investigations, (2) negotiating with other authorities who may receive access to the Systems through a request to the MPF and (3) with authorization of the MPF, providing information to former employees in order to aid their cooperation. *See, e.g.*, Saad Op. ¶ 11; BP Op. ¶ 35. Thus, Odebrecht's use of the Systems is tightly controlled and not a vehicle through which Plaintiffs can seek access, as evidenced by the MPF's recent statement. *See* Ex. G at 3.

### B. Brazilian Judicial Decisions Further Reinforce the Prohibition on Production

In addition to the Leniency Agreement, several decisions from Brazilian courts specifically have addressed the confidentiality requirements imposed on the Systems, each reinforcing the narrow circumstances under which access to the Systems is permissible.

#### 1. Decisions of the Curitiba Court Regarding the Leniency Agreement



---



███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

2. <u>The Brazilian Federal Supreme Court's Decision Independently Prohibits Disclosure</u>

████████████████████████████████████████████

███████████████████████████████████████████.  In May 2017, the Brazilian Federal Supreme Court determined that, among other things, documents and data provided in furtherance of the cooperation of seventy-seven individuals involved in the *Lava Jato* investigation must be kept under seal in order to preserve ongoing global investigations.  *See*, Ex. 3.  Because these materials were drawn primarily from the Systems, the order prevents Defendants from producing the Systems to Plaintiffs.

**C.  <u>Additional Agreements with Foreign Prosecutors Prohibit Disclosure</u>**

Finally, Defendants' agreements with prosecutors in Ecuador, Peru, the Dominican Republic and Mozambique, which further the cooperation the MPF sought to foster through the Leniency Agreement, separately bar production of the Systems.  *See supra* at 6.

## II.     The Comity Factors Weigh Heavily in Favor of Granting the Motion

   The Second Circuit has long warned that courts should not "take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures." *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960). Accordingly, the Supreme Court has held that a court considering a request for documents under the Federal Rules of Civil Procedure should not lightly disregard the laws of a foreign sovereign that might prohibit compliance with such a request. *Aérospatiale*, 482 U.S. at 544. Although foreign law does not automatically "deprive an American court of the power to order a party subject to its jurisdiction to produce evidence," the Court stressed that "[t]he lesson of comity is that neither the discovery order nor the blocking statute can have the same omnipresent effect that it would have in a world of only one sovereign." *Id.* at 544 n.29. Thus, courts are required to give "prior scrutiny in each case [to] the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Id.* at 544.

   Although the Supreme Court did not "articulate specific rules to guide this delicate task," *Aérospatiale*, 482 U.S. at 546, courts in this Circuit examine:

> (1) the importance to the litigation of the information requested; (2) the degree of specificity of the requests; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located; (6) the hardship that compliance would impose on the party from whom information is sought; and (7) the good faith of the party resisting production.

*Linde v. Arab Bank, PLC,* 706 F.3d 92, 109–10 (2d Cir. 2013). Consideration of these factors decisively weighs in favor of Defendants and against compelling the unlawful disclosure of the Systems.

A.   ***First and Fourth Factors***:  **Defendants' Admissions and Existing Document Productions Render the Systems of Marginal Additional Value to Plaintiffs and Provide an Alternative Means of Establishing the Facts Sought from the Systems**

"Where the outcome of litigation 'does not stand or fall on the present discovery order,' or where the evidence sought is cumulative of existing evidence, courts have generally been unwilling to override foreign secrecy laws."  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992); *see also Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 211–12 (E.D.N.Y. 2007) (noting that "some courts have applied a more stringent test of relevancy when applying the Federal Rules to foreign discovery" and requiring production where the requested documents were "highly relevant" and "crucial to the litigation of plaintiffs' claims").  Courts also are less likely to compel violation of a foreign law where the information sought by a request is already in Plaintiffs' possession or could be sought via alternative means. *See, e.g.*, *In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d 1078, 1083 (N.D. Cal. 2007) (denying request for documents provided to European Commission because they were "in large part, cumulative of information [plaintiff] already ha[d]"); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 529 (S.D.N.Y. 1987) (finding that requested production had "reduced degree of importance" in light of documents already in Plaintiffs' possession).

