```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED:   3/30/21            │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOUBLELINE CAPITAL LP, et al.

Plaintiffs,

-against-

ODEBRECHT FINANCE, LTD., et al.,

Defendants.

17-CV-4576 (GHW) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

By letter-motion dated May 12, 2020 (Pl. Ltr.) (Dkt. No. 109), plaintiffs DoubleLine Capital LP, DoubleLine Income Solutions Fund, and DoubleLine Funds Trust seek sanctions against defendants Odebrecht, S.A. (OSA), Construtora Norberto Odebrecht, S.A. (CNO), and Odebrecht Engenharia e Construção S.A. (OEC) – specifically, a mandatory adverse inference instruction at trial – as a remedy for defendants having intentionally destroyed the encryption keys needed to access the "MyWebDay" platform, which was an internal, "shadow" accounting system used to track the illicit bribe payments underlying this securities fraud lawsuit. *Id.* at 2. Defendants principally argue that sanctions would be inappropriate because plaintiffs have not (and cannot) demonstrate that the lost information cannot be replaced in discovery, and therefore have not shown that any relevant facts "have been rendered unavailable by virtue of the 2016 destruction of the MyWebDay encryption keys." Def. Opp. (Dkt. No. 110) at 3.

For the reasons that follow, the motion will be granted in part.

## I.    BACKGROUND

This action had its genesis in a long-running, international bribery scheme, during which defendants bribed "government officials in Brazil and at least 12 other countries in order to influence the award of large constructions contracts" to themselves. Third Amend. Compl. (TAC) (Dkt. No. 61) ¶ 62. Defendants have since admitted their criminal conduct in multiple jurisdictions.

The sections below describe the parties involved, and recount the events underlying the litigation, only to the extent relevant to the pending sanctions motion.

### A.    Parties

Defendant OSA is a Brazilian corporation that "through various subsidiaries and operating entities, conducts business in the construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States." TAC ¶ 30. Defendant CNO, an OSA affiliate, was Latin America's "largest engineering and construction company," and it was also "one of the largest such companies in the world." *Id.* ¶ 36. Defendant OEC, an "integral subsidiary of Odebrecht," became the "direct controller of CNO on March 31, 2015," and since then, "CNO has essentially become an empty shell and OEC substituted itself in as the replacement to CNO in all respects." *Id.* ¶ 40.

Plaintiffs purchased a "significant quantity" of two bonds issued by OSA at prices close to par. TAC ¶¶ 25, 230.[1] Plaintiffs purchased these bonds between May 2013 and March 2015. *Id.* ¶¶ 25-26.

### B.    The Underlying Bribery Scheme

In or around 2006, defendants created a standalone division of OSA called the "Division of Structured Operations," which plaintiffs allege "was created for the sole purpose of functioning as a 'bribe department' that made illicit payments to governmental officials in exchange for the receipt of lucrative public contracts by CNO." TAC ¶ 64. The then-CEO of OSA, Marcelo Odebrecht, later admitted that "between 0.5% and 2.0% of [OSA's] revenue was directed to illicit bribes." *Id.* ¶¶ 66-67.

---

[1] The bonds at issue were the 7.125% Notes due June 26, 2042 and the 7.50% Perpetual Notes. TAC ¶ 25 (collectively the Notes).

