

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOUBLELINE CAPITAL LP, et al.

    Plaintiffs,

  -against-

ODEBRECHT FINANCE, LTD., et al.,

    Defendants.

17-CV-4576 (GHW) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Before the Court are: (1) a motion filed by defendants Construtora Norberto Odebrecht, S.A. (CNO), Odebrecht Engenharia E Construção S.A. (OEC), and Odebrecht, S.A. - Em Recuperação Judicial (OSA) (collectively Odebrecht), dated November 12, 2020 (Def. Mot.) (Dkt. No. 130), seeking a protective order with respect to plaintiffs' discovery requests for documents and data from two file systems called "Drousys" and "MyWebDay" (sometimes rendered "Mywebday B"); and (2) a letter-motion filed by plaintiffs DoubleLine Capital LP, DoubleLine Income Solutions Fund, and DoubleLine Funds Trust (collectively DoubleLine), dated January 5, 2021 (Pl. Ltr.) (Dkt. No. 167), seeking an order compelling the production of documents responsive to certain other discovery requests.

In their brief in support of their protective order motion (Def. Mem.) (Dkt. No. 131), defendants argue that they cannot produce documents or data from Drousys or MyWebDay because "doing so would violate applicable foreign law, including Defendants' ongoing obligations to multiple foreign prosecutors and decisions of Brazilian courts." Def. Mem. at 1. In their letter-motion to compel, plaintiffs argue that defendants have failed to produce to them any of the other documents they previously provided to law enforcement agencies in the United States and elsewhere, despite a previous order from this Court compelling them to do so. Pl. Ltr. at 1.

For the reasons that follow, defendants' protective order motion will be granted, and plaintiffs' motion to compel will be denied.

## I.    BACKGROUND

This securities fraud action had its genesis in a long-running, international bribery scheme, during which defendants bribed "government officials in Brazil and at least 12 other countries in order to influence the award of large construction contracts" to themselves. Third Amend. Compl. (TAC) (Dkt. No. 61) ¶ 62. Defendants have since admitted their criminal conduct in multiple jurisdictions. The sections below describe the parties involved, and recount the ongoing foreign investigations, only to the extent relevant to the pending motions.

### A.    Parties

Defendant OSA is a Brazilian corporation that "through various subsidiaries and operating entities, conducts business in the construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States." TAC ¶ 30. Defendant CNO, an OSA affiliate, was Latin America's "largest engineering and construction company," and it was also "one of the largest such companies in the world." *Id.* ¶ 36. Defendant OEC, an "integral subsidiary of Odebrecht," became the "'direct controller' of CNO on March 31, 2015," and since then, "CNO has essentially become an empty shell and OEC substituted itself in as the replacement to CNO in all respects." *Id.* ¶¶ 39-40.

Plaintiffs – a group of affiliated investment advisors and funds formed under the laws of Delaware and Massachusetts – purchased a "significant quantity of two bonds" issued by OSA at prices close to par between May 2013 and March 2015. TAC ¶¶ 12-14, 25-26, 230.

### B.    The Underlying Bribery Scheme

In or around 2006, defendants created a standalone division of OSA called the "Division of Structured Operations," which plaintiffs allege "was created for the sole purpose of functioning

as a 'bribe department' that made illicit payments to governmental officials in exchange for the receipt of lucrative public contracts by CNO." TAC ¶ 64. The then-CEO of OSA, Marcelo Odebrecht, later admitted that "between 0.5% and 2.0% of [OSA's] revenue was directed to illicit bribes." *Id.* ¶¶ 66-67.

The Division of Structured Operations was able to conceal these "massive illicit payments" by omitting them from CNO's and OSA's formal accounting records, where they would have been reflected in their financial results and also would have been reported to external auditors. TAC ¶¶ 68-69. Instead, it "tracked these expenses on two 'shadow' systems that could only be accessed by members of the Division." *Id.* One such system, called MyWebDay, "was used for making payment requests, processing payments and generating spreadsheets tracking all illicit bribe payments." *Id.* The other system was called Drousys and "allowed members of the Division of Structured Operations to communicate with each other and other co-conspirators using secure emails and instant messages." *Id.*

### C.    *Lava Jato* Investigation and the Brazilian Leniency Agreement

In or around 2014, Brazilian authorities began investigating suspected corruption of another Brazilian multinational corporation called Petróleo Brazileiro S.A., better known as Petrobras. TAC ¶ 81. The investigation, initially covert, was called "Lava Jato," which translates to "Operation Carwash," and "did not originally focus on Odebrecht or CNO." *Id.*[1]

On December 1, 2016, Odebrecht and the *Ministério Público Federal do Brasil*, which is Brazil's Federal Prosecutor's Office (MPF), entered into a *Termo de Acordo de Leniência*

---

[1] Though not initially the target of the corruption investigations, OSA was directly embroiled in the bid-rigging scheme involving Petrobras. Between 2004 and 2012, OSA made illicit "payments to, and for the benefit of, foreign officials, including Brazilian politicians and Petrobras executives and employees, in order to secure contracts with Petrobras." *See* Plea Agreement, *United States v. Odebrecht, S.A.*, No. 16-CR-643 (RJD) (E.D.N.Y. Dec. 21, 2016), ECF No. 10, Ex. 1, ¶ 33. More specifically, OSA met with other construction companies in order "to evaluate and divide up future

3

(Leniency Agreement or Agreement), Kessler Decl. (Dkt. No. 133) Ex. 1 (Dkt. No. 133-1), intended to "preserve the company's existence" while "preventing the occurrence of illicit acts" and assisting prosecutors to pursue "other suspected natural and legal persons." Leniency Ag. at 1. The Agreement required Odebrecht to make various factual admissions related to the bribery scheme (which appear in annexes to the Agreement), provide relevant materials to the MPF, identify participants in the scheme, describe the roles of those participants, and cooperate with the MPF in its ongoing investigations. *Id.* at 4-5.[2] The Agreement specifies that its content (and all statements and documents produced in connection with it) are "of restricted access." *Id.* at 14. The Agreement "may be terminated" if Odebrecht fails to comply. *Id.* at 15.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ The rules provide, among other things, that ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

contracts for Petrobras projects" among themselves. *Id*. ¶ 34. Once it was decided which company or companies would be responsible for a given project (and the price Petrobras felt was appropriate), it was agreed among the co-conspirators that only that company would "present a qualifying bid," while the other companies "would present proposals that would ensure the predetermined company's winning bid." *Id.*

[2] The Leniency Agreement was "part of a global agreement coordinated by the competent authorities of the Brazilian, American and Swiss jurisdictions," pursuant to which Odebrecht agreed to pay, globally, the equivalent of R$3,828,000,000 (approximately $743 million USD). Leniency Ag. at 7. All of the Brazilian documents submitted to this Court by defendants (as well as documents from other non-English speaking jurisdictions) are accompanied by certified translations. Plaintiffs have raised no objection to the authenticity of the documents or to the translations.

