UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED:    07/19/2022        │
└─────────────────────────────────┘
```

DOUBLELINE CAPITAL LP, et al.,

                Plaintiffs,

        -against-

ODEBRECHT FINANCE, LTD., et al.,

                Defendants.

17-CV-4576 (GHW) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated November 5, 2021 (Dkt. 219), plaintiffs DoubleLine Capital LP, DoubleLine Income Solutions Fund, and DoubleLine Funds Trust (collectively DoubleLine) seek sanctions under Fed. R. Civ. P. 37(b) against defendants Odebrecht, S.A. – Em Recuperação Judicial (OSA), Construtora Norberto Odebrecht, S.A. (CNO), and Odebrecht Engenharia e Construção S.A. (OEC) (collectively Odebrecht), for their admitted refusal to comply with this Court's Order dated October 14, 2020 (the Order) (Dkt. 122), which, as relevant here, granted in part plaintiffs' letter-motion to compel discovery, filed on September 1, 2020 (9/1/20 Mot.) (Dkt. 114), and directed defendants to produce all nonprivileged documents responsive to plaintiffs' Requests for Production (RFPs) 1, 3, and 4.

RFPs 1, 3, and 4 sought all documents, deposition transcripts, and/or written statements provided by Odebrecht to the United States Department of Justice and any other governmental or regulatory agency in connection with the investigations conducted by those agencies into the large-scale bribery scheme, perpetrated by Odebrecht, that underlies this securities fraud action. *See* 9/1/20 Mot. Ex. A (Dkt. 114-1), at ECF pages 13, 16-17. On October 13, 2020, when the motion to compel was conferenced, the parties confirmed that plaintiffs had agreed to narrow RFPs 1, 3 and 4 to documents that pre-existed the various government investigations in which they were turned over, *see* Transcript of Oct. 13, 2020 Conf. (10/13/20 Hr'g Tr.) (Dkt. 123), at 6:13-24, and

defendants confirmed that – consistent with their prior written representations – they were ready, willing, and able to produce those documents, as long as they could include them "in our larger production rather than identify any specific set of documents as the specific set that was produced to the Department of Justice or to other regulators or government officials." *Id.* at 6:8-12. On that basis, the Court directed defendants to produce the documents within 30 days, "intermixed," at defendants' discretion, "with any other documents that [defendants] are prepared to produce by that date which are responsive to any of the plaintiffs' other requests." *Id.* at 17:24-18:20; *see also* Order ¶ 1.[1]

Two weeks later, by letter-motion dated October 27, 2020 (10/27/20 Def. Mot.) (Dkt. 125), defendants moved for reconsideration of the Order, arguing – for the first time – that "applicable Brazilian law" would apply "broadly" to prohibit them from producing *any* documents or data previously provided to prosecutors in Brazil, the United States, or elsewhere. 10/27/20 Def. Mot. at 1. By Order dated October 30, 2020 (10/30/20 Order) (Dkt. 127), I denied the reconsideration motion, leaving the Order intact.

---

[1] The Order did *not* require Odebrecht to produce documents and data responsive to RFP 5, which sought the contents of an off-the-books electronic system called "Drousys," which Odebrecht used to communicate about its bribery activity. As to RFP 5, defendants argued consistently that they could not produce evidence from the Drousys system because it (along with another electronic system called MyWebDay) was legally in the custody of Brazilian prosecutors, and because, even though defendants had a copy of the Drousys system in their possession, they could not disclose its contents to plaintiffs without violating Brazilian law, including various Brazilian court orders. (Dkts. 114-15, 120.) Consequently, as to RFP 5, I directed Odebrecht to file a protective order motion by November 12, 2020, *see* 10/13/2020 Hr'g Tr. at 25:1-26:11; Order ¶ 2, which it did. (Dkt. 130.) On September 23, 2021, I issued an Opinion & Order under seal (9/23/21 Op.) (Dkt. 190), granting the protective order motion with respect to RFP 5. A redacted version (Dkt. 194) was published as *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561 (S.D.N.Y. Oct. 6, 2021) (*Doubleline IV*). On May 27, 2022, the Hon. Gregory H. Woods, United States District Judge, overruled plaintiffs' objections to the Opinion & Order. (Dkt. 251.)

Under the Order, Odebrecht's production in response to RFPs 1, 3 and 4 was due on November 12, 2020. The next day, defendants filed a letter (11/13/20 Def. Ltr.) (Dkt. 144) stating that, with the exception of a limited set of documents "previously produced to the *Receita Federal do Brasil*" (Brazil's analogue to the Internal Revenue Service), they were "unable to comply" with the Order, in respect of RFPs 1, 3, and 4, without "violating applicable Brazilian and other foreign laws." 11/30/20 Def. Ltr. at 1.

Defendants never objected to the Order pursuant to Fed. R. Civ. P. 72(a). Nor did they object to the denial of their reconsideration motion. Instead, for the next year, Odebrecht simply remained in violation of the Order, telling the Court at a conference on October 13, 2021, that its position had not changed. *See* Transcript of Oct. 13, 2021 Conf. (10/13/21 Hr'g Tr.) (Dkt. 206), at 5:13-19. The instant motion followed.

Plaintiffs argue that the discovery compelled by the Order is "directly relevant" to their claim that defendants "made false and misleading statements . . . by failing to disclose their role in a massive world-wide Bribery Scheme," and constitutes "potentially the only remaining evidence available to Plaintiffs" with which they could prove key elements of their case, particularly given the unavailability of the Drousys and MyWebDay systems. Pl. Mem. (Dkt. 220) at 1.[2] Accordingly, they request that the Court (i) enter a default judgment against defendants, or, in the alternative; (ii) hold defendants in civil contempt, imposing a coercive fine of $10,000 per day, or,

---

[2] In *DoubleLine IV*, I agreed with Odebrecht that production of the Drousys system to plaintiffs would conflict with Brazilian court orders, *see* 2021 WL 4596561, at *10, and held, as a matter of comity, that such production should not be compelled. *Id.* at *11-14. The MyWebDay system was subject to the same Brazilian court orders but, in addition, was physically unavailable, because Odebrecht "intentionally destroyed the physical encryption keys needed to access the MyWebDay system in or about January 2016," well before this action was filed, as the investigations into the bribery scheme were gathering steam. *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at *5 (S.D.N.Y. Mar. 30, 2021) (*Doubleline III*). In *Doubleline III*, I imposed evidentiary sanctions pursuant to Fed. R. Civ. P. 37(e) for that spoliation.

