**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOUBLELINE CAPITAL LP; DOUBLELINE INCOME SOLUTIONS FUND; and DOUBLELINE FUNDS TRUST (on behalf of its: 1) DOUBLELINE CORE FIXED INCOME FUND SERIES; 2) DOUBLELINE EMERGING MARKETS FIXED INCOME FUND SERIES; and 3) DOUBLELINE SHILLER ENHANCED CAPE® SERIES), | No. 1:17-cv-4576-GHW-BCM |
| Plaintiffs, | |
| v. | |
| CONSTRUTORA NORBERTO ODEBRECHT, S.A.; ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.; and ODEBRECHT, S.A. | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINIONS</u>**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY.................................................. 1

A.    The Bribery Scheme and Plaintiffs' Purchases of Defendants' Bonds ..................................................................................................... 1

B.    Procedural History ........................................................................... 2

C.    Expert Reports .................................................................................. 3

      1.    The Unni Report .................................................................... 4

      2.    The Smith Report .................................................................. 6

LEGAL STANDARD............................................................................................... 8

A.    Loss Causation and Damages in Securities Fraud Actions.................... 8

B.    Rule 702 and *Daubert*...................................................................... 8

ARGUMENT ........................................................................................................... 10

The Court should exclude Dr. Unni's testimony as unreliable. .......................... 10

A.    Dr. Unni's event study does not reliably approximate the Subject Bonds' behavior absent the alleged corrective disclosures................... 10

B.    Dr. Unni fails to isolate the effect of the alleged corrective disclosures on the returns of the Subject Bonds. ..................................... 14

C.    Dr. Unni's analysis suffers from additional methodological errors that further discredit its reliability........................................................ 16

CONCLUSION......................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002).................................................................................. 9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014).................... 17

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014)................................................................................... 10, 17

*Carpe v. Aquila, Inc.*,
No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005)......................... 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................... 8, 9, 13, 17

*Disabled in Action v. City of New York*,
360 F. Supp. 3d 240 (S.D.N.Y. 2019)....................................................................... 9

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019)....................................................................... 2, 8

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
No. 17-CV-4576, 2022 WL 3029014 (S.D.N.Y. July 19, 2022)....................................... 2, 3

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................................ 8

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
No. 11-Civ-4209 (KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ........................... 11

*In re Exec. Telecard Ltd. Sec. Litig.*,
979 F. Supp. 1021 (S.D.N.Y. 1997)......................................................................... 11, 13

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)....................................................................... 8, 9

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
982 F.3d 113 (2d Cir. 2020).................................................................................... 9, 16

*In re N. Telecom Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................... 14, 15

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...................................................................................... 8

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)...................................................................................... 9

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007).................................................................. 14

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).................................................................................................. 9, 17

*Sciallo v. Tyco Int'l Ltd.*,
No. 03-Civ-7770 (KBF), 2012 WL 2861340 (S.D.N.Y. July 9, 2012) ........................... 8

**Rules and Statutes**

Fed. R. Evid. 702 ........................................................................................................... 9

**Other Authorities**

*Center for Research in Security Prices, LLC*, https://www.crsp.org/................................. 13

Expert Report of Sanjay Unni, Ph.D................................................................................ 2, 4, 13

Expert Report of David A. Smith, Ph.D. ......................................................................... *passim*

*Yahoo! Finance*, https://finance.yahoo.com/ ................................................................... 13

Defendants Odebrecht S.A. – Em Recuperação Judicial ("Odebrecht"), Construtora Norberto Odebrecht, S.A. ("CNO"), and Odebrecht Engenharia E Construção S.A ("OEC," and collectively, "Defendants") respectfully submit this memorandum in support of their motion to exclude the expert report and opinions of Dr. Sanjay Unni and to preclude plaintiffs DoubleLine Capital LP, DoubleLine Income Solutions Fund, and DoubleLine Funds Trust (collectively, "Plaintiffs") from relying on Dr. Unni's opinions for any purpose in this action.

