UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOUBLELINE CAPITAL LP; DOUBLELINE INCOME SOLUTIONS FUND; and DOUBLELINE FUNDS TRUST (on behalf of its: 1) DOUBLELINE CORE FIXED INCOME FUND SERIES; 2) DOUBLELINE EMERGING MARKETS FIXED INCOME FUND SERIES; and 3) DOUBLELINE SHILLER ENHANCED CAPE® SERIES), | |
| Plaintiffs, | 17 Civ. 4576 (DEH) |
| v. | **OPINION AND ORDER** |
| CONSTRUTORA NORBERTO ODEBRECHT, S.A.; ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.; and ODEBRECHT, S.A., | |
| Defendants. | |

DALE E. HO, United States District Judge:

Plaintiff DoubleLine Capital LP and its affiliated trusts (collectively, "Plaintiffs") bring fraud claims against Defendant Odebrecht, S.A. and several of its subsidiaries (collectively, "Defendants") under the Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiffs also allege New York state common law fraud. *Id.* Currently before the Court is Plaintiffs' Motion for Partial Summary Judgment. ECF No. 302. For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The following facts are drawn from the Plaintiffs' Third Amended Complaint ("TAC"), ECF No. 61; Defendants' Answer to the TAC ("Defs.' Answer to TAC"), ECF No. 106;[1] Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment ("Pls.' Mem."), ECF No. 303; Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Defs.' Mem."), ECF No. 308; and Defendants' Response to Plaintiffs' Local Rule 56.1 Statement ("Defs.' Statement"), ECF No. 307.  *See* Fed. R. Civ. P. 56(c); *see, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (describing summary judgment motions as being adjudicated based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any").[2]  The facts are either undisputed or, for the purposes of summary judgment, construed in the light most favorable to the nonmoving party—here, Defendants.  *See Blue Castle (Cayman) LTD v. 1767 TP Ave LLC*, No. 22 Civ. 9577, 2024 WL 4135194, at *1 (S.D.N.Y. Sept. 10, 2024) (citing *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023)).

I.    **The Parties**

    A.  **Plaintiffs**

Plaintiffs are three interrelated investment companies—DoubleLine Capital LP ("DoubleLine"), TAC ¶ 12; DoubleLine Income Solutions Fund, *id.* ¶ 13; and DoubleLine Funds Trust, *id.* ¶ 14—that purchased debt securities issued by Odebrecht Finance, Ltd. ("Odebrecht

---

[1] As explained in more detail below, under a prior Rule 37 Sanctions Order in this case, *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576, 2022 WL 3029014 (S.D.N.Y. July 19, 2022) ("*Sanctions II*"), the Court treats various facts alleged in the TAC as established, and therefore includes them in its discussion of Plaintiffs' Motion for Partial Summary Judgment and relies on them in resolving the motion.

[2] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

Finance"), *id.* ¶ 25, a subsidiary of Defendant Construtora Norberto Odebrecht, S.A. ("CNO"), *id.* ¶ 2.

### B. Defendants

The Defendants in this case are comprised of three interrelated corporate entities. The parent company, Odebrecht, S.A. ("Odebrecht") is a corporation headquartered in Brazil that conducts business in construction, engineering, infrastructure, chemicals, utilities, and real estate. Defs.' Answer to TAC ¶ 15. Through its affiliates and subsidiaries, Odebrecht conducts business in twenty-eight countries, including the United States and Brazil. *Id.* Among Odebrecht's subsidiaries, two are Defendants in this case: CNO and Odebrecht Engenharia e Construção, S.A. ("OEC"). Throughout the relevant period, Odebrecht maintained a 100% ownership share in OEC, *id.* ¶ 42, and, as of March 31, 2015, OEC maintained a 100% ownership share in CNO, id. ¶¶ 17, 31-32. Therefore, OEC operates as both a subsidiary of Odebrecht and as the parent company of CNO. *Id.* ¶¶ 17, 31-32, 42. Prior to CNO's assimilation under OEC, CNO operated directly below Odebrecht in the corporate chain and was the largest construction and engineering company in Latin America. *Id.* ¶ 16.

As noted, Odebrecht Finance is a subsidiary of CNO. TAC ¶ 2. While no longer a party to this suit, Odebrecht Finance is relevant to the case: Odebrecht Finance is a shell company established under CNO "for the sole purpose of selling bonds" and then funneling the proceeds back up to Odebrecht and/or CNO, *id.* ¶ 55, which served as guarantor of the securities, *id.* ¶ 59. Odebrecht Finance, under the ownership of CNO, issued the notes—a type of debt security—that are the subject of this suit and described below. Defs.' Answer to TAC ¶ 2.

### II. The Securities

Among the securities issued by Odebrecht Finance, two are at issue in this case: 7.125% notes with a June 26, 2042 maturity date (the "7.125% Notes") and 7.50% perpetual notes that

have no maturity date (the "7.50% Notes").[3]  TAC ¶ 25.  Plaintiffs purchased and sold a material amount of these notes (the "Odebrecht Notes").  *Id.* ¶¶ 26-27.  As of March 31, 2015—the last day that Plaintiffs recorded a purchase or sale of the Odebrecht Notes—Plaintiffs held approximately $47,800,000 of Odebrecht Notes: $36.8 million of 7.125% Notes and $11 million of 7.50% Notes.[4] *Id.*  Before Odebrecht's organizational restructuring on March 31, 2015, CNO served as the guarantor of the Odebrecht Notes.  *Id.* ¶¶ 41, 44.  After CNO was consolidated under OEC as a result of Odebrecht's restructuring, OEC became the guarantor of all previously issued notes under the guaranty of CNO.  *Id.* ¶ 44.

### III.    Defendants' Bribery and Kickback Scheme

Defendants represented to creditors that they were successful because of their skill and expertise, which enabled them to win large public contracts through competitive bidding processes.  *Id.* ¶ 121.  In fact, Defendants' financial success was predicated on a massive bribery scheme totaling more than $3 billion, spanning nearly a decade, and implicating government officials across at least thirteen countries.  *Id.* ¶ 62; Defs.' Statement ¶ 7.

In approximately 2006, Defendants established a department within Odebrecht called the "Division of Structured Operations."  TAC ¶ 63.  While the Division of Structured Operations operated initially from Brazil, members of the Division eventually conducted part of their work in the United States, primarily in Florida.  *Id.* ¶¶ 83-90.  The Division of Structured Operations had no legitimate business purpose; it was tasked solely with bribing government officials.  *Id.* ¶ 64.  These bribes, which totaled $60 million in 2006, ballooned to $730 million annually in both 2012

---

[3] The percentages associated with each note—7.125% and 7.50%, respectively—refer to the annual interest payment paid by the note issuer (here, Odebrecht Finance) to the note holder (here, Plaintiffs).