Here, Plaintiffs' claims can be distilled into a single allegation:  that Odebrecht engaged in a wide-scale bribery scheme which was never disclosed in its financial statements or similar documents related to Defendants' debt securities.  *See* TAC ¶¶ 1–10.  Defendants' substantial admissions—which formed the basis of a criminal guilty plea, multi-billion dollar fine and which were affirmed specifically in connection with the factual allegations made in the TAC—combined with Defendants' repeated willingness to enter into stipulations regarding perceived factual disputes (discussed further below)—provide more than enough evidence

through which Plaintiffs can prosecute their claims.[9]  Accordingly, any additional information that could be gleaned from the Systems would be either cumulative or irrelevant, and Plaintiffs have a ready alternative source of information for use in this case.

In 2016, Odebrecht entered a guilty plea in the United States District Court for the Eastern District of New York.  *See* ECF No. 10, Plea Agreement, *U.S. v. Odebrecht S.A.*, No. 16-cr-643 (E.D.N.Y. Dec. 21, 2016).  As detailed above and in the publicly filed, twenty-three page SOF, Odebrecht made significant admissions in connection with that plea agreement.  *See generally* SOF; *supra* at 3-4.  These admissions include that between 2001 and 2016 "Odebrecht, together with its co-conspirators, paid approximately $788 million in bribes in association with more than 100 projects in twelve countries, including Angola, Argentina, Brazil, Colombia, Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela."  SOF ¶ 20.  Odebrecht also admitted to creating and funding "an elaborate, secret financial structure" to effectuate the Bribery Scheme, *id.* ¶ 21, and that the Bribery Scheme provided a benefit of approximately $3.3 billion to Odebrecht and its co-conspirators.  *Id.* ¶ 23. Odebrecht further admitted that the Bribery Scheme involved the management and distribution of funds "that Odebrecht never recorded on its balance sheet."  *Id.*

The Answer confirms each of these admissions.  *See, e.g.*, Answer ¶ 62 (admitting the existence of a bribery scheme between 2001-2016, as part of which more than $788 million in bribes were paid); *id.* at 278 (admitting to bribing government authorities in each of the countries identified in the SOF).  Defendants further admitted, no fewer than forty-three times, that "Odebrecht and CNO did not disclose the bribery scheme in the company's financial statements," *see, e.g., id.* ¶¶ 68, 93, 110, and that the scheme was carried out by some of

---

[9] For the avoidance of doubt, Defendants believe there are multiple legal bars to Plaintiffs' claims, none of which relate to specific facts concerning the payment of specific bribes, the only subject that the Systems could address.

Odebrecht's most senior executives, including its former CEO. *See, e.g., id.* ¶¶ 65–6. Taken together, the admissions provide more than enough for Plaintiffs to prosecute their claims.

As explained above, throughout this litigation, Plaintiffs have raised nebulous concerns regarding the sufficiency of Odebrecht's admissions but, to date, have identified only one purported factual dispute: whether the bribery scheme involved the payment of $788 million in bribes (as admitted) or $3.3 billion (as Plaintiffs claim was alleged in testimony in Brazil). *See supra* at 3-4. But, Plaintiffs have provided no basis for their assertion that this perceived factual dispute is material, or even relevant, to any of their causes of action. And, even if it were, Defendants have already agreed to eliminate that dispute through stipulation. *See supra* at 9. This stipulation would eliminate any dispute over the only issue that Plaintiffs have identified, *i.e.*, the amount of payments made as part of the bribery scheme and would render production of the Systems—which, as Plaintiffs allege, contain financial data regarding the amount of bribes made as part of the bribery scheme—entirely unnecessary.