The Division of Structured Operations was able to conceal these "massive illicit payments" by omitting them from CNO's and OSA's formal accounting records, where they would have been reflected in their financial results and also would have been reported to external auditors. TAC ¶¶ 68-69. Instead, it "tracked these expenses on two 'shadow' systems that could only be accessed by members of the Division." *Id.* One such system was called "MyWebDay," which "was used for making payment requests, processing payments and generating spreadsheets tracking all illicit bribe payments." *Id.* The other such system was called "Drousys," which "allowed members of the Division of Structured Operations to communicate with each other and other co-conspirators using secure emails and instant messages." *Id.*

### C.    Lava Jato Investigation

In or around 2014, Brazilian authorities began investigating suspected corruption of another Brazilian multinational corporation called Petróleo Brazileiro S.A., better known as Petrobras. TAC ¶ 81. The investigation, initially covert, was called "Lava Jato," which translates to "Operation Carwash," and "did not originally focus on Odebrecht or CNO." *Id.*[2] Soon after, the United States and Switzerland launched their own investigations. *Id.* The investigations began to focus on OSA after the arrest of its CEO, Marcelo Odebrecht, on charges of corruption and money-laundering, on June 19, 2015. *Id.* ¶¶ 6-7, 82. Following that arrest, the market price of the securities

---

[2] Though not initially the target of the corruption investigations, OSA was directly embroiled in the bid-rigging scheme involving Petrobras. Between 2004 and 2012, OSA made illicit "payments to, and for the benefit of, foreign officials, including Brazilian politicians and Petrobras executives and employees, in order to secure contracts with Petrobras." Plea Agreement, *United States v. Odebrecht, S.A.*, No. 16-CR-643 (RJD) (E.D.N.Y. filed Dec. 21, 2016), ECF No. 10, Ex. 1 (SOF), ¶ 33. More specifically, OSA met with other construction companies in order "to evaluate and divide up future contracts for Petrobras projects" among themselves. *Id.* ¶ 34. Once it was decided which company or companies would be responsible for a given project (and the price Petrobras felt was appropriate), it was agreed among the co-conspirators that only that company would "present a qualifying bid," while the other companies "would present proposals that would ensure the predetermined company's winning bid." *Id.*

at issue in this action declined 6.7% in the case of the 7.125% Notes and 10% in the case of the 7.50% Notes. *Id.* ¶ 233 & n.51. Thereafter, the bribery scheme continued to publicly unravel when, among other things, Brazilian authorities filed formal charges against Marcelo Odebrecht in July 2015 for his role in bribing Brazilian officials. *Id.* ¶ 246. On December 10, 2015, Marcelo Odebrecht resigned as the CEO of OSA. *Id.* ¶ 248. OSA issued a press release announcing his resignation while also maintaining that he was innocent of the bribery charges. *Id.*

Aware that authorities had launched criminal investigations, defendants sought to keep themselves "out of the crosshairs . . . by concealing or destroying evidence of their criminal activities." TAC ¶ 82. For example, defendants tried to "bribe foreign officials to prevent their compliance with requests for information from these investigators" and "order[ed] their employees to take steps to evade authorities, including by moving aspects of the [Division] of Structured Operations outside of Brazil, including relocating its two principal officers to Florida." *Id.* Most importantly (for purposes of the sanctions motion), in January 2016, "after Lava Jato and the investigations by the United States and Swiss authorities were well known to Defendants, they intentionally destroyed physical encryption keys that were needed to access the MyWebDay system." *Id.* ¶ 281; *see also* SOF ¶ 73. The fact of the destruction is undisputed.

### D.    Plea Agreement

On December 21, 2016, OSA entered into a plea agreement with the United States Attorney for the Eastern District of New York. TAC ¶ 272; *see also* Plea Agreement, *U.S. v. Odebrecht.* "Pursuant to the Plea Agreement, OSA: 1) pleaded guilty to violating the anti-bribery provisions of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3); 2) agreed to an independent compliance monitor to oversee its operations; and 3) agreed to pay a massive criminal penalty of $2.6 billion." TAC ¶ 272. The Plea Agreement included a "Statement of Facts" outlining the bribery scheme, to

which OSA stipulated. OSA also agreed that it would not challenge any portion of the Statement of Facts. TAC ¶¶ 273-74; *see* Plea Agreement, *U.S. v. Odebrecht* ¶ 28; SOF at 1.

In the Statement of Facts, OSA admitted that it (together with its co-conspirators) "paid approximately $788 million in bribes in association with more than 100 projects in twelve countries." SOF ¶ 20. In return, OSA and its co-conspirators received "ill-gotten benefits" of "approximately $3.336 billion." *Id.* ¶ 23. In the TAC, plaintiffs allege that OSA actually paid more than $788 million – as much as $3.3 billion – in bribes from 2006 through 2014, relying on the testimony of Hilberto Mascarenhas Silva (head of the Division of Structured Operations). TAC ¶ 72.