███████████████████████████████████████████

████████████████████████████████████████

### D.    Odebrecht's Other Agreements with Foreign Prosecutors

In addition to the MPF, Odebrecht entered cooperation agreements with several other foreign authorities in connection with the bribery scheme. For example, it entered into a Cooperation Agreement with the *Fiscalía General del Estado* (the General Prosecutor of Ecuador), in which the General Prosecutor was granted access to the Systems. Vinueza Op. (Dkt. No. 138) ¶¶ 4-6. According to Ecuadorian attorney Emiliano Javier Donoso Vinueza, "all information contained in the Cooperation Agreement, along with all information [Odebrecht] provided to the General Prosecutor of Ecuador as a result of the Cooperation Agreement, is confidential according to Ecuadorian law and must not be published, shared or used for any reason other than furthering the Cooperation Agreement." *Id.* ¶ 4. In particular, Vinueza explains, Article 494 of Ecuador's Criminal Code provides that "all actions related to effective cooperation must be kept secret and kept out of judicial proceedings." *Id.* ¶ 7. Vinueza further asserts that any violation could result in "harsh consequences, including termination of the Cooperation Agreement and its protections, and criminal prosecutions." *Id.* ¶ 4.

Odebrecht also entered into a cooperation agreement with the *Ministério Público del Perú*, (Public Ministry) which is the public prosecution office of Peru. In a letter addressed to CNO, written by Peruvian prosecutors, they say that the information provided to the Public Ministry as part of the "special effective collaboration process" is confidential (based on a "court ruling"), and that in order to access that confidential information, "the specific international judicial cooperation mechanisms would have to be operated – by the relevant central authority – for the competent court to determine whether or not the submission of what is requested by the judicial authority of

the United States [is] within the orders of our domestic law." Kessler Decl. Ex. 2 (Dkt. No. 133-2) at 2.

In addition, Odebrecht entered into a leniency agreement with the *Procuradoría General de la República*, which is the prosecutor's office in the Dominican Republic. *See* Valdez Decl. (Dkt. No. 136) ¶ 3. According to Dominican attorney and law professor Robert Valdez, "there are several restrictions in the Dominican Republic that prevent Defendants from providing . . . any information originated from the Drousys and/or MyWebDay systems and/or the evidence provided by Odebrecht related to the Leniency Agreement to third parties, including the Plaintiffs in this matter," which are "mainly set forth in articles 290 and 291 of the Dominican Republic Criminal Procedure Code." *Id.* ¶ 4.

Finally, Odebrecht entered into an agreement with prosecutors in Mozambique. *See* Rocha Decl. (Dkt. No. 137) ¶ 4. Mozambican Attorney Paula Duarte Rocha asserts that "there are restrictions in Mozambique that prevent Defendants from providing the Drousys and/or MyWebDay systems to third parties, including the Plaintiffs in this matter," as "set forth in an agreement between certain of the Defendants and the General Attorney Office." *Id.* Producing these file systems would result in a "material risk that they would face harsh consequences." *Id.*

### E.   Brazilian Court Decisions

In their protective order motion, defendants rely on a series of decisions by Brazilian courts directly relating to Odebrecht's Leniency Agreement with the MPF. Below I summarize the Brazilian judicial decisions most relevant to the motion.

#### 1.   Decision by the Brazilian Federal Supreme Court dated May 30, 2017

In 2017, parties affiliated with Odebrecht requested that the Brazilian Federal Supreme Court (the highest court in Brazil) "extend the secrecy imposed on [testimony and corroborating evidence] linked to plea bargaining agreements, on the grounds that restricting the disclosure of

their contents is necessary for the viability of new agreements that would be entered into with foreign authorities." Kessler Decl. Ex. 3 (Dkt. No. 133-3) at 1. On May 30, 2017, because of the "possibility of concrete damage to the negotiations" with foreign officials should the evidence " rendered in the respective plea bargaining agreements [be] made public," the court granted Odebrecht's request "to keep under secrecy the terms of [the testimony and corroborating evidence] rendered in the plea bargaining agreements signed with the Federal Prosecutor's office, as of June 1, 2017, until further deliberation according to the content of the replies from the foreign authorities regarding measures related to the ascertainment of the narrated facts." *Id.* at 2.

### 2.   Decisions of the Curitiba Court

Proceedings conducted before the 13th Federal Court of Curitiba in Brazil (the Curitiba Court) and the decisions rendered by that court are central to the issues raised in defendants' protective order motion,



*See* Sealing Mot. (Dkt. No. 129) at 2; Barros Pimentel Op. (Dkt. No. 140) ¶ 5; Supp. Kessler Decl. (Dkt. No. 146) Ex. 4 (Dkt. No. 146-1) (March 26, 2010 directive), at 7. Caio Farrah Rodriguez and Bruno Andre Bredda Carrara, who are partners at the Brazilian law firm Barros Pimentel Alcantara Gil & Rodriguez (which assisted Odebrecht entities in negotiating the Leniency Agreement), explain that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Barros Pimentel Op. ¶ 5. The relevant orders of the Curitiba Court, discussed below, were filed in this Court under seal, viewable only by the parties and by Court personnel.

██████████████████████████████████████████████████████

███████████████████ Sealed Kessler Decl. Ex. A (Dkt. No. 135-1).

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ Supp. Sealed Kessler Decl. (Dkt. No. 148) Ex. L (Dkt. No.

148-2). ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████ *Id*.

Following this Court's order scheduling defendants' protective order motion (Dkt. No. 122),

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ Sealed

Kessler Decl. Ex. F (Dkt. No. 135-6). ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ *Id*. at 4-5.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



Summing up the decisions of the Brazilian Supreme Federal Court and the Curitiba Court, Barros Pimentel opines that Odebrecht is "prevented from providing to [plaintiffs in this action], directly or indirectly, access to the contents of its copy of the Systems, either for generic or specific searches, including information and evidences contained therein, for any purpose other than compliance with the obligations and prerogatives of [Odebrecht] set forth in the Leniency Agreement itself, under the penalty of violation thereof." Barros Pimentel Op. at 7-8.