in the alternative; (iii) make "certain findings of fact," including (a) that "[d]efendants made false statements in their offering materials" with respect to the Odebrecht debt securities that plaintiffs purchased; (b) that "[d]efendants' false statements were made with scienter"; (c) that "[p]laintiff[s] relied upon the false statements"; and (d) that "OEC is the successor of CNO." *Id.* at 2, 23-24. They also seek an award of their attorneys' fees and other expenses incurred in obtaining whatever sanctions the Court assesses. *Id.* at 24.

Defendants, for their part, acknowledge that they "are not in compliance with the Court's Order . . . and they accept that accordingly they may be subject to Rule 37 sanctions." Def. Opp. (Dkt. 225) at 1. They explain that they could not comply because they have "the same confidentiality obligations" under "applicable foreign law" regarding the broad range of documents and information now at issue as they did with respect to the specific electronic systems that were the subject of their successful protective order motion, *id.* (emphasis omitted); that they "promptly updated the Court after receiving clarification from Brazilian counsel" that they could not comply with the Order, *id.*; and that they have "acted in good faith throughout this dispute." *Id.* As a result, defendants propose that the Court establish only the following facts: (1) that "[d]efendants made [unspecified] false statements in their offering materials" regarding the securities at issue; (2) that "[d]efendants' false statements were made with scienter"; and (3) that "[f]or the purposes of liability imposed in this litigation, [OEC] is the successor of [CNO]." *Id.* at 7. Defendants further propose that no expenses be awarded to plaintiffs because their disobedience of the Order was "substantially justified." *Id.* at 8 n.6.

As is often the case in sanctions litigation, the appropriate result lies somewhere between the parties' proposals. A default judgment would be disproportionately harsh and would relieve plaintiffs of the burden of establishing elements of their claims – such as reliance – that are not

dependent upon the withheld evidence. Civil contempt sanctions would almost certainly fail to produce compliance with the Order, are not necessary to compensate plaintiffs, and are therefore ill-suited to the problem at hand. Under defendants' proposal, on the other hand, the Court would deem established little more than that which defendants have already admitted (in multiple jurisdictions), and thus would do nothing to cure the prejudice that plaintiffs have suffered as a result of defendants' intransigence. Consequently, the following facts will be taken as established for purposes of this action:

(1)     Defendants made all of the misrepresentations and omissions alleged in plaintiffs' Third Amended Complaint (TAC) (Dkt. 61) concerning the Odebrecht Notes;

(2)     Those misrepresentations and omissions were material;

(3)     Defendants made those material misrepresentations and omissions with scienter; and

(4)     Defendant OEC is the successor of defendant CNO.

In addition, defendants will be assessed the expenses, including reasonable attorneys' fees, incurred by plaintiffs to obtain and attempt to enforce the Order with respect to RFPs 1, 3, and 4, and to litigate the instant sanctions motion.

## I.     BACKGROUND

During the long-running, international bribery scheme underlying this action, defendants bribed "government officials in Brazil and at least 12 other countries in order to influence the award of large construction contracts" to themselves. TAC ¶ 62. Defendants have since admitted their criminal conduct in multiple jurisdictions. The sections below describe the parties involved and the ongoing investigations only to the extent relevant to the pending sanctions motion.

### A.     Parties

Defendant OSA is a Brazilian corporation that "through various subsidiaries and operating

entities, conducts business in the construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States." TAC ¶ 30. Defendant CNO, an OSA affiliate, was Latin America's "largest engineering and construction company," and it was also "one of the largest such companies in the world." *Id.* ¶ 36. On March 31, 2015, defendant OEC, an "integral subsidiary of Odebrecht," "became the direct controller" of CNO, and since then, "CNO has essentially become an empty shell and OEC substituted itself in as the replacement to CNO in all respects." *Id.* ¶¶ 39-40.

Plaintiffs – a group of affiliated investment advisors and funds from Delaware and Massachusetts – purchased a "significant quantity of two bonds" issued by defendants' affiliate Odebrecht Finance, Ltd. and guaranteed by CNO (the Odebrecht Notes), at prices close to par, between May 2013 and March 2015. TAC ¶¶ 12-14, 25-26, 230.[3]

### B.     The Underlying Bribery Scheme

In or around 2006, defendants created a standalone division of OSA called the "Division of Structured Operations," which plaintiffs allege "was created for the sole purpose of functioning as a 'bribe department' that made illicit payments to governmental officials in exchange for the receipt of lucrative public contracts by CNO." TAC ¶ 64. The then-CEO of OSA, Marcelo Odebrecht, later admitted that "between 0.5% and 2.0% of [OSA's] revenue was directed to illicit bribes." *Id.* ¶¶ 66-67.

The Division of Structured Operations was able to conceal these "massive illicit payments" by omitting them from CNO's and OSA's formal accounting records, where they would have been reflected in their financial results and reported to auditors. TAC ¶¶ 68-69. Instead, the Division "tracked these expenses on two 'shadow' systems that could only be accessed by members of the

---

[3] Plaintiffs purchased 7.125% Notes due June 26, 2042 and 7.50% perpetual notes. TAC ¶¶ 25-27.

Division." *Id.* ¶ 68. One of the systems, MyWebDay, "was used for making payment requests, processing payments and generating spreadsheets tracking all illicit bribe payments." *Id.* The other system, Drousys, "allowed members of the Division of Structured Operations to communicate with each other and other co-conspirators using secure emails and instant messages." *Id.*

### C.   *Lava Jato* Investigation and the Brazilian Leniency Agreement

In or around 2014, Brazilian authorities began investigating suspected corruption of another Brazilian multinational corporation called Petróleo Brazileiro S.A., better known as Petrobras. TAC ¶ 81. The investigation, initially covert, was called "Lava Jato," which translates to "Operation Carwash," and "did not originally focus on Odebrecht or CNO." *Id.* However, on June 19, 2015, Brazilian police arrested Odebrecht CEO Marcelo Odebrecht, and "the fraud began to unravel." *Id.* ¶ 231. As a "direct result" of the arrest, the market price of the Odebrecht Notes "declined sharply," *id.* ¶ 233, and kept falling (despite Odebrecht's efforts to mitigate the price damage by minimizing its culpability) as more facts emerged concerning the bribery scheme, prosecutors in other jurisdictions opened criminal investigations, and Marcelo Odebrecht was reportedly sentenced to 19 years in prison. *Id.* ¶¶ 239-268.