## PRELIMINARY STATEMENT

Event studies are frequently used in securities cases in an effort to isolate the price effect on the relevant securities of an alleged fraud and related corrective disclosures. But the event study offered by Plaintiffs' expert, Dr. Sanjay Unni, does not accomplish that basic purpose because of fatal methodological flaws. Key inputs to Dr. Unni's event study—such as the baseline securities indices against which he compares the securities at issue—are inapt comparisons for Defendants' bonds. And the outputs of Dr. Unni's event study make clear that he failed to disentangle the effect of the alleged corrective disclosures from confounding factors unrelated to the alleged fraud. These fundamental, but highly technical, defects with Dr. Unni's analysis are the sort that should prevent his opinions from reaching a jury—they are not questions of weight that jurors can be expected to solve for themselves. Defendants respectfully request that the Court exercise its "gatekeeper" function under *Daubert* to exclude Dr. Unni's opinions.

## BACKGROUND AND PROCEDURAL HISTORY

### A.  The Bribery Scheme and Plaintiffs' Purchases of Defendants' Bonds

As the Court is aware, in December 2016, Defendants admitted the existence of an illegal bribery scheme that principally involved the payment of bribes by former Odebrecht executives

to certain private and governmental entities and individuals in connection with the awarding and performance of construction projects ("Bribery Scheme").  *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576, 2022 WL 3029014, at *3 (S.D.N.Y. July 19, 2022) ("Sanctions Order").  Defendants entered into multiple leniency agreements, pleaded guilty to crimes in the United States, and made expansive binding admissions about the payment of bribes.  *See id.* at *3–5.

Plaintiffs are three related investment companies that, as of June 18, 2015, held two series of bonds issued by Defendants' affiliates.  *See id.* at *3 & n.3.  Dr. Unni reports that as of that date, Plaintiffs held a total face amount of $37 million of a series of notes that carried a 7.125% coupon rate and that were due on June 26, 2042 (the "7.125% Notes"), and that Plaintiffs held a total face amount of $11.350 million of a series of perpetual notes with a 7.50% coupon rate (the "7.50% Notes," and together, the "Subject Bonds").  *See* Declaration of Thomas S. Kessler, Ex. A, Expert Report of Sanjay Unni, Ph.D. at ¶¶ 16–17 (Nov. 7, 2022) ("Unni Report").

### B.  Procedural History

Plaintiffs filed this action on June 16, 2017, ECF No. 1, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as pendent state law. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 199 (S.D.N.Y. 2019).  To prevail on those claims, Plaintiffs must prove that Defendants made material misrepresentations or omissions with scienter in connection with the purchase or sale of a security; that Plaintiffs relied on those misstatements or omissions; and that Plaintiffs suffered economic loss as a result of Defendants' misrepresentations or omissions.  *Id.* at 205 (citing

*Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

Fact discovery began in October 2019.  ECF No. 83.  During fact discovery, Plaintiffs requested certain documents and other information that Defendants were unable to produce given Defendants' confidentiality obligations under applicable foreign law.  *See generally* ECF No. 224.  After several rounds of motions practice, as a discovery sanction, this Court established several elements of Plaintiffs' claims for purposes of this case, but expressly declined to establish three elements—reliance, loss causation, and damages—leaving them for further litigation.  Sanctions Order, 2022 WL 3029014, at *12 (establishing remaining elements would "represent something of a litigation windfall" for Plaintiffs).  Discovery closed on February 28, 2023.  *See* ECF No. 278.  Defendants submitted a letter motion regarding their anticipated motion to exclude Plaintiffs' expert opinions on March 30, 2023, and Judge Woods set a briefing schedule and referred the motion to this Court following a conference on April 6, 2023.  *See* ECF Nos. 285 & 288–89.[1]

### C.  <u>Expert Reports</u>

With three elements of their claims still to prove, Plaintiffs disclosed one expert report, the Unni Report, on November 7, 2022 as purported expert evidence of loss causation and damages.  Dr. Unni's report relies principally on an "event study," an analysis that is meant to isolate the effects of the alleged fraud on the returns of the relevant securities by "identif[ying] abnormal returns due to truly abnormal price fluctuations—such as those potentially due to the [alleged fraud]—and exclud[ing] from consideration ordinary price fluctuations."  Declaration of

---

[1] Both sides also raised proposed motions for summary judgment in their pre-motion letters.  *See* ECF Nos. 283 & 285.  Judge Woods slated the proposed motions for summary judgment to follow this *Daubert* motion, if necessary.  *See* ECF No. 288.