[4] This calculation reflects the par value of the Odebrecht Notes, rather than their market value as of March 31, 2015, which does not appear in the record.

and 2013.  *Id.* ¶ 72.  This amount usually equaled 0.5% to 2.0% of Defendants' annual revenue. *Id.* ¶ 67.  The Division of Structured Operations would use these funds to bribe top government officials in Brazil and throughout Central and South America, *id.* ¶¶ 76-77; in exchange for the bribe money, Defendants received preferential treatment in governmental contracts bidding processes, *id.* ¶ 62.  This operation was Defendants' bribery and kickback scheme (the "Bribery and Kickback Scheme").  *Id.*

To conceal the Bribery and Kickback Scheme, employees within the Division of Structured Operations did not enter the illicit payments into Defendants' official accounting records.  *Id.* ¶ 68.  Instead, they used two software applications that concealed the transactions and could be accessed only by Division of Structured Operations employees: the "MyWebDay" system and the "Drousys" system.  *Id.*  The MyWebDay system was used to process and track payment requests, while the Drousys system was used by Division of Structured Operations members to communicate securely with each other about the Division's illicit operations.  *Id.*

As a counterpart to the payment system, Defendants also employed an "off-the-books" funding mechanism.  *Id.* ¶ 70.  Defendants used numerous methods, including "(1) standing overhead charges collected from clients; (2) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (3) undeclared retainers and success fees for the purchase of company assets; and (4) self-insurance and self-guarantee transactions."  *Id.*  These funds were then funneled to offshore entities and kept off Defendants' official accounting records.  *Id.*

## IV.    Defendants' False and Misleading Statements

Defendants misrepresented their financial circumstances to creditors.  They did this through false and misleading statements that did not disclose the Bribery and Kickback Scheme. Defendants made these statements in (A) offering memoranda associated with the Odebrecht

Notes, (B) press releases and other public statements, and (C) statements made directly to Plaintiffs. *Id.* ¶ 120.

### A. Offering Memoranda

Defendants provided false and misleading statements regarding their financial health in the offering memoranda associated with the Odebrecht Notes. As part of the memoranda, Defendants provided audited and unaudited financial statements for various periods from 2008 through 2012. *Id.* ¶¶ 123. Brazilian corporate law requires both public and private companies to prepare their financial statements in accordance with generally accepted accounting practices ("GAAP"). *Id.* ¶ 93 n.12. Financial statements that are not prepared in compliance with GAAP are presumed to be misleading. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 207 (S.D.N.Y. 2019) (citing 17 C.F.R. § 210.4–01(a)(1)); Pls.' Mem. at 5.

In the offering memoranda associated with the Odebrecht Notes, Defendants represented that their financial statements were prepared in conformity with Brazilian GAAP. TAC ¶ 94. But this was not true because the memoranda:

> 1) failed to disclose the contingent expenses that were "more likely than not" to occur from exposure of the Bribery and Kickback Scheme; 2) failed to distinguish and separately disclose revenues resulting from its illicit business practices; and 3) failed to recognize material amounts of expenses related to bribery payments made on CNO's behalf.

TAC ¶¶ 123, 142; *see also id.* ¶¶ 93-117; Pls.' Mem. at 5-6; Defs.' Statement ¶¶ 45, 49; *DoubleLine Cap.*, 413 F. Supp. 3d at 200-01.

Apart from these irregularities in the financial statement disclosures, Defendants also made false disclosures regarding:

> 1) CNO's purported "financial strength" based on incorrect reported financial information; 2) CNO's purported success in managing "political risk," misleadingly failing to disclose that its principal strategy for managing political risk was making more than $3.3 billion in illicit bribes and kickbacks to elected officials; 3) CNO's purported success in obtaining contracts in foreign countries,

which was misleading for failing to disclose this "success" was the result of corrupt bribe and kickback payments; and 4) CNO's purported "competitive advantages in obtaining public works contracts" due to its "experience," "reputation," "technological capabilities" or other legitimate business reasons, when the truth was that CNO's true competitive advantage was massive levels of illicit bribes to public officials.

Pls.' Mem. at 7; Defs.' Statement ¶¶ 46, 50; *see also DoubleLine Cap.*, 413 F. Supp. 3d at 201.

### B.  Press Statements and Earnings Reports

Defendants consistently released financial results for periods from 2012 through 2014 that contained false and misleading statements.  These releases were false and misleading for the same reasons as the offering memoranda: they "1) failed to disclose the contingent expenses that were 'more likely than not' to occur from exposure of the Bribery and Kickback Scheme; 2) failed to distinguish and separately disclose revenues resulting from its illicit business practices; and 3) failed to recognize material amounts of expenses related to bribery payments made on CNO's behalf."  TAC ¶¶ 194, 197, 201, 205, 209, 212, 216; Defs.' Statement ¶ 51.

### C.  Direct Statements to Plaintiffs

Plaintiffs allege that Defendants made another false and misleading statement when Plaintiffs asked Defendants in February 2015 about search warrants CNO received from Brazilian authorities.  TAC ¶ 229.  Defendant Odebrecht, through its head of investor relations, explained to Plaintiffs that the search warrants were in connection with a "weak" accusation that Defendants were "part of a cartel."  *Id.*  But this statement was false: the search warrants were connected, in part, to an extensive investigation by Brazilian authorities into government corruption that implicated Defendants' Bribery and Kickback Scheme.  *Id.*[5]  For purposes of Plaintiffs' Motion,

---

[5] This allegation is outlined in ¶ 229 of Plaintiffs' TAC and repeated in the Christensen Declaration, along with Plaintiffs' assertion that, at the time, they were "not overly concerned about this investigation in light of the facts that Odebrecht and CNO denied any wrongdoing,

Defendants do not dispute that this statement was false, in part because they acknowledge they paid $3.3 billion in bribes between 2006 and 2014.  *See* Defs.' Statement ¶ 7.

## V.    Subsequent Fallout

In or around 2014, Brazilian authorities began investigating corruption and bribery allegations in Brazil's state-owned oil company, Petrobras.  TAC ¶ 81.  The operation, known as "Lavo Jato" ("Operation Carwash"), initially did not target Defendants, *id.*, but they nonetheless took steps to conceal the Bribery and Kickback Scheme in its wake, *id.* ¶ 82.  Among other actions: Odebrecht's CEO directed employees to delete records that might reveal the scheme; Defendants' representatives attempted to bribe foreign officials to prevent them from cooperating with investigating authorities seeking information related to the Bribery and Kickback Scheme; Defendants' employees destroyed information necessary to access the Drousys system; and Odebrecht's CEO incentivized Division of Structured Operations employees to take steps to evade authorities, including by moving aspects of the Division outside of Brazil.  *Id.* ¶¶ 82, 84.