Plaintiffs' undefined, unsupported "interests"—which has been the only basis for their refusal to eliminate this perceived dispute through any means other than production of the Systems or a full stipulation as to liability—are entirely insufficient to demonstrate that production of the Systems is necessary to establish facts that are either already admitted to, or that Defendants have agreed to stipulate away. Thus, the lack of "importance to the litigation of the information requested" factor weighs in Defendants' favor and against compelling production of the Systems in violation of applicable foreign law. *See Richmark Corp.*, 959 F.2d at 1475 (noting that courts "have generally been unwilling" to override foreign law "where the evidence sought is cumulative of existing evidence"); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 929–30 (N.D. Ill. 2019) (refusing to compel inspection of foreign computers

where plaintiff "failed to carry its burden that the additional discovery it seeks – which would come after mountains of discovery have already been produced – is necessary or proportional to the needs of the case"); *cf. Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *15 (S.D.N.Y. Feb. 16, 2016) (refusing to compel production where, "to the extent they bear on facts relevant to this action, they bear only on facts that are not in dispute").

For this same reason, the fourth comity factor, the availability of alternative means of obtaining the information weighs in Defendants' favor or, at a minimum, is neutral. Plaintiffs have a ready alternative source of information regarding the information allegedly contained in the Systems—the repeated admissions made by Defendants. *See supra* at 3-4. Just as with the first comity factor, the fact that Plaintiffs' "interests" may be to receive every piece of information available regarding the bribery scheme, that is not a sufficient basis on which to compel violation of applicable Brazilian law—particularly where they already have substantial evidence available to them through Defendants' sworn statements.[10] *See, e.g.*, *In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d at 1083; *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. at 529 (finding that requested production had "reduced degree of importance" in light of documents already in Plaintiffs' possession).

**B.**   *Second Factor*:  **Plaintiffs' Requests Are Overbroad**

The second factor, "the degree of specificity" of Plaintiffs' requests, also weighs in Defendants' favor.  Courts are entrusted with preventing "'fishing expeditions' or an undirected rummaging . . . for evidence of some unknown wrongdoing." *Cuomo v. Clearing House Ass'n LLC*, 557 U.S. 519, 531 (2009).  Accordingly, Courts will not permit discovery requests that are overbroad, particularly where compliance would violate foreign law.  *Accord.*

---

[10] And, of course, Plaintiffs are free to follow the process established by the MPF for requesting access to the Systems, *see* Saad Op. ¶ 26, something Defendants understand Plaintiffs have not attempted.

*Catalano v. BMW of N. Am., LLC*, 2016 WL 3406125, at *7 (S.D.N.Y. June 16, 2016) (refusing to compel discovery as propounded by plaintiffs where requests were "substantially overbroad for [the plaintiff's] needs").  Plaintiffs' requests for production of the Systems are exactly that.

Plaintiffs' requests broadly sweep in "[a]ll DOCUMENTS stored on the [Systems] CONCERNING any payments made to political parties, foreign officials, or corporate executives (or their representatives or agents)."  RFP Nos. 5, 6.  Plaintiffs make no effort to limit their requests to documents that concern facts or issues that cannot be addressed through alternative means.  This failure is particularly egregious where, as explained above, Defendants have already admitted that a wide array of bribe payments were made to political parties, foreign officials and corporate executives as part of the Bribery Scheme.  *See supra* at 3-4.  Plaintiffs' refusal to accept these admissions on their face does not excuse their impermissibly broad requests, which does not even attempt to exclude documents that concern payments already admitted to by Defendants.  *See Vaigasi*, 2016 WL 616386, at *15.

C.    ***Third Factor*:  The Systems Originate Outside the United States**

"The overseas location of [] information weighs in favor of non-enforcement of" requests for production.  *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, 2013 WL 2661037, at *10 (S.D.N.Y. June 12, 2013); *see also Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 150 (E.D.N.Y. 2009).  Here, there is no dispute that the Systems originated outside the United States and remain housed entirely outside the United States.  *See, e.g.*, Saad Op. ¶ 9.  This consideration therefore favors granting the Motion.  *See, e.g.*, *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *10; *Linde*, 262 F.R.D. at 150; *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 2019 WL 1988525, at *5 (S.D.N.Y. May 6, 2019) ("there is no dispute that most of the information at issue in this case is of foreign origin, which favors deference to the law of the jurisdiction in which the information was created or is currently being held").