### E.    Relevant Procedural History

Plaintiffs commenced this action on June 16, 2017, alleging violations of the federal securities laws and pendent state law. Specifically, they alleged that when defendant CNO sold the bonds at issue, it portrayed itself in the Offering Memoranda used to sell the bonds and in the accompanying financial statements (as well as in other public statements) as being "extraordinarily successful in obtaining . . . large public contracts based on its business skills, expertise and efficiencies," when in reality, its "success" was grounded in the illegal bribery scheme outlined above. Compl. (Dkt. No. 1) ¶¶ 3-4. Unaware of the bribery scheme, plaintiffs bought a substantial number of Notes. *Id.* ¶ 5.

After plaintiffs amended their complaint twice, on September 1, 2017 (Dkt. No. 26) and November 21, 2017 (Dkt. No. 41), defendants moved to dismiss. (Dkt. No. 49.) The Hon. Gregory H. Woods, United States District Judge, issued a decision on August 8, 2018, granting in part and denying in part defendants' motion, while granting plaintiffs leave to replead those claims that he dismissed. (Dkt. No. 57.) Plaintiffs filed the TAC on September 7, 2018. Defendants again moved

to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 75), and on September 23, 2019, Judge Woods issued a decision granting in part and denying in part defendants' motion. Mem. Op. and Order (Dkt. No. 81) at 41-42. Plaintiffs' remaining claims include federal securities fraud claims pursuant to § 10(b) of the Exchange Act and Rule 10b-5 against CNO and OEC; a claim pursuant to § 20(a) of the Exchange Act against OSA; and state law claims for fraud and negligent misrepresentation. *Id.*

Judge Woods issued a civil case management plan and scheduling order on October 28, 2019, which set the fact discovery deadline for May 1, 2021. (Dkt. No. 88 ¶ 7(a).) On the same day, he referred this case to me for general pretrial management. (Dkt. No. 87.)

### F.    The Sanctions Motion

Plaintiffs filed their letter-motion on May 12, 2020, requesting spoliation sanctions for defendants' admitted destruction of the encryption keys needed to access the MyWebDay system, which contained "crucial evidence regarding the scope and nature of the Bribery Scheme." Pl. Ltr. at 2. Plaintiffs seek a mandatory adverse inference instruction, pursuant to Fed. R. Civ. P. 37(e)(2)(B), regarding the information that was destroyed. *Id.* at 4; *see also* Tr. of June 11, 2020 Hr'g (June 11 Tr.) (Dkt. No. 121-1) at 5:2-11.

In their opposition letter, dated May 15, 2020, defendants principally argue that the motion was premature, noting that discovery had only just begun, and assert that plaintiffs could not demonstrate that "the information cannot be replaced or otherwise approximated through additional discovery." Def. Opp. at 3. Defendants also contend the "single issue that [plaintiffs] are concerned about with respect to the unavailable MyWebDay information," namely, the dollar amount of the bribes, could be addressed through a stipulation in which they would agree not to assert that "any element of any claim asserted in the TAC is not satisfied" on the basis that the total

bribe payments were less than $3.3 billion. *Id.* at 4. Defendants do not deny that they intentionally destroyed the encryption keys.

On May 18, 2020, plaintiffs filed a reply letter (Pl. Reply) (Dkt. No. 111), arguing that defendants' proposed stipulation, which "would admit only to the items in the Statement of Facts," was not enough, because Judge Woods had already ruled that those items "are insufficient to state a claim." *Id.* at 3. The Court held argument on the motion, by videoconference, on June 11, 2020. *See* June 11 Tr. at 1-36.[3]

## II.   ANALYSIS

### A.   Legal Standards

Because this action was referred to me for general pretrial management pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(a), I have broad authority to impose discovery sanctions. Orders imposing such sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction employed disposes of a claim.'" *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017) (quoting *Seena Int'l Inc. v. One Step Up, Ltd.*, 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017). A magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the "sanction the magistrate judge actually imposes." *Id.* (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3068.2, at 383 (Thomson Reuters 2014)).

---

[3] Months later, on December 14, 2020, plaintiffs submitted a letter notifying the Court that defendants "submitted certain documents" in connection with another motion which "suggest[ed] that they currently have a copy of the MyWebDay system in their possession in Brazil." (Dkt. No. 159.) The next day, defendants responded, explaining that the "system itself still exists" but reiterating that the encryption keys to access the system have been destroyed. (Dkt. No 162.)