F.    **U.S. Plea Agreement**

On December 21, 2016, OSA entered into a plea agreement in the Eastern District of New York. TAC ¶ 272. "Pursuant to the Plea Agreement, OSA: 1) pleaded guilty to violating the anti-

---

[3] ████████████████████████████████████████████████████████
Sealed Kessler Decl. Ex. H, at 3-4.

bribery provisions of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3); 2) agreed to an independent compliance monitor to oversee its operations; and 3) agreed to pay a massive criminal penalty of $2.6 billion." TAC ¶ 272. The Plea Agreement included a stipulated "Statement of Facts" (SOF) outlining the bribery scheme, which OSA agreed not to challenge. TAC ¶¶ 273-74; *see* Plea Agreement, *U.S. v. Odebrecht*, ¶ 28; *id*. Ex. 1 (SOF) at 1. In the Statement of Facts, OSA admitted that it (together with its co-conspirators) "paid approximately $788 million in bribes in association with more than 100 projects in twelve countries." SOF ¶ 20. In return, OSA and its co-conspirators received "ill-gotten benefits" of "approximately $3.336 billion." *Id.* ¶ 23.

In the TAC, plaintiffs allege that OSA actually paid more than $788 million – as much as $3.3 billion – in bribes from 2006 through 2014, relying on the testimony of Hilberto Mascarenhas Silva (head of Odebrecht's Division of Structured Operations) to Brazilian prosecutors. TAC ¶ 72.

### G.   Relevant Procedural History

Plaintiffs commenced this action on June 16, 2017, alleging violations of the federal securities laws and pendent state law. Specifically, they alleged that when defendant CNO sold the bonds at issue, it portrayed itself in the Offering Memoranda used to sell the bonds and in the accompanying financial statements (as well as in other public statements) as being "extraordinarily successful in obtaining . . . large public contracts based on its business skills, expertise and efficiencies," when in reality, its "success" was grounded in an illegal bribery scheme. Compl. (Dkt. No. 1) ¶¶ 3-4. Unaware of the bribery scheme, plaintiffs bought a substantial number of OSA bonds. *Id.* ¶ 5.

After plaintiffs amended their complaint twice, on September 1, 2017 (Dkt. No. 26) and November 21, 2017 (Dkt. No. 41), defendants moved to dismiss. (Dkt. No. 49.) On August 8, 2018, the Hon. Gregory H. Woods, United States District Judge, granted in part and denied in part defendants' motion, while granting plaintiffs leave to replead those claims that he dismissed.

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 446 (S.D.N.Y. 2018) (*DoubleLine I*). Plaintiffs filed the TAC on September 7, 2018. Defendants again moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 75), and on September 23, 2019, Judge Woods granted in part and denied in part that motion. *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 208 (S.D.N.Y. 2019) (*DoubleLine II*). Plaintiffs' remaining claims include federal securities fraud claims pursuant to § 10(b) of the Exchange Act and Rule 10b-5 against CNO and OEC; a claim pursuant to § 20(a) of the Exchange Act against OSA; and state law claims for fraud and negligent misrepresentation. *Id.*

On October 28, 2019, Judge Woods referred the case to me for general pretrial management. (Dkt. No. 87.) Since then, the parties have been engaged in fact discovery.

On September 1, 2020, plaintiffs filed a letter-motion requesting a pre-motion conference regarding their contemplated motion to compel the production of documents. (Dkt. No. 114.) Specifically, they sought an order directing defendants to produce documents responsive to plaintiffs' Requests for Production (RFPs) 1, 3, 4, and 5. RFP 1 sought "production of all documents provided to the United States Department of Justice or the United States Attorney's Office for the Eastern District of New York in connection with their investigation of the Defendants." (*Id.* at 2.) RFPs 3 and 4 sought "production of all documents provided to 'any governmental or other regulatory agency or panel in connection with any investigation performed by those entities of any of the [defendants], including but not limited to the 'Lava Jato' investigation by the Federal Police of Brazil.'" (*Id.* at 3.) Finally, RFP 5 sought production of all documents

stored on the Drousys system concerning "any payments made to political parties, foreign officials or corporate executives (or their representatives or agents)." (*Id.*)

Defendants responded on September 4, 2020, that as to RFPs 1, 3, and 4, they had not "refused to produce responsive documents," and were willing to do so, as long as they were not required to "specifically identify which documents were provided to the Department of Justice or other regulators, as requested by the U.S. Attorney's Office." (Dkt. No. 115, at 2.) As to RFP 5, however, defendants objected to production entirely, because "the relevant information sought by Plaintiffs was already admitted to in connection with Defendants' 2016 guilty plea and related statement of facts, as well as the answer filed in this case, and, critically, because production of the Drousys system would be in violation of applicable Brazilian law or orders and/or Defendants' leniency agreement with Brazilian or other applicable authorities." (*Id.* at 3.)

On October 9, 2020, the parties filed a joint letter (Dkt. No. 120), enclosing correspondence from the Brazilian Federal Prosecutor's Office dated August 21, 2020 (Dkt. No. 120-1). The MPF wrote: "We hereby confirm that 'Drousys' and 'Mywebday B' systems were delivered to the MPF for custody in virtue of the Leniency Agreement signed with company Odebrecht S/A. The information and documents concerning the systems are kept confidentially and can only be accessed to support investigations conducted by competent authorities, including to avoid jeopardizing ongoing investigations, in Brazil and abroad. The Leniency Agreement provides for a specific procedure for sharing such information with other authorities." (*Id.*)

After a discovery conference on October 13, 2020, I issued an order on October 14, 2020 (October 14 Order) (Dkt. No. 122), directing defendants to produce all nonprivileged documents responsive to RFPs 1, 3, and 4 (as narrowed by plaintiffs), but specifying that defendants "need not make this production separately from their production in response to plaintiffs' remaining

RFPs, and need not specifically identify which documents are responsive to" RFPs 1, 3, and 4. Oct. 14 Order at 1. As to RFP 5, I directed defendants to file a protective order motion supported by "information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.* at 2.

On October 27, 2020, defendants filed a letter-motion (Oct. 27 Ltr.) (Dkt. No. 125) requesting that the October 14 Order be "revised" to "expand the scope of Defendants' forthcoming motion for a protective order" to include plaintiffs' RFPs 1, 3, and 4. Oct. 27 Ltr. at 1. Defendants explained that after the October 13 discovery conference, and "in the course of preparing the Protective Order Motion," they "received further clarification from Brazilian counsel that applicable Brazilian law, including binding precedent from Brazil's Supreme Federal Court, which prevents Defendants from producing materials related to potential misconduct that occurred in foreign countries (i.e., outside Brazil), applies broadly to encompass documents previously produced to the United States Department of Justice and other government regulators and prosecutors." *Id.* at 1.