On December 1, 2016, Odebrecht and the *Ministério Público Federal do Brasil* (Brazil's Federal Prosecutor's Office, or MPF), entered into a *Termo de Acordo de Leniência* (Leniency Agreement or Agreement), Kessler Decl. (Dkt. 133) Ex. 1 (Dkt. 133-1), intended to "preserve the company's existence" while "preventing the occurrence of illicit acts" and assisting prosecutors to pursue "other suspected natural and legal persons." Leniency Ag. at 1. The Agreement required Odebrecht to make various factual admissions related to the bribery scheme (which appear in annexes to the Agreement), provide relevant materials to the MPF, identify participants in the scheme, describe the roles of those participants, and cooperate with the MPF in its ongoing

investigations. *Id.* at 4-5.[4] The Agreement specifies that its content (and all statements and documents produced in connection with it) are "of restricted access." *Id.* at 14. The Agreement "may be terminated" if Odebrecht fails to comply. *Id.* at 15.

The rules provide, among other things, that

### D.  Odebrecht's Other Agreements with Foreign Prosecutors

In addition to the MPF, Odebrecht entered into cooperation or leniency agreements with several other foreign authorities in connection with the bribery scheme, including Ecuador's *Fiscalía General del Estado* (General Prosecutor), *see* Vinueza Op. (Dkt. 138) ¶¶ 4-6; Peru's *Ministerio Público* (Public Ministry, of prosecution), *see* Kessler Decl. Ex. 2 (Dkt. 133-2) at 2; the Dominican Republic's *Procuradoría General de la República* (the Attorney General), *see* Valdez Decl. (Dkt. 136) ¶ 3; and Mozambique's prosecutorial authorities, *see* Rocha Decl. (Dkt. 137) ¶ 4. According to legal practitioners in those jurisdictions, Odebrecht's agreements with these prosecutorial entities and, in some instances, judicial orders, require that the information or

---

[4] The Leniency Agreement was "part of a global agreement coordinated by the competent authorities of the Brazilian, American and Swiss jurisdictions," pursuant to which Odebrecht agreed to pay, globally, the equivalent of R\$3,828,000,000 (approximately US\$743 million). Leniency Ag. at 7.

evidence defendants provided to these entities – including, but not limited to, the Drousys and MyWebDay systems – must be kept strictly confidential, on pain of severe penalties under those jurisdictions' criminal laws. *See* Vinueza Op. ¶¶ 4-7; Kessler Decl. Ex. 2 at 2; Valdez Decl. ¶¶ 3-4; Rocha Decl. ¶ 4.

### E.   Brazilian Court Decisions

As explained at length in the Opinion & Order, familiarity with which is assumed, both the Brazilian Federal Supreme Court and the 13th Federal Court of Curitiba (the Curitiba Court) issued decisions addressing the confidentiality of evidence rendered in connection with the Leniency Agreement that defendants signed with the MPF and related plea bargaining agreements. *See* 9/23/21 Op. at 6-9. ████████████████████████████████████ ████████████████████████████████ and consequently were filed in this Court under seal. *Id.* at 7.

On May 30, 2017, the Federal Supreme Court agreed (at Odebrecht's request) "to keep under secrecy" the testimony and corroborating evidence "rendered in the plea bargaining agreements signed with the Federal Prosecutor's office, as of June 1, 2017, until further deliberation according to the content of the replies from the foreign authorities regarding measures related to the ascertainment of the narrated facts." Kessler Decl. Ex. 3 (Dkt. 133-3) at 2.



Sealed Kessler Decl. Ex. A (Dkt. 135-1), at 6. *See* Supp. Sealed Kessler Decl. (Dkt. 148) Ex. L (Dkt. 148-2), at 3.

All of the decisions summarized above were known to defendants prior to and on October 13, 2020, when they represented to the Court that although they could not produce materials from the Drousys or MyWebDay systems, they could and would produce the documents responsive to RFPs 1, 3, and 4, as long as they were not required to identify which documents had been produced to which prosecutors.



*see* Sealed Kessler Decl. Ex. F (Dkt. 135-6) – ██████████ ████████████████████████████ ████████████████████████████████████ ████████████████████████████ Sealed Kessler Decl. Ex. H (Dkt. 135-8), at 3.

Three days later, on November 13, 2020, Odebrecht submitted an opinion by its Brazilian counsel, Barros Pimentel, Alcântara Gil & Rodriguez (which assisted Odebrecht in negotiating the Leniency Agreement) in support of its protective order motion concerning the Drousys and MyWebDay systems. *See* Barros Pimental Op. (Dkt. 140) ¶ 2. Barros Pimentel summarized the relevant Brazilian court decisions and opined that defendants were "prevented from providing to [plaintiffs here], directly or indirectly, access to the content[s] of [their] copy of the [Drousys and MyWebDay] Systems." *Id.* ¶ 34.

## F.    U.S. Plea Agreement

On December 21, 2016, OSA entered into a plea agreement in the Eastern District of New York. TAC ¶ 272. "Pursuant to the Plea Agreement, [OSA]: 1) pleaded guilty to violating the anti-bribery provisions of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3); 2) agreed to an

independent compliance monitor to oversee its operations; and 3) agreed to pay a massive criminal penalty of $2.6 billion." *Id.* The plea agreement included a stipulated "Statement of Facts" (SOF) outlining the bribery scheme, which OSA agreed not to challenge. TAC ¶¶ 273-74; *see* Plea Agreement, *United States v. Odebrecht S.A.*, No. 16-CR-643 (E.D.N.Y.), Dkt. 10 ¶ 28; *id.* Ex. 1 (SOF), at 1. In the SOF, OSA admitted, in broad terms, that it (together with its co-conspirators) "paid approximately $788 million in bribes in association with more than 100 projects in twelve countries" over 15 years, from 2001 through 2016. SOF ¶ 20. In return, OSA and its coconspirators received "ill-gotten benefits" of "approximately $3.336 billion." *Id.* ¶ 23. The SOF did not break down each of the bribes paid by year, recipient, and/or project with which they were associated.