Thomas S. Kessler, Ex. B, Expert Rebuttal Report of David A. Smith, Ph.D., at 19 (Jan. 6, 2023) ("Smith Report").  Defendants in turn submitted a rebuttal expert report from Dr. David Smith, an economist and Vice President at Analysis Group Inc., on January 6, 2023.  *See generally* Smith Report.[2]

### 1.  The Unni Report

Dr. Unni offers his event study in an effort to estimate whether and to what extent the "corrective disclosures" alleged in Plaintiffs' complaint affected the price of the Subject Bonds.  *See* Unni Report at 3.  Dr. Unni asserts that a properly conducted event study includes three primary steps:

> (1) measuring the returns of the Subject Bonds on each day within the Relevant Period, (2) identifying a suitable benchmark index to measure the expected returns of the Subject Bond Portfolio in the absence of the news being analyzed, and (3) establishing a criterion to determine if the difference between these returns (i.e., the abnormal return) is statistically significant.

*Id*. at 23.[3]  Following his recipe, Dr. Unni first calculated the returns of the Subject Bonds and selected a benchmark index against which to compare them.  *Id.* at 25.

For his benchmark, Dr. Unni chose the JP Morgan CEMBI Broad Diversified BBB index for the portion of the Relevant Period when the Subject Bonds were rated BBB, and then selected the JP Morgan CEMBI Broad Diversified High Yield index for the remainder of the period after the Subject Bonds were downgraded to a BB+ rating.  *Id.* at 25–27.  Although Dr. Unni touts these indices as "widely followed . . . by investors," *see id.*, he offers no meaningful qualitative or quantitative analysis to justify his decision to use them as benchmarks for the

---

[2] Neither party conducted depositions of their respective experts.

[3] Dr. Unni defines "Relevant Period" as the period between June 19, 2015—when he claims the alleged corrective disclosures began—and May 6, 2016—when he claims that the alleged fraud was fully revealed to the market.  *See* Unni Report at 3.  This is the period for which Dr. Unni conducts his event study.

Subject Bonds apart from the similarity in credit ratings for the Subject Bonds and those contained in the index. *See id.* As Dr. Unni concedes, his chosen benchmark indices are broadly focused on "corporate entities in emerging markets"—rather than particularly on Defendants' industry or region—and include securities issued by companies in the Financials and Technology, Media and Telecom industries and that are located in Asia, the Middle East, and Europe. *See id.* at 26.

With the benchmark set, Dr. Unni then purports to determine whether any differences between the returns of the Subject Bonds and of the benchmark are statistically significant in his view. This includes a few steps:

- Dr. Unni first calculates "abnormal returns" on the Subject Bonds during the Relevant Period by taking the difference between the returns on the Subject Bonds and the returns on the benchmark index. *Id.* at 23–27.

- Next, Dr. Unni applies a *t*-test in an effort to determine whether any observed "abnormal returns" are statistically significant. *Id.* at 23, 27–28.

- Finally, Dr. Unni identifies days during the Relevant Period on which both (i) supposed corrective disclosures were made and (ii) the Subject Bonds experienced statistically significant abnormal returns. *Id.* at 29–39.

Dr. Unni identified nineteen days during the Relevant Period that he claims fit that bill, using the cumulative losses in the Subject Bonds' market value on those days to calculate Plaintiffs' alleged damages. *Id.* at 29–39. Notably, Dr. Unni made no effort to account for other events happening on those nineteen days (often known colloquially as "confounding factors"): if a day during the Relevant Period met his test described above and the price of the Subject Bonds declined on that day, he added that decline to the damages tally, no matter what else might have happened in the world that day or how those events may have affected the Subject Bonds' price disproportionately from the targeted indices. *See id.* at 22–23. Dr. Unni's bottom-line

conclusion is that the fraud alleged in Plaintiffs' complaint caused Plaintiffs $17.307 million in damages.  *See id.* at 4, 18, 39.

### 2. The Smith Report

Dr. Smith, an economist with significant academic and professional experience analyzing event studies in the bond context, carefully reviewed Dr. Unni's event study methodology and came to the conclusion that it was "inconsistent with standard practice[,] . . . unreliable[,] and prone to falsely identifying statistically significant abnormal returns."  Smith Report at 6–7.  Dr. Smith's analysis focuses on two primary flaws with Dr. Unni's methods and results, and he also identifies a number of other missteps that further support the exclusion of Dr. Unni's opinions.