Despite these measures, on June 19, 2015, Brazilian authorities arrested Marcelo Odebrecht, Odebrecht's CEO, along with four other Odebrecht executives.  *Id.* ¶¶ 231-32.

---

disclosed that it was cooperating fully with the investigation and neither the companies nor any of their executives had been charged with any misconduct."  Christensen Decl. ¶ 8, ECF No. 306.  In Defs.' Statement ¶ 75, Defendants declare their intention to dispute the claims made in the Christensen Declaration.  This Court understands Defendants to be disputing the Christensen Declaration for the proposition that *Plaintiffs relied* on Defendants' various false and misleading statements when trading the Odebrecht Notes.  But this Court does not understand Defendants to be disputing Mr. Christensen's statement, also stated in Plaintiffs' TAC ¶ 229, that Defendants made false and misleading statements during the interaction between Plaintiffs and Odebrecht's head of investor relations.  Given that the Court has already held that, for purposes of this action, it has been established as a factual matter that "Defendants made all of the misrepresentations and omissions alleged in [P]laintiffs' [TAC]," *Sanctions II*, 2022 WL 3029014, at *3, Defendants have lost the right to dispute whether these statements were false and misleading.  As a result, the Court does not take this incident between Plaintiffs and the Odebrecht head of investor relations to be disputed, even when construed "in the light most favorable to Defendants as the non-moving party."  *Blue Castle*, 2024 WL 4135194, at *1.

Defendants responded by releasing a statement on June 22, 2015, in which they claimed the arrests were "illegal." *Id.* ¶ 234. This, Plaintiffs allege, constitutes yet another false and misleading statement, given "Defendants were well aware [that] Marcelo Odebrecht was a central player in the bribery and kickback scheme, and his arrest was entirely justified under the circumstances." *Id.* ¶ 235. Defendants also claimed that they "never hindered the [Operation Carwash] investigations in any way," *id.* ¶ 236—a claim that is clearly false given the lengths to which Defendants went to conceal their scheme. *See id.* ¶¶ 82, 84, 237. Defendants released two more press releases on June 24, 2015, reiterating that the arrests of top Odebrecht officials were "illegal" and denying the claims that employees were instructed to delete documents that would reveal Defendants' illegal activities. *Id.* ¶¶ 240-41. If there was any doubt that these statements were false and misleading, Marcelo Odebrecht later admitted in his plea agreement with U.S. authorities that he had, in fact, directed employees to delete records that revealed Defendants' illegal Bribery and Kickback Scheme, *id.* ¶ 242, including the destruction of the physical encryption access keys needed to access the MyWebDay system, *Doubleline Cap. LP*, No. 17 Civ. 4576, 2021 WL 1191527, at *5 (S.D.N.Y. Mar. 30, 2021).

Over the next eleven months, news outlets reported numerous adverse disclosures related to the Bribery and Kickback Scheme, including: an investigation by Swiss prosecutors, TAC ¶ 245; criminal charges filed against Marcelo Odebrecht, *id.* ¶ 246; Marcelo Odebrecht's resignation as CEO, *id.* ¶ 248; evidence suggesting Defendants' scheme extended beyond Brazil, *id.* ¶ 251; Marcelo Odebrecht's decision to cooperate with Brazilian prosecutors, *id.* ¶ 256-57; Marcelo Odebrecht's formal indictment by Brazilian authorities in connection with the Bribery and Kickback Scheme, *id.* ¶ 265; and Marcelo Odebrecht's being sentenced to serve nineteen years in prison, *id.* ¶ 255.

## VI.    Procedural History

Plaintiffs filed their TAC on September 7, 2018, bringing six claims against all Defendants: violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder; common law negligent misrepresentations; common law fraud; common law conspiracy; violation of N.Y. Debtor and Creditor Law § 276; and violation of N.Y. Debtor and Creditor Law § 276-a.[6]  TAC ¶ 302-08, 313-42.  Plaintiffs also included a claim against Odebrecht specifically for violation of Section 20(a) of the Exchange Act.  *Id.* ¶ 309-12.  On Defendants' motion to dismiss, ECF No. 75, the Court dismissed Plaintiffs' conspiracy and state statutory claims but held that Plaintiffs stated a claim for negligent misrepresentations,[7] fraud, and violations of federal securities laws.  Mem. Op. & Order, ECF No. 81; *DoubleLine Cap.*, 413 F. Supp. 3d at 224.  The TAC, as amended by the Court's ruling on Defendants' motion to dismiss, is the operative complaint.

## VII.    Discovery Sanctions

Over the course of the litigation, the Court issued two sanctions orders against Defendants pursuant to Rule 37[8] for their failure to comply with orders to provide discovery.  *See Doubleline Cap.*, 2021 WL 1191527, at *10 ("*Sanctions I*"); *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576, 2022 WL 3029014, at *3 (S.D.N.Y. July 19, 2022) ("*Sanctions II*").

---

[6] In the TAC, these claims are brought specifically "[a]gainst Defendants Odebrecht, OEC and CNO."  *See* TAC ¶¶ 331-42.  As of this Opinion being published, these are the only Defendants remaining.  Therefore, functionally, all claims are brought against all Defendants (except for the Exchange Act § 20(a) claim, which is against Odebrecht specifically as noted *supra*).

[7] Plaintiffs note in their request for leave to file this Motion that their "claims for negligent misrepresentation are . . . subject to summary resolution of all elements other than damages."  ECF No. 300, at 1 n.1.  But Plaintiffs do not address their negligent misrepresentation claim in either their Motion for Partial Summary Judgment, ECF No. 302, or their accompanying Brief, ECF No. 303.

[8] All references to Rules are to the Federal Rules of Civil Procedure.

The *Sanctions II* decision is central to Plaintiffs' current motion.  On October 14, 2020, the Court issued a discovery order, ECF No. 122, granting in part Plaintiffs' request for documents, transcripts, and Defendants' statements to the United States Department of Justice and other regulatory agencies.  *Sanctions II*, 2022 WL 3029014, at *1.  Two weeks later, Defendants moved for reconsideration of the order, raising for the first time that compliance with the discovery order would violate agreements with other foreign governments, including Brazil.  *Id.* at *2; Defs.' Oct. 27, 2020 Letter Mot., ECF No. 125; Defs.' Mem at 3.  The Court denied Defendants' motion to reconsider the discovery order, *see* Order, ECF No. 127, and Defendants subsequently informed the Court that they would not comply with the discovery order, Def.'s Nov. 13, 2020 Letter, ECF No. 144; Defs.' Mem. at 3.