**D.**     *Fifth Factor*:  **Compelling Production of the Systems in Violation of Applicable Foreign Law Would Violate Important Brazilian Interests**

Central to courts' comity analysis is the competing interests of the United States and the country whose laws would be violated by the production of the requested documents, here Brazil.  *Linde*, 706 F.3d at 109–10; *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *13–14.  Where the request is made by a private litigant with a "generalized interest in fully and fairly adjudicating matters before [United States] courts," rather than a government actor as part of an enforcement or criminal action, "courts allocate relatively less weight to the United States in this analysis."  *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *13–14 (internal quotation marks omitted).  Courts evaluating whether to defer to foreign law also should consider "the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance."  Restatement (Third) of Foreign Relations Law § 442 (1987).

In sharp contrast to the "generalized interest" Plaintiffs may assert in the adjudication of this matter—which, as discussed above, Plaintiffs can do through existing discovery, Defendants' admissions and proposed stipulations—preserving the secrecy of the Systems is central to the Brazilian government, including in order to preserve its ongoing investigations into the *Lava Jato* scheme and its cooperation with other foreign governments conducting similar investigations, who manifestly share this interest.  *See* BP Op. ¶ 37.

As the Leniency Agreement states, it is intended to:

> expand and deepen investigations throughout the country with regard to acts of administrative impropriety, especially those pertaining to the facts that also constitute crimes against the Government and the National Financial System, money laundering crimes and crimes against the Economic Order and Taxation System, among others, especially with regard to the repercussions of these unlawful acts in the areas of civil, government, regulatory and criminal law. . . . [and] encourage [Odebrecht] to enter into negotiations and agreements in other jurisdictions that may be interested in similar agreements, in order to expand anti-corruption investigations in Brazil and abroad.

Ex. 1, Cl. 1.  Indeed, the MPF has expressly stated that the information and documents contained in the Systems are "kept confidentially and can only be accessed to support investigations conducted by competent authorities, including to avoid jeopardizing ongoing investigations, in Brazil and abroad."  ECF No. 120-1 at 4.  The MPF's unequivocal expression of Brazil's interests, ██████████████████████████████████████████████, should be afforded significant weight.  *See, e.g.*, *Minpeco*, 116 F.R.D. at 523.  This interest in ensuring the integrity of ongoing investigations is not limited to Brazil, and is shared by the governments of Ecuador, Peru, the Dominican Republic and Mozambique, whose prosecutors have executed agreements with Defendants in order to facilitate cooperation with ongoing investigations and potential forthcoming prosecutions.  *See* Vinueza Op. ¶ 5; Ex. 2 at 2; Valdez Decl. ¶ 9; Rocha Decl. ¶¶ 4-5.

This compelling interest is further evidenced by ████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ *See supra* at 7-8.  Moreover, if an American court refuses to recognize Defendants' cooperation agreements, including the extraordinary protections afforded to the Systems as part of the Leniency Agreement, that rejection is likely to have a chilling effect on future cooperation with foreign authorities because companies could have no confidence that the materials they provide will not be subject to the expansive U.S. discovery regime.  *See* Saad Op. ¶ 51(c); *In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d at 1084 (considering that disclosure could

---

[11] In fact, Brazilian courts, including the Supreme Court, have specifically denied access to the Systems to several criminal defendants that are being prosecuted in connection with the *Lava Jato* Operation.  For instance, courts have denied former President Luiz Inácio Lula da Silva access to the contents of Odebrecht's Leniency Agreement at least 16 times since 2017.  *See* Vinicius Konchinski, Embate entre Lula e Lava Jato pode fazer caso de terreno em SP prescrever, UOL (Oct. 23, 2020), https://noticias.uol.com.br/politica/ultimas-noticias/2020/10/23 /lula-lava-jato-prescricao.html.