Rule 37(e), which was significantly amended in 2015, governs sanctions for failure to preserve ESI. "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court:

(1)     upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)     only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A)     presume that the lost information was unfavorable to the party;

(B)     instruct the jury that it may or must presume the information was unfavorable to the party; or

(C)     dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As amended, therefore, Rule 37(e) requires "a three-part inquiry":

The first is to decide if the rule applies at all – that is, if a party failed to take "reasonable steps" to preserve electronically stored information "that should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been "prejudice to another party from loss of the information," in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Lastly, the third step to consider – regardless of prejudice to any other party – is whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation," in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Coan v. Dunne*, 602 B.R. 429, 437 (D. Conn. Apr. 16, 2019).

The sanctions permitted under subsection (e)(1), available upon a finding that the spoliation caused "prejudice to another party," must be limited to "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Thus, for example, if the only prejudice to the movant "lies in the extra time and expense that have been necessary to obtain relevant discovery from third

parties," *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at \*12 (S.D.N.Y. Mar. 12, 2018), monetary sanctions may be a sufficient cure. Other sanctions permissible under subsection (e)(1) include more "serious measures," such as "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendment.

However, to obtain the "particularly harsh" sanctions listed in subsection (e)(2) – including adverse inference instructions and terminating sanctions – the court must first find that the party to be sanctioned acted with an "intent to deprive." *Lokai Holdings*, 2018 WL 1512055, at \*8. If such a finding is made, no separate showing of prejudice is required, because "the finding of intent [to deprive] . . . support[s] . . . an inference that the opposing party was prejudiced by the loss of information." *Id.* (quoting Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment).[4]

"In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Lokai Holdings*, 2018 WL 1512055, at \*9; *see also CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016).

---

[4] "The requirement of intent, which is unique to Rule 37(e), distinguishes the destruction of electronically-stored information from alternative forms of evidence; for all other types of evidence, a movant can obtain a severe sanction, including an adverse inference instruction, upon a showing that a party engaged in only 'negligent spoliation.'" *Greene v. Bryan*, 2019 WL 181528, at \*3 (E.D.N.Y. Jan. 14, 2019) (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 12 (E.D.N.Y. 2018)).

The "party seeking spoliation sanctions" – here, plaintiffs – "has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence." *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014).

**B.    Application of Standards**

The parties do not dispute that defendants intentionally destroyed the physical encryption keys needed to access the MyWebDay system in or about January 2016, "after Lava Jato and the investigations by the United States and Swiss authorities were well-known to Odebrecht." SOF ¶ 73; *see also* Pl. Ltr. Ex. A (Dkt. No. 109-1), at 6-7 (defendants' responses to plaintiffs' requests for admission). Before considering sanctions under either subsection of Rule 37(e), however, the Court must determine whether the keys were destroyed after a duty of preservation arose.

"The first element of the traditional spoliation test," which is also applicable to ESI under Rule 37(e), "requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (citation and quotation marks omitted). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *accord Resnik v. Coulson*, 2019 WL 1434051, at *7 (E.D.N.Y. Mar. 30, 2019) (quoting *Rabenstein v. Sealift, Inc.*, 18 F. Supp. 3d 343, 360 (E.D.N.Y. 2014)). "Although the obligation to preserve evidence commonly arises when the suit has already been filed, it can arise earlier 'when a party should have known that the evidence may be relevant to future litigation.'" *Field Day, LLC v. Cnty. of Suffolk*, 2010 WL 1286622, at * 4 (E.D.N.Y. Mar. 25, 2010) (quoting *Kronish v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Treppel v. Biovail*, 249

F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)). Because the rule "does not apply when information is lost before a duty to preserve arises," courts frequently need to decide when the duty of preservation arose. Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment.

The moving party must also show that the lost ESI cannot be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Ordinarily, if emails were sent to or from other parties, those emails are not "permanently lost or unrecoverable" because they can be replaced in discovery by obtaining them from those other parties. *See Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *17 n.21 (S.D.N.Y. June 20, 2019); *see also* Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment ("Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere.").