Plaintiffs opposed the letter-motion (which they correctly construed as a motion for reconsideration), arguing that defendants did not meet the standard for reconsideration set out in Local Civil Rule 6.3. (Dkt. No. 126.) Largely agreeing with plaintiffs, I denied the letter-motion. (Dkt. No. 127.)

Defendants filed their motion for a protective order on November 12, 2020, accompanied by their memorandum of law; three declarations signed by Thomas S. Kessler, one of their attorneys in this action, attaching the Leniency Agreement, various orders of the Curitiba Court, and related documents; the Valdez and Rocha Declarations; the Vinueza and Barros Pimentel Opinions; and a statement by Brazilian attorney and law professor Marta Saad (Saad Stmt.) (Dkt.

No. 142), who opines that if defendants were forced to produce the Systems or their contents to plaintiffs in this action, defendants would face "serious consequences, including the breach of the Leniency Agreement and civil and criminal proceedings," and that "the Brazilian public interest would be hindered." Saad Stmt. at 4.[4]

Also on November 13, 2020, defendants filed a letter (Nov. 13 Ltr.) (Dkt. No. 144) confirming that although they were "prepared to commence production" of certain documents responsive to RFPs 1, 3, and 4, they were "unable to comply with the remainder of the Court's Order in respect of the RFPs without violating applicable Brazilian and other foreign law, including binding decisions of the Brazilian Federal Supreme Court" and other foreign jurisdictions. Nov. 13 Ltr. at 1. According to defendants, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ *Id*. at 2. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████ *Id*.

On December 2, 2020, plaintiffs filed a letter-motion (Dkt. No. 150) suggesting that defendants had failed to comply with this Court's orders requiring them to produce all documents

---

[4] ████████████████████████████████████████████████████████████ ████████████████████████████████████ Sealed Kessler Decl. Ex. H, at 3-4, Odebrecht filed those orders – along with the unredacted version of its brief and the unredacted versions of the declarations and opinions discussing the Curitiba Court orders – under seal. Redacted versions of the sealed documents, with the confidential portions excised, were simultaneously filed in public view. The parties followed the same convention when filing their opposition and reply papers.

responsive to RFPs 1, 3, and 4. Because that letter-motion did not request any specific relief (and otherwise failed to comply with my individual practices), I denied it. (Dkt. No. 153.)

On December 14, 2020, plaintiffs filed a memorandum of law (Pl. Opp.) (Dkt. No. 160) in opposition to defendants' motion for a protective order. Plaintiffs did not submit any analyses or opinions from foreign lawyers or experts as to the interpretation, reach, or implications of the Leniency Agreement or the Brazilian court decisions upon which defendants rely.

On January 5, 2021, plaintiffs filed their letter-motion "to compel the production of all documents responsive to Plaintiffs' Requests for Production Nos. 1, 3, and 4." Pl. Ltr. at 1. Plaintiffs seek an order from this Court (1) "enforcing the Court's October 14, 2020 and October 30, 2020 Orders," and (2) "compelling production of all documents responsive to Plaintiffs' RFP Nos. 1, 3, and 4." *Id.*

On January 8, 2021, defendants filed a reply brief (Def. Reply) (Dkt. No. 171) in further support of their protective order motion. On the same day, they filed a letter in opposition to plaintiffs' letter-motion (Def. Opp.) (Dkt. No. 172), asserting that plaintiffs do not seek "any new or additional relief beyond that which the Court has already provided," and reiterating that they are "unable" to fully comply with this Court's October 14 Order. Def. Opp. at 1-2. Plaintiffs filed a reply letter (Pl. Reply) (Dkt. No. 176) on January 12, 2021.

I heard oral argument on both motions on January 25, 2021.[5]

Fact discovery is currently set to conclude on November 1, 2021, with all discovery to be completed by June 1, 2022. (Dkt. No. 185.)

_____

[5] The parties did not file the transcript of the oral argument (Tr.) on the electronic docket of this action, but the Court was furnished a copy by the Southern District Reporters and has filed it under seal. (Dkt. No. 188.).

### H.    Defendants' Protective Order Motion

In support of their protective order motion, defendants argue that disclosure of the Drousys and MyWebDay systems "would violate applicable foreign law, Brazilian judicial decisions and cooperation agreements, including the Leniency Agreement" with Brazilian prosecutors, the May 30, 2017 Brazilian Federal Supreme Court decision, and the decisions of the Curitiba Court summarized in Part I(E)(2) of this Opinion. Def. Mem. at 9, 12. Thus, they say, there is a "true conflict" between domestic and foreign law as to the discoverability of the Systems. *Id*. at 9. The remaining comity factors, according to defendants, also weigh in favor of precluding production in this action because, among other things: any additional information to be gained from production of the Systems "would be either cumulative or irrelevant"; plaintiffs' requests are overbroad; the Systems originate outside the United States; production would violate important Brazilian interests and could have a "chilling effect on future cooperation with foreign authorities"; defendants would run a substantial risk of civil and criminal liability (as well as liquidation) should they fail to comply with Brazilian law; and there is no dispute as to defendants' good faith. *Id.* at 14-24.

In their opposition brief, plaintiffs maintain that there is no "true conflict" between American law and that of foreign jurisdictions, as required to trigger a comity analysis, because such a conflict only occurs "when compliance with the *regulatory* laws of both countries would be impossible." Pl. Opp. at 4 (emphasis added). Here, the conflict arises from what plaintiffs characterize as defendants' less weighty "contractual" obligations to foreign prosecutors. *Id.* at 5. Even assuming, *arguendo*, the existence of a true conflict, plaintiffs continue, the remaining comity factors favor production of the Systems in this action because: "the information contained in the Systems is directly probative of plaintiffs' claims"; the RFPs at issue are "narrow and

specific"; although "the information did not originate in the U.S., neither did it originate in Brazil"; defendants fail to offer any "alternative means by which plaintiffs could obtain the Systems"; Brazil's interests are diminished by the fact that "no statute would be violated by the production, and the alleged privacy requirements are purely contractual in nature"; there is no showing that the supposed risks are "likely"; and plaintiffs did act in bad faith, in that they initially failed to mention that they still possess a copy of the MyWebDay system. *Id.* at 12-24.