In this action (relying on the reported testimony of Hilberto Mascarenhas Silva, head of Odebrecht's Division of Structured Operations, to Brazilian prosecutors), plaintiffs allege that OSA actually paid more than $788 million – as much as $3.3 billion – in bribes from 2006 through 2014. TAC ¶¶ 62, 72. Plaintiffs further allege an escalating series of bribes over that period, ranging from $60 million in 2006 to $730 million in 2013, before scaling back to $450 million in 2014. *Id.* ¶¶ 72, 101. The TAC goes beyond the SOF in other respects as well. For example, the TAC alleges the dates and amounts of individual bribes to various recipients, both inside and outside of Brazil, in finer detail than is recapitulated in the SOF. *Id.* ¶¶ 74-76. It also alleges, specifically, not only that CNO's construction contracts with Petrobras were obtained as a result of the bribery scheme, but also that the resulting revenues (listed on an annual basis from 2009 through 2013) were a "significant proportion" of its total revenues in each of those years, ranging from 3.7% to 11.3%. *Id.* ¶ 107.

### G.   Relevant Procedural History

#### 1.   The Pleadings

Plaintiffs commenced this action on June 16, 2017, alleging violations of the federal

securities laws and pendent state law. After plaintiffs amended their complaint twice, defendants moved to dismiss the Second Amended Complaint (SAC) (Dkt. 41), which was based in large part on the admissions made in the stipulated SOF included in the Eastern District plea agreement. On August 8, 2018, Judge Woods granted the motion in substantial part, giving plaintiffs leave to replead the claims that he dismissed. *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 446 (S.D.N.Y. 2018) (*DoubleLine I*).

Plaintiffs filed the TAC on September 7, 2018, this time alleging facts going beyond those admitted in the SOF. Defendants again moved to dismiss, and on September 23, 2019, Judge Woods permitted plaintiffs to proceed on their federal securities fraud claims pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against CNO and OEC; a control person claim pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), against OSA; and state law claims for fraud and negligent misrepresentation. *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 224 (S.D.N.Y. 2019) (*DoubleLine II*).

In *Doubleline II*, Judge Woods held that plaintiffs met their pleading burden with respect to certain of their § 10(b) claims – in particular, those asserting that CNO's financial statements violated Brazilian GAAP and were therefore misleading – precisely because the TAC included new factual allegations going beyond the admissions made in the SOF and alleged in the SAC. For example, when plaintiffs broadly alleged in the SAC that defendants had paid nearly $800 million in bribes over a 15-year period, Judge Woods held that they failed to allege "facts showing that CNO had any reason to believe that losses related to the bribery scheme were more than a remote possibility at the time the company filed its financial statements," *DoubleLine I*, 323 F. Supp. 3d at 446, and thus failed to allege that defendants were required to disclose such losses as contingent

liabilities. As noted above, however, the TAC claims that defendants paid over $3 billion in bribes, specifies the escalating dollar amount of bribes paid per year, and alleges that such a "widespread and dramatically escalating scheme could not evade the notice of regulators indefinitely and was 'more likely than not' to be exposed." TAC ¶ 102. The district judge found that these new allegations were sufficient to remedy the pleading deficiency and "adequately demonstrate that company officials thought the possibility of detection was more than remote by 2009, triggering their obligation to footnote the liability[.]" *DoubleLine II*, 413 F. Supp. 3d at 208.

Similarly, with respect to plaintiffs' claim that CNO's financial statements failed to separately disclose the amount of revenue it obtained through the use of bribes, Judge Wood concluded that the SAC (like the SOF) did not "identify which illegally obtained contract revenues were reported in those financial statements and the corresponding bribe payments that should have been reported as expenses," and therefore "fail[ed] to plead with particularity CNO's violation." *DoubleLine I*, 323 F. Supp. 3d at 447. In the TAC, plaintiffs corrected this deficiency when they alleged that "CNO obtained all of the Petrobras contracts through bribery, and listed CNO's yearly revenue from those contracts between 2009 and 2013." *Doubleline II*, 413 F. Supp. 3d at 208-09 (specifically citing "the chart underneath Paragraph 107 in the third amended complaint" as "more than adequate to meet their pleading burden" on this issue).

Plaintiffs' new allegations also rescued their claim that defendants violated Brazilian GAAP by "[f]ailing to properly report bribes as contract expenses." *DoubleLine II*, 413 F. Supp. 3d at 209. The SAC failed to plead a violation of this GAAP requirement "because Plaintiffs provided only an aggregate amount of bribe payments made between 2001 and 2016." *Id.* "In contrast, the third amended complaint identifies at least one $23 million payment in 2010 that

CNO made in 2010 to a specific individual to secure a construction contract for Brazil's Abreu e Lima Refinery." *Id.* (citing TAC ¶ 75).

On October 28, 2019, Judge Woods referred the case to me for general pretrial management (Dkt. 87), and on January 4, 2020, defendants answered the TAC, admitting the facts to which they had stipulated in their plea agreement, but denying (or denying information sufficient to form a belief as to the truth or falsity of) the expanded or more detailed allegations that convinced the district judge to permit plaintiffs' claim to advance. *Compare, e.g.,* TAC ¶ 62 (alleging that "between 2006 and 2014," defendants "paid at least $3.3 billion in bribes") *with* Ans. (Dkt. 106) ¶ 62 (admitting that "as reflected in the SOF," defendants paid bribes "between 2001 and 2016" and that "the amount of the bribes paid was more than $788 million").