First, Dr. Unni selected ill-fitting benchmarks for his study, which renders unreliable any "abnormal returns" observed by comparing the Subject Bonds to the indices.  *See id.* at 10–12.  Not only are his benchmark indices mostly composed of securities issued by companies from entirely different regions and industries than Defendants, *see id.*, but the returns on the benchmark indices were at best loosely correlated to the returns on the Subject Bonds during the year before the Relevant Period and during the Relevant Period itself.  *Id.* at 13–14.

Second, Dr. Unni failed to "isolate the effects of the [alleged corrective disclosures]" on the Subject Bonds' returns from other confounding factors that could have affected the returns just the same.  *Id.* at 6.  Instead, on each day with supposedly significant abnormal returns and a claimed corrective disclosure, Dr. Unni assumes that the abnormal returns were caused entirely by the alleged corrective disclosure, *id.* at 26–27, despite the clear indications in Dr. Unni's report that confounding factors were at play during the Relevant Period.  *See id.* at 32–34.  As Dr. Smith observes, because Dr. Unni does not disentangle the price fluctuations caused by these

confounding factors (or even attempt to), it is impossible for him to reliably estimate the price movements caused by the alleged corrective disclosures.  *Id.* at 27, 31, 38.

In addition to these two fundamental (and independently fatal) flaws in Dr. Unni's methodology, Dr. Smith also highlights a litany of other issues with Dr. Unni's work.  For example:

- Dr. Unni's construction of the "subject bond portfolio" is inconsistent with standard practice for measuring abnormal bond performance.  *Id.* at 14.  Dr. Unni focuses only on "a market-value weighted average of the returns experienced by each of the Subject Bonds[,]" rather than considering the returns of any other Odebrecht bonds held by Plaintiffs, and in doing so ignores "approximately half of the available information on how the Subject Conduct affected expectations of Odebrecht's cash flow prospects."  *Id.* at 14–15.  This "novel approach" is not only contrary to the academic literature in the field generally, but specifically contradicts authorities that Dr. Unni himself cites.  *Id.* at 14–16.

- In calculating statistical significance, Dr. Unni heavily relies on the critical and entirely unsupported assumption that price fluctuation during the year prior to the Relevant Period is approximately equal to price fluctuation during the Relevant Period itself.  *Id.* at 19.  As Dr. Smith analogizes, Dr. Unni "calibrates a standard wave on a calm day and attempts to identify comparatively large waves during a storm" by using a *t*-test to determine statistical significance.  *Id.* at 20.  But Dr. Unni can only use this *t*-test because he assumes that any abnormal returns are normally distributed.  *Id.* at 23.  It is not only possible, but likely, that this assumption is incorrect, which would increase the likelihood of false positives.  *Id.* at 25.

- Dr. Unni fails to correct for the fact that his analysis tests multiple hypotheses.  *Id.* at 25.  In simultaneously testing abnormal returns from each day with alleged corrective disclosures during the Relevant Period—fifty-nine tests in total—Dr. Unni creates a near certainty of unreliably identifying statistically significant abnormal returns in his analysis.  *Id.* at 26.

For each of these reasons, Dr. Smith concludes that Dr. Unni's analysis is methodologically unfit, and its resulting damages estimate is "unreliable."  *Id.* at 6.

## LEGAL STANDARD

### A.  Loss Causation and Damages in Securities Fraud Actions

A securities fraud claim requires proof of loss causation and damages.  *See DoubleLine*, 413 F. Supp. 3d at 199.  On the former, the Supreme Court has recognized that a "tangle of factors" affect the price of a security, which raises a challenge for plaintiffs to prove that defendant's misrepresentations or omissions do not simply "'touch upon' a loss [but] *cause* a loss, [as] it is the latter that the law requires."  *Dura*, 544 U.S. at 343 (emphasis in original).  Given this challenge, plaintiffs often look to expert opinions based on event studies, which "seek[] to isolate various 'events' and thereby determine [the] relationship between the alleged [corrective] disclosure, the misstatement, and the share price decline."  *Sciallo v. Tyco Int'l Ltd.*, No. 03-Civ-7770 (KBF), 2012 WL 2861340, at *3 (S.D.N.Y. July 9, 2012) (internal citations omitted).  This focus on isolating the effects of alleged corrective disclosures, as opposed to other market factors, is critical, because an event study does not demonstrate loss causation where it "merely links the decline in the value of [the securities] to various events" rather than "show[ing] a price decline due to a corrective disclosure."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512–13 (2d Cir. 2010) (internal quotations omitted).