Plaintiffs subsequently filed a motion for sanctions pursuant to Rule 37(b) for Defendants' failure to comply with the Court's order compelling discovery.  *See* ECF No. 219.  The Court granted Plaintiffs' motion on July 19, 2022.  *See Sanctions II*, 2022 WL 3029014, at *13.  For purposes of adjudicating this Motion, the Court notes that the following facts were established in the July 19 Order:

(1) Defendants made all of the misrepresentations and omissions alleged in plaintiffs' Third Amended Complaint concerning the Odebrecht Notes.

(2) Those misrepresentations and omissions were material.

(3) Defendants made those material misrepresentations and omissions with scienter.

(4) Defendant Odebrecht Engenharia e Construção S.A. is the successor of defendant Construtora Norberto Odebrecht, S.A..

*Sanctions II*, 2022 WL 3029014, at \*13.  The Court also precluded Defendants from offering evidence or argument contesting these established facts.  *Id.*[9]

## VIII.    Relief Requested

Plaintiffs request that this Court grant partial summary judgment on certain elements of their Section 10(b), Section 20(a), and common law fraud claims. Pls.' Mem at 3, 20.  Specifically, Plaintiffs ask this Court to grant partial summary judgment against Defendants CNO and OEC on all elements, except loss causation and damages, for their Section 10(b) and common law fraud claims; and to grant partial summary judgment against Defendant Odebrecht for all elements of their Section 20(a) claim, except damages.  *Id.*  Plaintiffs' request is somewhat unconventional insofar as they seek partial summary judgment based in part on facts established in a Rule 37(b) order, rather than solely on facts developed through discovery.

## LEGAL STANDARDS

## I.    Summary Judgment

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 247.  "A genuine factual dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Truitt v. Salisbury Bank and Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates that no genuine factual dispute exists, the burden shifts to the nonmoving party, who must either "cit[e] to particular parts of materials in the

---

[9]    Over a year after the Court issued *Sanctions II*, this case was reassigned to the undersigned. *See* Notice of Reassignment, ECF No. 296 (dated December 11, 2023).

record" to demonstrate a genuine factual dispute, Fed. R. Civ. P. 56(c)(1)(A), or "show[] that the materials cited do not establish the absence . . . of a genuine dispute," *id.* 56(c)(1)(B). *See also Anderson*, 477 U.S. at 250 ("[T]he adverse party must set forth specific facts showing that there is a genuine issue for trial."); *Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) ("When a motion for summary judgment is supported by documentary and testimonial evidence, the nonmoving party may not rest upon mere allegations or denials—rather, he must present sufficient probative evidence to establish a genuine issue of material fact.").

## II.    Rule 37(b)

Under Rule 37, "a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). If the court grants the party's motion, and the compelled party subsequently fails to comply with the court's order, then the court may sanction the noncompliant party through various means under Rule 37(b). *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (noting that "District Courts have a range of sanctions from which to choose" to discipline parties that fail to comply with orders compelling discovery). Among these tools is the court's ability to "direct[] that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A)(i). The court may also prevent the sanctioned party from providing any evidence or arguments that contest the facts established by the court under Rule 37(b)(2)(A)(i). *Id.* 37(b)(2)(A)(ii); *see also Sanctions II*, 2022 WL 3029014, at *13.

## DISCUSSION

Plaintiffs request partial summary judgment on elements of their Section 10(b), Section 20(a), and New York state common law fraud claims. Based on the somewhat unusual posture of the case—that is, a motion for partial summary judgment filed pursuant to a sanctions order—the Court must (I) consider whether a motion for partial summary judgment can be granted based on

facts deemed as established through a Rule 37 sanctions order, and, if so, (II) determine whether the facts established in *Sanctions II*, in concert with the undisputed material facts Plaintiffs' set forth in their motion papers, satisfy the elements of Plaintiffs' (A) Section 10(b) claim, (B) Section 20(a) claim, and (C) New York common law fraud claim.

## I.    Facts Established Pursuant to Rule 37 May Provide the Basis for a Motion for Summary Judgment

As explained *supra*, summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 247. In the usual summary judgment posture, the moving party will offer evidence showing a lack of dispute between the parties as to a material fact. If the movant meets their requisite burden, the respondent must offer evidence showing there is a genuine dispute of material fact between the parties. *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986) (describing this burden shifting framework). The Court then evaluates whether the parties have met their respective burdens and, in doing so, decides whether there is a genuine dispute of fact.

Unlike a typical summary judgment motion, here, the lack of dispute between the parties on many issues is not the result of an agreement in the record or the failure of a party to meet its evidentiary burden. Rather, there is no dispute as to numerous critical facts in this case because the Court deemed these facts established through a sanctions order. *See Sanctions II*, 2022 WL 3029014, at *13. That same order precluded Defendants from offering evidence to contest these established facts. *See id.*; Defs.' Mem. at 6 ("The effect[s] of Sanctions Order II [are] clear: it absolves Plaintiffs of any burden to prove the elements it established, and also prevents Defendants from presenting contrary evidence.").

Defendants advance three arguments as to why this Court should nonetheless deny the pending Motion. First, Defendants argue that to grant partial summary judgment, this Court must find a lack of dispute regarding facts in the record rather than facts established by the Court in *Sanction II*. *See* Defs.' Mem. at 6. But this argument is not supported by the text of Rule 56, which does not distinguish between facts in the record and facts established by court order; the Rule concerns whether "there is no genuine dispute as to *any* material fact." Fed. R. Civ. P. 56(a) (emphasis added). Nothing in the text of Rule 56 limits a court's inquiry to facts in the post-discovery evidentiary record. And while this question does not appear to have arisen in this Circuit, the Court notes that there are cases out-of-Circuit cases suggesting that facts established in a sanctions order may be relied upon in granting summary judgment. *See, e.g.*, *Villanueva Echon v. Sackett*, 809 F. App'x 468, 469 (10th Cir. 2020) (recounting, without disapproval, that after defendants "failed to comply with several of the court's discovery orders . . ., the district court imposed sanctions on [d]efendants by deeming certain facts established at summary judgment"). For their part, Defendants cite no legal authority for the proposition that a court, in ruling on summary judgment, *cannot* rely on facts deemed established pursuant to a sanctions order. For that reason, and because Defendants' argument is not supported by the text of Rule 56, the Court rejects the notion that the facts established in *Sanctions II* cannot form part of the basis for Plaintiffs' Motion.