"undermine [the European Commission's] ability to initiate and prosecute future investigations by creating disincentives to cooperate with the Commission").[12]

This demonstrable, particularized interest in maintaining the secrecy of the Systems is exactly the sort that courts have accepted as sufficiently compelling to deny discovery requests by civil litigants in American litigation. *See, e.g.*, *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 2005 WL 3046284, at \*1–2 (S.D.N.Y. 2005) *aff'd* 476 F.3d 140 (2d Cir. 2007) (declining to issue contempt sanctions for non-production of documents, finding "the Korean national interest in the unimpeded function of regulatory bodies trumps the United States' interest in ensuring compliance with discovery obligations"); *In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d at 1084.[13]  And, importantly, the interests of the Brazilian and other governments here—which are codified in the Leniency Agreement and similar agreements, and multiple decisions of Brazilian courts that specifically address the Systems—are far stronger than in the typical foreign discovery case, where courts have in certain circumstances deferred to generalized blocking or secrecy statutes. *See, e.g.*, *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at \*6 (Singapore's Banking Act); *Leibovitch v. Islamic Republic of Iran*, 188 F.Supp.3d 734, 758–59 (N.D. Ill. 2016) (French and Japanese banking secrecy laws).[14]

---

[12] It also may affect the ongoing cooperation between U.S. authorities and the Brazilian government, which also weighs against compelling production. *See* Restatement (Third) of Foreign Relations Law § 442 (1987).

[13] Indeed, even outside the comity context, courts frequently deny discovery requests to preserve the integrity of criminal investigations and proceedings. *See, e.g.*, *Abdell v. City of New York*, 2006 WL 2664313, at \*5 (S.D.N.Y. Sept. 14, 2006) (noting the "peril [of compelling production] is exacerbated where the ongoing case is criminal, since the information disclosed could end up in the hands of the criminal defense attorneys and jeopardize the prosecution"); *Sec. and Exch. Comm'n v. Downe*, 1993 WL 22126, at \*13 (S.D.N.Y. Jan. 26, 1993) ("Courts have granted stays of discovery in order to protect the integrity of the pending criminal investigations, even where an indictment has not yet been returned."); *cf Nat'l Broad. Co. v. U.S. Dep't of Justice*, 735 F.2d 51, 52 (2d Cir. 1984) (affirming refusal to compel disclosure of "descriptive data regarding confidential informants").

[14] *See also Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 116 F.R.D. 517, 524 (denying motion to compel production where Swiss Banking Act prohibited the disclosure of customer information); *S.E.C. v. Stanford Int'l. Bank, Ltd.*, 776 F. Supp. 2d 323, 342 (2011) (rejecting requests for production directed to documents subject to Swiss law); *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. at 160–61 (same with respect to Chinese law).

Because Brazil's interest in maintaining the secrecy of the Systems, shared by, *inter alia*, Ecuador, Peru, the Dominican Republic and Mozambique, far outweighs the general interests of the United States, the fifth factor weighs decisively in favor of Defendants.

E.   *Sixth Factor*: Compelling Defendants to Violate Applicable Foreign Law Would Give Rise to Potential Civil and Criminal Liability

Courts disfavor compelling production where doing so "would subject the party on whom compliance is sought to liability or sanctions[.]"  *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *15; *see also Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 454 (E.D.N.Y. 2007) ("The prospect that the foreign litigant would face criminal penalties rather than civil liabilities weighs in favor of the objecting party").  Courts do not require sanctions to be a certainty.  *See, e.g.*, *Tiffany (NJ) LLC  v. Qi Andrew*, 276 F.R.D. 143, 160 (S.D.N.Y. 2011) (refusing to compel production where doing so "could potentially" lead to sanctions).

The potential consequences of forcing Defendants to produce the Systems in violation of applicable Brazilian law are severe.  As discussed above, production of the Systems would violate the Leniency Agreement, which would give the MPF the right to terminate it.  *See* Saad Op. ¶ 50(a); BP Op. ¶¶ 39-40.  Termination of the Leniency Agreement would eliminate the protections provided to Odebrecht, including, for example, the MPF's agreement to not institute any action against Odebrecht in respect of the substantial information it has provided to the MPF pursuant to the Leniency Agreement.  *See* Ex. 1, Cl. 8.  In other words, the MPF could seek to use the information Odebrecht provided as part of its cooperation (which it provided only after receiving the protections afforded under the Leniency Agreement) to pursue additional claims and penalties against Odebrecht.  Further, termination of the Leniency Agreement would allow authorities to increase or modify the terms of the fine owed to the Brazilian government under the agreement (currently, a nine-figure fine to be paid over twenty-two years).  *See* BP Op. ¶ 42.