### 1.    The Duty of Preservation Attached Before January 2016

At the time of the destruction of the encryption keys, defendants did not yet have specific notice that the information stored in the MyWebDay system would be relevant to *this* litigation, which would not commence for more than a year. The question, however, is whether defendants knew or should have known that the evidence they destroyed "may be relevant to future litigation." *See Field Day, LLC*, 2010 WL 1286622, at * 4. The Court agrees with plaintiffs that the answer to that question is yes.

By January 2016 defendants knew (and had known for months) that their international bribery scheme was the subject of many investigations, including investigations by "United States . . . authorities." SOF ¶ 73. Defendants also knew that Marcelo Odebrecht had been arrested (months earlier) on charges related to the bribery of Brazilian officials, and that disclosure of the arrest resulted in a decline of the prices of the Notes. TAC ¶¶ 6-7, 82, 233. Then, shortly before it destroyed the physical encryption keys, OSA issued a press release announcing Marcelo

Odebrecht's resignation while maintaining his innocence – which again resulted in a decline in the market price of the Notes. *Id.* ¶¶ 248, 250.

"[C]ertain types of incidents tend to trigger litigation." *Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013); *accord Greene v. Bryan*, 2019 WL 181528, at *6 (E.D.N.Y. Jan. 14, 2019). Large-scale criminal bribery schemes fall into this category, particularly when the schemes implicate issuers of equity or debt securities. When such schemes are revealed, civil securities fraud litigation is seldom far behind. *See, e.g., Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194 (S.D.N.Y. 2020); *In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919 (E.D.N.Y. Oct. 9, 2020); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 500 (S.D.N.Y. 2017).[5] In this case, the Court concludes that by the time of the destruction, defendants – already under investigation in the United States for a wide-ranging criminal bribery scheme – were "on notice that litigation was likely and that the information would be relevant" to that litigation. Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment.

### 2.     Plaintiffs are Prejudiced by the Loss of the Information

The Court must next consider whether defendants have been prejudiced by the spoliation, in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Plaintiffs here assert they are prejudiced by the loss of the information contained in the MyWebDay system because the destroyed data – in particular, data that would reveal the full scope and extent of the scheme – is relevant to several elements they must prove at

---

[5] The phenomenon is not, of course, limited to bribery schemes. As Judge Furman noted in a similar case, securities fraud lawsuits were "perhaps inevitable" after a slew of negative media attention and the company's "disclosure of an investigation by the Department of Justice in late 2015 and early 2016 led to a steep decline in the price" of the company's stock. *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *2 (S.D.N.Y. Jan. 18, 2018).

trial under both federal and state law, including "the materiality of the false statements and omissions; Defendants' scienter; reliance upon the misrepresentations; and loss causation." Pl. Ltr. at 3-4. Defendants disagree. They contend that plaintiffs "have identified only a single issue that they are concerned about with respect to the unavailable MyWebDay information:  their perceived dispute regarding whether the total volume of bribe payments at issue in the case is $788 million, as stated in the Statement of Facts, or $3.3 billion, as asserted in the TAC." *Id.* at 4. Defendants argue that their proposed stipulation,  in which they would agree not to "raise any claim or defense in [this action] or otherwise assert that any element of any claim asserted in the TAC is not satisfied, on the basis that the total amount of [bribe payments during the relevant period] was any amount less than $3.3 billion," *id*., would adequately protect plaintiffs against prejudice. *See also id.* Ex. C (proposed stipulation) at 2. Defendants did not, however, offer to stipulate to the $3.3 billion figure that plaintiffs say they hope to prove.

During oral argument, plaintiffs explained in more detail why the lack of specific information about the bribes paid (information allegedly existing in the MyWebDay system) would prejudice them at trial. First, they noted, after Judge Woods dismissed their Second Amended Complaint, they were required to plead the bribery scheme with more particularity, which they did. *See* TAC ¶¶ 75-76 (detailing the illicit payments to specific individuals in specific amounts). However (as noted in the TAC itself), the information on which they relied for pleading purposes largely came from news articles, *see* TAC ¶ 74, which may be insufficient for proving their case at trial. *See* June 11 Tr. at 16:15-19. Second, plaintiffs stated, the aggregate amount of the bribes, as well as the revenue associated with each bribe, is relevant to plaintiffs' claims that CNO's financial statements were false and misleading. *See id*. at 16:20-17:2. Specifically, plaintiffs assert, the precise information allegedly contained in the MyWebDay system (which can no longer

be accessed due to defendants' destruction) may be relevant to the following issues, all raised in the TAC and relevant to one or more of their surviving claims: (1) that CNO failed to disclose the nature and range of the contingent expenses that were "more likely than not" to occur after exposure of the bribery and kickback scheme, TAC at 29; (2) that CNO improperly failed to distinguish and separately disclose contract revenue obtained as a result of its illegal bribery activity from other contract revenue, *id.* at 32; and (3) that CNO improperly failed to recognize or disclose material amounts of expenses related to illegal bribes, *id.* at 33.