## I.     Plaintiffs' Letter-Motion to Compel

Plaintiffs, for their part, seek an order compelling the production of all non-privileged documents responsive to RFPs 1, 3, and 4. They explain that on October 14, 2020, this Court ordered defendants to produce the documents they previously produced to the DOJ and foreign authorities; that on October 30, 2020, this Court denied defendants' motion for reconsideration; but that defendants have taken the position, ever since November 12, 2020, that they are unable to comply with the October 14 Order because Brazilian law supposedly forbids the production of any documents (not just the Systems) previously provided to the MPF (including the documents also provided to the DOJ). Pl. Ltr. at 1-2. Plaintiffs add that although defendants made an initial production of documents in December 2020, they failed to produce "even a single document" responsive to RFPs 1, 3, and 4. *Id*. at 3.

Defendants do not dispute plaintiffs' basic contention that they have failed to comply with the October 14 Order regarding RFPs 1, 3, and 4. Rather, they argue, plaintiffs' request (seeking an order compelling production) is duplicative of the relief plaintiffs already sought and received when the Court issued that October 14 Order and then denied defendants' reconsideration motion. Def. Opp. at 1-2. However, defendants assert that their December production was both extensive (nearly 700,000 pages) *and* responsive, at least in part, to RFPs 1, 3, and 4, in that it included

documents previously produced to the *Receita Federal do Brazil*, which they describe as the "Brazilian IRS." *Id*. at 3. What they cannot do, they say, is provide plaintiffs with the same documents they produced to the DOJ or to "other government regulators and prosecutors," as such production is prohibited under Brazilian law. *Id*.

## II.   ANALYSIS

### A.   Legal Standards

"[W]here the alleged obstacle to production is foreign law, the burden of proving what that law is and demonstrating why it impedes production falls on the party resisting discovery." *S.E.C. v. Gibraltar Glob. Securities, Inc.*, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015). To satisfy this burden, "the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 96 (S.D.N.Y. 2014) (citations omitted). Among other things, that party must identify "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id*. (internal quotation marks and citation omitted).

While courts in the United States have "no legal obligation to give effect or deference to the orders or holdings of a court of a foreign country, absent a specific treaty or legislative rule," they may do so "on the basis of comity." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 2009 WL 1055673, at *2 (S.D.N.Y. Apr. 17, 2009). Comity "is the recognition which one nation allows within its territory to the legislative, executive *or judicial acts* of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *In re Maxwell Comm'n Corp.*, 93 F.3d 1036, 1046 (2d Cir. 1996) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)) (emphasis added); *accord Exp.-Imp. Bank of U.S.*, 2009 WL 1055673, at *2; *see also Black's Law Dictionary* 324 (10th ed. 2014)

(defining "comity" as "[a] practice among political entities (as countries, states, or courts of different jurisdictions), involving esp[ecially] mutual recognition of legislative, executive, and judicial acts").

Federal courts, including in this district, view foreign court orders – as well as foreign statutory or regulatory enactments – through the lens of comity. *See*, *e.g.*, *United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248-49 (S.D.N.Y. 2009) ("International comity requires recognition of foreign actions, decrees, and proceedings that do not conflict with the interests or policies of the United States." (quoting *United States v. Portrait of Wally*, 2002 WL 553532, at *9 (S.D.N.Y. Apr. 12, 2002)); *Exp.-Imp. Bank of U.S.*, 2009 WL 1055673, at *1-2 (applying comity analysis to Indonesian court's temporary, provisional injunction, which prevented defendants from "providing statements or information regarding their respective assets");; *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 809 (S.D.N.Y. 1992) ("It is settled that federal law recognizes decisions of foreign courts on the basis of international comity."); *Air-Prods. & Chemicals, Inc. v. Inter-Chemical, Ltd.*, 2005 WL 196543, at *7 (E.D. Pa. Jan. 27, 2005) ("Cases involving comity issues most often arise where a party seeks to enforce a final monetary judgment obtained in a foreign jurisdiction in the United States. However, a judicial act need not be a final judgment to be granted comity[.]").[6]

If the foreign law conflicts with domestic law, the court must perform a comity analysis "to determine the weight to be given to the foreign jurisdiction's law." *Laydon v. Mizuho Bank,*

---

[6] *See also In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, 2019 WL 1988525, at *4 (S.D.N.Y. May 6, 2019) (applying comity analysis to the "common law of England and Wales" as it bears on the disclosure of certain information); *cf. Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 129-30 (E.D.N.Y. 2000) (concluding that recommendations contained within a report issued by a French "informal historic commission" do not "provide a conflicting judicial, legislative or executive act to which this Court could reasonably defer").

*Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (quotation marks and citations omitted). Conversely, in the absence of a "true conflict," a comity analysis is "unnecessary." *Gibraltar Glob. Securities*, 2015 WL 1514746, at *4.

"When evaluating a motion for a protective order to prevent discovery of documents and information 'in the face of objections by foreign states,'" *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438 (E.D.N.Y. 2008) (quoting *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the Southern Dist. Of Iowa*, 482 U.S. 522, 544 n.28 (1987)), courts follow the Restatement (Third) of Foreign Relations Law § 442(1)(c), and consider the following factors:

(1)    the importance to the investigation or litigation of the documents or other information requested;

(2)    the degree of specificity of the request;

(3)    whether the information originated in the United States;

(4)    the availability of alternative means of securing the information; and

(5)    the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

*Laydon*, 183 F. Supp. 3d at 419-20; *Wultz*, 298 F.R.D. at 96; *Royal Park Invs., SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 7512815, at *10 (S.D.N.Y. Dec. 29, 2017). Courts in the Second Circuit consider two additional factors:

(6)    the hardship of compliance on the party or witness from whom discovery is sought; and

(7)    the good faith of the party resisting discovery.

*Laydon*, 183 F. Supp. 3d at 420; *Wultz*, 298 F.R.D. at 96; *Royal Park Invs.*, 2017 WL 7512815, at *10. The court may also consider "whether the person resisting discovery is a party to the litigation," and whether the requirements of another country's privacy laws are "absolute." *Laydon*,

183 F. Supp. 3d at 420 (citing *Tansey v. Cochlear Ltd.*, 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)).

### B.      Production of the MyWebDay System is Moot and Not an Appropriate Subject of the Protective Order

At the outset, the Court notes that defendants made a protective order motion as to all documents requested in RFPs 5 *and* 6, which call for documents stored on the Drousys and MyWebDay file systems, respectively. However, the Court's October 14 Order neither required production of the MyWebDay system nor authorized a protective order motion with respect to it. Moreover, the question of producing documents or data stored in MyWebDay is moot, because the encryption keys needed to access the system have been destroyed. *See Doubleline Capital LP v. Odebrecht Finance, Ltd.*, 2021 WL 1191527, at *10 (S.D.N.Y. Mar. 30, 2021) (imposing Rule 37(e)(1) sanctions for defendants having intentionally destroyed the encryption keys). Consequently, I evaluate the comity question only with respect to RFP 5.