### 2. The RFPs

In their September 1, 2020 letter-motion, plaintiffs sought to compel the production of documents responsive to plaintiffs' RFPs 1, 3, 4, and 5. 9/1/20 Mot. at 2-3. RFP 1 requested "all documents provided to the United States Department of Justice or the United States Attorney's Office for the Eastern District of New York in connection with their investigation of the Defendants." *Id.* at 2. RFPs 3 and 4 requested "all documents provided to 'any governmental or other regulatory agency or panel in connection with any investigation performed by those entities of any of the [defendants], including but not limited to the "Lava Jato" investigation by the Federal Police of Brazil.'" *Id.* at 3. RFP 5 specifically requested all documents stored on the Drousys system concerning "any payments made to political parties, foreign officials or corporate executives (or their representatives or agents)." *Id.*

By letter dated September 4, 2020 (9/4/20 Def. Ltr.) (Dkt. 115), defendants responded that as to RFPs 1, 3, and 4, they had not in fact "refused to produce responsive documents" and were willing to do so, as long as they were not required to "specifically identify which documents were

provided to the Department of Justice or other regulators, as requested by the U.S. Attorney's Office." 9/4/20 Def. Ltr. at 2. As to RFP 5, defendants objected to production entirely, principally because "production of the Drousys system would be in violation of applicable Brazilian law or orders and/or Defendants' leniency agreement with Brazilian or other applicable authorities." *Id.* at 3 (internal quotation marks omitted). Defendants took the same position at the October 13, 2020 conference, confirming that they were prepared to produce the documents responsive to RFPs 1, 3, and 4 as long as they could include them "in our larger production rather than identify any specific set of documents as the specific set that was produced to the Department of Justice or to other regulators or government officials." 10/13/2020 Hr'g Tr. at 6:8-12. Consequently, at the conclusion of that conference I issued the Order, directing defendants to produce all nonprivileged documents responsive to RFPs 1, 3, and 4, but specifying that they "need not make this production separately from their production in response to plaintiffs' remaining RFPs, and need not specifically identify which documents are responsive to" RFPs 1, 3, and 4. Order at 1. As to RFP 5, I gave defendants a schedule for their protective order motion, which was to be supported by "information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.* at 2.

Two weeks later, on October 27, 2020, defendants requested that the Order be "revised" to "expand the scope of Defendants' forthcoming motion for a protective order" to include RFPs 1, 3, and 4. 10/27/20 Mot. at 1. Defendants explained that *after* the October 13 conference, "in the course of preparing the Protective Order Motion," they "received further clarification from Brazilian counsel that applicable Brazilian law, including binding precedent from Brazil's Supreme Federal Court, which prevents Defendants from producing materials related to potential misconduct that occurred in foreign countries (*i.e.*, outside Brazil), applies broadly to encompass

documents previously produced to the United States Department of Justice and other government regulators and prosecutors." *Id.* Plaintiffs opposed, arguing that defendants did not meet the standard for reconsideration set out in Local Civ. R. 6.3. (Dkt. 126.) Largely agreeing with plaintiffs, I denied the reconsideration motion on October 30, 2020.

Defendants did not file any objections, as permitted by Fed. R. Civ. P. 72(a), to the original Order or to the 10/30/20 Order. Instead, on November 13, 2020 (the day after they were due to produce the documents responsive to RFPs 1, 3, and 4), they informed the Court that they were "unable to comply with the . . . Order," in respect of RFPs 1, 3, and 4, without "violating applicable Brazilian and other foreign laws." 11/13/20 Def. Ltr. at 1. According to defendants, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* at 2. ██

████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

On January 5, 2021 – at which point defendants' protection order motion with respect to RFP 5 was partially briefed – plaintiffs filed a letter-motion (1/5/20 Ltr.) (Dkt. 167) "to compel the production of all documents responsive to Plaintiffs' Requests for Production Nos. 1, 3, and 4." *Id.* at 1. Plaintiffs sought an order from this Court (1) "enforcing the Court's October 14, 2020 and October 30, 2020 Orders," and (2) "compelling production of all documents responsive to Plaintiffs' RFP Nos. 1, 3, and 4." *Id.* On September 23, 2021, I granted defendants' protective order motion with respect to RFP 5 and denied plaintiffs' second motion to compel as moot. *Doubleline IV*, 2021 WL 4596561, at *14. On May 27, 2022, Judge Woods overruled plaintiffs' objections to that decision.

### 3.    The Sanctions Motion

On October 13, 2021, I held a status conference, during which defendants reiterated that they would not comply with the Order, *see* 10/13/21 Hr'g Tr. at 5:13-19, and set a briefing schedule for the instant sanctions motion. *Id.* at 9:5-10:12. On November 5, 2021, plaintiffs filed their motion, accompanied by their memorandum of law; on November 30, 2021, defendants filed their opposition memorandum, under seal, accompanied by the Second Legal Opinion of Barros Pimentel (Barros Pimental Supp. Op.) (Dkt. 227), also filed under seal; and on December 7, 2021, plaintiffs filed their reply memorandum (Pl. Reply) (Dkt. 228).

### 4.    Other Discovery

Defendants have not merely refused to turn over the documents they provided to prosecutors in the Eastern District and elsewhere (which likely comprise the vast bulk of documentary evidence concerning the bribery scheme). During the course of fact discovery, they have, for the most part, refused to provide any *other* discovery concerning the factual allegations that the district judge found sufficient to plead a cognizable securities fraud claim.

For example, in response to plaintiffs' requests for admission as to the magnitude of the bribery scheme and the identities of the recipients, defendants denied that they paid more than $788 million in bribes in the aggregate, and claimed to lack knowledge or information sufficient to form a belief as to the accuracy of plaintiffs' allegations (made in TAC ¶¶ 75-76) regarding specific bribes paid to specific recipients. *See* Barth Decl. (Dkt. 216) Ex. B (Dkt. 216-2), at 14-19. When served with interrogatories on the same topic – inquiring about specific bribes paid to specific recipients, as well as specific revenues resulting from those bribes – defendants refused to answer, objecting on the ground that the questions sought "information that is publicly set forth in the Plea Agreement or other applicable leniency or similar agreements, which set out facts Defendants have agreed they will not contest." Barth Decl. Ex. C (Dkt. 216-3), at 9-11. Defendants

further objected to these interrogatories on the ground that they called for "the identification of information that was requested by and/or produced to, the United States Department of Justice and/or the United States Attorney's Office for the Eastern District of New York," and on the additional ground that plaintiffs sought "information subject to confidentiality restrictions or other limitations on its dissemination, including, without limitation, those imposed by Brazilian authorities and/or other applicable authorities and insofar as it seeks information in violation of applicable Brazilian law or orders and/or Defendants' leniency agreements with Brazilian or other applicable authorities." *Id.*

Fact discovery was set to conclude on April 30, 2022 (Dkt. 235), but remains incomplete. Currently pending are two letter-motions filed by plaintiffs on April 22, 2022 (Dkts. 238, 239), seeking to compel defendants' responses to certain interrogatories (including those summarized above) and to provide deposition testimony, pursuant to Fed. R. Civ. P. 30(b)(6), on certain topics (including Topics 1-5, concerning the identities of various Odebrecht personnel involved in the bribery scheme, the specific bribe payments made from 2009 through the current date, and the contracts obtained as a result of those bribes). On April 27, 2022, Odebrecht filed letter-briefs in opposition to those motions (Dkts. 241, 242) arguing that it cannot provide detailed information concerning the bribery scheme, beyond that which it has already admitted, because the necessary information is only available from the Drousys system, or "from other materials that are subject to the same confidentiality obligations because they were also produced to the MPF as part of Defendants' cooperation under the Leniency Agreement, or from documents derived from such sources." (Dkt. 241, at 3; Dkt. 242, at 3.) Odebrecht attached a declaration from OSA's General Counsel, Rogerio Bautista Da Nova Moreira, reiterating that the "information requested by these Interrogatories and Topics cannot be provided without breaching judicial orders" by Brazilian

courts, because that information "can only be found in the Drousys or [MyWebDay] systems, in other materials produced to the MPF pursuant to the Leniency Agreement, or in documents deriving from such sources." Moreira Decl. (Dkts. 241-1, 242-1) ¶¶ 3-4.