### B.  Rule 702 and *Daubert*

As the Court is familiar, the admissibility of expert opinions is governed by Federal Rule of Evidence 702 and the *Daubert* standard.  *See, e.g.*, *In re Libor-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d. 430, 499 (S.D.N.Y. 2018) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).  Rule 702 allows opinion testimony from an expert witness if the proponent demonstrates to the court that "the testimony is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of

the case." *See* Fed. R. Evid. 702(c)–(d).  An expert's analysis must be "reliable at *every step* . . . any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."  *See Libor*, 299 F. Supp. at 499–500 (internal citations omitted) (emphasis added).  And it is the party offering expert testimony which bears the burden of establishing, by a preponderance of the evidence, that the testimony satisfies Rule 702.  *Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 243 (S.D.N.Y. 2019).

*Daubert* in turn makes clear that it is the Court which must play a "gatekeeping" role to determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.  509 U.S. at 579, 597; *see also In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).  This gatekeeping obligation is applicable to testimony based on "technical" and "other specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  Accordingly, the Court "should undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (emphasis added) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  That includes looking to what is generally accepted by other experts in the field to make "certain that [Dr. Unni] . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Amorgianos*, 303 F.3d at 265–66 (quoting *Kumho Tire*, 526 U.S. at 152).

And, more specifically, the Court must "take a hard look at" Dr. Unni's report to confirm that his "methodology [is] reliable at every step of the way."  *In re Mirena*, 982 F.3d at 123.  Although reliable expert evidence can be illuminating, unreliable expert evidence may confuse

the jury; *Daubert*'s gatekeeping requirement is meant to protect against precisely that risk.  As a result, where the Court finds an event study lacks sufficient reliability, the event study cannot be presented to a jury.  *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 90, 95 (1st Cir. 2014).

## ARGUMENT

### The Court should exclude Dr. Unni's testimony as unreliable.

The point of an event study is to isolate the effects of an alleged fraud on the returns of the securities at issue, removing the effects of extraneous and confounding factors unrelated to the alleged fraud.  Although that is what Dr. Unni appears to have set out to do, he failed along the way in two critical respects, each discussed below.  Those issues render his event study, and the faulty conclusions Dr. Unni derives from it, so unreliable as to be inadmissible under Rule 702 and *Daubert*.  The Court should exclude Dr. Unni's opinions, just as other courts in this district and elsewhere have when confronted with event studies suffering from similar technical and methodological flaws.

### A. Dr. Unni's event study does not reliably approximate the Subject Bonds' behavior absent the alleged corrective disclosures.

In an event study, the benchmark index serves as a stand-in for the "but-for" world—i.e., to approximate how the relevant securities would be expected to perform but-for the alleged fraud and resulting corrective disclosures.  *See* Smith Report at 6.  That role demands the selection of a benchmark composed of securities that closely resemble the securities at issue.[4]

---

[4] *See* Smith Report at 10 ("[A] suitable benchmark for the Subject Bonds would comprise bonds issued by companies with exposure to industries and geographies similar to those that Odebrecht operated in and therefore would be affected by economic events affecting those industries and geographies in a manner similar to Odebrecht's bonds.  On the other hand, returns of a benchmark comprising bonds issued by companies in different industries and geographies than Odebrecht would not be expected to experience the expected returns of the Subject Bonds absent

Yet, Dr. Unni's benchmark indices are so far afield of the industry and region where Defendants' operate that they simply cannot perform their intended function.  That is grounds for exclusion.