Second, Defendants contend that granting Plaintiffs' Motion would give Plaintiffs relief that "they already have." Defs.' Mem. at 6. It is not clear how this argument affects the legal analysis for summary judgment, if at all. But, more fundamentally, Defendants' argument misconstrues the effect of partial summary judgment, suggesting that there is no functional difference between the imposition of discovery sanctions to deem certain facts established, and the

granting of a motion for partial summary judgment with respect to a claim (or "part" of one). Defendants are incorrect.

Rule 37 allows a court to "direct[] that . . . designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A)(i). As Defendants note, once a fact has been established pursuant to Rule 37(b), a court may "instruct the jury at trial that the relevant facts and elements have been established for purposes of the case." Defs.' Mem. at 6. But granting summary judgment goes further. When a court grants a motion for summary judgment, it enters a judgment on a "claim or defense – or the part of [a] claim or defense . . . as a matter of *law*." Fed. R. Civ. P. 56(a) (emphasis added). If granted, summary judgment does not establish *facts*, but rather resolves *issues* (if there are no genuine disputes of material fact with respect to those issues). *See Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.").[10] Summary judgment on a claim "prevent[s] trials that are unnecessary because of an absence of material issues of fact for the jury to decide," *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 130 (2d Cir. 1999); partial summary judgment on one or more parts of a claim similarly serves judicial efficiency, streamlining the range of issues that must be resolved at trial. *See* 11–56 Moore's Federal Practice–Civil § 56.122 ("The freedom to use summary judgment procedure to address particular issues or elements of a claim is an important

---

[10] Before 2010, "[s]ome courts ha[d] limited the availability of summary judgment motions to foreclosure of specific claims, not remedies." *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 306 (E.D.N.Y. 2010). "[B]ut a 2010 amendment to Rule 56 clarified that a party could move for summary judgment on part of each claim or defense, which was intended to make clear . . . that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense . . . ." *Gaither v. Stop & Shop Supermarket Co.*, 84 F. Supp. 3d 113, 123 n.8 (D. Conn. 2015).

feature of Rule 56, making it a much more useful case management device."). By contrast, holding trial on all elements of a claim where the facts underlying one or more of those elements have already been deemed established would serve no useful function, and would simply prolong the trial.

Third, Defendants argue that granting Plaintiffs' Motion for Partial Summary Judgment would be unprecedented—that they are aware of no case in which a motion for summary judgment has been granted based on facts established under Rule 37(b)—and would deprive them of due process. *See* Defs.' Mem. at 6. The Court takes this assertion seriously; given the unconventional posture of this Motion, one might be concerned that Defendants, precluded from meaningfully contesting Plaintiffs' motion, may suffer a procedural injury. But Supreme Court case law adequately assuages any such concerns.

In *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, the plaintiff failed to comply with a discovery order because "disclosure of the required bank records would violate Swiss penal laws and consequently might lead to imposition of criminal sanctions." 357 U.S. 197, 200 (1958). The district court adopted a finding that plaintiff acted in good faith in that it attempted to comply with the court's discovery production order,[11] *id.* at 201, but nevertheless granted defendant's motion to dismiss pursuant to Rule 37(b), *id.* at 201-02. The decision was affirmed on appeal, *id.* at 203, but the Supreme Court reversed, explaining that a court violates due process when the sanctioned party fails to comply with a production order due to "inability" rather than "willfulness, bad faith, or any fault of [the party]." *Id.* at 210, 212-13.[12]

---

[11] Critically, the plaintiffs in *Rogers* attempted to rectify their noncompliance by working with the Swiss government to obtain waivers to provide addition documents. *Rogers*, 357 U.S. at 203.

[12] The Second Circuit follows this jurisprudence, consistently noting that, in the context of motions to dismiss, a district court violates a party's due process rights when it grants such a motion based on Rule 37(b) sanctions imposed due to *inability* to comply with discovery orders, rather than

The Court expounded on this standard in *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee.* 456 U.S. 694 (1982). There, the Court considered whether "a district court, as a sanction for failure to comply with a discovery order directed at establishing jurisdictional facts, [could] proceed on the basis that personal jurisdiction over the recalcitrant party has been established." *Id.* at 695. It found in the affirmative, noting there are instances in which a party's bad faith creates a "presumption that the refusal to produce evidence . . . was but an admission of the want of merit in the asserted defense." *Id.* at 705 (citing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350-351 (1909)). "If there is no abuse of discretion in the application of the Rule 37 sanction, . . . then the sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." *Id.* at 706.

Defendants here do not contest that *Sanctions II* was predicated on their willful noncompliance with the Court's discovery order. *Sanctions II* articulated the relevant standard for willful noncompliance: "Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control." 2022 WL 3029014, at \*10. It went on to find this standard met. *Id.* Defendants did not and do not contest the Court's finding that they willfully refused to comply. And, as Magistrate Judge Moses aptly explained, if Defendants were "genuinely caught by surprise" when they learned compliance with the order may negatively

---

willfulness, bad faith, or any fault of the sanctioned party. *See, e.g.*, *Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d Cir. 2013) ("Rule 37 does not 'authorize dismissal of a complaint because of a party's noncompliance with a pretrial production order when . . . that failure to comply is due to inability and not to willfulness, bad faith, or any fault of petitioner.'" (quoting *Rogers*, 357 U.S. at 212)); *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) ("[D]ismissal or default is justified if the district court finds that the failure to comply with discovery orders was due to 'willfulness, bad faith, or any fault' of the party sanctioned." (quoting *Rogers*, 357 U.S. at 212)).

impact their agreements with the Brazilian authorities, Defendants still had options other than noncompliance:

> Defendants could have objected to the Order, or to the 10/30/20 Order, and pressed their case with the district judge[]. They did not. They could have sought prior authorization by the Brazilian Federal Prosecutors and the Brazilian competent judge, which . . . would have permitted them to comply with the Order without fear of adverse repercussions in Brazil. They did not. With or without advance permission, defendants also had it within their power to obey the Order and face the risk of adverse repercussions in Brazil. While it is possible that this choice would trigger adverse consequences, it was nonetheless a choice.

*Id.* at *10-11.

Because Defendants do not contest the Magistrate Judge's determination that they willfully refused to comply with the Court's discovery order, this Court has no cause to reconsider it. Defendants' willful noncompliance with the Court's discovery order led to the Court's decision in *Sanctions II* deeming certain facts established, and Defendants themselves acknowledge that this "prevents Defendants from presenting contrary evidence" with respect to these facts. Defs.' Mem. at 6. Given that concession, it is difficult to see how the Court's consideration of these facts in its adjudication of Plaintiffs' Motion for Partial Summary Judgment would violate Defendants' due process rights.