That modification could cripple Defendants' ability to operate their businesses and, could force Defendants into liquidation.  *See id*; Saad Op. ¶ 51(b).  And, because Defendants' production of the Systems necessarily would result in production of confidential information related to cooperating individuals, disclosure would violate the FSC Order and could give rise to meaningful civil liability in Brazil.  *See* Saad Op. ¶ 33; 43; 50(d); 51(e); BP Op. ¶ 14.

Although these severe sanctions alone would warrant granting the Motion, compelling production of the Systems also could give to the most "weighty excuse for nonproduction"—potential criminal liability.  *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 211 (1958); *see also CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *16 (hardship of compliance favors the producing party where production would place the party and "its employees at risk of criminal sanctions").  As explained above, production of the Systems would violate multiple Brazilian judicial decisions, which in turn could give rise to a charge of breach of judicial confidentiality or contempt of court against Defendants' employees and agents.  *See* Saad Op. ¶ 50.  If convicted, the penalties could include substantial fines and even incarceration for up to two years.  *Id*.  Notably, although it is rare for Brazilian citizens to violate this statute, Brazilian prosecutors have sought and received convictions against individuals who disclosed confidential information, in at least one case even where the disclosure was intended for self-defense.  *See id*. n.23.  Compelled disclosure also would give rise to a substantial risk of criminal prosecution in Ecuador and the Dominican Republic, which could lead to fines and/or incarceration for those involved in the disclosure.  *See* Vinueza Op. ¶¶ 7-9; Valdez Decl. ¶¶ 13-14.

In sum, compelled disclosure of the Systems would give rise to a substantial risk that, among other things, the MPF will terminate the Leniency Agreement—ending the

protections Odebrecht has received and accelerating crippling fines that could lead to Defendants' liquidation—that civil litigants will assert claims associated with Defendants' disclosure of their confidential information and, critically, that Defendants' employees and agents will be the target of criminal prosecution.  The meaningful risk of these severe sanctions weighs decisively in favor of granting the Motion.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 262 F.R.D. at 151 (refusing to compel production where doing so "could lead to substantial civil liability and criminal punishment" for the producing party).[15]

**F.**      ***Seventh Factor*:  Defendants' Good Faith Is Not in Dispute**

"Although good faith will not insulate a party from the obligation to respond in discovery, bad faith delays and dilatory tactics will weigh against the objecting party." *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *16.  At no point have Plaintiffs suggested that Defendants have acted in bad faith by asserting the applicability of Brazilian law here.  Nor could they, given that foreign law clearly bars the production of the Systems to Plaintiffs, and that Defendants consistently have maintained their objection to Plaintiffs' RFPs on that basis since serving their responses and objections in January 2020.  *See, e.g.*, *id.*; *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 2019 WL 1988525, at *5.

<u>**CONCLUSION**</u>

Defendants respectfully request the Court grant the Motion and issue a protective order in respect of Plaintiffs' RFPs that call for production of the Systems.

*[The remainder of this page is left blank intentionally]*

---

[15] *See also CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *16 (S.D.N.Y. June 12, 2013); *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 339 (N.D. Tex. 2011) (denying request to compel, holding that "because [the producing party] shows that unilateral compliance runs the risk of prosecution, the Court finds that comity counsels deference to [the producing party's] potentially well-founded fear").

Dated:   November 12, 2020
          New York, New York

*/s/ Luke A. Barefoot*       
Victor L. Hou
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to Defendants*
*Construtora Norberto Odebrecht, S.A.,*
*Odebrecht Engenharia E Construção S.A., and*
*Odebrecht S.A. - Em Recuperação Judicial*