"Although Rule 37(e)(1) requires a finding of 'prejudice' in order for sanctions to issue, the Rule is unclear as to what is meant by that word." *Ungar*, 329 F.R.D. at 15. The advisory committee's notes do not offer much guidance, stating only that "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendments. Moreover, while the moving party ordinarily "has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence," *Ottoson*, 268 F. Supp. 3d at 580 (quoting *Sekisui Am. Corp.*, 945 F. Supp. 2d at 509-10), Rule 37(e)(1), as amended, "does not place a burden of proving or disproving prejudice on one party or the other. . . . The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendments.

Because this is a securities fraud action – and therefore revolves around defendants' *disclosures* regarding the bribery scheme, rather than the scheme itself – plaintiffs do not need (and arguably would not be entitled to) the same level of detailed information concerning the underlying crimes that might be appropriate in litigation seeking, for example, to recoup the bribe payments from their recipients. Nonetheless, plaintiffs have persuaded me that the more granular

and specific information that apparently resided in MyWebDay would be helpful to them in connection with establishing several elements of their securities fraud claims. I therefore find that plaintiffs have in fact been prejudiced by the spoliation.[6]

### 3.   The Lost ESI Cannot be "Restored or Replaced Through Additional Discovery"

This is not a typical ESI spoliation case, in which the missing data – for example, emails improperly deleted from a party's account – can be "restored or replaced" from another source, such as the accounts to or from which the missing emails were sent. *See*, *e.g.*, *Morgan Art Foundation Ltd. v. McKenzie*, 2020 WL 5836438, at *19 (S.D.N.Y. Sept. 30, 2020) (deleted emails were not "permanently lost or unrecoverable" because they could be obtained from the parties and non-parties to which (or from which) they were sent); *cf. Karsch* 2019 WL 2708125, at *17 n.21 (*some* emails housed on a spoliated server were not "permanently lost or unrecoverable," because they were "sent to or from defendants" or "sent to or from any of the non-destroyed, non-corrupted accounts maintained by Karsch and his affiliates," but other emails from that server were "permanently lost or unrecoverable"). This case involves persons who intentionally hid their illicit bribe payments from the corporation's legitimate accounting systems by inputting the details of the bribes in a single "shadow" accounting system, the doors to which are now, according to the parties, permanently shut. While it is theoretically possible that – as defendants' counsel suggested at oral argument, *see* June 11 Tr. at 28:13-29:8 – individual employees of the defendant corporations emailed the secret MyWebDay information to one another unencrypted, thereby making their secret more easily discoverable; it is both improbable and, at present, wholly speculative. The suggestion that another copy of the MyWebDay system may exist, and may be

---

[6] I also agree with plaintiffs that the stipulation that defendants propose does not fully ameliorate that prejudice, as it does not assist plaintiffs in proving, or invite the jury to presume, any of the specific facts that plaintiffs believe would have been revealed by the MyWebDay data.

accessible without the destroyed physical encryption keys, seems even more unlikely, particularly after defendants' December 2020 confirmation that the information is not within their possession. (*See* Dkt. No. 162.) There is thus every reason to believe that the information at issue here is "permanently lost."

As a result, Rule 37(e)(1) sanctions are warranted.

### 4. Defendants Did Not Act with the Intent to Deprive Plaintiffs of the Information's Use in this Litigation

Although plaintiffs have demonstrated that they are entitled to Rule 37(e)(1) sanctions for defendants' spoliation, they cannot demonstrate that the Rule 37(e)(2) sanctions they seek are appropriate, as that requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Such a finding is a necessary predicate to the imposition of the "particularly harsh" sanctions permitted under subsection (e)(2). *Lokai Holdings*, 2018 WL 1512055, at *8 (characterizing adverse-inference instructions as "extreme sanction[s] that should not be given lightly," and default judgments or dismissals as "even more drastic") (internal quotation marks and citations omitted). The intent standard is both stringent and specific: "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig*, 2017 WL 6512353, at *11 (holding that although plaintiff intended to "disable his websites" and delete certain email files, he did not do so for the purpose of depriving the moving defendants of the use of the ESI in litigation and therefore could not be sanctioned under subsection (e)(2)).