### C.      Production of the Drousys System Conflicts with Specific Foreign Court Orders

Defendants are correct that this case presents "a true conflict between domestic and foreign law," *Aerospatiale*, 482 U.S. at 555; *Gibraltar Glob. Securities*, 2015 WL 1514746, at *4, as to whether they may (or must) produce documents and data from the Drousys file system in this civil litigation. As an initial matter, and as explained above, the fact that the conflict stems primarily from a series of Brazilian court decisions – rather than a statute or regulation – does not mean that there is no "true" conflict, nor that comity does not attach. Similarly, the fact that the foreign court decisions on which defendants rely arose out of the Leniency Agreement (which plaintiffs characterize as a "contractual agreement into which [defendants] willingly entered," Pl. Opp. at 4, while defendants liken it to a "plea agreement" with the government, entitled to "special solicitude," Tr. at 10) does not detract from the deference owed those decisions.

21

The language in the Leniency Agreement itself is somewhat difficult to parse and its meaning may have been lost in translation at times. However, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ *Id.*; *see also* Barros

Pimentel Op. ¶¶ 11, 15, 18, 26, 28(c), 30-31; Saad Stmt. ¶ 30 ("All [court] decisions confirm the general understanding expressed in the previous sections that no parties with access to sensitive information in the Leniency Agreement (including, therefore, Odebrecht) should grant access to third parties to sensitive cooperation evidence outside the cases provided for in the agreement.").[7]

In response, plaintiffs offer nothing but their own (American) lawyers' argument that the Leniency Agreement was not intended, or should not be interpreted, to restrict Odebrecht's ability to disclose documents and data from the copy of the Drousys system that remains in its physical possession. *See* Pl. Opp. at 9 █████████████████████████████

███████████████████████████████ *id*. at 10 (arguing that although ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ Unsurprisingly, plaintiffs' interpretation of ██████████████████ which would as

a practical matter render Odebrecht's duty of confidentiality meaningless, is unsupported by the

---

[7] As an exception to this rule, Odebrecht is permitted to "use the information to negotiate agreements similar to the Leniency Agreement with foreign government authorities." Saad Stmt. ¶ 24 (citing § 5, cl. 21 of the Leniency Agreement). That exception does not apply here.

testimony of any qualified Brazilian lawyer or legal scholar.[8] Moreover, there is no dispute that plaintiffs here have not gone through the procedures required by the Brazilian courts to request access to the Drousys system. *See* Tr. at 34-35. Consequently, there is a direct conflict between defendants' discovery obligations in the action before me and the court decisions in Brazil restricting access to the discovery plaintiffs seek.

Although not necessary to the resolution of defendants' motion, I also note that production of the Drousys system may run afoul of other foreign statutes and common law. For example, articles 290 and 291 of the Dominican Republic Criminal Procedure Code may prohibit production of documents disclosed to the Dominican Republic authorities during their criminal investigation. Valdez Decl. ¶¶ 4, 6, 12.[9]

### D.    The Comity Analysis Weighs Against Production

Because defendants have demonstrated the existence of a true conflict of law, the Court turns to the comity analysis governed by § 442(1)(c) of the Restatement (Third) of Foreign

---

[8] "Determination of a foreign country's law is an issue of law." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir. 1998); *see also In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 540 (E.D.N.Y. 2011); *Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.,* 364 F. Supp. 2d 346, 349 (S.D.N.Y. 2005). In determining foreign law, however, courts "may consider any relevant material or source," Fed. R. Civ. P. 44.1, including expert testimony, which, although not required in every case, "remains the 'basic mode of proving foreign law.'" *Jonas v. Est. of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (quoting *Bigio v. Coca–Cola Co.,* 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010), *aff'd,* 675 F.3d 163 (2d Cir. 2012), and relying on the testimony of defendants' Panamanian law expert to determine the effect of Panama's veil-piercing statute). *See also*, *e.g.*, *Royal Park Invs.*, 2017 WL 7512815, at *1 (noting that the parties submitted "competing declarations from Belgian law experts" as to whether Belgian and European Union privacy laws precluded the discovery sought). Here, as in *Jonas*, only defendants submitted expert testimony to assist this Court in determining the foreign country's law.

[9] It is unclear to the Court whether any court decision or statute in Mozambique actually prohibits disclosure of the Systems. Attorney Rocha states broadly that "there are restrictions in Mozambique that prevent Defendants from providing the Drousys and/or MyWebDay systems to third parties," but cites nothing beyond a clause in the agreement between "certain of the Defendants" and the Mozambican Attorney General's Office stating that the provisions of that agreement shall remain confidential. Rocha Decl. ¶¶ 4-7 & Ex. A.

Relations Law. The first factor – the importance of the information sought to the litigation – weighs in favor of production, though not as heavily as plaintiffs believe.

The information that plaintiffs seek is relevant to their claims and could be important to the litigation, as is evident from Judge Woods's decisions on defendants' motions to dismiss. In their brief, plaintiffs highlight several examples. For instance, when plaintiffs broadly alleged (in their Second Amended Complaint (SAC) (Dkt. No. 41)) that defendants had paid nearly $800 million in bribes over a 15-year period, Judge Woods held that they failed to "sufficiently allege that CNO's public statements" violated relevant accounting standards because they had not pled "facts showing that CNO had any reason to believe that losses related to the bribery scheme were more than a remote possibility at the time the company filed its financial statements." *DoubleLine I*, 323 F. Supp. 3d at 446. In order to overcome this deficiency, the TAC specifies the dollar amount of bribes paid per year, TAC ¶¶ 101, 115, and alleges that such a "widespread and dramatically escalating scheme could not evade the notice of regulators indefinitely and was 'more likely than not' to be exposed." TAC ¶ 102. The district judge found that these new allegations were sufficient to remedy the deficiency and "adequately demonstrate that company officials thought the possibility of detection was more than remote by 2009, triggering their obligation to footnote the liability in any of the covered reporting periods." *DoubleLine II*, 413 F. Supp. 3d at 208.