All discovery is set to close on February 28, 2023. (Dkt. 260.)

## II.   ANALYSIS

### A.   Legal Standards

Fed. R. Civ. P. 37(b)(2) states that "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under Rule . . . 37(a), the court where the action is pending may issue further just orders." Such orders may include: (1) directing that matters addressed in the order be taken as established by the prevailing party; (2) prohibiting the sanctioned party from supporting or opposing claims or defenses or from introducing evidence; (3) striking pleadings in whole or in part; (4) staying the proceedings until the order at issue is obeyed; (5) dismissing the action in whole or in part; (6) entering judgment against the disobedient party; and (7) treating the failure to obey the orders at issue as contempt of court (except where the orders direct the party to submit to a physical or mental examination). Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to the orders above, the court must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Discovery sanctions are designed to serve three primary purposes: (1) to "ensure that a party will not benefit from its own failure to comply"; (2) as a "specific deterrent[]," to obtain compliance with the court's orders; and (3) as a "general deterrent," both in the particular case and in other cases, "provided that the party against whom they are imposed was in some sense at fault." *Seena Int'l, Inc. v. One Step Up, Ltd.*, 2016 WL 2865350, at *12 (S.D.N.Y. May 11, 2016) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)); *accord Cine Forty-Second*

*St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979).

A magistrate judge has broad authority to impose discovery sanctions. Orders imposing such sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of [Fed. R. Civ. P.] 72(a), unless the sanction employed disposes of a claim," *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2018 WL 4760345, at *6 (S.D.N.Y. Sept. 28, 2018) (cleaned up), or includes contempt sanctions, which must be certified to the district judge. *Id.* at *7; *see also* 28 U.S.C. § 636(e)(6)(B).

The only predicates to the imposition of sanctions under Rule 37(b) are a "court order directing compliance with discovery requests" and "non-compliance with that order." *Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*, 2017 WL 2840279, at *9 (S.D.N.Y. June 27, 2017). Rule 37(b) applies "notwithstanding a lack of willfulness or bad faith," although such factors may be "relevant . . . to the sanction to be imposed for the failure." *Oz v. Lorowitz*, 2011 WL 803077, at *2 (S.D.N.Y. Mar. 7, 2011) (alteration in the original) (quoting *Auscape Int'l v. Nat'l Geographic Soc'y*, 2003 WL 134989, at *4 (S.D.N.Y. Jan. 17, 2003)).

When determining whether sanctions should be imposed under Rule 37, courts in the Second Circuit weigh the following non-exhaustive factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (alteration in the original) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)). "Prejudice to the moving party may also be a significant consideration, though not an absolute prerequisite in all circumstances." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 319 F.R.D. 122, 126 (S.D.N.Y. 2016) (citing *S. New*

20

*Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 148-49 (2d Cir. 2010)). No single factor is dispositive, and "they need not each be resolved against the party challenging the district court's sanctions . . . to conclude that those sanctions were within the court's discretion." *World Wide Polymers*, 694 F.3d at 159. However, when considering whether to impose discovery sanctions, the Court's discretion is limited to the imposition of sanctions that are both "just" and "commensurate" in severity with the non-compliance. S*hcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).

The harshest sanctions, such as dismissal or default, are reserved for extreme situations, such as those involving willfulness or bad faith. *Agiwal*, 555 F.3d at 302 (affirming sanctions against *pro se* litigant where he refused to follow orders issued by the presiding magistrate judge over a six-month period). Even where the disobedience is willful, courts "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *21 (S.D.N.Y. July 18, 2017), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017).

**B.    Defendants' Disobedience Warrants an Order Establishing all of the Facts that Defendants Have Prevented Plaintiffs from Proving and Requiring Defendants to Pay Plaintiffs' Attorneys' Fees and Other Expenses.**

The question for this Court is not whether sanctions are in order but what sanctions are appropriate as a remedy for defendants' open and intentional refusal, for more than 20 months (thus far), to comply with an order that they agreed to in advance, objected to only after the fact, made no effort to test before the district judge, and consequently may not now challenge on appeal. *See* Fed. R. Civ. P. 72(a) ("A party may not assign as error a defect in the [magistrate judge's] order not timely objected to.").

### 1. Defendants' Position

Defendants acknowledge that they "may" be subject to sanctions, Def. Opp. at 1, and "accept that they missed the opportunity to seek a protective order" that, if granted, would have justified their conduct, *id.* at 9 n.7, but nonetheless claim that their noncompliance was "not willful or in bad faith because Brazilian law bars the production of the Subject Documents." *Id.* at 8. On this basis, defendants propose that the sanction be limited to a judicial finding, made "for purposes of this litigation" pursuant to Rule 37(b)(2)(A)(i), that they made unspecified "false statements" in their offering materials, with scienter, and that OEC is the successor of CNO. *Id.* at 7, 16. This solution, they say, "would address any prejudice to Plaintiffs from the unavailability of the Subject Documents." *Id.* at 8.

"Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control." *Figueroa v. W.M. Barr & Co., Inc.*, 2020 WL 996473, at *3 (S.D.N.Y. Mar. 2, 2020) (quoting *Davidson v. Dean,* 204 F.R.D. 251, 255 (S.D.N.Y. 2001)). That test is met here. Defendants do not suggest that the Order was unclear or that they failed to understand it. Nor was their non-compliance due to factors beyond their control. Even assuming, *arguendo*, that they were genuinely caught by surprise when they "received further clarification from Brazilian counsel that their obligations under Brazilian law prevent not only the production of the Drousys system, but also apply more broadly to all documents previously produced to the MPF," Def. Opp. at 6,[5] it is simply not the case that the only option they had was to disobey the Order.

---

[5] Defendants' description of their epiphany is not entirely convincing. They received the RFPs in November 2019, and served objections on January 28, 2020. *See* 9/1/20 Ltr. Mot. Ex. A. In those objections, defendants initially argued that RFPs 1, 3 and 4 "seek[] the production of documents in violation of applicable Brazilian law or orders and/or Defendants' leniency agreement with

Defendants could have objected to the Order, or to the 10/30/20 Order, and pressed their case with the district judge (and, if necessary, on appeal). They did not. They could have sought "prior authorization by the [Brazilian] Federal Prosecutors and the Brazilian competent judge," which according to Barros Pimental would have permitted them to comply with the Order without fear of adverse repercussions in Brazil. *See* Barros Pimental Supp. Op. ¶¶ 1, 7. They did not. With or without advance permission, defendants also had it within their power to obey the Order and face the risk of adverse repercussions in Brazil. While it is possible that this choice would trigger adverse consequences, *see Doubleline IV*, 2021 WL 4596561, at *13, it was nonetheless a choice. This case is thus fundamentally different from those in which a party is genuinely *unable* to comply with a court order. *See, e.g.*, *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 434 (S.D.N.Y. 2011) (declining to sanction a plaintiff where his failure to produce documents "was caused by forces outside the plaintiff's control," namely, the sudden dissolution of the law firm that had been representing him and its failure to forward his file); *M'Baye v. New Jersey Sports Prod., Inc.*, 2008 WL 1849777, at *4 (S.D.N.Y. April 21, 2008) (declining to impose sanctions where the documents that plaintiff failed to produce were held by his former manager, who refused to release them despite repeated requests).

---

Brazilian or other applicable authorities." *Id.* at ECF pages 14, 17-18. After considering the matter for another nine months – during which time they had ample opportunity to consult their Brazilian counsel – defendants told the Court, in September and October 2020, that that they would in fact produce the documents responsive to RFPs 1, 3, and 4, asking only that they not be required to identify which documents were produced to which prosecutors. *See* 9/4/20 Def. Ltr. at 2 ("Defendants have, both in meet and confers and in email, continuously stated that Defendants would in no way withhold any documents responsive to RFP numbers 1, 3, and 4 and would produce such documents that were located through an agreed-upon search and collection, provided, however[,] that they would not specifically identify which documents were provided to the [DOJ] or other regulators."); 10/13/20 Hr'g Tr. 5:19-6:24 (same). It was only after the Court ordered them to do exactly what they offered to do that defendants came to the "updated understanding," Def. Opp. at 6, animating their non-compliance.

As to "good faith," it is true that defendants have been forthright with the Court, since November 13, 2020, concerning their refusal to obey the Order. In the context of discovery sanctions, however, "good faith" does not mean a good faith belief that the disobedient party would have prevailed on a protective order motion that it never made or on Rule 72(a) objections that it never filed. Rather, "good faith" means "good faith efforts to comply" with the court's directions. *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066. Here, no such efforts were made. Moreover, when plaintiffs sought alternative forms of discovery that did not require the production of the documents required by RFPs 1, 3, and 4 – serving requests to admit, interrogatories, and Rule 30(b)(6) deposition notices – defendants took an even more aggressive position, asserting that the information sought by plaintiffs exists "only" in the Drousys system or the documents previously produced to the MPF, such that defendants could not provide *any* discovery, in *any* form or fashion, concerning the key factual assertions made in the TAC. Moreira Decl. ¶ 3. I thus cannot agree with defendants that they acted in good faith.

Moreover, defendants' proposal would not cure the prejudice that plaintiffs have suffered as a result of defendants' disobedience of the Order.

The first element that a plaintiff must show to succeed on a claim under § 10(b) of the Exchange Act and Rule 10b-5 is "a *material* misrepresentation or omission." *DoubleLine II*, 413 F. Supp. 3d at 205 (citing *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013)) (emphasis added).[6] An immaterial false statement is not actionable, even when made with scienter. *See In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (dismissing complaint that "fail[ed] to state a *material* misrepresentation or concealment," which is necessary to "prove

---

[6] The remaining elements are: "(2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Doubleline II*, 413 F. Supp. 3d at 205 (citing *Kleinman,* 706 F.3d at 152).

a violation of the federal securities laws") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)), *aff'd*, 113 Fed. App'x 427 (2d Cir. 2004).

When moving to dismiss the TAC, defendants argued that plaintiffs failed adequately to plead materiality. *DoubleLine II*, 413 F. Supp. 3d at 205. The district judge disagreed, holding that plaintiffs overcame their prior pleading deficiencies by alleging specific new facts – going beyond those admitted to by Odebrecht in the SOF – as to the scale of Odebrecht's bribery scheme, the "escalating" amount of bribes paid from 2010 through 2014, the amount of its yearly contract revenue (from Petrobras) illegally obtained through bribes, and certain specific bribes, paid to secure specific contracts, that should have been reported as expenses associated with those contracts. *Id.* at 207-09. These facts, taken as true at the pleading stage, showed that CNO's financial statements violated Brazilian GAAP, and therefore also showed that CNO made "*materially* false and misleading statements about [its] financial strengths and ability to manage political risk." *Id.* at 211-12 (emphasis added).

At trial, of course, it is not sufficient for plaintiffs to allege the facts necessary to establish materiality; they must prove them. That is why plaintiffs want to see (and I ordered defendants to produce) the documents that Odebrecht provided to the Department of Justice and other authorities concerning the bribery scheme. In violation of the Order, however, defendants have for the past 20 months not only refused to produce those documents; they have refused either to admit the facts that plaintiffs allege or permit other discovery into them (by interrogatory or deposition), claiming, in effect, that "applicable foreign law" prevents them from divulging any *information* previously shared with a prosecutor, except for the negotiated admissions contained in the Leniency Agreement and the SOF. As a practical matter, therefore, the limited sanction proposed by defendants – which would establish only that they made "misrepresentations," without specifying

what those misrepresentations were or whether they were material – would doom plaintiff's case, by making it impossible for them to establish the first element of their claim, and would thus improperly reward defendants for their discovery misconduct.