Courts recognize that a reliable event study must use an appropriate benchmark to approximate the behavior of the relevant securities in the absence of the events being studied, and that failing to do so subjects an expert's opinion to exclusion.  *See, e.g.*, *In re Exec. Telecard Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding an expert's opinions even where the relevant security and benchmark reflected securities from the same industry because they did not behave similarly due to differences in volatility); *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, No. 11-Civ-4209 (KBF), 2013 WL 5815472, at *15–16 (S.D.N.Y. Oct. 29, 2013) (rejecting opinions where expert failed to account for markets that were more relevant to the securities at issue than the market the expert actually studied); *see also Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (citing *In re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 457–460 (S.D.N.Y. 2000)) (rejecting an expert's event study because the expert did not compare the securities in question either to a benchmark of similar companies or to the relevant industry as a whole).

Dr. Unni's chosen benchmark indices badly miss the mark.  First, although Defendants are construction companies with operations concentrated primarily in Latin America, *see* Smith Report at 10–11, Dr. Unni's benchmarks sweep in a broad range of securities of companies from completely different industries—Financials and Technology, Media & Telecom—and regions— Asia, the Middle East, and Europe—ignoring Defendants' own almost entirely.  *Id*. at 11–12.  In fact, Dr. Smith estimated that almost half of Defendants' construction work during the Relevant

---

the Subject Conduct, and differences between the returns of the Subject Bonds and an unsuitable benchmark could not be reliably attributed to Odebrecht-specific news.").

Period was slated to take place in Brazil and Venezuela, and yet only between five to twelve percent of the bonds in Dr. Unni's benchmark come from Brazil and almost none come from Venezuela. *Id*. As a result of these significant differences, the benchmark indices and the Subject Bonds cannot reliably be expected to react similarly to market news; thus, some the major economic crises that were impacting the Brazilian and Venezuelan markets (and thus, the returns on the Subject Bonds) during the Relevant Period would have had little, if any, impact on Dr. Unni's benchmark indices. *Id*. at 12.

Dr. Smith quantified the effects of these differences on the comparison Dr. Unni attempts to draw. That effort revealed that the returns on Dr. Unni's benchmarks were at best loosely correlated with those of the Subject Bonds in the year before the alleged corrective disclosures began. *See id*. at 13–14. The Subject Bonds and Dr. Unni's selected benchmarks had a correlation coefficient of only 0.31 (on a scale of -1.0 to 1.0, where -1.0 represents perfect inverse correlation, 1.0 represents perfect positive correlation, and zero represents the absence of any linear correlation). In other words, the correlation coefficient indicates that there is some relationship between the movements of the Subject Bonds and the benchmarks, but a weak one at best. A correlation coefficient of 0.31 is particularly low—while securities issued by companies in the same industry tend to have higher correlation coefficients (such as financial services firms JP Morgan and Goldman Sachs, which have a correlation coefficient of 0.81), the correlation coefficient observed between the Subject Bonds and Dr. Unni's indices is much more in line with what one would expect from issuers in unrelated industries (for instance, Coca Cola and the

pharmaceutical company Merck & Co. have a correlation coefficient of 0.31).[5]  And during the Relevant Period, the correlation was even worse.  *See id.* at 14.

These figures demonstrate that the indices that Dr. Unni chose are not benchmarks for the Subject Bonds at all—they provide no reliable approximation for the performance of the Subject Bonds but-for the alleged fraud, as the benchmark indices and the Subject Bonds cannot be expected to (and, as discussed below, did not) react similarly to the same market news or macroeconomic factors on a given day.

As Dr. Smith explains, a highly correlated benchmark is critical to an event study, and the comparison between the at-issue securities and the benchmark is the basis for the rest of the event study.  Therefore, Dr. Unni's error here infects the entirety of his analysis.  *See* Unni Report at 27 ("With these choices of benchmark index returns, the abnormal return of the Subject Bond Portfolio on a given day is measured as the return on the Bond minus the return on the benchmark index that day.").  The choice of a benchmark is a technical decision that is fundamental to the reliability of the event study, and, as ample case law and the Federal Rules of Evidence reflect, it is a decision that the Court is far better positioned to evaluate than a lay jury.  *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.").  The Court should exclude Dr. Unni's opinions on this basis.  *See Exec. Telecard*, 979 F. Supp. at 1027.