* * *

In sum, this Court finds no procedural reason why it should not grant Plaintiffs' Motion for Partial Summary Judgement. Granting the Motion based, in part, on facts established in *Sanctions II* is not prohibited by the text of Rule 56, does not duplicate relief granted in *Sanctions II*, and does not violate Defendants' due process rights. That there appears to be no case in this Circuit where a court granted a motion for summary judgment based, in part, on facts established pursuant to Rule 37(b) sanctions does not counsel in favor of wholesale denial of Plaintiffs' Motion,

as Defendants suggest.  Therefore, Plaintiffs may use facts established in *Sanctions II* to support their Motion for Partial Summary Judgment.

**II.**  ***Sanctions II* and the Undisputed Facts in Plaintiffs' Moving Papers Establish Plaintiffs' Entitlement to Partial Summary Judgment**

Having established that facts established via Rule 37 *can* be used to support a motion for summary judgment, the Court now turns to whether the facts established in *Sanctions II*, in concert with the facts Plaintiffs set forth in their papers supporting this Motion, *do* satisfy the elements of Plaintiffs' (A) Section 10(b) claim, (B) Section 20(a) claim, and (C) New York common law fraud claim.

**A.  Section 10(b)**

Plaintiffs move for partial summary judgment on their Section 10(b) claims against Defendants CNO and OEC, in its capacity as the successor organization to CNO, on all elements except loss causation and damages.  "To succeed on a Section 10(b) claim, a plaintiff must . . . show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation."  *DoubleLine Cap.*, 413 F. Supp. 3d at 205.  Plaintiffs request partial summary judgment on the first four elements: (1) material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, and (4) reliance.

As to the first three elements of Plaintiffs' Section 10(b) claim, the facts underlying these elements were established in *Sanctions II*.  *See* Defs.' Mem. at 5-6; Pls.' Mem. at 8-12.  There is therefore no genuine dispute of material fact as to these elements of the Section 10(b) claim, and Plaintiffs are entitled to summary judgment on them: (1) a material misrepresentation or omission, (2) scienter, and (3) a connection with the purchase or sale of a security.  The sole remaining question is, therefore, whether there is any genuine dispute of material fact as to the fourth element:

reliance. The summary judgment burden shifting framework described *supra* applies to Plaintiffs' reliance claim.

To prove the reliance element of a Section 10(b) claim, a plaintiff must show it relied on the relevant misrepresentation or omission. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). "The . . . most direct[] way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Here, Plaintiffs must show they knew of information that included a misrepresentation or omission and that they acted on that information to buy the relevant securities.

Plaintiffs assert that they "undisputably relied on [Defendants'] false statements and omissions." Pls.' Mem. at 12. To support this assertion, Plaintiffs rely almost entirely on the Declaration of Mark Christensen (the "Christensen Decl."). Christensen states that he and his team "considered . . . the reported financial results of Defendant CNO" and that his team incorporated the financial data released quarterly by Defendant into their analysis. Christensen Decl. ¶ 4, ECF No. 306; Pls.' Mem. at 13. This, Plaintiffs assert, demonstrates that they relied on this financial information when they purchased Odebrecht Notes from May 2013 to March 2015. For their part, Defendants argue that the Christensen Declaration "cannot carry Plaintiffs' [summary judgment] burden" because the document is (1) not based on personal knowledge and (2) "self-serving." Defs.' Mem. at 7-8. Neither of Defendants' arguments prevail.

For their first argument, Defendants focus on the third paragraph of the Christensen Declaration, which states in relevant part, "I believe that *DoubleLine analysts* would have reviewed these memoranda. In doing so, *our analysts* would have reviewed . . . the financial statements included on these memoranda." Christensen Decl. ¶ 3 (emphasis added). As Defendants note, declarations supporting a motion for partial summary judgment must be made

"on personal knowledge" of the relevant information. Fed. R. Civ. P. 56(c)(4). That said, courts in this Circuit have found the "personal knowledge" requirement satisfied in similar situations, such as where a high-ranking official's position and tenure gives him broad familiarity with an organization's practices. *See, e.g.*, *Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 457-58 (S.D.N.Y. 2022) (declining to exclude declaration by agency executive whose "position . . . and length of tenure . . . presumptively g[ave] him broad familiarity with his agency's pay practices" such that he was competent to testify as to payroll codes and terminology, even though the executive "stated that information and belief was the basis on which he was attesting" to the meaning of those codes and terms); *Jordan v. United Cerebral Palsy of N.Y.C., Inc.*, No. 12 Civ. 5715, 2016 WL 9022502, at *4 (E.D.N.Y. Mar. 31, 2016), *aff'd*, 682 F. App'x 48 (2d Cir. 2017), *as amended* (Mar. 10, 2017) (noting that even though it was "true that some contents of the declaration [were] not based on the affiant's direct knowledge," the declaration was nonetheless admissible because the affiant, "as the Acting Director of the Program, ha[d] primary knowledge with respect to the information that he attests to in his declaration").

Here, Christensen describes himself as "Emerging Markets Portfolio Manager and Co-Director of Corporate Research for DoubleLine Capital LP," a position that gave him "personal knowledge of the procedures employed in Plaintiffs' decisions to purchase the Odebrecht Notes at issue in this action." Christensen Decl. ¶ 2. With respect to his employer's practices, Christensen notes that "DoubleLine's standard procedures provide for a thorough review of offering memoranda in connection with the purchase of any security," that "[b]ased on [his] review of the files and knowledge of DoubleLine operating procedures, [he] believe[d] that DoubleLine analysts would have reviewed these memoranda," and that "[i]t is DoubleLine's procedure in reviewing potential investments to review each Offering Memorandum thoroughly, including the financial statements and the narrative descriptions of the business." *Id.* ¶ 3. These assertions, albeit cursory,

suffice to render the Christensen Declaration admissible. "An affiant's conclusions based on personal observations over time . . . may constitute personal knowledge. . . . The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *Giallanzo*, 630 F. Supp. 3d at 458. Defendants offer nothing to the contrary. There is therefore no genuine dispute that Christensen, based on his position and presumptive experience, would know that DoubleLine's analysts reviewed offering memoranda and that DoubleLine relied on the information contained in those memoranda when it decided to purchase the Odebrecht Notes. Thus, "the purposes underlying Rule 56, to safeguard and legitimate the evidence used to decide a motion for summary judgment, are served by considering the declaration on this motion." *Jordan*, 2016 WL 9022502, at *4. Even construing the declaration in the light most favorable to Defendants as the non-movants, paragraph three of the Christensen Declaration is sufficiently based on "personal knowledge" as to be admissible for purposes of adjudicating Plaintiffs' Motion.