It is the movant's burden to demonstrate that the spoliating party acted with the intent to deprive, not merely the intent to destroy. *Rhoda v. Rhoda*, 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017); *Watkins v. New York City Transit Auth.*, 2018 WL 895624, at *10 (S.D.N.Y. Feb.

13, 2018). "Although Rule 37(e)(2) does not specify the standard by which the 'intent to deprive' must be established, it is appropriate, given the severity of the sanctions permitted under that provision of the Rule, for the intent finding to be based on clear and convincing evidence." *Lokai Holdings*, 2018 WL 1512055, at *8; *see also CAT3*, 164 F. Supp. 3d at 499 (finding that, where a party seeks "terminating sanctions" pursuant to Rule 37(e)(2), "it is appropriate to utilize the clear and convincing standard" in making a finding of intent to deprive). Plaintiffs have not shown, and cannot show, that defendants destroyed the physical encryption keys with the intent of depriving *plaintiffs in this litigation* of that evidence. *See Johnson v. L'Oreal USA*, 2020 WL 5530022, at *4 (S.D.N.Y. Sept. 15, 2020) (finding an adverse inference would be improper where "[t]here is no evidentiary basis for Plaintiff's allegations that L'Oreal acted with an intent to deprive Plaintiff of relevant ESI *in this litigation*"); *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 11727416, at *5 (S.D.N.Y. May 19, 2016) (rejecting Rule 37(e)(2) sanctions where plaintiffs failed to prove "by a preponderance of the evidence that Metro or Burgess-Allen acted with the intent to deprive Plaintiffs of the use of the allegedly destroyed information *in this litigation*"); *Learning Care Grp., Inc. v. Armetta*, 315 F.R.D. 433, 440 (D. Conn. 2016) ("In other words, to award the default and adverse inference sanctions" sought pursuant to the December 1, 2015 Amendments adding Rule 37(e)(2), "they need to show that LCG destroyed Ms. DeWalt's laptop 'with intent to deprive' them of her e-mails for use *in this litigation*") (all emphases added).[7]

---

[7] During the argument, plaintiffs took the position that Rule 37(e)(2) does not require a showing that the spoliating party acted with the specific intent to deprive another party *in this litigation* of the destroyed ESI. Rather, they argued, the duty to preserve "would attach to potential litigation as well." June 11 Tr. at 12:15-16. It is true, as explained above, that the duty of preservation often attaches before litigation has begun, and in some circumstances does not require proof that the spoliating party knew precisely who would sue him or when. Once that threshold showing has been made, however, Rule 37(e)(2), by its express terms, requires a more specific showing of intent before subsection (e)(2) sanctions are available.

Therefore, more severe sanctions under Rule 37(e)(2), including the mandatory adverse inference instruction that plaintiffs seek, are not warranted on the present record.