The district judge also concluded, in *DoubleLine I*, that the SAC did not "identify which illegally obtained contract revenues were reported in those financial statements and the corresponding bribe payments that should have been reported as expenses," and therefore "fail[ed] to plead with particularity CNO's violation" certain accounting standards. *DoubleLine I*, 323 F. Supp. 3d at 447. In their TAC, plaintiffs corrected this deficiency by listing various bribes by year and amount, including, for example, a "$23 million bribe to the former director of Supply and

Refining of Petrobras, Paulo Roberto Costa," paid in 2010 "to obtain the construction contract for the Abreu e Lima Refinery in Brazil." TAC ¶ 75. In *DoubleLine II*, Judge Woods concluded that this satisfied plaintiffs' pleading burden because – in contrast to the SAC, which provided only "an aggregate amount of bribe payments made between 2001 and 2016" – the TAC "identifies at least one $23 million payment in 2010 that CNO made in 2010 to a specific individual to secure a construction contract for Brazil's Abreu e Lima Refinery." *DoubleLine II*, 413 F. Supp. 3d at 209.[10]

Plaintiffs further note that the allegations contained in the SAC (including those that Judge Woods found insufficient) largely came from the SOF, to which defendants stipulated in the Eastern District. *See* Tr. at 35:10-17. The additional allegations in the TAC (which Judge Woods found sufficient) came from "news reports based on what was going on in the Brazilian investigation and things like that," Tr. at 35:18-22, which will likely not be admissible at trial. During oral argument, plaintiffs explained more broadly that the "larger the scheme" they are able to show, the stronger their case will be, both as to the accounting improprieties they allege and as to scienter. *See* Tr. at 36, 40-41. Consequently, they argue, it may be crucial to their case to be able to prove that Odebrecht paid $3.3 billion in bribes, as alleged, as opposed to $788 million, as admitted in the SOF. *Id*. at 41-42.

---

[10] Plaintiffs also point to Judge Woods's conclusion that the SAC "fail[ed] to identify which, if any, revenue derived from unlawfully obtained contracts during the periods for which CNO's financial figures were disclosed." *DoubleLine I*, 323 F. Supp. 3d at 447. In order to cure that deficiency, plaintiffs alleged in the TAC that "governmental investigations and investigative news reports have identified a number of contracts that CNO illicitly obtained through the Bribery and Kickback Scheme, including CNO's construction contracts with Petrobras," TAC ¶ 107, and included a chart of revenue received from the Petrobras contracts for each year from 2009 through 2013. *Id*. The district judge found this "more than adequate," explaining that plaintiffs had "clarified that CNO obtained all of the Petrobras contracts through bribery," that they "listed CNO's yearly revenue from those contracts between 2009 and 2013," and that the chart "clearly indicate[s] the five years in which the contract yielded revenue that ought to have been separately reported in CNO's financial disclosures." *DoubleLine II*, 413 F. Supp. 3d at 208-09.

Defendants do not deny that access to the Drousys system could assist plaintiffs in establishing a more detailed picture of the bribes paid by defendants. Moreover, although defendants offered a stipulation on this point,[11] plaintiffs found the language of the proposed stipulation "kind of convoluted," explaining that they were not convinced that the jury would understand it, and wondering aloud, during oral argument "why wouldn't they just stipulate to the $3.3 billion[?]" Tr. at 37. I agree with plaintiffs that, while the proposed stipulation may ameliorate the difficulties posed to plaintiffs' case by the unavailability of the Drousys system, it does not eliminate them. Consequently, I conclude that the information contained in the Drousys system is relevant to plaintiffs' claims and (depending on their ability to develop other sources for the specific bribe amounts paid) potentially important to this civil litigation.

The second factor – the degree of specificity of the request – weighs slightly in favor of defendants. Although RFP 5 (which seeks the production of all documents stored on the Drousys system concerning "any payments made to political parties, foreign officials or corporate executives (or their representatives or agents)") requests a "specific, discrete source of information," *see Gucci Am., Inc. v. Curveal Fashion*, 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010), the request is not "narrowly tailored" to obtain the information plaintiffs claim they actually need. *See Strauss*, 249 F.R.D. at 440-41. In particular, rather than narrowly focus their requests on the factual issues they are concerned about proving – for example, the specific bribes paid to identified recipients – they asked for what is effectively the entire Drousys system, which apparently consists of "terabytes" of data. Def. Reply at 8.

---

[11] Defendants offered to stipulate that, *inter alia*, they would "not raise any claim or defense in this action (or otherwise assert that any element of any claim asserted in Plaintiffs' complaint was not met), on the basis [that] the total amount of the bribe payments during the relevant period was anything less than $3.3 billion." Def. Mem. at 8.

The third factor – whether the information originated in the United States – weighs against compelled production, as it is undisputed that Drousys (and MyWebDay) were hosted "on servers owned by external service providers located in Switzerland and/or Sweden." Saad Stmt. ¶ 9. Plaintiffs point out that the Systems were not hosted in Brazil, but they do not cite any authority suggesting that this is a relevant consideration when evaluating the third comity factor.

The fourth factor – the availability of alternative means of securing the information – is difficult for the Court to evaluate at this time. Defendants argue, with some force, that plaintiffs have not yet attempted to seek the "underlying information" about the bribes from alternative sources, such as testimony from "the recipients of alleged bribes, testimony from knowledgeable former employees or third-party witnesses, and the myriad purported evidence referenced in the operative complaint." Def. Reply at 7; *see also* Tr. at 14 ("plaintiffs have not served a single third-party subpoena in this case"). Plaintiffs respond, not unreasonably, that third-party subpoenas are "in our plans" but "we were hoping to get the documents first." Tr. at 44. They add that, while "other foreign governments" have copies of Drousys, they too will likely claim that their plea arrangements with Odebrecht are confidential, and, in any event, "there's no place that we could get it that would have less burden than Odebrecht to produce it." *Id.* at 44-45.

Defendants are correct, however, that the question is not whether plaintiffs can secure Drousys itself from an alternative source; it is whether there are "alternative means of securing the *information.*" *Wultz*, 298 F. R.D. at 96 (emphasis added). Those means could include depositions of individual Odebrecht witnesses; organizational depositions pursuant to Fed. R. Civ. P. 30(b)(6); interrogatories or requests for admission; third-party document or deposition subpoenas; and, potentially, a more helpful stipulation or series of stipulations from defendants, who assert that they have "offered to discuss alternative methods of eliminating" the factual disputes to which the

information in the Drousys system would be relevant. Def. Reply at 7. Thus, on the relatively slim record presented to the Court on the protective order motion, I conclude that the fourth factor favors neither plaintiffs nor defendants.