Consequently, I reject defendants' proposal.

### 2.    Plaintiffs' Position

Plaintiffs seek the ultimate sanction – the entry of a default judgment against defendants. Pl. Mem. at 2, 16-20. This would of course relieve them of the burden of proving materiality. It would also relieve them of the burden of proving *any* of the elements of their federal securities fraud claims, including reliance and damages, which do not depend in any significant way upon the discovery that defendants have thwarted.[7] In that respect, the sanction sought by plaintiffs could represent something of a litigation windfall for them. Moreover, it is not, in my judgment, "the least harsh sanction that will remedy the discovery violation and deter such conduct in the future," *Grammar v. Sharinn & Lipshie, P.C.*, 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016), and is not necessary to cure the prejudice that plaintiffs have suffered. Since a default judgment is best reserved for cases "where no other sanction will suffice," *id.* (citing *Agiwal*, 555 F.3d at 302), I decline to recommend it here.

Plaintiffs also propose coercive civil contempt sanctions, arguing that a penalty of $10,000 per day might cause defendants to comply with the Order at long last. Pl. Mem. at 22. I agree that

---

[7] Plaintiffs have alleged both substituted reliance under the "fraud on the market" and *Affiliated Ute* presumptions, TAC ¶¶ 299-300, and direct reliance on defendants' misrepresentations and omissions. TAC ¶¶ 294-298. Under the fraud on the market presumption, it is plaintiffs' burden to show that the alleged misrepresentations were publicly transmitted into a "well-developed" market. *GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 252 (S.D.N.Y. 2013). To establish direct reliance, it is plaintiffs' burden to show that "but for" defendants' misrepresentations or omissions, they would not have purchased the Odebrecht Notes. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

defendants have failed to comply with a "clear and unambiguous" order of this Court, that their intransigence is unmistakable, and that they have not "diligently attempted to comply [with the Order] in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). However, "[t]he purpose of civil contempt, broadly stated, is to compel a reluctant party to do what a court requires of [it]." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986). "It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014). Thus, in exercising its contempt discretion, a district court must consider "the probable effectiveness of any suggested sanction in bringing about compliance[.]" *Chase Bank USA, N.A. v. M. Harvey Rephen & Assocs., P.C.*, 2019 WL 13046982, at *4 (S.D.N.Y. Aug. 16, 2019) (Woods, J.) (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). Here, it is highly unlikely that a daily fine would convince defendants to comply with the Order. Nor would it benefit plaintiffs. Consequently, contempt sanctions are not the appropriate tool to remedy defendants' discovery misconduct. *See Joint Stock Co. Channel One Russia Worldwide*, 2018 WL 4760345, at *11 (declining to recommend coercive contempt sanctions where the exercise would likely be "bootless"); *SD Prot., Inc. v. Del Rio*, 587 F. Supp. 2d 429, 435 (E.D.N.Y. 2008) (declining to impose coercive sanctions where "the effectiveness of any additional monetary sanction in compelling SD Protection's compliance with the Court's Orders is doubtful").

### 3. Sanctions

Although the judicial findings proposed by defendants would be an inadequate sanction, a more robust set of findings, coupled with a fee award, would be "commensurate" with the non-compliance, S*hcherbakovskiy*, 490 F.3d at 140, and would adequately cure the prejudice flowing from defendants' discovery misconduct. *See Shanghai Weiyi*, 2017 WL 2840279, at *11 (where

"discovery misconduct has deprived the opposing party of key evidence needed to litigate a contested issue, an order prohibiting the disobedient party from contesting that issue – or simply directing that the matter be taken as established – is also appropriate"); *Joint Stock Co. Channel One Russia Worldwide*, 2018 WL 4760345, at *13 (finding defendant's discovery misconduct "willful" but eschewing contempt sanctions in favor of a "moderate" remedy including an order taking certain facts as established). Thus, rather than simply establish that defendants made unspecified misrepresentations and omissions, the Court will establish that they made all of the misrepresentations and omissions alleged in the TAC concerning the Odebrecht Notes, and that those misrepresentations and omissions were material. In addition (and as invited by defendants), the Court will establish that defendants made those material misrepresentations and omissions with scienter, and that OEC is the successor of CNO.

## III.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for discovery sanctions is GRANTED.

It is hereby ORDERED, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i), that the following facts shall be taken as established for purposes of this action:

(1)    Defendants made all of the misrepresentations and omissions alleged in plaintiffs' Third Amended Complaint concerning the Odebrecht Notes.

(2)    Those misrepresentations and omissions were material.

(3)    Defendants made those material misrepresentations and omissions with scienter.

(4)    Defendant Odebrecht Engenharia e Construção S.A. is the successor of defendant Construtora Norberto Odebrecht, S.A.

It is further ORDERED, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii), that defendants are precluded from offering evidence or argument to contest these established facts.

It is further ORDERED, pursuant to Fed. R. Civ. P. 37(b)(2)(C), that defendants shall pay the reasonable expenses, including attorneys' fees and out-of-pocket costs, caused by their failure to obey this Court's Order dated October 14, 2020, including expenses incurred by plaintiffs in (a) seeking additional discovery to substitute for the documents that defendants refused to produce; and (b) preparing and pursuing the instant sanctions motion.

It is further ORDERED that plaintiffs shall file one or more declarations setting forth those expenses no later than **August 9, 2022**, and shall attach the relevant time and expense records, including attorney time records and invoices for out-of-pocket expenses. Defendants may file responding papers, limited to the amount of fees and costs to be awarded, no later than **August 23, 2022**. There shall be no reply.

All relief not expressly granted herein is DENIED.

The Clerk of Court is respectfully directed to close the motion at Dkt. 219 and to **file this Opinion and Order under seal, at the "selected parties" viewing level, such that only the attorneys appearing for the parties, and court personnel, may view it.** By separate order, the Court will give the parties an opportunity to submit proposed redactions before this Opinion and Order is filed in public view.

Dated:  New York, New York             **SO ORDERED**.
        July 19, 2022

_____
**BARBARA MOSES**
**United States Magistrate Judge**