---

[5] Correlation coefficients may be calculated based on publicly available stock price data sourced from the *Center for Research in Security Prices, LLC*, https://www.crsp.org/ (last visited June 2, 2023), or *Yahoo! Finance*, https://finance.yahoo.com/ (last visited June 2, 2023).

### B. **Dr. Unni fails to isolate the effect of the alleged corrective disclosures on the returns of the Subject Bonds.**

In addition to using a suitable benchmark, a reliable event study must account for factors that affect the price of the relevant securities <u>other</u> than the disclosure of the alleged fraud.  To do otherwise would taint an expert's damages calculation by sweeping in lost value that cannot be tied to the alleged fraud.  Although an expert may have some leeway in deciding how to disaggregate these "confounding factors," the expert cannot simply "[make] a judgment call as to confounding information without any methodological underpinning." *Bricklayers*, 752 F.3d at 90, 95 (excluding an expert's event study where the expert simply "attributed a rough proportion of the movement to each [corrective disclosure] or blamed it all on the defendants").  And the expert cannot flatly refuse to "differentiate between fraud and non-fraud effects on note prices," especially in the face of confounding factors like "general economic conditions, broad market trends, [or] industry-specific stresses." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1275, 1256 (N.D. Okla. 2007); *see also N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 460 (criticizing expert for failure to "rule out . . . alternative causes" for security's price movements).

That is exactly Dr. Unni's approach.  He made no effort to disentangle the effects (if any) that the alleged corrective disclosures had on the price of the Subject Bonds during the Relevant Period from the effects of the many confounding factors in play at that time.  *See* Smith Report at 36–38.  For that matter, Dr. Unni's report does not even try to justify that decision, or explain why removing the readily apparent effects of non-fraud factors was not necessary here.  *See id.*

Nor could he, given that the consequences of Dr. Unni's decision are manifest in his results.  For example, the two series of Subject Bonds experienced divergent movements on the same day and offsetting movements on subsequent days.  In other words, there were days where the price of one series of Subject Bonds increased while, on that same day, the other series

decreased in price, and other days where the prices would change materially, only to reverse course and return to its pre-jump price in the following days. Smith Report at 27–31. Both of these anomalies are highly unusual,[6] and they "indicate[], at a minimum, that additional investigation is warranted" to determine that corrective disclosures, and not some confounding factors, caused the changes in price. *Id*. at 28. Similarly puzzling is the fact that Dr. Unni's event study identifies "statistically significant abnormal returns" for the Subject Bonds on dates when <u>no</u> corrective disclosures are alleged to have occurred at all, and other times identifies no such abnormal returns on dates when corrective disclosures <u>were</u> alleged to have occurred. That shows that "statistically significant abnormal returns can be caused by factors other than the [corrective disclosures], and that any estimate of the effect of the [corrective disclosures] must isolate" that effect from the effect of confounding factors. *Id*. at 31. But Dr. Unni offers nothing to explain these anomalous results, much less suggest why he should be allowed to brush them aside while relying on the portions of his event study that support Plaintiffs' legal theories. *See id.* at 31–36.

Importantly, Dr. Unni makes no attempt "to remove the effects on [the Subject Bonds'] price of market and industry information." *N. Telecom*, 116 F. Supp. 2d at 460. For example, Dr. Unni did not account for any of a number of well-publicized events—unrelated to the alleged fraud but potentially material to the returns for the Subject Bonds—that became public on Dr. Unni's alleged corrective disclosure dates. *See id.* at 32–34 (describing that statistically significant and negative abnormal returns on the Subject Bonds coincided with news of steep

---

[6] *See* Smith Report at 28 ("I would not expect news to cause an increase in price for one of the Subject Bonds and a decrease in price for the other."); *id.* at 30 ("It is unusual for bond prices to experience large, offsetting returns on subsequent days. Such offsetting returns suggest a temporary dislocation of prices on one day that were corrected—or 'undone'—on the subsequent day.").

declines in the Brazilian stock market's average performance, a credit downgrade to Odebrecht's offshore drilling arm, and the impeachment of Brazilian President Dilma Rousseff). In light of this, Dr. Unni cannot (and does not attempt to) justify his assumption that, for each of the nineteen days with both supposedly significant abnormal returns and a claimed corrective disclosure, 100% of the abnormal returns were caused by the alleged corrective disclosure. Smith Report at 26–27. Dr. Unni's error is made more glaring given his highly anomalous results, which can only be explained by the fact that his damages estimate includes the effects of (potentially many) confounding factors that Dr. Unni chooses not to disaggregate and is, by his definition, not limited to the supposed price effects of the alleged fraud. *See id*. at 36.