Moreover, even if that paragraph was not admissible, the offering memoranda are not the only sources Plaintiffs relied on in making their investment decisions. As part of their consideration, Christensen and his team evaluated the "quarterly financial results reported by CNO." *Id.* ¶ 4; Defs.' Statement ¶ 51. And as Christensen explains in his declaration, "[a]n important issue considered *by me* and our team was the reported financial results of Defendant CNO." Christensen Decl. ¶ 4 (emphasis added). Christensen also declared that DoubleLine purchased the Odebrecht Notes based on some of these quarterly financial reports. Christensen Decl. ¶ 7. The statements in the declaration, no matter how construed, indicate that Christensen has direct personal knowledge of CNO's quarterly reports and that Plaintiffs relied on the misrepresentations and omissions contained in the reports when buying the Odebrecht Notes. Therefore, even if Christensen's statements as to the offering memoranda were impermissible

under Rule 56(c), his statements regarding CNO's quarterly financial reports are clearly based on personal knowledge and, therefore, satisfy Rule 56(c).

Defendants next claim that the Christensen Declaration is insufficient to satisfy Plaintiffs' summary judgment burden because the declaration is "self-serving." Defs.' Mem. at 7-9. They cite two cases: *Madeira v. United Talmudical Acad. of Kiryas Joel*, 351 F. Supp. 2d 162 (S.D.N.Y. 2004) and *Adler v. Penn Credit Corp.*, No. 19 Civ. 7084, 2022 WL 744031 (S.D.N.Y. Mar. 11, 2022). In *Madeira*, the Court explained in dicta that it could "not grant summary judgment" based "*only* [on] the self-serving affidavit" of a representative of the defendant. 351 F. Supp. 2d at 167 (emphasis added). In *Adler*, the Court noted that "a non-moving party's self-serving statement, *without direct or circumstantial evidence to support the charge*, is insufficient to defeat a motion for summary judgment." 2022 WL 744031, at *9 (emphasis added). These cases indicate at most that a party may not rely solely on a "self-serving" statement to satisfy its burden on summary judgment.

But that is not the case here. According to Christensen, Plaintiffs proceeded to purchase the Odebrecht Notes after reviewing and analyzing CNO's reported financial results. *See* Christensen Decl. ¶¶ 4, 7. Thus, the purchases themselves serve as evidence that Defendants relied on CNO's quarterly results. Furthermore, on February 24, 2015, Plaintiffs asked Defendants directly about the Brazilian authorities' investigation into Defendants bribery scheme. *See* TAC ¶ 229. Defendants then attempted to assuage Plaintiffs' concerns. *See id.* One month after Defendants misrepresented the truth of the allegations against them, Plaintiffs proceeded to purchase $5.25 million more Odebrecht Notes. TAC ¶ 26. This further supports what is clear from the Christensen Declaration: Defendants lied to Plaintiffs, and Plaintiffs relied on these misrepresentations when they proceeded to buy Odebrecht Notes.

Accordingly, for the reasons stated above, the declaration can be used to satisfy Plaintiffs' initial summary judgment burden. And because the Christensen Declaration and Plaintiffs' subsequent purchase of the Odebrecht Notes provide an initial showing that Plaintiffs reviewed the quarterly reports and relied on them in purchasing the Odebrecht Notes, Plaintiffs have satisfied their initial burden to demonstrate that there is no genuine dispute of fact as to the reliance element of their Section 10(b) claim.

The burden now shifts to Defendants, who must proffer evidence demonstrating a genuine dispute of fact. Defendants fail to do so. As the Second Circuit has explained, to show a genuine dispute of fact, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002). To satisfy their burden, Defendants must cite "particular materials in the record." *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 22 Civ. 8139, 2024 WL 1251177 (S.D.N.Y. Mar. 22, 2024), *aff'd*, No. 24 Civ. 1085, 2025 WL 704278 (2d Cir. 2025). The only material in the record Defendants cite is the Christensen Declaration itself. Defs.' Mem. at 8. But rather than using statements in the declaration as evidence to establish a genuine dispute of fact, Defendants simply question its validity on the basis of arguments this Court has rejected *supra*.

Defendants' only remaining argument is that Mark Christensen may not be credible and that a jury should make this determination. *Id.* While the Court acknowledges that questions of reliance are fact-intensive and, therefore, often left to a jury, *see STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011), Defendants still must satisfy their summary judgment burden, which requires that they establish a genuine factual dispute by offering

some piece of evidence to rebut Plaintiffs' showing of reliance. Because Defendants fail to do so, Plaintiffs have adequately proved reliance under Section 10(b).[13]

* * *

The Court's *Sanctions II* opinion established facts such that there is no genuine dispute of material fact as to the first three elements of a Section 10(b) claim: material misrepresentation or omission, scienter, and a connection with the purchase or sale of a security. Plaintiffs, in their papers submitted pursuant to this Motion, have established that there is no genuine dispute of material fact as to the fourth element of a Section 10(b) claim: reliance. Therefore, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** with respect to the first four elements of their Section 10(b) claim: (1) material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, and (4) reliance.

## B. Section 20(a)

In addition to their Section 10(b) claim against CNO and OEC, Plaintiffs also bring a cause of action against Odebrecht for violating Section 20(a) of the Exchange Act, which states, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person

---

[13] Because this Court bases its ruling on direct reliance, it need not consider the parties' alternative arguments on presumed reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). *See, e.g.*, Pls.' Mem. at 12 (describing Plaintiffs' "two independent methods" of proving reliance: "through their direct reliance on the false statements" and "pursuant to the *Affiliated Ute* presumption of reliance upon material omissions"); *cf. In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019) (explaining, in resolving a claim under Section 10(b), that plaintiffs "must successfully allege that their losses were caused by reliance on an assumption of an efficient market free of manipulation" and "can do so either by plausibly alleging actual, reasonable reliance on that assumption or, if applicable, through a rebuttable presumption of such reliance," such as "the *Affiliated Ute* presumption. . . .").

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "Section 20(a) of the Exchange Act provides for joint and several liability of any person who directly or indirectly controls a person found liable for a primary violation of Section 10."  *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 275 (E.D.N.Y. 2023) (citing 15 U.S.C. § 78t(a)).  As the Second Circuit has stated, a Section 20(a) prima facie claim has three elements: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Plaintiffs fail at this stage to establish the first element of a Section 20(a) claim.  In their memorandum of law, Plaintiffs state in a single, conclusory sentence that they had "readily show[n] Defendant CNO's violation of Section 10(b)." Pls.' Mem. at 17.  But Plaintiffs seek only *partial* summary judgment on their 10(b) claim, explicitly stating in their memorandum of law that the "undisputed facts establish elements (1) though (4)" of their Section 10(b) claim but that "[e]lements (5) and (6), relating to damages, will be the subject of expert testimony at trial."  *Id.* at 9, 9 n.8.  Given that Section 20(a) liability is predicated on an established violation of Section 10(b), it is not clear to the Court that *partial* summary judgment on a Section10(b) claim—that is, summary judgment as to four of the six elements necessary to establish a Section 10(b) violation— is sufficient to show "a primary violation by the controlled person."  *ATSI Commc'ns, Inc.,* 493 F.3d at 108.  And Plaintiffs cite no case for the proposition that partial summary judgment as to these elements of a 10(b) claim establishes a "primary violation" for purposes of Section 20(a) Therefore, the Motion for Partial Summary Judgment is **DENIED** as to Plaintiffs' Section 20(a) claim.