### C.      Remedy

Once a party has demonstrated its entitlement to sanctions, the Court has "broad discretion" in selecting an appropriate remedy among those available. *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2019 WL 4727537, at *28 (S.D.N.Y. Sept. 26, 2019) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir. 2002)), *aff'd sub nom. Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1479018 (S.D.N.Y. Mar. 26, 2020). In this case, where discovery is not yet complete and the precise scope of the issues that will be presented to the jury is not yet known, the appropriate sanction is as follows:

Pursuant to Rule 37(e)(1), plaintiffs will be permitted to present evidence and argument to the jury concerning defendants' intentional destruction of the physical encryption keys needed to access the MyWebDay system, and the jury will be permitted to consider that evidence, along with all the other evidence in the case, in making its decision. Such a sanction (as distinguished from a mandatory or permissive adverse inference instruction, both of which come under Rule 37(e)(2) is permitted under Rule 37(e)(1) without any predicate finding of intent to deprive. *See* Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendment (subdivision (e)(2) "does not apply to jury instructions that do not involve such an inference" and "would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision"); *Leidig*, 2017 WL 6512353, at *14 (permitting a party to "present

18

evidence to the jury" that the opposing party lost ESI it should have preserved "after litigation was threatened and at a time when they were legally obligated to preserve" it).[8]

This sanction leaves the district judge free to determine the precise scope of the spoliation evidence to be permitted at trial and to craft any related jury instructions on a full evidentiary record. *See Franklin*, 2018 WL 4784668, at *7 ("Of course the evidence to be allowed and the extent of the presentation of the litigation hold are matters to be decided at trial."); *Schmalz*, 2018 WL 1704109, at *7 ("The Court leaves it to the district judge to determine the appropriate means for presenting the evidence and arguments at trial on this issue."). This flexibility is particularly important where, as here, the sanctions motion was made on a thin record – at the beginning of discovery – before any depositions were conducted. Accordingly, plaintiffs will be permitted to "present evidence to the jury concerning the loss and [potential] relevance" of the ESI contained in the MyWebDay system, and may seek a jury instruction – the exact language of which must be

---

[8] *See also*, *e.g.*, *Franklin v. Howard Brown Health Ctr.*, 2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) (recommending, as a Rule 37(e)(1) sanction, that the parties "be allowed to present evidence and argument to the jury regarding the defendant's destruction/failure to preserve electronic evidence in this case, and that the jury be instructed as the trial judge deems appropriate"), *report and recommendation adopted,* 2018 WL 5831995 (N.D. Ill. Nov. 7, 2018); *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *7 (N.D. Ill. Mar. 23, 2018) (recommending, as a Rule 37(e)(1) sanction, "that the parties shall be allowed to present evidence to the jury regarding the destruction of the text messages and the likely relevance of the lost information; and that the jury shall be instructed that it may consider this information when making its decision," but that "the jury shall not be given specific instructions on any presumption or inference based on the destruction of the text messages"); *Spencer v. Lunada Bay Boys*, 2017 WL 10518023, at *13 (C.D. Cal. Dec. 13, 2017) (recommending sanctions pursuant to Rule 37(e)(1) for spoliation of text messages, including that plaintiff be granted monetary sanctions and that the parties "be permitted to present evidence and argument related to the unrecoverable text messages"), *report and recommendation adopted,* 2018 WL 839862 (C.D. Cal. Feb. 12, 2018); *Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *5 (N.D. Cal. May 23, 2016) (ruling, pursuant to Rule 37(e)(1), that to the extent certain testimony is presented at trial, "Chrysler may present evidence and argument about [plaintiff's] spoliation of customer communications," and the trial judge may, if she deems it necessary, "giv[e] the jury instructions to assist in its evaluation of such evidence or argument") (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendment).

left to the trial judge – informing the jury "that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment. *See Lokai Holdings*, 2018 WL 1512055, at *17 (permitting injured party to seek a jury instruction, in a form to be approved by the district judge, as a sanction under Rule 37(e)(1)).

Practically speaking, it is not clear what if any impact this decision will have on the trial itself, considering that defendants have never contested either the fact of the spoliation or the fact that the MyWebDay system contained details of the bribery scheme. Nor is it clear why plaintiffs sought an adverse inference jury instruction during the early stages of discovery rather than closer to trial, on a fuller record. Nevertheless, plaintiffs have demonstrated that the spoliation warrants Rule 37(e)(1) sanctions, and thus, the Court will issue them. The Court will not, however, impose monetary sanctions, which are discretionary under Rule 37(e). *Morgan Art Found. Ltd. v. McKenzie*, 2020 WL 5836438, at *17; *Lokai Holdings*, 2018 WL 1512055, at *9.

## III.    CONCLUSION

Because the Court imposes Rule 37(e)(1) sanctions but declines to impose an adverse inference instruction pursuant to Rule 37(e)(2), plaintiffs' letter-motion (Dkt. No. 109) is GRANTED IN PART AND DENIED IN PART.  The Clerk of Court is respectfully directed to close the motion at Dkt. No. 109.

Dated:  New York, New York
           March 30, 2021

**SO ORDERED.**

_____

**BARBARA MOSES**
**United States Magistrate Judge**