The fifth factor, which goes to the heart of the international comity concerns underlying the doctrine, weighs strongly against production. Whether or not plaintiffs agree with the public policy choices made by the Brazilian authorities, it is clear from the Leniency Agreement itself,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ (Dkt. No. 135-7 at 3.) Likewise, as Barros Pimentel explained, respecting the confidentiality of the evidence submitted as part of the investigation is "imperative, especially so [Odebrecht has] the means to conclude negotiations for executing agreements in other jurisdictions and meeting their obligations of continuous cooperation and confidentiality assumed with foreign authorities in the scope of agreements executed abroad, an objective recognized by the Federal Prosecution as [a] public interest of Brazil." Barros Pimentel Op. ¶ 13.

In addition, as explained by attorney Saad, the Brazilian public interests at stake include, most notably, "evidentiary leverage for the civil and criminal prosecution [by Brazilian authorities] of other people involved in corruption." Saad Stmt. ¶¶ 15, 21. If Odebrecht were to disclose the contents of the Drousys system to plaintiffs in this action, they would likely be required to do so repeatedly, which would "jeopardize the investigative process and adversely affect the Brazilian government's ability to pursue the malefactors and fight corruption in the country." *Id.* ¶ 51(c).

This would also have repercussions beyond the Odebrecht case, as it would "inform the entire Brazilian business community that consensual solutions to corruption issues are unreliable," which could cause "resistance to similar agreements in the future." *Id.* ¶ 51(a). In addition, Saad adds, "every evidence of cooperation of the Leniency Agreement also matters directly to the seventy-seven plea agreements." *Id.* ¶ 19; *see also id.* ¶ 51(d).[12]

Likewise, the sixth factor – the hardship of compliance upon Odebrecht – weighs in defendants' favor. Defendants have offered persuasive evidence, through the attestations of Brazilian attorneys, that producing the Drousys system to plaintiffs in this action would risk triggering civil and criminal liability and – perhaps – force Odebrecht into liquidation. For example, attorney Saad opines that breaching the Leniency Agreement by violating its secrecy clause "could result in termination of the agreement and Odebrecht would be subject to hundreds of new litigations, in addition to bankruptcy liquidation." Saad Stmt. ¶ 51(b).[13] Saad further explains that because the "content of the Systems refers to third parties . . . which are not signatories to leniency agreements or similar agreements," sharing such information with plaintiffs could also trigger tort liability to those third parties. *Id.* ¶ 51(e). Finally, there may be criminal consequences for any of defendants' executive officers "responsible for deciding and/or making the delivery of the Systems." *Id.* ¶ 51(f). Saad surmises, based on a similar case, that "the conviction of such individuals would be likely." *Id.* Likewise, attorney Valdez opines that there is a "material risk"

---

[12] The seventy-seven plea agreements were executed, confidentially, by "members and former members of the Odebrecht Group" as part of the ongoing investigations. Kessler Decl. Ex. 3 at 2; Saad Stmt. ¶ 51(d).

[13] Barros Pimentel expands on this point, explaining that termination of the Leniency Agreement "would subject [Odebrecht] to a set of sanctions and indemnifications that could cause it to be bankrupt, including but not limited to . . . indemnity being charged by authorities that signed or adhered to the agreement in amounts in excess of those provided by the agreement . . . injunctive freezing of assets . . . penalties set forth by Law 8.429/1992 . . . declaration of unreliability for bidding or entering into contracts with Brazilian public administration." Barros Pimentel Op. ¶ 42.

that defendants would "face harsh consequences" in the Dominican Republic, including civil damages and possible criminal prosecution of the company and its former executives. Valdez Decl. ¶¶ 5, 14. Attorney Rocha asserts that the same would be true in Mozambique. Rocha Decl. ¶ 4. Although plaintiffs contend that the chances of those consequences are "unlikely," they do not offer any evidence, expert or otherwise, to support their conclusory statement. Consequently, the Court is persuaded that production of the Drousys system to plaintiffs would put defendants, and their personnel, at risk for significant hardship.

The seventh and last factor – the good faith of the party resisting discovery – also weighs against production. There can be no real dispute that defendants, who apprised this Court more than a year ago that RFP 5 sought production of documents in violation of Brazilian law (Dkt. No. 115), have acted in good faith in withholding the production of the Drousys system on that ground. The fact that defendants are in possession of an (inaccessible) copy of the MyWebDay system, and that they were (arguably) late in disclosing that fact, *see* Pl. Opp. at 22-23, is simply not relevant to RFP 5 or to the motion for a protective order, which solely concern the Drousys system.

Weighing all of the comity factors, as I must, I find that the scales tip in favor of granting the protective order sought by plaintiffs with respect to RFP 5.

### E.     Plaintiffs' Letter-Motion to Compel

Defendants are correct that plaintiffs' letter-motion to compel production of documents responsive to RFPs 1, 3, and 4 "does not seek any new or additional relief beyond that which the Court has already provided." Def. Opp. at 1. In their reply letter, plaintiffs confirm that the "specific relief" they request is an order "compelling Defendants to produce all documents responsive to Plaintiffs' RFP Nos. 1, 3, and 4." Pl. Reply at 2, 3. I issued that order pursuant to Fed. R. Civ. P. 37(a) on October 14, 2020, refused to reconsider it on October 30, 2020, and see no need to issue it again.

In the last sentence of their reply letter, plaintiffs add a request for "sanctions," including their attorneys' fees incurred in making the motion and "that a default judgment be granted against defendants for failing to comply" with this Court's prior orders. Pl. Reply at 3. A party may not, however, use a reply brief (or letter) to make a different motion – this one, presumably, pursuant to Fed. R. Civ. P. 37(b) – or otherwise request relief not identified in its moving papers. *See Charles v. United States*, 2019 WL 1409280, at *4 n.1 (S.D.N.Y. Mar. 28, 2019) (refusing to construe defendant's Rule 12(b)(1) motion as a Rule 12(b)(6) motion based on arguments made for the first time on reply, which would be "unfair and prejudicial to plaintiff"); *see generally Rowley v. City of New York*, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) (collecting cases).

## III.    CONCLUSION

For the reasons stated above, defendants' protective order motion as to RFP 5 (Dkt. No. 130) is GRANTED. Plaintiffs' letter-motion for an order compelling discovery (Dkt. No. 167) is DENIED as moot, as the relief request has already been granted.

**The Clerk of Court is respectfully directed to file this Opinion and Order under seal, at the "selected parties" viewing level, such that only the attorneys appearing for the parties, and court personnel, may view it**. By separate order, the Court will give the parties an opportunity to submit proposed redactions before this Opinion and Order is filed in public view.

Dated: New York, New York
      September 23, 2021           **SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**