In sum, Dr. Unni asserts that the Subject Bonds' value was materially affected by the alleged corrective disclosures, except when it wasn't (either in whole or in part), and that there were no other factors that contributed to statistically significant price drops, except on days when those drops occurred without any corrective disclosures. A core purpose of an event study is to isolate the effect of the alleged corrective disclosures. Because Dr. Unni's purported event study does not achieve this task, it is not a reliable estimate of damages caused by the alleged fraud, and he should not be allowed to present it to a jury as if it were. *See Bricklayers*, 752 F.3d at 95.

### C. **Dr. Unni's analysis suffers from additional methodological errors that further discredit its reliability.**

The fundamental errors discussed above each serve as an independent basis for excluding Dr. Unni's opinions. *In re Mirena*, 982 F.3d at 123 (specifically, the Court must "take a hard look at" expert evidence to confirm that the "methodology [is] reliable at every step of the way."). But the problems do not stop there. Dr. Smith catalogues a number of additional methodological errors in Dr. Unni's analysis, including (1) Dr. Unni's non-standard approach to constructing the Subject Bond portfolio (contrary to his own cited authority), Smith Report at 14;

(2) Dr. Unni's unsupported assumptions in his approach to calculating statistical significance, *id.*

at 25; and (3) his failure to correct for testing multiple hypotheses, *id*. *Daubert* requires a

holistic analysis of an expert's methodology, and each of these errors chips away at the reliability

of Dr. Unni's analysis.  As the First Circuit affirmed in *Bricklayers*, multiple flaws with an event

study add up to the point where the analysis lacks the reliability to reach a jury.  *See* 752 F.3d at

96 (affirming district court exclusion of event study that had multiple methodological flaws).[7]

\*          \*          \*

As the Court knows, while expert testimony can be a powerful tool to assist jurors, it can

confuse and mislead where it is flawed in ways that are difficult for jurors to understand.  *See*

*Kumho Tire*, 526 U.S. at 149 (explaining that the Court's gatekeeping obligation extends to

technical knowledge because "the trial judge's effort to assure that the specialized testimony is

reliable and relevant can help the jury evaluate that foreign experience").  That is why *Daubert*

requires the Court to scrutinize an expert's analysis to ensure it is reliable at every step.  509 U.S.

at 597 (tasking the Court with "a gatekeeping role" of "ensuring that an expert's testimony . . .

rests on a reliable foundation").  Where the expert analysis does not clear that bar, the Court

should exclude it, not leave lay jurors to struggle through the issues themselves.  And here, the

analysis underlying Dr. Unni's opinions is flawed each step of the way.  First, Dr. Unni selects a

benchmark that bears no meaningful resemblance to the Subject Bonds, either in composition or

behavior.  Then, in comparing the Subject Bonds' behavior to his benchmark indices, Dr. Unni

---

[7] *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 90 (1st Cir. 2014) (acknowledging court might have allowed the expert's event study had it "suffered from only one of the four methodological defects identified . . . or suffered from those flaws jointly but to a lesser degree," but concluding that "preclusion was necessary . . given the extent" of these errors).

does nothing to disentangle the readily apparent impact of confounding factors on the price of the Subject Bonds—a necessary aspect of any event study claiming to isolate the damages caused by alleged corrective disclosures.  Each of these errors, in tandem with Dr. Unni's many other missteps along the way, renders his analysis unreliable, and it should be excluded before it reaches a jury.

## **CONCLUSION**

For these reasons, this Court should exclude the expert report and all expert opinions of Dr. Sanjay Unni and preclude Plaintiffs from relying on his opinions for any purpose in this action.

Dated: June 5, 2023
New York, New York

*/s/ Thomas S. Kessler*

Victor L. Hou
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-2086

*Counsel to Defendants*
*Odebrecht S.A. – Em Recuperação Judicial*
*Construtora Norberto Odebrecht, S.A.*
*Odebrecht Engenharia E Construção S.A.*