### C.  New York Common law Fraud

Plaintiffs' final claim for which they seek partial summary judgment is New York state common law fraud.  The five elements of common law fraud in New York state are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).  Of these, Plaintiffs only seek partial summary judgment for the first four elements, reserving the issue of resulting damage for trial.

Under *Sanctions II*, clearly, the first element—material misrepresentation or omission of fact—is met.  Plaintiffs argue that elements two and three—knowledge of falsity and intent to defraud—are also satisfied under *Sanctions II*'s finding that Defendants made their misrepresentations and omissions with scienter.  Pls.' Mem. at 18-19.  As the Court has held, and as Plaintiffs note in their brief, "[t]o prove scienter [regarding New York common law fraud], a plaintiff must ultimately show that a defendant had knowledge of the falsity of the statement and an intent to defraud."  *Id.*; *Silvercreek Management, Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d. 428, 438 (S.D.N.Y. 2017).  Therefore, in establishing that Defendants acted with scienter, *Sanctions II* established that Defendants acted with knowledge of the falsity of their memoranda, reports, and statements, and that they acted with an intent to defraud; the second and third elements are met as well.  Defendants do not dispute this reasoning.  Rather, they only argue that this Court should not grant Plaintiffs relief they already have.  Defs.' Mem. at 6.  But, for reasons explained *supra*, this Court rejects that argument.

Next, as was the case with their Section 10(b) claim, Plaintiffs seek summary judgment on the reliance element of the state fraud claim by relying on facts in the record.  Under New York State Law, "[t]o show reliance for the purposes of a fraud claim, a plaintiff's burden is twofold.

28

First, [they] must show actual reliance . . . in addition, [they] ha[ve] to show reasonable or justifiable reliance—that a reasonable participant would have considered the withheld information important in making the decision." *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 428 (S.D.N.Y. 2023).  To satisfy "reasonable or justifiable reliance . . . the party claiming fraud must at least have conducted 'minimal diligence' and not have been reckless."  *Id.* at 428-29 (quoting *Banque Franco-Hellenique de Com. Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997)).  Because a determination of reasonable reliance "involve[s] many factors to consider and balance, . . . reasonable reliance is often a question of fact for the jury rather than a question of law for the court." *STMicroelectronics, N.V.*, 648 F.3d at 81; *see also Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.").  When the party alleging fraud is a sophisticated entity, the alleging party's evidentiary burden is heightened.  *See, e.g.*, *Crigger*, 443 F.3d at 235 ("The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required.").

As explained *supra* in the discussion regarding the reliance element of Plaintiffs' Section 10(b) claim, Plaintiffs have demonstrated actual reliance.  Therefore, to satisfy the reliance element of their state law claim, Plaintiffs need only show that there is no dispute of material fact that their reliance was reasonable or justifiable.

There is no genuine dispute that Plaintiffs' reliance was reasonable.  The Second Circuit has noted that the evidentiary burden is heightened when the moving party is a sophisticated investor.  *See, e.g., Crigger*, 443 F.3d at 235.  But this heightened burden only reflects the reluctance of New York courts to "entertain claims of justifiable reliance" when "sophisticated [parties] engaged in major transactions enjoy access to critical information but fail to take advantage of that access." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541

(2d Cir. 1997). That is not the case here. According to the Christensen Declaration, Plaintiffs consistently reviewed CNO's quarterly reports, analyzed the relevant financial information, and made their investment decisions in accordance with this due diligence. *See* Christensen Decl. ¶¶ 4, 7; *Cambridge Cap.*, 675 F. Supp. 3d at 429 (noting that "minimal diligence" is required to satisfy reasonable or justifiable reliance). And unlike in some Second Circuit cases where deal terms "should have . . . sufficiently alerted [plaintiffs] to look into the legitimacy of the proposed transactions," *Crigger*, 443 F.3d at 236, there is no reason—and Defendants suggest none—that Plaintiffs should have been actively investigating the possibility Defendants were orchestrating a global bribery scheme.

Defendants only counterargument is that the Christensen Declaration does not carry Plaintiffs' summary judgment burden, for the same reasons Defendants raised against the reliance element of Plaintiffs' Section 10(b) claim. Defs.' Mem. at 12. As explained above, the Court rejects this argument because the Christensen Declaration is based on personal knowledge and is not "self-serving."

In sum, because Plaintiffs demonstrate actual and reasonable reliance, this Court finds that Plaintiffs satisfy the reliance element of their common law fraud claim. And because Plaintiffs satisfy all the common law fraud elements for which they request partial summary judgment, the Motion for Partial Summary Judgment is **GRANTED** as it relates to New York common law fraud.

## CONCLUSION

For the reasons state herein, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART**. Specifically, summary judgment is **GRANTED** as to elements (1)-(4) of Plaintiffs' Section 10(b) claim and elements (1)-(4) of Plaintiffs' New York common law fraud claim. Summary judgment is **DENIED** as to Plaintiffs' Section 20(a) claim.

With respect to Plaintiffs' Section 10(b) claim, because summary judgment is granted as to elements one though four—(1) material misrepresentation or omission; (2) scienter; (3) a connection with the sale or purchase of a security; and (4) reliance—at trial, Plaintiffs must prove elements five and six: (5) economic loss and (6) loss causation.

With respect to Plaintiffs' state common law fraud claim, because summary judgment is granted as to elements one through four—a (1) material misrepresentation or omission of fact (2) made by Defendants with knowledge of its falsity and (3) intent to defraud and that (4) Plaintiffs reasonably relied upon—at trial, Plaintiffs must prove: (5) its resulting damages.

Trial is also necessary to resolve two of Plaintiffs' other claims: Plaintiffs' Section 20(a) claim and their negligent misrepresentation claim.

By **July 23, 2025**, the parties are hereby ORDERED to submit a joint letter indicating their availability for a trial commencing in November 2025, December 2025, or January 2026.

The Clerk of Court is respectfully directed to terminate ECF No. 302.


SO ORDERED.

Dated: July 16, 2025
     New York, New York

                              DALE E. HO
                     United States District Judge